CHRISTOPHER B. GHIO (259094)
christopher.ghio@dinsmore.com
CHRISTOPHER CELENTINO (131688)
christopher.celentino@dinsmore.com
JEREMY B. FREEDMAN (308752)
jeremy.freedman@dinsmore.com
DINSMORE & SHOHL LLP
655 West Broadway, Suite 800
San Diego, California 92101
Tele:  619.400.0500
Fax:   619.400.0501

Special Counsel to Richard A. Marshack, Chapter 11 Trustee for the Bankruptcy
Estate of The Litigation Practice Group PC

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>THE LITIGATION PRACTICE GROUP P.C.,<br><br>Debtor. | Bankr. Case No. 8:23-bk-10571-SC<br><br>Related Adv. Proceeding: 8:23-ap-01046-SC<br><br>Adv. Proc. No.<br><br>Chapter 11 |
| RICHARD A. MARSHACK, Chapter 11 Trustee,<br><br>Plaintiff,<br><br>v.<br><br>MARICH BEIN, LLC, a New York Limited Liability Corporation; BANKUNITED, N.A., a Florida based National Banking Association; GOFI LLC, a California Limited Liability Company, VULCAN CONSULTING GROUP LLC, a California Limited Liability Company, LISA COHEN, individually, and DOES 1 through 10, inclusive, | **TRUSTEE'S COMPLAINT AS TO MARICH BEIN, LLC; BANKUNITED, NA; GOFI LLC; VULCAN CONSULTING GROUP LLC; AND LISA COHEN FOR:**<br><br>**(1)  INJUNCTIVE RELIEF;**<br><br>**(2)  AVOIDANCE, RECOVERY, AND PRESERVATION OF TWO-YEAR ACTUAL FRAUDULENT TRANSFERS;**<br><br>**(3)  AVOIDANCE, RECOVERY, AND PRESERVATION OF TWO-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;**<br><br>**(4)  AVOIDANCE, RECOVERY, AND PRESERVATION OF FOUR-** |

1

Defendants.

**YEAR ACTUAL FRAUDULENT TRANSFERS;**

**(5) AVOIDANCE, RECOVERY, AND PRESERVATION OF FOUR-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;**

**(6) AVOIDANCE, RECOVERY AND PRESERVATION OF PREFERENTIAL TRANSFER MADE WITHIN ONE YEAR OF THE PETITION DATE;**

**(7) BREACH OF CONTRACT;**

**(7) CONVERSION; AND**

**(8) TURNOVER.**

Judge:   Hon. Scott C. Clarkson
Place:   Courtroom 5C
            411 West Fourth Street
            Santa Ana, California 92701

For his *Complaint and causes of action  initially filed in the main Adversary Proceeding No. 8:23-ap-01046-SC ("1046 Action") and having severed his claims from the 1046 Action, now brings this action against Defendants for (1) Injunctive Relief; (2) Avoidance, Recovery, and Preservation of Two-Year Actual Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of Two-Year Constructive Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of Four-Year Actual Fraudulent Transfers; (5) Avoidance, Recovery, and Preservation of Four-Year Constructive Fraudulent Transfers*; (6) *Avoidance, Recovery and Preservation of Preferential Transfer Made Within Ninety Dates of the Petition Date; (7) Conversion; and (8) Turnover* (the "Complaint"). Plaintiff Richard A. Marshack, Chapter 11 Trustee ("Trustee" or "Plaintiff") for the bankruptcy estate (the "Estate") of Debtor The Litigation Practice Group, PC (the "Debtor" or "LPG") in the above-captioned bankruptcy case (the "Bankruptcy Case"), alleges and avers as follows:

/ / /

## STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the United States District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), and which is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "Court"). Regardless of whether this proceeding is core, non-core, or otherwise, the Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court. Defendants are hereby notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires Defendants to plead whether consent is given to the entry of a final order and judgment by the bankruptcy court. Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to the Debtor's pending Bankruptcy Case.

2.     Regardless of whether this proceeding is core, non-core, or otherwise, Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court.

3.     Defendants are notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires Defendants to plead whether consent is given to the entry of a final order and judgment by the Bankruptcy Court.

4.     Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to Debtor's pending Bankruptcy Case.

## THE PARTIES

5.     Debtor LPG is, and at all material times was, a professional corporation organized, existing, and in good standing under the laws of the State of California, with its principal place of business in Tustin, California.

6.     Defendant Marich Bein, LLC ("Marich Bein") is, and at all material times

3

was, a New York limited liability corporation organized, existing, and in good standing under the laws of the State of New York. Marich Bein filed its Articles of Incorporation in the State of New York on or about August 18, 2022. On August 19, 2022, the New York Department of State Records indicate Marich Bein was using the assumed name "LPG" listing LPG's Tustin, California phone number (949-299-6262) as its own. On information and belief, some or all wire transfers from Marich Bein to LPG, when they occurred, were identified with the ACH transaction ID "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875." Marich Bein was retained and/or under the control of Tony Diab ("Diab") until the relationship between Marich Bein and LPG degraded as alleged herein. Marich Bein processed and controlled LPG ACH transactions with Diab's authorization, however, without the authority of LPG itself or its authorized agent Daniel March. Marich Bein also obtained, was provided or misappropriated a copy of LPG client payment information prior to LPG's Bankruptcy filing which, on information and belief, it has in its possession.

7.      Defendant BankUnited, NA, ("BankUnited") is, and at all material times was, a NACHA approved financial institution insured by the FDIC with its principal place of business in Miami Lakes, Florida. Through DebtPayPro ("DPP"), LPG utilized the services of BankUnited as its NACHA compliant ACH financial institution necessary for entities, such as Marich Bein, to initiate and debit client accounts as indicated by the LPG client payment history detail screen contained in DPP.

8.      Defendant GoFi LLC ("GoFi") is, and at all material times represented that it was, a limited liability company, existing under the laws of the State of California. GoFi received monies due to LPG under purchase agreements, identified later in this pleading, from Marich Bein.

9.      Defendant Vulcan Consulting Group LLC ("Vulcan") is, and at material times was, a California limited liability company organized, existing, and in good standing under the laws of the State of California. Vulcan filed its Articles of Organization on or about December 15, 2019. Vulcan was retained and/or under the

1  control of Lisa Cohen until Diab took over control of Vulcan on or about September 23,

2  2023. Vulcan received monies due to LPG under purchase agreements, identified later

3  in this pleading, from Marich Bein.

4     10.    Lisa Cohen ("Cohen") is, and at all material times was, an individual

5  residing in the State of California. Cohen controlled Vulcan.

6              **RELEVANT DEFENDANTS NAMED IN THE 1046 ACTION**

7     11.    Tony Diab is, and at all material times was, an individual residing in

8  the State of California. Diab owned, operated, dominated and controlled LPG, a national

9  debt relief law firm.

10             **GENERAL ALLEGATIONS**

11    **A.    LPG'S BANKRUPTCY CASE**

12    12.    On March 20, 2023 (the "Petition Date"), LPG filed a voluntary petition

13 for relief under Chapter 11 of the Bankruptcy Code, commencing the Bankruptcy Case.

14 Diab made the decision for LPG to file for bankruptcy in order to avoid a plethora of

15 pending lawsuits, two of which sought an order appointing a receiver, including but not

16 limited to: *Validation Partners, LLC v. The Litigation Practice Group, PC, et al*. Case

17 No. 30-2022-01281911-CU-BC-CXC (Orange County Super Ct. September 20, 2022)

18 and *Debt Validation Fund II, LLC, et al. v. The Litigation Practice Group PC, et al*.

19 Case No. 30-2023-01303355-CU-CO-CXC (Orange County Super. Ct. January 23,

20 2023), among many others. In order to abscond with and delay discovery of substantial

21 assets and continue to profit from LPG client files and client payment obligations

22 pursuant to LPG'S client Legal Services Agreements ("ACH Receivables") prior to

23 filing bankruptcy, Diab and other defendants devised a plan to fraudulently transfer

24 funds, assets, client files, and ACH Receivables out of LPG to third parties.  The 1046

25 Action deals primarily with the wholesale transfer of client files and the related ACH

26 Receivables; this action deals primarily with the transfer of client ACH Receivables to

27 Marich Bein, subject to the contracts and agreements attached to Marich Bein's proof

28 of claim [Omni Claim No. 102106-1] ("Proof of Claim").

13.     After the Office of the United States Trustee (the "UST") filed the *Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No. 44], the Court entered the *Order Directing Unites States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58] on May 4, 2021, thereby granting the UST's motion and directing the UST to appoint a Chapter 11 Trustee in the Bankruptcy Case.

14.     Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63; the *Order Approving Appointment* is 1046 Action Docket No. 65], on May 8, 2023, Plaintiff accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case, and he continues to serve in this capacity at this time.

15.     Plaintiff Trustee was not appointed until after the events giving rise to this action and, therefore, bases these allegations on information and belief. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, at *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was allowed and "necessary at times"); *see also Mireskandari v. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL 12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.'" (citations omitted)).

/ / /

16.    Plaintiff brings this action solely in his capacity as the Chapter 11 Trustee for the benefit of the Debtor's Estate and its creditors.

**B.    LPG'S OWNERSHIP AND MANAGEMENT**

17.    Prior to the Petition Date, LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts. LPG services over 50,000 customers across the United States, with annual revenue estimated to total $150,000,000 in 2022. At all relevant times, LPG was controlled and operated by an individual named Tony Diab ("Diab").

18.    Despite having been disbarred in California and Nevada, Diab controlled and operated LPG since its inception. However, Diab endeavored to conceal his control over LPG, its finances, marketing, affiliates and operations. For example, Diab purportedly required his LPG employees to call him "Admin," his email address was "admin@lpglaw.com" and the name plate on his desk apparently read, "I don't work here."

**C.    LPG**

19.    LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts they would identify.

20.    The consumers would pay LPG over a period of time via monthly debits from their bank accounts.

21.    The monthly payments were meant to cover all legal services LPG provided to the consumers including validation of the debts, review of documents to determine enforceability, and court appearances to halt lawsuits to obtain judgments.

22.    In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt or to prosecute affirmative claims held by the consumers.

23.    LPG mismanaged the consumers' monthly payments.

24.    To obtain consumer clients, LPG contracted with marketing companies, who engaged in illegal capping.

25.    The marketing companies would advertise to or call to solicit consumers

with debt to become clients of LPG.

26.     The marketing affiliates went so far as to assist with the execution of an engagement letter between the consumer and LPG.

27.     In exchange, LPG agreed to pay the marketing affiliates a percentage of the ACH Receivables collected by LPG from the consumers.

28.     Because LPG received payments from consumers over time, it often sought financing against its future ACH Receivables. This borrowing was used to finance operations at LPG, to pay the fees owed to the marketing companies for providing the client referrals, and to pay creditors which had provided earlier-in-time financing in a growing Ponzi scheme, among other improper purposes.

29.     Many of the documents executed in connection with such financing described the transactions as account receivable purchase agreements.

**D.     DIAB'S SCHEME**

30.     As discussed above, the Debtor borrowed against its future ACH Receivables by entering into accounts receivable purchase agreements or similar transactions with factoring companies. In many instances, the ACH Receivables were sold multiple times over to different alleged purchasers or factoring companies.

31.     Given that all and/or a substantial portion of Debtor's ACH rRceivables were transferred and/or sold multiple times over there were more claims for payment from any one ACH Receivable than that receivable generated. Accordingly, prior to the petition date, Debtor engaged in a scheme to defraud its creditors by transferring ownership of the ACH Receivables to various fraudulent conveyance partners as alleged herein  and the various adversary proceedings brought by the Trustee, including but not limited to the 1046 Action.

**E.     DIAB'S CONTROL OVER LPG'S PAYMENT PROCESSING**

32.     LPG's monthly revenue from client files is primarily received via ACH payments. In order to process ACH payments, LPG is required to enlist the services of ACH payment processing companies who handle high risk transactions. In this regard,

Diab enlisted numerous ACH processing companies[1] in order to easily switch between different vendors and quickly transfer millions of dollars of LPG funds to entities he controlled, generally in less than three days from receipt of funds by the processing company. One reason for the plethora of processing company vendors was to avoid payment disputes and complications with the vendor itself, as in the case with Marich Bein. Switching between ACH processing companies further facilitated unauthorized double pulls, and made it more difficult for LPG clients to dispute, prevent or stop unauthorized ACH transactions, even where the Client disputed the transactions, had cancelled their services, and/or requested a refund.

33.    LPG's monthly gross revenue from receipt of client payments ranged between $8.4 million to $11.2 million per month from May 2022 through September 2022. Notwithstanding LPG's substantial monthly revenue and relatively low pre-petition monthly expenses (ranging between $2.3 to $3.4 million at the end of 2022), LPG was not accumulating any cash on hand and claimed to have only $4,500 in its bank account on the Petition Date.

**F.    MARICH BEIN'S FRAUDULENT SERVICING AND ACH RECEIVABLE PURCHASE AGREEMENTS**

34.    In an action filed in the Central District of California, Case No. 8:23-cv-00339-JWH-ADS (the "Marich Bein Action"), Marich Bein contends that on September 18, 2022, Plaintiff and LPG entered into an Assignment of Servicing Rights Agreement ("SRA") on approximately 50,000 LPG client files, pursuant to which LPG purportedly agreed to the following:

**Article I. ASSIGNMENT**
Section I.1 Assignment of Servicing Rights. [LPG], by these presents does hereby presently, unconditionally, absolutely and

---

[1]    The ACH processing companies LPG used and which Diab controlled includes, but is not limited to, EPPS; EquiPay; Merit Fund; Authorize.net; World Global; Optimum Bank; BankUnited; Marich Bein; Revolv3; Maverick Bankcard; FIS; Guardian; and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875" or any such substantially similar ACH identification transaction.

irrevocably assign, transfer, convey and set over to [Plaintiff] (it being intended by [LPG] that such assignments constitute present, absolute and unconditional assignments and not assignments for additional security only, but such assignment shall constitute security for [LPG]'s obligations to [Plaintiff] or its affiliates), all of [LPG]'s right, title and interest in and to the Servicing Rights, including, without limitation, any right of [LPG] or any of its affiliates (whether such rights are currently existing or arising in the future) to service collection of subscription fees, return payment fees, or any other fee or payment resulting from any Customer's engagement with [LPG] or any of its affiliates, or give notices, sue for payment under the Customer contracts or to take any action at law or in equity relating to the Customer contracts.

## Article II. SERVICING OF CONTRACTS

Section I.2 [*sic*] Appointment as Third-Party Servicer. . . . [LPG] hereby retains [Plaintiff] to act as third party [Plaintiff] for the Receivables . . . .

Section I.3 [*sic*] Servicing of Receivables. . . . [LPG] agrees to provide [Plaintiff] and its subcontractors with such assistance in the servicing, collection and administration of any Receivable as may be requested by [Plaintiff] from time to time.

Section I.4 [*sic*] Limited Power of Attorney. [LPG] hereby irrevocably appoints and empowers [Plaintiff] as [LPG]'s true and lawful attorney-in-fact, with full power of substitution, to endorse and promptly deposit on [LPG]'s behalf any checks or other instruments made payable to [LPG] and submitted by a Customer as payment on any Receivable, and to take any other action relating to the Receivables in [LPG]'s name and place that [Plaintiff] deems advisable and consistent with the terms of this Agreement. This power of attorney shall be deemed to a right coupled with an interest.

## ARTICLE III. OBLIGATIONS OF MERCHANT

Section III.1 Access to All Digital Records, Databases, and Applications. [LPG] shall provide [Plaintiff] any information requested by [Plaintiff] with respect to its Customers and the Customer contracts. At all times, [Plaintiff] must have unfettered access to all software applications used by [LPG], including, but not limited to, Debt Pay Pro, Snowflake, or any other databases used by [LPG] in its ordinary course of business.

* * *

Section III.3 No Impairment. [LPG] will not take any action (including placing or allowing placement of a lien or security interest on any Purchased Receivable) or make any omission that has, individually or in the aggregate, an adverse effect on any Purchased Receivable or on [Plaintiff]'s ability to collect on any Purchased Receivable.

Section III.4 Amounts Received. . . . [LPG] shall not in any way encourage or cause any proceeds to be paid, processed, settled or delivered to any person or account other than the [Plaintiff]'s account, and shall take all affirmative steps at its expense and as necessary or appropriate to prevent any such occurrence from recurring. [LPG] is prohibited from instructing any Customer to pay [LPG] or any other third party on a Receivable or otherwise suggest that Customer may make a payment to [LPG] or any other third party instead of paying [Plaintiff] to satisfy its payment obligation.

* * *

**ARTICLE VI. MISCELLANEOUS**

Section I.7 [*sic*] Term and Termination. This Assignment shall commence on [September 19, 2022] and shall continue in full force and effect, until released by [Plaintiff]. [LPG] may terminate this Assignment at any time and for any reason provided that the total amount of Purchased Receivables held by [Plaintiff] and its affiliates are less than $1,000,000.00.[2]

* * *

Section VI.1[*sic*] Exclusivity. [LPG]understands and agrees that the relationship set forth in this Assignment is exclusive. [LPG] forgoes any right to contract with other parties for the same or similar services provided by [Plaintiff] under this Assignment.

A true and correct copy of the SRA is attached as **Exhibit 1.**

35.    In addition to the SRA, on August 18, 2022, September 21, 2022, October 6, 2022, and November 14, 2022, LPG entered into four (4) separate Accounts Receivables Purchase Agreement (each an "ARPA") on approximately 15,000 to 20,000 client files and the associated payment information necessary to process the ACH Receivables were purportedly transferred and assigned by LPG to Marich Bein. True and complete copy of the ARPA are attached as **Exhibit 2**, and incorporated here.

36.     On information and belief, all or a substantial portion of, the same client files, servicing rights and ACH Receivables were transferred multiple times to different entities between September 2022 and March 20, 2023, directly and/or indirectly through a myriad of transactions as alleged in the 1046 Action.

37.     The SRA ("Transfer") was made without consideration to LPG. Due to the lack of consideration, the SRA is fraudulent and must be set aside.

38.     Pursuant to the SRA, Diab and LPG hired Marich Bein to process its ACH transactions on most or all LPG client files, well in excess of the number of client files and payment information purportedly transferred as alleged in Paragraph 35 above. On information and belief, at all material times, the NACHA bank used and necessary for Marich Bein to process such ACH transactions through DPP included, but was not limited to, Defendant BankUnited. Marich Bein further held multiple financial accounts at BankUnited in order to receive ACH funds from LPG client files. On information and belief, Marich Bein is the only entity that held a financial account at BankUnited relevant to the allegations herein.

39.     On information and belief, Diab had a close connection and insider relationship with the principals of Marich Bein prior to and at the time the ACH transactions and alleged transfer of LPG client files and/or payment information necessary for processing the ACH Receivables.  Marich Bein utilized the d/b/a LPG.

40.     The deal between Diab and Marich Bein evidences Diab's influence and control over Marich Bein, which he maintained until the relationship began to deteriorate. Under the SRA and ARPA schemes between Marich Bein and Diab, Marich Bein was given access to LPG's DPP account, client files and the NACHA information necessary to initiate ACH transactions. On information and belief, access to client files was provided without client consent. Based on the ACH and payment data contained in DPP, Marich Bein had all it needed to initiate ACH transactions on all LPG client files. Based on the testimony of Diab, Marich Bein was permitted to keep and hold only those ACH funds related to client files and ACH Receivables purportedly transferred to

Marich Bein, which as alleged in the Marich Bein Action, was transferred more than once. The remaining proceeds from the ACH transactions processed on LPG client files by Marich Bein were to be remitted to LPG.

41.     The ARPA ("Transfer") were fraudulent because the client files were sold to other entities without client consent and in order to defraud LPG creditors.

42.     According to Marich Bein's Proof of Claim, Marich Bein collected $16,989,963.23 from Debtor pursuant to the SRA and ARPA ("Transfer", and collectively with the SRA Transfer defined in paragraph 37, the ARPA Transfer defined in paragraph 41, "Transfers").

43.     Based on Diab's testimony, Marich Bein initially processed ACH transactions on client files and remitted payment to LPG. By approximately December 2022 and/or January 2023, and at or around the time Diab caused the same client files and/or ACH Receivables to be transferred to Oakstone Law Group, P.C. ("Oakstone"), Marich Bein started withholding ACH payments received on LPG client files, including those that had not purportedly been transferred or assigned to Marich Bein and/or Oakstone. According to Diab and as listed in Debtor's Schedule A/B [Bankr. Docket No. 33], Marich Bein withheld approximately $12 million dollars in ACH funds on LPG client files that were not associated with the foregoing fraudulent SRA and ARPA. In the Marich Bein Action, Marich Bein alleges that it is in possession of at least $1,000,000 processed via ACH from LPG clients. Pre-petition, Debtor demanded said funds be returned and that Marich Bein cease and desist from processing ACH transactions. Marich Bein has refused to return and/or turnover said funds.

44.     In approximately February 2023, Marich Bein's ability to access LPG client's NACHA payment information through DPP was terminated. To wit, Diab caused all service contract payments to DPP to cease, DPP locked LPG's account and all of LPG's client information was transferred to Diab's proprietary platform, LUNA. In turn, Marich Bein was locked out of DPP.

45.     On information and belief, and based on the testimony of Diab, however,

13

this did not stop Marich Bein from initiating ACH transactions on LPG clients using old data Marich Bein had usurped when it had access to DPP and without having updated client, payment or other related information in violation of NACHA and other applicable laws and regulations.

46.     The effect of the SRA and ARPA was to accomplish an unlawful purpose. Thus, the agreements may be declared illegal regardless of the intention of the parties. *Stockton Morris Plan Co. v. Cal. Tractor & Equip. Corp.*, 112 Cal. App. 2d 684, 690 (1952) (citing *Fewel & Dawes, Inc. v. Pratt*, 17 Cal. 2d 85, 91 (1941)). This remains true regardless of whether the contracts have been performed. *Stevens v. Boyes Hot Springs Co.*, 113 Cal. App. 479, 483 (1931) (A contract by a corporation to purchase its own stock has the effect of illegally withdrawing and paying to a stockholder a part of the capital stock of the corporation and is illegal and void, regardless of the fact that the contract is fully performed by the sellers and partially performed by the corporation.); *Mansfield v. Hyde*, 112 Cal. App. 2d 133, 139 (1952), overruled, *Fomco, Inc. v. Joe Maggio, Inc.*, 8 Cal. Rptr. 459 (1960) (Where object of statute requiring licenses is to prevent improper persons from engaging in particular activity, or is for purpose of regulating occupation or business for protection of public, imposition of penalty amounts to prohibition against engaging in occupation or business without license, and contract made by unlicensed person in violation of statute is invalid.); *Firpo v. Murphy*, 72 Cal. App. 249, 252 (1925) (A contract to pay commissions to a real estate broker is illegal and he is not entitled to recover thereon where he fails to secure the license required by law to carry on his business.).

47.     According to Diab, Defendants' failure to remit ACH payments due and owing to LPG caused LPG to take out a line of credit from City Capital NY (also a scheduled creditor) in the approximate amount of $2,9500,000.

### G.     BANKUNITED ACH TRANSACTIONS

46.     In order for a third party ACH processor, portal, integrated software or other non-regulated entity to process and/or receive ACH transactions, a NACHA

compliant financial institution is and at all relevant times herein was required to complete such transactions. Based on DPP records, BankUnited was listed as the NACHA financial institution engaged to process and/or receive ACH transactions on client files through DPP. On information and belief, Marich Bein, Diab or others acting in concert with Diab and having access to LPG's DPP account and its financial controls designated BankUnited as the NACHA financial institution to which ACH Receivables on LPG client files would be deposited.

47.    On information and belief, BankUnited processed and/or received the foregoing ACH transactions at the direction of Marich Bein, and prior to Marich Bein's involvement at the direction of LPG, Diab and/or alter egos of same. On information and belief, the funds received from ACH transactions processed by and through BankUnited were initially deposited into an operating account held at BankUnited in order to ensure the funds cleared. After an initial holding period to account for insufficient funds and other charge backs, BankUnited either retained said funds in an account held at its institution and/or transferred a portion or all of the funds to an account designated by Marich Bein. Funds processed and received by Marich Bein and/or BankUnited that were to be delivered to LPG were then wired, transferred or otherwise directed to accounts designated by Diab, including those held by Vulcan, PrimeLogix, BAT, Inc. dba Coast Processing among many others. Marich Bein, at all relevant times has and continues to maintain a bank account at BankUnited which, on information and belief, was used to receive ACH Receivables from LPG client files fraudulently transferred, sold or both to Marich Bein.

48.    On information and belief, BankUnited has and/or continues to retain all or a portion of said funds and received fees and profits from engaging in such activity that were taken from wrongfully obtained funds processed against LPG client files, including but not limited to those LPG client files fraudulently transferred to Marich Bein. This further includes the alleged wrongful, fraudulent and/or double pulls initiated against LPG client accounts. Bank United is also in possession of all relevant records

pertaining to the number of ACH transactions processed by Marich Bein and accounts where funds such funds not currently held in a BankUnited account were transferred.

## H.   THE SALE OF LPG'S ASSETS

49.   On July 7, 2023, Richard Marshack in his capacity as the Chapter 11 Trustee moved the Court for an order (A) Approving Sale, Subject to Overbid, of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests Pursuant to 11 U.S.C. § 363(b) and (B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and Other Agreements ("Sale Motion") [Bankr. Docket No. 191]. After supplemental briefing, addressing multiple oppositions, holding a lengthy hearing and auction wherein Morning Law Group was the highest bidder, the Court granted the Sale Motion entered August 2, 2023 ("Sale Order") [Bankr. Docket No. 352].

## I.   LPG'S PREPETITION CREDITORS

50.   Debtor was insolvent when each Transfer was made. This insolvency is evidenced in part by the fact that 14 separate UCC-1 statements were of record securing debts of the Debtor as of September 1, 2022. These statements remained unreleased as of the Petition Date. These statements either reflected secured liens against the Debtor's assets then owned or thereafter acquired, or provided evidence of the assignment or sale of substantial portions of the Debtor's future income.

51.   When the Transfers were made, these prior UCC-1 statements secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (i) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed on or about May 19, 2021; (ii) approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UCC statement filed on or about May 28, 2021; (iii) approximately $5,000,000 owed to Azzure Capital, LLC as evidenced by Proof of Claim No. 127 secured by a UCC statement filed on or about May 28, 2021; and (iv) approximately $1.5 million dollars owed to Diverse

Capital, LLC purportedly secured by UCC statements filed on or about September 15, 2021, and December 1, 2021.[2]

52.     As alleged above, LPG was borrowing against its assets and future income, often on unfavorable terms, not only to finance operations at LPG, but also to pay the fees owed to the marketing affiliates for providing it with consumer clients and to pay other loans to creditors that were in default or about to be in default as part of Diab's scheme to keep LPG creditors at bay for as long as possible until he could transfer LPG's assets, client files and ACH Receivables to other entities under his control. Pursuant to the agreements with the marketing companies, significant percentages of future payments were already promised to be paid to the marketing affiliates from whatever future income the Debtor would receive. And, of course, the payments LPG received in the form of ACH Receivables were also trust funds paid to LPG by its law firm clients, subject to a return of funds in the event of a request for a refund or termination of the representation before LPG had earned said funds. In this regard, except to the extent earned, the ACH Receivables also represented a liability of the Debtor.

53.     In addition, on Debtor's Schedule E/F [Bankr. Docket No. 33], Debtor scheduled 11 unsecured creditors with priority unsecured claims totaling $374,060.04. These priority unsecured creditors include Indiana Dept. of Revenue, Dept. of Labor and Industries, Arizona Dept. of Economic Security, Arkansas Dept. of Finance & Admin., California Franchise Tax Board, Georgia Dept. of Labor, Internal Revenue Service, Mississippi Dept. of Revenue, Nevada Dept. of Taxation, Utah State Tax Commission, and Wisconsin Dept. of Revenue (collectively, "Priority Unsecured Creditors").

54.     Another group of creditors that Debtor listed on its Schedule E/F [Bankr. Docket No. 33] are nonpriority unsecured creditors. Those 58 creditors have scheduled

---

[2] Trustee reserves all rights, claims, and defenses with respect to these and any other purported secured or unsecured claims.

claims totaling $141,439,158.05 and include Ajilon; Anthem Blue Cross; Azevedo Solutions Groups, Inc.; Carolina Technologies & Consulting Invoice; Collaboration Advisors; Credit Reporting Service Inc.; CT Corporation – Inv.; Debt Pay Pro; Document Fulfillment Services; EnergyCare, LLC; Exela Enterprise Solutions; First Legal Network, LLC; GHA Technologies Inc.; Harrington Electric, Inc.; Imagine Reporting; Juize, Inc.; Krisp Technologies, Inc.; Liberty Mutual; Marc Lemauviel – Allegra; MarkSYS Holdings, LLC; Netsuite-Oracle; Pitney Bowes; Rapid Credit, Inc.; SBS Leasing A Program of De Lage Landen; Security Solutions; Sharp Business Systems; Streamline Performance, Inc.; Thomson Reuters; Twilio, Inc.; Nationwide Appearance Attorneys; Executive Center, LLC; Outsource Accelerator, Ltd.; TaskUs Holdings, Inc.; Marich Bein, LLC; Validation Partners; MC DVI Fund 1, LLC; MC DVI Fund 2, LLC; Debt Validation Fund II, LLC; Tustin Executive Center; LexisNexus; JP Morgan Chase; Business Centers of America; Michael Schwartz; Anibal Colon Jr.; Kathleen Lacey; David Ulery; Kimberly Birdsong; Kevin Carpenter; Karen Suell; Gloria Eaton; Carolyn Beech; Debra Price; Kenneth Topp; Darcey Williamson, Trustee; James Hammett; Johnny Rizo; Beverly Graham; Kathleen Scarlett; and Geneve and Myranda Sheffield (collectively, "Nonpriority Unsecured Creditors" and, together with the Secured Creditors and Priority Unsecured Creditors, "Prepetition Creditors").

## FIRST CLAIM FOR RELIEF

### Injunctive Relief

### (Against All Defendants)

55.     Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 54 as though set forth in full.

56.     Plaintiff requests that this Court incorporate and enter its preliminary injunction order entered in the 1046 Action [Dkt No. 70] attached as **Exhibit 3** and incorporated by reference as if fully set forth herein, or in substantially the same form enjoining Defendants and each of them from interfering with any ACH transfer being

1  executed pursuant to documents authorizing such transfers to be executed in favor of

2  Debtor's estate.

3  57. Plaintiff requests that this Court incorporate and enter its preliminary

4  injunction order entered in the 1046 Action [Dkt No. 70] attached as **Exhibit 3** and

5  incorporated by reference as if fully set forth herein, or in substantially the same form,

6  ordering Defendants, among other things, to turn over to trustee any and all client files;

7  ACH files; ACH processing information; financial records; administrative user names

8  and log in information; accounting records; contracts; and email accounts.

9  58. Plaintiff also requests that this Court incorporate and enter its preliminary

10  injunction order entered in the 1046 Action [Dkt No. 70] attached as **Exhibit 3** and

11  incorporated by reference as if fully set forth herein in substantially the same form

12  ordering Defendants, among other things, to turn over all funds originating from LPG

13  client files, ACH Receivables and/or ACH transactions.

14  <u>**SECOND CLAIM FOR RELIEF**</u>

15  **Avoidance, Recovery, and Preservation of Two-Year Actual Fraudulent**

16  **Transfers**

17  **(Against All Defendants)**

18  **[11 U.S.C. §§ 548(a)(1)(A), 550, and 551]**

19  59. Plaintiff realleges and incorporates herein by reference each and every

20  allegation contained in Paragraphs 1 through 54 as though set forth in full.

21  60. The source of the client files, ACH Receivables, and funds that are the

22  subject of the Transfers alleged herein are that of LPG, and the Debtor's Estate.

23  61. Defendants wrongfully retain possession and control of the client files,

24  ACH Receivables, and funds fraudulently transferred to others by Diab and LPG.

25  62. Diab made the Transfers alleged herein after LPG faced multiple lawsuits

26  including those initiated by factoring companies and in order to avoid its creditor

27  liability and abscond with assets of the Estate, including but not limited to, Validation

28  Partners' lawsuit filed on September 20, 2022 (Case No. 30-2022-01281911-CU-BC-

CXC) in the Superior Court of California, County of Orange; DVF II's lawsuit filed on January 23, 2023 (Case No. 30-2023-01303355-CU-CO-CXC) in the Superior Court of California, County of Orange; among others. The lawsuits sought the appointment of a receiver to perform many of the same duties of the Trustee and obtain information, an accounting of LPG funds, assets and accounts receivables and maintain the status quo, among other relief, pending the outcome of the litigation. Notably, Diab admitted the foregoing under oath at the hearing on Trustee's preliminary injunction.

63.   The LPG client files, ACH Receivables, and funds that were subject to the Transfers alleged herein constitute a substantial portion of LPG's pre-petition non-exempt property and assets.

64.   The Transfers and transactions alleged herein, including but not limited to the multiple transfers of LPG client files and/or ACH Receivables were made by Diab to insiders that were and/or are still under Diab's control and/or other alter egos working in concert with Diab.

65.   The Transfers and transactions alleged herein, including but not limited to the multiple transfers of LPG client file and/or ACH receivable transfers left LPG insolvent and according to Diab required LPG to seek emergency financing in the amount of $2.95 million dollars pre-petition. The Debtor scheduled $141,813,219.09 in total debt to pre-petition creditors. However, without LPG's client files, ACH Receivables, and funds, the fraudulent Transfers and transaction alleged herein left the Debtor with approximately $12,186,500 in assets and no income stream. Included in the assets scheduled by LPG are the approximated $12,000,000 in funds wrongfully withheld by Defendants. Moreover, the Transfers to Marich Bein were made at a time when LPG was insolvent.

66.   Marich Bein diverted monies due Debtor to non-Debtor entities GoFi, Vulcan, PrimeLogix, BAT, Inc. dba Coast Processing among others who are subsequent transferees of the fraudulent Transfers.

67.   Thus, the Transfers and transactions alleged herein, including but not

limited to the fraudulent transfer of LPG client files and/or ACH Receivables were made with actual intent to hinder, delay, or defraud creditors of the Debtor.

68.    The Transfers and transactions alleged herein, including but not limited to the fraudulent transfer of LPG client files and/or ACH Receivables occurred within two years prior to the Petition Date.

69.    Accordingly, the Transfers and transactions alleged herein, including but not limited to the fraudulent transfer of LPG client files and/or ACH Receivables that Diab caused the Debtor to make should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(A), and such property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

## THIRD CLAIM FOR RELIEF

**Avoidance, Recovery, and Preservation of Two-Year Constructive Fraudulent Transfers**

**(Against All Defendants)**

**[11 U.S.C. §§ 548(a)(1)(B), 550, and 551]**

70.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 48 as though set forth in full.

71.    At the time of the Transfers and transactions alleged herein, LPG received less than reasonably equivalent value in exchange for said Transfers.

72.    The Transfers, transactions and retention of LPG assets, client files, ACH Receivables and funds alleged herein, among others, left LPG insolvent. LPG scheduled $141,813,219.09 in total debt to pre-petition creditors. However, without the files, accounts receivable, and funds, the Transfers left the Debtor with approximately $12,186,500 in assets and no income stream; virtually none of those alleged $12,186,500 assets have been turned over to the Trustee despite repeated request for same.

73.    On or after the date that the fraudulent Transfers and transactions alleged herein were made, LPG was not paying debts to the pre-petition creditors, including but

not limited to, Validation Partners and DVF II as they came due and, based on the testimony of Diab, was forced to incur further debt obligations, including but not limited to emergency financing through City Capital NY in the amount of $2.95 million dollars pre-petition.

74.     The source of LPG client files, ACH Receivables, and funds that are the subject of the alleged fraudulent Transfers, are and were at all relevant times, assets and property of LPG and its clients.

75.     By transferring LPG client files, ACH Receivables, and funds to Marich Bein, Diab endeavored to hide and conceal LPG client files, ACH Receivables, funds, and the Transfers alleged herein.

76.     Diab made the Transfers alleged herein after LPG faced multiple lawsuits including those initiated by factoring companies and in order to avoid its creditor liability and abscond with assets of the Estate, including but not limited to, Validation Partners lawsuit filed on September 20, 2022 (Case No. 30-2022-01281911-CU-BC-CXC) in the Superior Court of California, County of Orange; DVF II lawsuit filed on January 23, 2023 (Case No. 30-2023-01303355-CU-CO-CXC) in the Superior Court of California, County of Orange; among others. The lawsuits sought the appointment of a receiver to perform many of the same duties of the Trustee and obtain information, an accounting of LPG funds, assets and accounts receivables and maintain the status quo, among other relief, pending the outcome of the litigation. Notably, Diab admitted the foregoing under oath at the hearing on Trustee's preliminary injunction.

77.     Marich Bein diverted monies due Debtor to non-Debtor entities GoFi, Vulcan, PrimeLogix, BAT, Inc. dba Coast Processing among others who are subsequent transferees of the fraudulent Transfers.

78.     Thus, at the time of the Transfers and transactions alleged herein related to LPG client files, ACH Receivables, ACH transactions and withholding of funds occurred, or as a result thereof, LPG was either:

        a.      insolvent on the date the alleged Transfers and transactions were

made, or became insolvent as a result thereof;

b.     engaged or was about to engage in a Transfer or transaction for which any property remaining with LPG was of unreasonably small capital;

c.     intended to incur, or believed that LPG would incur, debts beyond its ability to pay as such debts matured.

79.     The Transfers and transactions alleged herein were made with intent to hinder, delay, or defraud creditors as Diab testified to at the preliminary injunction hearing. In fact, Diab caused such Transfers to occur on the same LPG client files and ACH Receivables to multiple entities to accomplish just that, including but not limited to those purportedly transferred to Marich Bein.

80.     The Transfers and transactions alleged herein of LPG's client files, ACH Receivables, and funds occurred within the two years prior to the Petition Date.

81.     Accordingly, the fraudulent Transfers and transactions alleged herein that Diab caused LPG to make should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(B), and such property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

## **FOURTH CLAIM FOR RELIEF**

**Avoidance, Recovery, and Preservation of Four-Year Actual Fraudulent**

**Transfers**

**(Against All Defendants)**

**[11 U.S.C. §§ 544(b), 550, and 551; CAL. CIV. CODE §§ 3439.04(a) and 3439.07]**

82.     Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 59 as though set forth in full.

83.     At the time of the Transfers and transactions alleged herein, LPG received less than reasonably equivalent value in exchange for said Transfers.

84.     The Transfers, transactions and retention of LPG assets, client files, ACH Receivables and funds alleged herein, among others, left LPG insolvent. LPG scheduled $141,813,219.09 in total debt to Pre-petition creditors. However, without the files,

accounts receivable, and funds, the Transfers left the Debtor with approximately $12,186,500 in assets and no income stream; virtually none of those alleged $12,186,500 assets have been turned over to the Trustee despite repeated request for same.

85.    On or after the date that the fraudulent Transfers and transactions alleged herein were made, LPG was not paying debts to the pre-petition creditors, including but not limited to, Validation Partners and DVF II as they came due and, based on the testimony of Diab, was forced to incur further debt obligations, including but not limited to emergency financing through City Capital NY in the amount of $2.95 million dollars pre-petition.

86.    The source of LPG client files, ACH Receivables, and funds that are the subject of the alleged fraudulent Transfers are and were at all relevant times, assets and property of LPG and its clients.

87.    Diab and/or LPG retained possession and control of the files, ACH receivable, and funds transferred to the alter egos or elsewhere after the alleged Transfers.

88.    By transferring LPG client files, ACH Receivables, and funds to Marich Bein, Diab endeavored to hide and conceal LPG client files, ACH Receivables, funds, and the Transfers alleged herein.

89.    Diab made the Transfers alleged herein after LPG faced multiple lawsuits including those initiated by factoring companies and in order to avoid its creditor liability and abscond with assets of the Estate, including but not limited to, Validation Partners lawsuit filed on September 20, 2022 (Case No. 30-2022-01281911-CU-BC-CXC) in the Superior Court of California, County of Orange; DVF II lawsuit filed on January 23, 2023 (Case No. 30-2023-01303355-CU-CO-CXC) in the Superior Court of California, County of Orange; among others. The lawsuits sought the appointment of a receiver to perform many of the same duties of the Trustee and obtain information, an accounting of LPG funds, assets and accounts receivables and maintain the status quo,

among other relief, pending the outcome of the litigation. Notably, Diab admitted the foregoing under oath at the hearing on Trustee's preliminary injunction.

90.    The LPG client files, ACH Receivables, and funds that were subject to the Transfers alleged herein constitute a substantial portion of LPG's pre-petition non-exempt property and assets.

91.    The Transfers and transactions alleged herein, including but not limited to LPG client files and/or ACH receivable transfers were made by Diab to insiders that were and/or are still under Diab's control and/or others working in concert with Diab.

92.    The Transfers and transactions alleged herein left LPG insolvent. LPG scheduled $141,813,219.09 in total debt to pre-petition creditors. However, without the client files, ACH Receivables, and funds, the alleged Transfers left the LPG with approximately $12,186,500 in assets and no income stream; virtually none of those alleged $12,186,500 assets have been turned over to the Trustee despite repeated request for same. Included in the assets scheduled by LPG are approximately $12,000,000 or more in funds held by Defendants.

93.    As such, the Transfers and transactions alleged herein left LPG with remaining assets that were unreasonably small in relation to the Transfers and transactions.

94.    Further, LPG was insolvent at the time of the alleged Transfers and transactions alleged herein or became insolvent as a result thereof; the exact aim of Diab's scheme to bankrupt LPG in the event a receiver was appointed.

95.    On or after the date that such Transfers and transactions alleged herein were made, LPG was not paying debts to the pre-petition creditors, all of which arose before the Transfers alleged herein were made, as they became due.

96.    Marich Bein diverted monies due Debtor to non-Debtor entities GoFi, Vulcan, PrimeLogix, BAT, Inc. dba Coast Processing among others who are subsequent transferees of the fraudulent Transfers.

97.    Thus, the Transfers and transactions alleged herein were made with actual

1  intent to hinder, delay, or defraud creditors of LPG, as well as any duly appointed

2  receiver.

3      98.    Thus, at the time of the Transfers and transactions alleged herein related to

4  LPG client files, ACH Receivables, ACH transactions and withholding of funds

5  occurred, or as a result thereof, LPG was either:

6          a.    insolvent on the date the alleged Transfers and transactions were

7  made, or became insolvent as a result thereof;

8          b.    engaged or was about to engage in a Transfer or transaction for

9  which any property remaining with LPG was of unreasonably small capital;

10          c.    intended to incur, or believed that LPG would incur, debts beyond

11  its ability to pay as such debts matured.

12      99.    The alleged Transfers and transactions of the LPG's client files, ACH

13  Receivables, and funds occurred within the four years prior to the Petition Date.

14      100.   At all relevant times, the alleged Transfers and transactions related to

15  LPG's client files, ACH receivable, and funds are avoidable as fraudulent pursuant to

16  11 U.S.C. § 544(b) and California Civil Code sections 3439.04(a) and 3439.07 by one

17  or more creditors who held and hold unsecured claims against the Debtor that were and

18  are allowable against his Estate under 11 U.S.C. § 502 or that were not and are not

19  allowable only under 11 U.S.C. § 502(e), including, without limitation, the pre-petition

20  creditors.

21      101.   Accordingly, the fraudulent Transfers and transactions alleged herein that

22  Diab caused LPG to make should be avoided as fraudulent under 11 U.S.C. §§ 544(b)

23  and California Civil Code sections 3439.04(a) and 3439.07, and such property, or the

24  value thereof, should be recovered and preserved for the benefit of the Estate pursuant

25  to 11 U.S.C. §§ 550 and 551 and California Civil Code section 3439.07.

26  / / /

27  / / /

28  / / /

**FIFTH CLAIM FOR RELIEF**

**Avoidance, Recovery, and Preservation of Four-Year Constructive Fraudulent Transfers**

**(Against All Defendants)**

**[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.05, and 3439.07]**

102.   Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 78 as though set forth in full.

103.   At the time of the Transfers and transactions alleged herein, LPG received less than reasonably equivalent value in exchange for said Transfers.

104.   The Transfers, transactions and retention of LPG assets, client files, ACH Receivables and funds alleged herein, among others, left LPG insolvent. LPG scheduled $141,813,219.09 in total debt to pre-petition creditors. However, without the files, accounts receivable, and funds, the Transfers left the Debtor with approximately $12,186,500 in assets and no income stream; virtually none of those alleged $12,186,500 assets have been turned over to the Trustee despite repeated request for same.

105.   On or after the date that the fraudulent Transfers and transactions alleged herein were made, LPG was not paying debts to the pre-petition creditors, including but not limited to, Validation Partners and DVF II as they came due and, based on the testimony of Diab, was forced to incur further debt obligations, including but not limited to emergency financing through City Capital NY in the amount of $2.95 million dollars pre-petition.

106.   The source of LPG client files, ACH Receivables, and funds that are the subject of the alleged fraudulent Transfers, are and were at all relevant times, assets and property of LPG and its clients.

107.   Diab and/or LPG retained possession and control of the files, ACH Receivables, and funds transferred to the alter egos or elsewhere after the alleged Transfers.

108.   By transferring LPG client files, ACH Receivables, and funds to Marich Bein, Diab endeavored to hide and conceal LPG client files, ACH Receivables, funds, and the Transfers alleged herein.

109.   Diab made the Transfers alleged herein after LPG faced multiple lawsuits including those initiated by factoring companies and in order to avoid its creditor liability and abscond with assets of the Estate, including but not limited to, Validation Partners lawsuit filed on September 20, 2022 (Case No. 30-2022-01281911-CU-BC-CXC) in the Superior Court of California, County of Orange; DVF II lawsuit filed on January 23, 2023 (Case No. 30-2023-01303355-CU-CO-CXC) in the Superior Court of California, County of Orange; among others. The lawsuits sought the appointment of a receiver to perform many of the same duties of the Trustee and obtain information, an accounting of LPG funds, assets and accounts receivables and maintain the status quo, among other relief, pending the outcome of the litigation. Notably, Diab admitted the foregoing under oath at the hearing on Trustee's preliminary injunction.

110.   The LPG client files, ACH Receivables, and funds that were subject to the Transfers alleged herein constitute a substantial portion of LPG's pre-petition non-exempt property and assets.

111.   The Transfers and transactions alleged herein, including but not limited to LPG client files and/or ACH receivable transfers were made by Diab to insiders that were and/or are still under Diab's control and/or others working in concert with Diab.

112.   The Transfers and transactions alleged herein left LPG insolvent. LPG scheduled $141,813,219.09 in total debt to pre-petition creditors. However, without the client files, ACH Receivables, and funds, the alleged Transfers left the LPG with approximately $12,186,500 in assets and no income stream; virtually none of those alleged $12,186,500 assets have been turned over to the Trustee despite repeated request for same. Included in the assets scheduled by LPG are approximately $12,000,000 or more in funds held by Defendants.

113.   As such, the Transfers and transactions alleged herein left LPG with

remaining assets that were unreasonably small in relation to the Transfers and transactions.

114. Further, LPG was insolvent at the time of the alleged Transfers and transactions alleged herein or became insolvent as a result thereof; the exact aim of Diab's scheme to bankrupt LPG in the event a receiver was appointed.

115. On or after the date that such Transfers and transactions alleged herein were made, LPG was not paying debts to the pre-petition creditors, all of which arose before the Transfers alleged herein were made, as they became due.

116. Marich Bein diverted monies due Debtor to non-Debtor entities GoFi, Vulcan, PrimeLogix, BAT, Inc. dba Coast Processing among others who are subsequent transferees of the fraudulent Transfers.

117. Thus, the Transfers and transactions alleged herein were made with actual intent to hinder, delay, or defraud creditors of LPG, as well as any duly appointed receiver.

118. Thus, at the time of the Transfers and transactions alleged herein related to LPG client files, ACH Receivables, ACH transactions and withholding of funds occurred, or as a result thereof, LPG was either:

    a.    insolvent on the date the alleged Transfers and transactions were made, or became insolvent as a result thereof;

    b.    engaged or was about to engage in a Transfer or transaction for which any property remaining with LPG was of unreasonably small capital;

    c.    intended to incur, or believed that LPG would incur, debts beyond its ability to pay as such debts matured.

119. The alleged Transfers and transactions of the LPG's client files, ACH Receivables, and funds occurred within the four years prior to the Petition Date.

120. At all relevant times, the alleged Transfers of the LPG's client files, ACH Receivables, and funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and California Civil Code sections 3439.04(a) and 3439.07 by one or more creditors who

1  held and hold unsecured claims against the Debtor that were and are allowable against

2  his Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11

3  U.S.C. § 502(e), including, without limitation, the pre-petition creditors.

4      121.   Accordingly, the Transfers alleged herein that Diab caused LPG to make

5  should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and California Civil Code

6  sections 3439.04(a) and 3439.07, and such property, or the value thereof, should be

7  recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and

8  551 and California Civil Code section 3439.07.

9                          **SIXTH CLAIM FOR RELIEF**

10  **Avoidance, Recovery, and Preservation of Preferential Transfer to Defendant in**

11                              **Preference Period**

12                          **(Against All Defendants)**

13                      **[11 U.S.C. §§ 547, 550, and 551]**

14      122.  Plaintiff realleges and incorporates herein by reference each and every

15  allegation contained in Paragraphs 1 through 97 as though set forth in full.

16      123.   Marich Bein claims that pursuant to the ARPA, Marich Bein transferred

17  $12,058,335.00 to Debtor to acquire Accounts Receivables (as that term is defined in

18  the ARPA), and Debtor was guaranteed payment of not less than $37,104,601.84 under

19  the ARPA. A true and correct copy of Marich Bein's Proof of Claim is attached as

20  **Exhibit 4**. Thus, the obligations due to Marich Bein under the ARPA represent a debt

21  for which Marich Bein contends LPG is liable (the "Marich Debt").

22      124.   Further, the SRA allows Marich Bein to service the Accounts Receivables

23  and provides that Marich Bein is entitled collect and withhold additional monies due to

24  Marich Bein under the ARPA. The SRA authorizes Marich Bein to repay the Marich

25  Debt from the collections it received under the SRA.

26      125.   Of the $37,104,601.84, Marich Bein has paid itself back $16,989,963.23

27  by Debtor ("Marich Debt Payments"). Debtor made the Marich Debt Payments, which

28  were applied to the Marich Debt, during the one-year preference period ("Preference

Transfers"). The Marich Debt Payments constitute payment of an antecedent debt to or for a creditor for purposes of satisfying §547(b)(1) and (b)(2).

126. Marich Bein was a non-statutory insider of Debtor as Marich Bein had a close relationship with Debtor and the transactions pursuant to the SRA and ARPA were not at arm's length. Moreover, Marich Bein used the d/b/a LPG during this time.

127. The Preference Transfers happened while LPG was insolvent.

128. Debtor is also entitled to the presumption of insolvency when the Preference Transfers happened pursuant to 11 U.S.C. § 547(f).

129. As a result of the Preference Transfers, Defendant recovered more than it would have received if: (i) the Debtor's case was under chapter 7 of the Bankruptcy Code; (ii) the Preference Transfers had not been made; and (iii) Defendant received payments of its debts under the provisions of the Bankruptcy Code. As evidenced by the Debtor's schedules filed in the underlying Bankruptcy Case, as well as the proofs of claim that have been received to date, the Debtor's liabilities exceed its assets to the point that unsecured creditors will not receive a full payout of their claims from the Debtor's Estate.

130. In accordance with the foregoing, the Preference Transfers are voidable pursuant to 11 U.S.C. § 547(b), and may be recovered and preserved for the benefit of the estate pursuant to 11 U.S.C. §§ 550 and 551.

## SEVENTH CLAIM FOR RELIEF

### Breach of Contract

### (Against Marich Bein)

131. The ARPA identified in Paragraph 40 above were between Marich Bein as the buyer and Debtor as the seller. Each ARPA states a purchase price in Section 2.3 of each ARPA ("Purchase Price").

132. Marich Bein claims that pursuant to the ARPA, Marich Bein transferred $12,058,335.00 to Debtor to acquire Accounts Receivables (as that term is defined in the ARPA) and Debtor was guaranteed payment of not less than $37,104,601.00 under

1  the ARPA.

2  133.  However, the ARPA attached to Marich Bein's Proof of Claim evidence a

3  total amount actually paid to Debtor to be $11,101,745.75.

4  134.  The Purchase Price under the ARPA were due to the Debtor as the seller

5  of the accounts receivables that were the subject of the ARPA, and thus, should have

6  been paid to the Debtor.

7  135.  However, $5,540,000.00 of the Purchase Price of the combined ARPA due

8  the Debtor were diverted from Debtor and wired to non-Debtor entities, including GoFi,

9  Vulcan, PrimeLogix, BAT, Inc. dba Coast Processing among others. Specifically,

10  $1,200,563.85 was transferred to GoFi per the wire instructions, and $4,339,436.15 was

11  transferred to Vulcan per the wire instructions.

12  136.  Marich Bein breached the ARPA by diverting payments due the Debtor

13  under the ARPA to other non-Debtor entities.

14  137.  Debtor suffered damages due to Marich Bein's breach of contract in the

15  amount transferred from Marich Bein to non-Debtor entities, i.e. $5,540,000.00.

### EIGHTH CLAIM FOR RELIEF

#### Conversion

#### (Against All Defendants)

#### [Cal. Civ. Code § 3336]

20  138.  Plaintiff realleges and incorporates herein by reference each and every

21  allegation contained in Paragraphs 1 through 97 as though set forth in full.

22  139.  Defendants' exercised dominion and control over LPG client files, ACH

23  Receivables and funds obtained by way of processing ACH transactions on LPG client

24  files without consent or in excess of any potential consent found to exist at the time of

25  the alleged transactions.

26  140.  LPG and its clients owned, possessed and had a lawful right to possess

27  LPG client files, ACH Receivables and funds alleged to have been processed and

28  retained by Defendants. Notwithstanding the alleged fraudulent transfers of LPG client

files and ACH Receivables, none of the purported transfers were made with client approval.

141. Defendants were informed and knew that all or some of funds it processed on behalf of LPG were LPG assets and/or unauthorized by LPG clients.

142. Marich Bein was provided with a cease and desist letter from processing ACH transactions as fraudulent and without consent on February 6, 2023 by LPG as alleged in the Marich Bein Action. BankUnited similarly received a cease and desist letter on February 10, 2023 as alleged in the Marich Bein Action. Moreover, in addition to Defendants acting without consent, outside of the scope of any consent that may be found to have existed at the time of the alleged transactions herein, consent, if it existed at all, terminated at the time Diab caused LPG client files to be transferred to LUNA.

143. On information and belief, even after Marich Bein was denied access to DPP as a result of Diab causing LPG's client files to be transferred to LUNA, Defendants continued to process ACH transactions on LPG client files with outdated client information in order to ensure the accuracy of payments, client account information, debit account information, security and to avoid double ACH transactions on client files. Moreover, these subsequent ACH transactions were processed through BankUnited as its NACHA financial institution.

144. As scheduled by LPG and as alleged by Diab, March Bein and/or BankUnited knowingly processed, retained and controlled $12,000,000 or more of ACH transactions on LPG client files which are and were LPG assets. Pre-petition and by and through the preliminary injunction attached hereto as **Exhibit 3**, LPG and Trustee have demanded the turnover of said funds. To date no funds have been turned over.

145. As a result of the conversion of LPG assets alleged herein and based on the testimony of Diab, LPG was forced to incur further debt obligations, including but not limited to emergency financing through City Capital NY in the amount of $2.95 million dollars pre-petition.

146.  LPG and its Estate have been harmed by the foregoing conduct which was a substantial factor in causing the harm, including but not limited to:

      a.    initiating ACH transactions on LPG client files without consent and/or exceeding the scope of any potential consent found to have existed at the time of the transactions;

      b.    processing ACH transactions after access to LPG client files was denied;

      c.    retaining LPG assets and funds obtained by way of the foregoing ACH transactions; and

      d.    failing to turnover said funds upon demand and/or order of the Court.

147.  As a result of the foregoing harm, LPG and its Estate have been harmed in amount to be proven at trial in accordance with California Civil Code section 3336, including but not limited to the value of the property at the time of conversion, with interest from that time and a fair compensation for the time and money properly expended in pursuit of the property.

## NINTH CLAIM FOR RELIEF

### Turnover of Estate Property

### (Against All Defendants)

### [11 U.S.C. § 542]

148.  Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 107 as though set forth in full.

149.  One or all of Defendants have possession or control over property of the Estate, including but not limited to LPG client files, ACH Receivables, and funds; including LPG's assets totaling $12,000,000 or more based on Debtor's Bankruptcy schedules. None of the $12,000,000 or more in pre-petition payment assets have been turned over to the Trustee.

150.  LPG's client files, ACH Receivables, funds, and potentially other property

1    are property of the Estate and are not of inconsequential value to the Estate.

2        151. LPG's client files, ACH Receivables, and funds that are the subject of the

3    transfers and transactions alleged herein were paramount to the operation of LPG and

4    its ability to pay creditors pre-petition. As a result of the alleged transfers and

5    transactions alleged herein and based on the testimony of Diab, LPG was forced to incur

6    further debt obligations, including but not limited to emergency financing through City

7    Capital NY in the amount of $2.95 million dollars pre-petition.

8        152. Accordingly, the Trustee is entitled to a judgment for turnover of the files,

9    accounts receivable, and funds pursuant to 11 U.S.C. § 542.

10   **RESERVATION OF RIGHTS**

11       153. Plaintiff reserves the right to bring all other claims or causes of action that

12   the Plaintiff may have against any of the defendants, on any and all grounds, as allowed

13   under the law or in equity, including but not limited to, those claims not known by the

14   Trustee at this time but that he may discover during the pendency of this adversary

15   proceeding.

16   **PRAYER FOR RELIEF**

17       **WHEREFORE**, Plaintiff prays for a judgment as follows:

18       **On the First Claim for Relief:**

19   1.    <u>Control over ACH Transfers</u>: Entry and enforcement of the preliminary

20   injunction ordered by the court [Dkt No. 70] prohibiting interference with any ACH

21   Transfer being executed pursuant to documents authorizing such transfers to be

22   executed in favor of LPG as follows:

23       a.    <u>Covered Entities and Individuals</u>: The following entities and

24   individuals, and anyone acting on their behalf: LPG, Oakstone; Greyson; Phoenix;

25   Maverick; LGS Holdco, LLC; CLG; Vulcan; Coast Processing; Prime Logix; Tony

26   Diab; Rosa Loli aka Rosa Bianca Loli aka Bianca Loli; Lisa Cohen, Dan March, Ty

27   Carss, Eng Heng and all other aliases, agents, or corporate entities affiliated with same

28   shall, absent further order from this Court:

b.    <u>Enjoined Conduct re ACH Instructions</u>: No covered entity or individual shall initiate, cause to be initiated, or instruct any company or person that processes ACH transfers and/or their affiliated financial institution including Marich Bein and BankUnited, N.A.; and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875" or any such substantially similar ACH identification transaction, to execute any ACH EFT on any file, financial institution, or current or former client of LPG, to or for the benefit of LPG without the express written authorization of Trustee;

c.    <u>Enjoined Conduct re Bank Accounts</u>: No covered entity or individual shall open, or cause to be opened, any account, whether business or personal, that can receive or send money or anything of value, at any company including banking, financial, or similar institution and/or receive, directly or indirectly, any funds drawn from ACH Transfers;

2.    <u>Execution of ACH Transfers</u>: Entry and enforcement of the preliminary injunction ordered by the court [Dkt No. 70] prohibiting interference with any ACH Transfer being executed pursuant to documents authorizing such transfers to be executed in favor of LPG as follows:

a.    <u>Covered Entities and Individuals</u>: All companies capable of processing ACH transfers including Marich Bein and BankUnited, N.A.; and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875," or any such substantially similar ACH identification transaction, are enjoined absent further order of this court, from:

i.    <u>Enjoined Conduct re ACH Transfers</u>: No covered entity or individual shall initiate or receive funds from any ACH EFT on any file, financial institution, or current or former client of LPG, to or for the benefit of LPG or any one or more of its alleged assignees or transferees;

ii.    <u>Injunction Mandating Turnover to Trustee</u>: All covered entities or individuals shall hold in trust any and all funds, receipts, and transfers related

to any account, file, or current or former client of LPG, or any one or more of its alter egos or fraudulent transferees,  until expressly directed to release, wire or transfer such funds by the Trustee and to a bank account whose information shall be provided with any such request; and, shall upon request by the Trustee provide an accounting of any and all such funds held in trust to the Trustee upon written request within 10 days of said request;

b.    enjoining LPG, or any one or more of its alter egos or fraudulent transferees from incurring, taking out, or pledging any receivables of LPG or any one or more of its alter ego entities without seeking leave of court;

c.    enjoining LPG, or any one or more of its alter egos or fraudulent transferees from instructing any person and/or Client to cancel and/or demand a refund from LPG;

3.    For entry of an order amending the preliminary injunction order [Dkt No. 70] requiring Defendants to turnover all pre-petition client files, documents, ACH information, funds and fees for every transaction processed from March 20, 2019 to the present.

**On the Second and Third Claims for Relief:**

4.    Avoiding, recovering, and preserving the two-year transfers against all Defendants:

**On the Fourth and Fifth Claims for Relief:**

5.    Avoiding, recovering, and preserving the four-year transfers against all Defendants:

**On the Sixth Claim for Relief:**

6.    Ordering turnover to the Trustee of all funds obtained by way of processing ACH transactions against LPG client files from March 20, 2019 through the present that have not already been remitted to LPG and/or the Trustee.

7.    For attorney's fees and costs expended in pursuit of the property. Cal. Civil Code § 3336.

8.      For pre-judgment interest from the date of conversion. Cal. Civil Code § 3336.

**On the Seventh Claim for Relief:**

9.      Ordering turnover to the Trustee of the following:

a.      All Client files, including but not limited to names, contact information, client file management, communications, account information, letters, pleadings, communications, payment history, financial account information, credit reports, executed legal services contracts, ACH contracts, executed installment contracts, account balances, debts in dispute, payment history, file status, settlements, debt invalidations and/or any other information created, managed and stored electronically utilizing DPP software program's software license, key or account, that was opened and is maintained and controlled by LPG, or any one or more of its alter egos, including but not limited to Defendants;

b.      All administrative usernames and passwords that give the Trustee access to any account held, maintained or controlled by LPG, or any one or more of its alter egos;

c.      All ACH files related to Client information, details, accounts, history of EFTs, payments, amounts held, interest on held amounts, penalty fees, nonsufficient fund fees or other ACH related charges to the Clients stored electronically or in hard copy associated with ACH processing service providers and/or affiliated financial institutions, including but not limited to Marich Bein and BankUnited, N.A. and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875", or any such substantially similar ACH identification transaction;

d.      All files, information, reports, spreadsheets, account numbers, routing numbers, and databases related to transfer of funds out of any account opened, maintained and controlled by LPG, or any one or more of its alter egos, that were processed and executed by ACH processing service providers and/or their affiliated

financial institutions, including but not limited to Marich Bein and BankUnited, N.A. and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875", or any such substantially similar ACH identification transaction;

      e.    All administrative usernames and passwords that give the Trustee access to any ACH processing accounts, software, database or other program at ACH processing service providers and/or affiliated financial institutions, including but not limited to Marich Bein and BankUnited, N.A. or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875", or any such substantially similar ACH identification transaction, used to upload or input Client information, initiate Client ACH EFTs, transfer Client ACH funds to outside financial institutions or otherwise manage any account opened, maintained and controlled by LPG, or any one or more of its alter egos,;

      f.    All accounting records, files, data and information obtained, received or prepared for using LPG client files and/or ACH information by Defendants, or any one or more of LPG's alter egos and stored on NetSuite; QuickBooks and Microsoft SharePoint; G-Suite or other permanent or cloud based systems;

      g.    All contracts, records, reports, information, data and details regarding the transfer or sale of any client files or future Client ACH payments to Defendants and/or any other law firm, organization, corporate entity, person(s), or investment group (otherwise known as factoring companies);

      h.    All contracts, records, reports, information, data, cost basis, payment information and details regarding the transfer or receipt of any Client files or future Client ACH payments from any other law firm, organization, corporate entity, person(s), investment or marketing group (otherwise known as capping companies) to LPG or any one or more of its alter egos;

/ / /

/ / /

39

1       i.  All ACH payments originating from LPG client files, or any one or

2    more of its alter egos or fraudulent transferees, including but not limited to Defendants

3    from March 20, 2019 to the present.

4      **On All Claims for Relief:**

5      10. granting any other and further relief as the Court deems just and proper.

6

7    Dated: March 26, 2024       Respectfully submitted,

8                 DINSMORE & SHOHL LLP

9

10               By:  /s/ Christopher B. Ghio

11                 Christopher B. Ghio
             Christopher Celentino

12                 Jeremy Freedman
             Special Counsel to Richard A. Marshack,

13                 Chapter 11 Trustee

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28