CHRISTOPHER B. GHIO (259094)
Christopher.ghio@dinsmore.com
VENEETA JASWAL (320108)
veneeta.jaswal@dinsmore.com
655 West Broadway, Suite 800
San Diego, California 92101
Tele: (619) 400-0468
Fax: (619) 400-0501

RICHIK SARKAR (OH 0069993)
*Admitted pro hac vice*
richik.sarkar@dinsmore.com
1001 Lakeside Avenue, Suite 990
Cleveland, Ohio 44114
Tele: (216) 413-3838
Fax: (216) 413-3839

Special Counsel to Richard A. Marshack, former Chapter 11 Trustee for the Bankruptcy Estate of The Litigation Practice Group P.C. and current liquidating trustee of the LPG Liquidation Trust

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>THE LITIGATION PRACTICE GROUP P.C.,<br><br>Debtor.<br><br>RICHARD A. MARSHACK,<br><br>Plaintiff,<br><br>v.<br><br>MARICH BEIN, LLC; BANK UNITED, N.A., et al.,<br><br>Defendants. | Case No.: 8:23-bk-10571-SC<br><br>Adv. Proc. No. 8:24-ap-01040-SC<br><br>Chapter 11<br><br>**DECLARATION OF VENEETA JASWAL IN SUPPORT OF PLAINTIFF RICHARD MARSHACK, FORMER CHAPTER 11 TRUSTEE AND CURRENT LIQUIDATING TRUSTEE'S MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT**<br><br>**Date:** March 5, 2025<br>**Time:** 11:00 a.m.<br>**Judge:** Hon. Scott C. Clarkson<br>**Dept.:** 411 West Fourth Street<br>Courtroom 5C – Via Zoom<br>Santa Ana, California 92701 |

I, Veneeta Jaswal, declare as follows:

1.      I am an attorney at law duly licensed to practice by the State of California and admitted to practice before this Court. I am an attorney with the law firm of Dinsmore & Shohl LLP and special counsel to Richard A. Marshack, the former Chapter 11 Trustee for the bankruptcy estate of The Litigation Practice Group P.C. and current Liquidating Trustee of the LPG Liquidation Trust.  I make this declaration in support of Trustee's Motion for Leave to File a First Amended Complaint. I have personal knowledge of the facts contained in this declaration, and if called upon to testify, I could and would testify competently thereto.

2.      Attached hereto as **Exhibit A** is a true and correct copy of the proposed First Amended Complaint in redline format without exhibits for each of reference for the Court.

3.      Attached hereto as **Exhibit B** is a true and correct copy of Trustee's proposed First Amended Complaint in final format with exhibits attached thereto.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 12th day of February 2025, at San Diego, California.

/s/ Veneeta Jaswal
Veneeta Jaswal

# EXHIBIT A

1   CHRISTOPHER B. GHIO (259094)
2   christopher.ghio@dinsmore.com
    ~~CHRISTOPHER CELENTINO (131688)~~
3   ~~christopher.celentino@dinsmore.com~~
4   ~~JEREMY B. FREEDMAN (308752)~~
    ~~jeremy.freedman~~VENEETA JASWAL (320108)
5   veneeta.jaswal@dinsmore.com
6   DINSMORE & SHOHL LLP
    655 West Broadway, Suite 800
7   San Diego, California 92101
8   Tele:  619.400.0500
    Fax:   619.400.0501
9

10  RICHIK SARKAR (OH 0069993)
    *Admitted pro hac vice*
11  richik.sarkar@dinsmore.com
12  Cleveland, Ohio 44114
    Tele: (216) 413-3838
13  Fax: (216) 413-3839

14
15  Special Counsel to Richard A. Marshack, former Chapter 11 Trustee for the
    Bankruptcy Estate of The Litigation Practice Group ~~PC~~P.C., and current Liquidating
16  Trustee of the LPG Liquidating Trust

17              **UNITED STATES BANKRUPTCY COURT**
18      **CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**
19
    In re:                                  Bankr. Case No. 8:23-bk-10571-SC
20
                                            Related Adv. Proceeding: 8:23-ap-01046-
21  THE LITIGATION PRACTICE GROUP           SC
    P.C.,
                                            Adv. Proc. No. 8:24-ap-011040-SC
22            Debtor.
                                            Chapter 11
23  _____

24  RICHARD A. MARSHACK, Chapter 11         **TRUSTEE'S FIRST AMENDED**
    Trustee,                                **COMPLAINT FOR:**
25
                                            **(1)  INJUNCTIVE RELIEF;**
26            Plaintiff,
                                            **(2)  AVOIDANCE, RECOVERY, AND**
27  v.                                           **PRESERVATION OF TWO-**
                                                 **YEAR ACTUAL FRAUDULENT**
28  MARICH BEIN, LLC, a New York                 **TRANSFERS;**
    Limited Liability Corporation;

                                1

BANKUNITED, N.A., a Florida based National Banking Association; GOFI LLC, a California Limited Liability Company; VULCAN CONSULTING GROUP, LLC, a California Limited Liability Company; BCB BANCORP, INC. d/b/a BCB COMMUNITY BANK, a New Jersey Corporation; PACIFIC STAFFING, LLC, a Delaware Limited Liability Corporation; CALLFI, LLC a Delaware Limited Liability Corporation; ACUFI, LLC, a Delaware Limited Liability Corporation;   LISA COHEN, individually; HESHY DEUSTCH, individually; NACHMAN WEISZ, individually; NICHOLAS KOHLSCHREIBER, individually; ISRAEL RECHES, individually; and, DOES 1 through 10, inclusive,

Defendants.

(3) **AVOIDANCE, RECOVERY, AND PRESERVATION OF TWO-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;**

(4) **AVOIDANCE, RECOVERY, AND PRESERVATION OF FOUR-YEAR ACTUAL FRAUDULENT TRANSFERS;**

(5) **AVOIDANCE, RECOVERY, AND PRESERVATION OF FOUR-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;**

(6) **AVOIDANCE, RECOVERY AND PRESERVATION OF PREFERENTIAL TRANSFER MADE WITHIN ONE YEAR OF THE PETITION DATE;**

(7) **BREACH OF CONTRACT;**

(8) **CONVERSION;**

(9) **TURNOVER;**

(10) **RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT VIOLATIONS;**

(11) **CONSPIRACY;**

(12) **AIDING AND ABETTING AGAINST MARICH BEIN, LLC, GOFI, LLC, PACIFIC STAFFING, LLC, CALLFI, LLC, ACUFI, LLC, LISA COHEN, HESHY DEUSTCH, NACHMAN WEISZ, ISRAEL RECHES, AND NICHOLAS KOHLSCHREIBER;**

(13) **AIDING AND ABETTING AGAINST BANKUNITED, N.A. AND BCB BANCORP, INC.; AND**

(14) **DECLARATORY RELIEF**

Judge:   Hon. Scott C. Clarkson

2

1

2          For his *Complaint and causes of action  initially filed in the main Adversary*

3  *Proceeding No. 8:23-ap-01046-SC ("1046 Action") and having severed his claims*

4  *from the 1046 Action, now brings this action against Defendants for (1) Injunctive*

5  *Relief; (2) Avoidance, Recovery, and Preservation of Two-Year Actual Fraudulent*

6  *Transfers; (3) Avoidance, Recovery, and Preservation of Two-Year Constructive*

7  *Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of Four-Year Actual*

8  *Fraudulent Transfers; (5) Avoidance, Recovery, and Preservation of Four-Year*

9  *Constructive Fraudulent Transfers*; (6) *Avoidance, Recovery and Preservation of*

10  *Preferential Transfer Made Within Ninety Dates of the Petition Date; (7)* ~~Conversion;~~

11  ~~and (8) Turnover~~ (the "Complaint"). Plaintiff Richard A. Marshack,*Breach of*

12  *Contract; (8) Conversion; (9) Turnover; (10) Racketeer Influenced and Corrupt*

13  *Organizations Act Violations (11) Conspiracy; (10) Aiding and Abetting Fraud and*

14  *Conversion; (11); (12) Aiding and Abetting against Marich Bein, LLC, GoFi LLC,*

15  *Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Choen, Heshy Deustch, Nachman*

16  *Weisz, Israel Reches, and Nicholas Kohlschreiber; (13) Aiding and Abetting against*

17  *BankUnited, N.A. and BCB Bancorp, Inc.; and (13) Declaratory Relief* (the

18  "Complaint"). Plaintiff Richard A. Marshack, former Chapter 11 Trustee ("Trustee"

19  or "Plaintiff") for the bankruptcy estate (the "Estate") of Debtor The Litigation Practice

20  Group, PC (the "Debtor" or "LPG") and current liquidating Trustee of the LPG

21  Liquidating Trust ("Trustee" or "Plaintiff"), in the above-captioned bankruptcy case

22  (the "Bankruptcy Case"), alleges and avers as follows:

23  ~~///~~

24  **STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE**

25          1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§

26  157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the United

27  States District Court for the Central District of California because this is a core

28  proceeding arising in and/or related to the Bankruptcy Case, which is a case under

Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), and which is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "Court"). Regardless of whether this proceeding is core, non-core, or otherwise, the Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court. Defendants are hereby notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires Defendants to plead whether consent is given to the entry of a final order and judgment by the bankruptcy court. Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to the Debtor's pending Bankruptcy Case.

2.      Regardless of whether this proceeding is core, non-core, or otherwise, Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court.

3.      Defendants are notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires Defendants to plead whether consent is given to the entry of a final order and judgment by the Bankruptcy Court.

4.      Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to Debtor's pending Bankruptcy Case.

### **THE PARTIES**

5.      Plaintiff Richard A. Marshack is the former Chapter 11 Trustee for the Bankruptcy Estate of The Litigation Practice Group P.C., and the current Liquidating Trustee of the LPG Liquidating Trust.

~~5.~~6.   Debtor LPG is, and at all material times was, a professional corporation organized, existing, and in good standing under the laws of the State of California, with its principal place of business in Tustin, California.

~~6.~~7.   Defendant Marich Bein, LLC ("Marich Bein") is, and at all material times was, a New York limited liability corporation organized, existing, and in good standing under the laws of the State of New York. Marich Bein filed its Articles of Incorporation in the State of New York on or about August 18, 2022. On August 19, 2022, the New

York Department of State Records indicate Marich Bein was using the assumed name "LPG" listing LPG's Tustin, California phone number (949-299-6262) as its own. On information and belief, some or all wire transfers from Marich Bein to LPG, when they occurred, were identified with the ACH transaction ID "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875." Marich Bein was retained and/or under the control of Heshy Deustch ("Deustch"), Nachman Weisz ("Weisz"), and Tony Diab ("Diab") until the relationship between Marich Bein and LPG degraded as alleged herein. Marich Bein processed and controlled LPG ACH transactions with Deustch's and Diab's authorization, however, without the authority of LPG itself or its authorized agent Daniel March. Marich Bein also obtained, was provided or misappropriated a copy of LPG client payment information prior to LPG's Bankruptcy filing which, on information and belief, it has in its possession.

7.8.    Defendant BankUnited, NA, ("BankUnited") is, and at all material times was, a NACHA approved financial institution insured by the FDIC with its principal place of business in Miami Lakes, Florida. Through DebtPayPro ("DPP"), LPG utilized the services of BankUnited as its NACHA compliant ACH financial institution necessary for entities, such as Marich Bein, to initiate and debit client accounts as indicated by the LPG client payment history detail screen contained in DPP.

9.    Defendant BCB Bancorp, Inc. d/b/a BCB Community Bank ("BCB Bancorp") is, and at all material times was, a New Jersey corporation with its principal place of business located in Bayonne, New Jersey. Upon information and belief, the services of BCB Bancorp as a NACHA compliant ACH financial institution were necessary for entities, such as Marich Bein, to initiate and debit client accounts and utilized to advance illegal activity.

8.10.    Defendant GoFi LLC ("GoFi"), also known as AcuFi, LLC ("AcuFi"), and CallFi, LLC ("CallFi"), (collectively, "GoFi Entities") is, and at all material times represented that it was, a limited liability company, existing under the laws of the State of California. GoFi Entities received monies due to LPG under purchase agreements,

5

1  identified later in this pleading, from Marich Bein.

2  ~~9.~~11.   Defendant Vulcan Consulting Group LLC ~~(~~", also known as VCG, LLC,

3  (collectively, "Vulcan") is, and at material times was, a California limited liability

4  company organized, existing, and in good standing under the laws of the State of

5  California. Vulcan filed its Articles of Organization on or about December 15, 2019.

6  Vulcan was retained and/or under the control of Lisa Cohen until Diab took over control

7  of Vulcan on or about September 23, 2023. Vulcan received monies due to LPG under

8  purchase agreements, identified later in this pleading, from Marich Bein.

9   12.   Prime Logix, LLC ("Prime Logix") is, and at material times was, a

10  Wyoming limited liability company.  Prime Logix served as an intermediary entity

11  between the GoFi Entities and received monies due to LPG.

12   13.   Defendant Pacific Staffing, LLC ("Pacific Staffing") is, and at all material

13  times was, a limited liability company existing under the laws of the State of Delaware.

14  Pacific Staffing served as an intermediary between Prime Logix and the GoFi Entities

15  and received monies due to LPG.

16  ~~10.~~14. Defendant Lisa Cohen ("Cohen") is, and at all material times was, an

17  individual residing in the State of California. Cohen controlled Vulcan.

18   15.   Defendant Heshy Deustch ("Deustch") is, and at all material times was,

19  an individual residing in the State of New York.  Deustch owned, operated and/or

20  controlled Marich Bein.

21   16.   Upon information and belief, Defendant Nachman Weisz  (on information

22  and belief, also known as Nachmy Weisz and Max Weisz) (collectively, ("Weisz") is,

23  and at all material times was, an individual residing in the State of New Jersey.  Weisz

24  was the business partner of Deustch and owned, operated and/or controlled Marich Bein

25   17.   Defendant Nicholas Kohlschreiber ("Kohlschreiber") is, and at all material

26  times was, an individual residing in the State of California. Kohlschreiber owned,

27  operated and/or controlled the GoFi Entities and Pacific Staffing.

28   18.   Defendant Israel Reches ("Reches"), upon information and belief, was the

6

business partner of Deustch and/or Weisz and controlled and directed transfers of money by and between Marich Bein and Debtor.

///

19.    Upon information and belief, each of the Defendants, including those fictitiously named, were the agent, servant, employee, partner, alter ego, or joint venture of the other Defendants, and in doing the things hereinafter alleged, each was acting within the scope of said agency, employment, partnership or venture, and with the knowledge, permission, consent and ratification of other Defendants in doing, or failing to do, the things alleged herein.

**RELEVANT DEFENDANTS NAMED IN THE 1046 ACTION**

~~11.~~20.Tony Diab is, and at all material times was, an individual residing in the State of California. Diab owned, operated, dominated and controlled LPG, a national debt relief law firm.

**GENERAL ALLEGATIONS**

A.    **LPG'S BANKRUPTCY CASE**

~~12.~~21.On March 20, 2023 (the "Petition Date"), LPG filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing the Bankruptcy Case. Diab made the decision for LPG to file for bankruptcy in order to avoid a plethora of pending lawsuits, two of which sought an order appointing a receiver, including but not limited to: *Validation Partners, LLC v. The Litigation Practice Group, PC, et al*. Case No. 30-2022-01281911-CU-BC-CXC (Orange County Super Ct. September 20, 2022) and *Debt Validation Fund II, LLC, et al. v. The Litigation Practice Group PC, et al*. Case No. 30-2023-01303355-CU-CO-CXC (Orange County Super. Ct. January 23, 2023), among many others. In order to abscond with and delay discovery of substantial assets and continue to profit from LPG client files and client payment obligations pursuant to LPG'S client Legal Services Agreements ("ACH Receivables") prior to filing bankruptcy, Diab and other defendants devised a plan to fraudulently transfer funds, assets, client files, and ACH Receivables out of LPG to third parties.  The 1046

Action deals primarily with the wholesale transfer of client files and the related ACH Receivables; this action deals primarily with the transfer of client ACH Receivables to Marich Bein, subject to the contracts and agreements attached to Marich Bein's proof of claim [Omni Claim No. 102106-1] ("Proof of Claim").

13.22.After the Office of the United States Trustee (the "UST") filed the *Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No. 44], the Court entered the *Order Directing Unites States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58] on May 4, 2021, thereby granting the UST's motion and directing the UST to appoint a Chapter 11 Trustee in the Bankruptcy Case.

14.   Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63; the *Order Approving Appointment* is 1046 Action Docket No. 65], on May 8, 2023, Plaintiff accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case, and he continues to serve in this capacity at this time.

15.23.. The Court approved the Trustee's appointment in its *Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee*, though he no longer serves in that capacity.  [Bankr. Docket No. 65].  Plaintiff Trustee was not appointed until after the events giving rise to this action and, therefore, bases these allegations on information and belief. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, at *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was allowed

and "necessary at times"); *see also Mireskandari v. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL 12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.'"") (Citations omitted)).)

24.    Pursuant to the *Order Confirming Modified First Amended Joint Chapter 11 Plan of Liquidation* entered September 9, 2024, and the *Notice of Occurrence of Effective Date of Modified First Amended Joint Chapter 11 Plan of Liquidation* filed September 24, 2024, Richard A. Marshack also became the Liquidating Trustee of the LPG Liquidation Trust, effective September 24, 2024, and he continues to serve in this capacity at this time.  [Bankr. Docket Nos. 1646 & 1762.]

25.    All claims have been transferred to the LPG Liquidation Trust pursuant to the confirmed plan and Plaintiff brings this action solely in his capacity as the former Chapter 11 Trustee and current Liquidating Trustee of the LPG Liquidation Trust for the benefit of the Debtor's Estate and its creditors.

**B.    LPG'S OWNERSHIP AND MANAGEMENT**

26.    Prior to the Petition Date, LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts. LPG services over 50,000 customers across the United States, with annual revenue estimated to total $150,000,000 in 2022. AtStatesAt all relevant times, LPG was controlled and operated by an individual named Tony Diab ("Diab").

27.    Despite having been disbarred in California and Nevada, Diab controlled and operated LPG since its inception. However, Diab endeavored to conceal his control over LPG, its finances, marketing, affiliates and operations. For example, Diab purportedly required his LPG employees to call him "Admin," his email address was "admin@lpglaw.com" and the name plate on his desk apparently read, "I don't work here."

**C.    LPG**

9

28.    LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts they would identify.

29.    The consumers would pay LPG over a period of time via monthly debits from their bank accounts.

///

30.    The monthly payments were meant to cover all legal services LPG provided to the consumers including validation of the debts, review of documents to determine enforceability, and court appearances to halt lawsuits to obtain judgments.

31.    In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt or to prosecute affirmative claims held by the consumers.

32.    LPG mismanaged the consumers' monthly payments by failing to segregate and hold client payments in trust until fees had been earned by LPG.

33.    Diab and other defendants devised a plan to fraudulently transfer funds, client files, client funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts Receivable") out of LPG to third parties prior to the filing of bankruptcy.

16.    To obtain consumer clients, LPG contracted with marketing companies, who engaged in illegal capping.

17.    The marketing companies and would advertise to or call to solicit consumers with debt to become clients of LPG.

33.34. in exchange for a percentage of the ACH Receivables collected by LPG from the consumers. The marketing affiliates went so far as to assist with the execution of an engagement letter between the consumer and LPG.

34.35. In exchange, LPG agreed to pay the marketing affiliates a percentage of the ACH Receivables collected by LPG from the consumers. LPG would also enter into purchase agreements, at a discount, with various marketing affiliates in an attempt to regain control over the receiveables that marketing companies had an interest in.

35.36. Because LPG received payments from consumers over time, it often

10

sought financing against its future ACH Receivables. This borrowing was used to finance operations at LPG, to pay the fees owed to the marketing companies for providing the client referrals, and to pay creditors which had provided earlier-in-time financing in a growing Ponzi scheme, among other improper purposes.

36.37. Many of the documents executed in connection with such financing described the transactions as account receivable purchase agreements.

///

### D.    DIAB'S SCHEME

37.38. As discussed above, the Debtor borrowed against its future ACH Receivables by entering into accounts receivable purchase agreements or similar transactions with marketers and factoring companies. In many instances, the ACH Receivables were sold multiple times over to different alleged purchasers or factoring companies.

38.39. Given that all and/or a substantial portion of Debtor's ACH rReceivablesReceivables were transferred and/or sold multiple times over there were more claims for payment from any one ACH Receivable than that receivable generated. Accordingly, prior to the petition date, Debtor engaged in a scheme to defraud its creditors by transferring ownership of the ACH Receivables to various fraudulent conveyance partners as alleged herein  and the various adversary proceedings brought by the Trustee, including, but not limited to, the 1046 Action.

### E.    DIAB'S CONTROL OVER LPG'S PAYMENT PROCESSING

40.    Diab used entities he controlled including, without limitation, Validation Partners, Vulcan, Coast Processing, PrimeLogix, and/or Maverick to divert LPG consumer funds and ACH Receivables to Diab would use numerous ACH processing companies in order to easily transfer millions of dollars from Debtor to these entities he controlled,  without oversight or detection, and to avoid payment disputes and complications.  The money that flowed from Debtor through these bank account to Defendants consisted of Client Funds that Debtor held in its bank accounts and funneled

to these entities by means of the ACH processing companies. Debtor regularly made deposits into these entities bank account such that they received Client Funds directly from Debtor in addition to future Accounts Receivable.

39.41. LPG's monthly revenue from client files is primarily received via ACH payments. In order to process ACH payments, LPG is required to enlist the services of ACH payment processing companies who handle high risk transactions. In this regard, Diab enlisted numerous ACH processing companies[1] in order to easily switch between different vendors and quickly transfer millions of dollars of LPG funds to entities he controlled, generally in less than three days from receipt of funds by the processing company. One reason for the plethora of processing company vendors was to avoid payment disputes and complications with the vendor itself, as in the case with Marich Bein. Switching between ACH processing companies further facilitated unauthorized double pulls, and made it more difficult for LPG clients to dispute, prevent or stop unauthorized ACH transactions, even where the Client disputed the transactions, had cancelled their services, and/or requested a refund. Diab used entities he controlled including, without limitation, Vulcan, Coast Processing, PrimeLogix, Marich Bein, PurchaseCo80 and/or Maverick to divert LPG consumer funds and ACH Receivables. Diab would use numerous ACH processing companies in order to easily transfer millions of dollars from Debtor to these entities he controlled, without oversight or detection, and to avoid payment disputes and complications. The money that flowed from Debtor through these bank account to Defendants consisted of Client Funds that Debtor held in its bank accounts and funneled to these entities by means of the ACH processing companies. Debtor regularly made deposits into these entities bank account such that they received Client Funds directly from Debtor in addition to future Accounts Receivable.

---

[1] The ACH processing companies LPG used and which Diab controlled includes, but is not limited to, EPPS; EquiPay; Merit Fund; Authorize.net; World Global; Optimum Bank; BankUnited; Marich Bein; Revolv3; Maverick Bankcard; FIS; Guardian; and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875" or any such substantially similar ACH identification transaction.

42. LPG's monthly ~~gross revenue from~~ receipt of client payments ranged between $8.4 million to $11.2 million per month from May 2022 through September 2022. ~~Notwithstanding LPG's substantial monthly~~Despite this receipt of client payments, which could not be considered revenue ~~and relatively low pre-petition monthly expenses (ranging between $2.3 to $3.4 million at the end of 2022),~~until earned, LPG was not accumulating any cash on hand and claimed to have only $4,500 in its bank account on the Petition Date.

**F.     MARICH BEIN'S FRAUDULENT SERVICING AND ACH RECEIVABLE PURCHASE AGREEMENTS**

~~40.~~43. In an action filed in the Central District of California, Case No. 8:23-cv-00339-JWH-ADS (the "Marich Bein Action"), Marich Bein contends that on September 18, 2022, Plaintiff and LPG entered into an Assignment of Servicing Rights Agreement ("SRA") on approximately 50,000 LPG client files, pursuant to which LPG purportedly agreed to the following:

> **Article I. ASSIGNMENT**
>
> Section I.1 Assignment of Servicing Rights. [LPG], by these presents does hereby presently, unconditionally, absolutely and irrevocably assign, transfer, convey and set over to [Plaintiff] (it being intended by [LPG] that such assignments constitute present, absolute and unconditional assignments and not assignments for additional security only, but such assignment shall constitute security for [LPG]'s obligations to [Plaintiff] or its affiliates), all of [LPG]'s right, title and interest in and to the Servicing Rights, including, without limitation, any right of [LPG] or any of its affiliates (whether such rights are currently existing or arising in the future) to service collection of subscription fees, return payment fees, or any other fee or payment resulting from any Customer's engagement with [LPG] or any of its affiliates, or give notices, sue for payment under the Customer contracts or to take any action at law or in equity relating to the Customer contracts.
>
> **Article II. SERVICING OF CONTRACTS**

13

Section I.2 [*sic*] Appointment as Third-Party Servicer. . . . [LPG] hereby retains [Plaintiff] to act as third party [Plaintiff] for the Receivables . . . .

Section I.3 [*sic*] Servicing of Receivables. . . . [LPG] agrees to provide [Plaintiff] and its subcontractors with such assistance in the servicing, collection and administration of any Receivable as may be requested by [Plaintiff] from time to time.

Section I.4 [*sic*] Limited Power of Attorney. [LPG] hereby irrevocably appoints and empowers [Plaintiff] as [LPG]'s true and lawful attorney-in-fact, with full power of substitution, to endorse and promptly deposit on [LPG]'s behalf any checks or other instruments made payable to [LPG] and submitted by a Customer as payment on any Receivable, and to take any other action relating to the Receivables in [LPG]'s name and place that [Plaintiff] deems advisable and consistent with the terms of this Agreement. This power of attorney shall be deemed to a right coupled with an interest.

**ARTICLE III. OBLIGATIONS OF MERCHANT**

Section III.1 Access to All Digital Records, Databases, and Applications. [LPG] shall provide [Plaintiff] any information requested by [Plaintiff] with respect to its Customers and the Customer contracts. At all times, [Plaintiff] must have unfettered access to all software applications used by [LPG], including, but not limited to, Debt Pay Pro, Snowflake, or any other databases used by [LPG] in its ordinary course of business.
                                        * * *

Section III.3 No Impairment. [LPG] will not take any action (including placing or allowing placement of a lien or security interest on any Purchased Receivable) or make any omission that has, individually or in the aggregate, an adverse effect on any Purchased Receivable or on [Plaintiff]'s ability to collect on any Purchased Receivable.

Section III.4 Amounts Received. . . . [LPG] shall not in any way encourage or cause any proceeds to be paid, processed, settled or delivered to any person or account other than the [Plaintiff]'s account, and shall take all affirmative steps at its expense and as necessary or appropriate to prevent any such occurrence from recurring. [LPG] is prohibited from instructing

any Customer to pay [LPG] or any other third party on a Receivable or otherwise suggest that Customer may make a payment to [LPG] or any other third party instead of paying [Plaintiff] to satisfy its payment obligation.

* * *

### ARTICLE VI. MISCELLANEOUS

Section I.7 [*sic*] Term and Termination. This Assignment shall commence on [September 19, 2022] and shall continue in full force and effect, until released by [Plaintiff]. [LPG] may terminate this Assignment at any time and for any reason provided that the total amount of Purchased Receivables held by [Plaintiff] and its affiliates are less than $1,000,000.00.[2]

* * *

Section VI.1[*sic*] Exclusivity. [LPG]understands and agrees that the relationship set forth in this Assignment is exclusive. [LPG] forgoes any right to contract with other parties for the same or similar services provided by [Plaintiff] under this Assignment.

———A true and correct copy of the SRA is attached as **Exhibit 1.**

41.44. In addition to the SRA, on August 18, 2022, September 21, 2022, October 6, 2022, and November 14, 2022, LPG entered into four (4) separate Accounts Receivables Purchase AgreementAgreements (each an "ARPA") on approximately 15,000 to 20,000 client files and the associated payment information necessary to process the ACH Receivables werewas purportedly transferred and assigned by LPG to Marich Bein. True and complete copycopies of the ARPA are attached as **Exhibit 2**, and incorporated here.

42.45. On information and belief, all or a substantial portion of, the same client files, servicing rights and ACH Receivables were transferred multiple times to different entities between September 2022 and March 20, 2023, directly and/or indirectly through a myriad of transactions as alleged in the 1046 Action.

43.46. The SRA ("Transfer") was made without consideration to LPG. Due to the lack of consideration, the SRA is fraudulent and must be set aside.

44.47. Pursuant to the SRA, Diab and LPG hired Marich Bein to process its ACH

transactions on most or all LPG client files, well in excess of the number of client files and payment information purportedly transferred as alleged in paragraph 35 44 above. On information and belief, at all material times, the NACHA bank used and necessary for Marich Bein to process such ACH transactions through DPP included, but was not limited to, Defendant Defendants BankUnited. and BCB Bancorp. Upon information and belief, Marich Bein further held multiple financial accounts at BankUnited and BCB Bancorp in order to receive ACH funds from LPG client files. On information and belief, Marich Bein is the only entity that held a financial account at BankUnited and BCB Bancorp relevant to the allegations herein.

45. 48. On information and belief, Diab had a close connection and insider relationship with the principals of Marich Bein, including, Deustch, Weisz and Reches prior to and at the time the ACH transactions and alleged transfer of LPG client files and/or payment information necessary for processing the ACH Receivables.  Marich Bein utilized the d/b/a LPG.

49.    The deal between Diab and Marich Bein evidences Diab's influence and control over Marich Bein, which he maintained until the relationship began to deteriorate. At all relevant times, Marich Bein, by and through its owners, operators, directors and/or controllers Deustch, Weisz, and Reches, controlled the flow of money and transfers of Debtor related to the ACH transactions and, on information and belief, all transfers required the consent of Marich Bein.

50.    The bank accounts maintained at BankUnited and BCB Bancorp used for Debtor's ACH transactions, on information and belief, were utilized by Marich Bein and Deustch, Weisz, and Reches.

51.    Diab and Marich Bein's agreement was part of a larger pattern of fraud, where everyone was trying to outmaneuver each other.  Even though Diab seemed to be in charge at first, both sides took advantage of each other's weaknesses and shared financial connections.  For example, LPG/Diab owed money to other businesses Marich Bein's leaders owned.  They used these connections to manipulate each other, which

1   eventually caused their partnership to fall apart.

2   46.52. Under the SRA and ARPA schemes between Marich Bein and Diab,

3   Marich Bein was given access to LPG's DPP account, client files and the NACHA

4   information necessary to initiate ACH transactions. On information and belief, access

5   to client files was provided without client consent. Based on the ACH and payment data

6   contained in DPP, Marich Bein had all it needed to initiate ACH transactions on all LPG

7   client files. Based on the testimony of Diab, Marich Bein was permitted to keep and

8   hold only those ACH funds related to client files and ACH Receivables purportedly

9   transferred to Marich Bein, which as alleged in the Marich Bein Action, was were

10  transferred more than once. The remaining proceeds from the ACH transactions

11  processed on LPG client files by Marich Bein were to be remitted to LPG.

12  47.53. The ARPA ("Transfer") were was fraudulent because the client files were

13  sold to other entities without client consent and in order to defraud LPG creditors. For

14  example, in executing a Legal Services Agreement with LPG and executing an ACH

15  Authorization in favor of LPG, the individual consumer clients of LPG had authorized

16  LPG – and only LPG – to make use of their ACH Authorization and initiate payments

17  to LPG.  There is no evidence that any consumer client of LPG authorized Marich Bein

18  d/b/a LPG to initiate any payments at any time.

19  48.54. According to Marich Bein's Proof of Claim, Marich Bein collected took –

20  without client authorization - $16,989,963.23, from Debtor money otherwise due to the

21  Debtor pursuant to the Debtor's consumer client's ACH Authorizations under the SRA

22  and ARPA ("Transfer", and collectively with the SRA Transfer defined in paragraph

23  3746, the ARPA Transfer defined in paragraph 41, "Transfers").

24  49.55. Based on Diab's testimony, Marich Bein initially processed ACH

25  transactions on client files and remitted payment to LPG. By approximately December

26  2022 and/or January 2023, and at or around the time Diab caused the same client files

27  and/or ACH Receivables to be transferred to Oakstone Law Group, P.C. ("Oakstone"),

28  Marich Bein started withholding ACH payments received on LPG client files, including

those that had not purportedly been transferred or assigned to Marich Bein and/or Oakstone. According to Diab and as listed in Debtor's Schedule A/B [Bankr. Docket No. 33], Marich Bein withheld approximately $12 million dollars in ACH funds on LPG client files that were not associated with the foregoing fraudulent SRA and ARPA. In the Marich Bein Action, Marich Bein alleges that it is in possession of at least $1,000,000 processed via ACH from LPG clients. Pre-petition, Debtor demanded said funds be returned and that Marich Bein cease and desist from processing ACH transactions. To date, Marich Bein has refused to return and/or turnover said funds.

50.56. In approximately February 2023, Marich Bein's ability to access LPG client's NACHA payment information through DPP was terminated. To wit, Diab caused all service contract payments to DPP to cease, DPP locked LPG's account and all of LPG's client information was transferred to Diab's proprietary platform, LUNA. In turn, Marich Bein was locked out of DPP.

51.57. On information and belief, and based on the testimony of Diab, however, this did not stop Marich Bein from initiating ACH transactions on LPG clients using old data Marich Bein had usurped when it had access to DPP and without having updated client, payment or other related information in violation of NACHA and other applicable laws and regulations.

52.58. The effect of the SRA and ARPA was to accomplish an unlawful purpose. Thus, the agreements may be declared illegal regardless of the intention of the parties. *Stockton Morris Plan Co. v. Cal. Tractor & Equip. Corp.*, 112 Cal. App. 2d 684, 690 (1952) (citing *Fewel & Dawes, Inc. v. Pratt*, 17 Cal. 2d 85, 91 (1941)). This remains true regardless of whether the contracts have been performed. *Stevens v. Boyes Hot Springs Co.*, 113 Cal. App. 479, 483 (1931) (A contract by a corporation to purchase its own stock has the effect of illegally withdrawing and paying to a stockholder a part of the capital stock of the corporation and is illegal and void, regardless of the fact that the contract is fully performed by the sellers and partially performed by the corporation.); *Mansfield v. Hyde*, 112 Cal. App. 2d 133, 139 (1952), overruled, *Fomco, Inc. v. Joe*

*Maggio, Inc.*, 8 Cal. Rptr. 459 (1960) (Where object of statute requiring licenses is to prevent improper persons from engaging in particular activity, or is for purpose of regulating occupation or business for protection of public, imposition of penalty amounts to prohibition against engaging in occupation or business without license, and contract made by unlicensed person in violation of statute is invalid.); *Firpo v. Murphy*, 72 Cal. App. 249, 252 (1925) (A contract to pay commissions to a real estate broker is illegal and he is not entitled to recover thereon where he fails to secure the license required by law to carry on his business.).

53.59. According to Diab, Defendants' failure to remit ACH payments due and owing to LPG caused LPG to take out a line of credit from City Capital NY (also a scheduled creditor) in the approximate amount of $2,9500,000.

### G.   BANKUNITED ACH TRANSACTIONS

60.   In order for a third party ACH processor, portal, integrated software or other non-regulated entity to process and/or receive ACH transactions, a NACHA compliant financial institution is, and at all relevant times herein was, required to complete such transactions. Based on DPP records, BankUnited was listed as the NACHA financial institution engaged to process and/or receive ACH transactions on client files through DPP. On information and belief, Marich Bein, Diab or others acting in concert with Diab and having access to LPG's DPP account and its financial controls designated BankUnited as the NACHA financial institution to which ACH Receivables on LPG client files would be deposited.

61.   On information and belief, BankUnited processed and/or received the foregoing ACH transactions at the direction of Marich Bein, and prior to Marich Bein's involvement at the direction of LPG, Diab and/or alter egos of same. On information and belief, the funds received from ACH transactions processed by and through BankUnited were initially deposited into an operating account held at BankUnited in order to ensure the funds cleared. After an initial holding period to account for insufficient funds and other charge backs, BankUnited either retained said funds in an

account held at its institution and/or transferred a portion or all of the funds to an account designated by Marich Bein. Funds processed and received by Marich Bein and/or BankUnited that were to be delivered to LPG were then wired, transferred or otherwise directed to accounts designated by Diab, including those held by Vulcan, PrimeLogix, BAT, Inc. dba Coast Processing among many others. Marich Bein, at all relevant times has and continues to maintain a bank account at BankUnited which, on information and belief, was used to receive ACH Receivables from LPG client files fraudulently transferred, sold or both to Marich Bein.

62.    On information and belief, BankUnited has and/or continues to retain all or a portion of said funds and received fees and profits from engaging in such activity that were taken from wrongfully obtained funds processed against LPG client files, including, but not limited to, those LPG client files fraudulently transferred to Marich Bein. This further includes the alleged wrongful, fraudulent and/or double pulls initiated against LPG client accounts. Bank United is also in possession of all relevant records pertaining to the number of ACH transactions processed by Marich Bein and accounts where ~~funds~~ such funds not currently held in a BankUnited account were transferred.

**H.    BCB BANCORP ACH TRANSACTIONS**

63.    On information and belief, BCB Bancorp also processed and/or received the foregoing ACH transactions at the direction of Deustch, Weisz, and Reches, and prior to Marich Bein's involvement, at the direction of LPG, Diab and/or alter egos of same. On information and belief, the funds received from ACH transactions processed by and through BCB Bancorp were initially deposited into an operating account held at BCB Bancorp in order to ensure the funds cleared. After an initial holding period to account for insufficient funds and other charge backs, BCB Bancorp either retained said funds in an account held at its institution and/or transferred a portion or all of the funds to an account designated by Deustch, Weisz, and Reches. Funds processed and received that were to be delivered to LPG were then wired, transferred or otherwise directed to accounts designated by Diab, including those held by Vulcan, PrimeLogix, BAT, Inc.

dba Coast Processing among many others. At all relevant times, BCB Bancorp has serviced accounts which, on information and belief, was used to receive ACH Receivables from LPG client files fraudulently transferred, sold or both to Marich Bein.

64.     On information and belief, BCB Bancorp has and/or continues to retain all or a portion of said funds and receive fees and profits from engaging in such activity that were taken from wrongfully obtained funds processed against LPG client files, including, but not limited to, those LPG client files fraudulently transferred to Marich Bein, Deustch, Weisz, and Reches. This further includes the alleged wrongful, fraudulent and/or double pulls initiated against LPG client accounts. BCB Bancorp is also in possession of all relevant records pertaining to the number of ACH transactions processed by Marich Bein, Deustch, Weisz, and Reches and accounts where such funds not currently held in a BCB Bancorp account were transferred.

**H.I.   THE SALE OF LPG'S ASSETS**

65.     On July 7, 2023, Richard Marshack in his capacity as the Chapter 11 Trustee moved the Court for an order (A) Approving Sale, Subject to Overbid, of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests Pursuant to 11 U.S.C. § 363(b) and (B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and Other Agreements ("Sale Motion") [Bankr. Docket No. 191]. After supplemental briefing, addressing multiple oppositions, holding a lengthy hearing and auction wherein Morning Law Group was the highest bidder, the Court granted the Sale Motion entered August 2, 2023 ("Sale Order") [Bankr. Docket No. 352].

**I.J.   LPG'S PREPETITION CREDITORS**

66.     Debtor was insolvent when each Transfer was made. This insolvency is evidenced in part by the fact that 14 separate UCC-1 statements were of record securing debts of the Debtor as of September 1, 2022. These statements remained unreleased as of the Petition Date. These statements either reflected secured liens against the Debtor's assets then owned or thereafter acquired, or provided evidence of the assignment or sale

1   of substantial portions of the Debtor's future income.

2     67. When the Transfers were made, these prior UCC-1 statements secured the

3   repayment of the following claimed amounts that are currently known to Trustee and

4   are allegedly owed by the Debtor: (i) $2,374,004.82 owed to Fundura Capital Group as

5   evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed on

6   or about May 19, 2021; (ii) approximately $15 million dollars owed to MNS Funding,

7   LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UCC statement

8   filed on or about May 28, 2021; (iii) approximately $5,000,000 owed to Azzure Capital,

9   LLC as evidenced by Proof of Claim No. 127 secured by a UCC statement filed on or

10   about May 28, 2021; and (iv) approximately $1.5 million dollars owed to Diverse

11   Capital, LLC purportedly secured by UCC statements filed on or about September 15,

12   2021, and December 1, 2021.[2]

13     68. As alleged above, LPG was borrowing against its assets and future income,

14   often on unfavorable terms, not only to finance operations at LPG, but also to pay the

15   fees owed to the marketing affiliates for providing it with consumer clients and to

16   ~~pay~~repay other loans to other creditors ~~that~~, which loans were either already in default

17   or about to be in default, as part of Diab's scheme to keep LPG creditors at bay for as

18   long as possible until he could transfer LPG's assets, client files and ACH Receivables

19   to other entities under his control. Pursuant to the agreements with the marketing

20   companies, significant percentages of future payments were already promised to be paid

21   to the marketing affiliates from whatever future income the Debtor would receive.  And,

22   of course, the payments LPG received in the form of ACH Receivables were also trust

23   funds paid to LPG by its law firm clients, subject to a return of funds in the event of a

24   request for a refund or termination of the representation before LPG had earned said

25   funds.  In this regard, except to the extent earned, the ACH Receivables also represented

26   a liability of the Debtor.

27

28   _____

[2] Trustee reserves all rights, claims, and defenses with respect to these and any other purported
secured or unsecured claims.

69.    In addition, on Debtor's Schedule E/F [Bankr. Docket No. 33], Debtor scheduled 11 unsecured creditors with priority unsecured claims totaling $374,060.04. These priority unsecured creditors include Indiana Dept. of Revenue, Dept. of Labor and Industries, Arizona Dept. of Economic Security, Arkansas Dept. of Finance & Admin., California Franchise Tax Board, Georgia Dept. of Labor, Internal Revenue Service, Mississippi Dept. of Revenue, Nevada Dept. of Taxation, Utah State Tax Commission, and Wisconsin Dept. of Revenue (collectively, "Priority Unsecured Creditors").

70.    Another group of creditors that Debtor listed on its Schedule E/F [Bankr. Docket No. 33] are nonpriority unsecured creditors. Those 58 creditors have scheduled claims totaling $141,439,158.05 and include Ajilon; Anthem Blue Cross; Azevedo Solutions Groups, Inc.; Carolina Technologies & Consulting Invoice; Collaboration Advisors; Credit Reporting Service Inc.; CT Corporation – Inv.; Debt Pay Pro; Document Fulfillment Services; EnergyCare, LLC; Exela Enterprise Solutions; First Legal Network, LLC; GHA Technologies Inc.; Harrington Electric, Inc.; Imagine Reporting; Juize, Inc.; Krisp Technologies, Inc.; Liberty Mutual; Marc Lemauviel – Allegra; MarkSYS Holdings, LLC; Netsuite-Oracle; Pitney Bowes; Rapid Credit, Inc.; SBS Leasing A Program of De Lage Landen; Security Solutions; Sharp Business Systems; Streamline Performance, Inc.; Thomson Reuters; Twilio, Inc.; Nationwide Appearance Attorneys; Executive Center, LLC; Outsource Accelerator, Ltd.; TaskUs Holdings, Inc.; Marich Bein, LLC; Validation Partners; MC DVI Fund 1, LLC; MC DVI Fund 2, LLC; Debt Validation Fund II, LLC; Tustin Executive Center; LexisNexus; JP Morgan Chase; Business Centers of America; Michael Schwartz; Anibal Colon Jr.; Kathleen Lacey; David Ulery; Kimberly Birdsong; Kevin Carpenter; Karen Suell; Gloria Eaton; Carolyn Beech; Debra Price; Kenneth Topp; Darcey Williamson, Trustee; James Hammett; Johnny Rizo; Beverly Graham; Kathleen Scarlett; and Geneve and Myranda Sheffield (collectively, "Nonpriority Unsecured Creditors" and, together with the Secured Creditors and Priority Unsecured Creditors,

23

"Prepetition Creditors").

**K.     LPG'S PONZI SCHEME**

71.     The Ponzi Scheme Presumption exists in bankruptcy proceedings.  The
Ponzi Scheme Presumption can be utilized to establish a debtor's "intent to defraud
future undertakers [investors] from the mere fact that a debtor was running a Ponzi
scheme.  Indeed, no other reasonable inference is possible. A Ponzi scheme cannot work
forever.  The investor pool is a limited resource and will eventually run dry.  The
perpetrator must know that the scheme will eventually collapse as a result of the
inability to attract new investors.  The perpetrator nevertheless makes payments to
present investors, which, by definition, are meant to attract new investors. He must
know all along, from the very nature of his activities, that investors at the end of the line
will lose their money.  Knowledge to a substantial certainty constitutes intent in the eyes
of the law, *cf. Restatement (Second) of Torts § 8A (1963 & 1964)*, and a debtor's
knowledge that future investors will not be paid is sufficient to establish his actual intent
to defraud them.  *Cf. Coleman Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co.
(In re American Properties, Inc.)* (Bankr.D.Kan. 1981)14 B.R. 637, 643 (intentionally
carrying out a transaction with full knowledge that its effect will be detrimental to
creditors is sufficient for actual intent to hinder, delay or defraud within the meaning of
§ 548(a)(1))." *Merrill v. Abbott (In re Independent Clearing House Co.)* (D. Utah 1987)
77 B.R. 843, 860. A trustee in bankruptcy is not required to show that an operator of a
Ponzi scheme was subjectively aware his Ponzi scheme was destined to fail.  *In re EPD
Inv. Co., LLC*, 114 F.4th at 1153 ("[a] trustee's action to recover assets fraudulently
conveyed in the course of a Ponzi scheme does not require that the trustee also prove
the Ponzi-scheme operator was subjectively aware his Ponzi scheme was destined to
fail.")

72.     "But if all the debtor receives in return for a transfer is the use of the
defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for
creditors to share. In fact, by helping the debtor perpetuate his scheme, the transfers

24

1    exacerbate the harm to creditors by increasing the amount of claims while diminishing

2    the debtor's estate. In such a situation, the use of the defendant's money cannot

3    objectively be called "reasonably equivalent value." *In re Independent Clearing House*

4    *Co.*, 77 B.R. at 859. Therefore, "[t]he trustee can avoid the transfers if they were

5    preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and

6    fraudulent. Therefore, they constitute 'property of the estate,' and the trustee can

7    recover them." *Id*. at 853 n.17 (citations omitted).

8         73.    Debtor was operating a Ponzi scheme that utilized affiliates and several

9    other entities, including Marich Bein, the GoFi Entities, Prime Logix, and Pacific

10   Staffing, and their owners, operators, directors, principals and/or controllers Deustch,

11   Weisz, Reches, Cohen, and Kohlscreiber, as payment processors and intermediaries to

12   conceal the scheme, and as investors to continue its unlawful business practices by using

13   funds provided by current investors to attract new investors hoping for very high returns.

14   Therefore, the Debtor was running a Ponzi scheme , and the Ponzi Scheme Presumption

15   can be utilized to infer that the Debtor had the intent to defraud investors within the

16   meaning of 11 U.S.C. § 548(a)(1).  This is evidenced by the Court in this Bankruptcy

17   Case declaring that Debtor was operating a Ponzi scheme when it stated the following:

18            It is important to note that this Court has never received any
19            significant and trustworthy evidence that Debtor accomplished
            meaningful results for its clients, but only anecdotal examples of
20            viable success for its clients. By reviewing the Estate's claims
            register, there is evidence of consumer claims for the fraud and
21            demanded but undelivered refunds of approximately $500
            million. There is ample evidence that the pre-petition Debtor
22            never placed the collected funds into an attorney-client trust
            account, and that Debtor or its principals simply looted the
23            payments received through the client automatic withdrawals,
            stiffing both the clients and outside attorneys who may have been
24            working on client cases with the hopes of being paid. There is
            also evidence before the Court that Debtor was running a Ponzi
25            scheme and paying some outside (or "network") attorneys with
            funds obtained from new clients. In this case, it appears that some
26            of the "lenders" may have been serving as "investors," hoping
            for very high returns before "the music stopped." The Ninth
27            Circuit has recently explained, "[b]y definition, a Ponzi scheme
            is destined to fail because the pool of available investors is not
28            limitless. When the Ponzi scheme operator's pool of investors
            inevitably runs dry, the scheme collapses and the swindler and
            their entities often end up in bankruptcy or equitable

1

receivership. See generally David R. Hague, Expanding the Ponzi Scheme Presumption, 64 DePaul L. Rev. 867 (2015). In bankruptcy, the court-appointed trustee is tasked with taking immediate control of the entity, ceasing ongoing fraudulent activity, locating and collecting assets for the bankruptcy or receivership estate, and achieving a final, equitable distribution of the remaining assets. See 11 U.S.C. § 704." *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 2024 U.S. App. LEXIS 21363, at *15 (9th Cir. Aug. 23, 2024). Finally, there is evidence that Debtor was encumbering (or as some creditors assert, "double or triple selling") their accounts or receivables to multiple lenders. With respect to Greyson's requested Administrative Claim [Dk. 676], and as more fully described in the concurrently entered order denying the claim, there has been no evidence presented that any work allegedly performed by Greyson assisted any clients or added any value to the Estate.

*See,* Case No. 8:23-bk-10571-SC [Bankr. Docket No. 1545 Fn. 5].

74.    Moreover, since the transfers were made with the intent to further the Ponzi scheme, the Debtor did not receive an objectively reasonable equivalent value for the Transfers, and the Trustee can avoid the Transfers because they were fraudulent.

**L.    THE CRIMINAL ENTERPRISE**

75.    Debtor's operations, activities and transfers done in furtherance of the Ponzi scheme, including those in conjunction with its affiliates and its dealings with Defendants, also constituted a criminal enterprise.

76.    This, too, is evidenced by the Court's order in the 1046 Action wherein it denied the Motion of Greyson Law Center to Vacate the Preliminary Injunction previously entered in Debtor's main case, and the Court offered the opinion:

Through the various proceedings and evidence produced in both the main case and the various adversary proceedings, including but not limited to various Motions for Temporary Restraining Orders, Preliminary Injunctions, Motions to Dismiss, a Motion for Appointment of a Chapter 11 Trustee, a Motion to Sell Assets, a multitude of pleadings filed by both secured and unsecured creditors (supported by evidence presented under oath) in support of their claims, and especially the pleadings and evidence presented by the "Watchdog of the Bankruptcy System" aka the Office of the United States Trustee (an arm of the United States Department of Justice), *it is clear to this Court that Debtor, since its pre-petition inception (and through the time of the appointment of the Chapter 11 Trustee) was in the Court's opinion, operating a criminal enterprise.*

26

(Case No. 8:23-bk-10571-SC; Adv. No. 8:23-ap-01046-SC [Bankr. Docket No. 1545, p.3 (emphasis in original)].)

77.    As part of this criminal enterprise, Debtor and Defendants engaged in fraudulent transfers of its accounts receivables pursuant to various agreements, including the ARPAs.

78.    On information and belief, Marich Bein performed payment processing for Debtor. The money was then passed through the various Defendant entities, including Prime Logix, Pacific Staffing, and ultimately to the GoFi Entities.  This was done to conceal the criminal enterprise and the Defendants' involvement therein.

79.    Defendants Deustch, Weisz and Reches, as the owners, operators, directors and/or controllers of Marich Bein, received and further directed the fraudulent ACH transactions and transfers by manipulating Marich Bein.

80.    Similarly, Defendant Kohlscreiber, as the owner, operator, director and/or controller of the GoFi Entities and Pacific Staffing, served as the intermediary of the fraudulent ACH transactions and transfers through the manipulation of the GoFi Entities and Pacific Staffing.

## FIRST CLAIM FOR RELIEF

### Injunctive Relief

### (Against All Defendants)

### (Against Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber)

71.81. Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 5480 as though set forth in full.

72.82. Plaintiff requests that this Court incorporate and enter its preliminary injunction order entered in the 1046 Action [Dkt No. 70] attached as **Exhibit 3** and incorporated by reference as if fully set forth herein, or in substantially the same form enjoining Defendants Marich Bein, LLC,  GoFi, LLC, Pacific Staffing, LLC, CallFi,

1  LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches,

2  Nicholas Kohlschreiber (collectively, "Injunction Defendants"), and each of them from

3  processing or interfering with any ACH transfer being executed pursuant to documents

4  authorizing such transfers to be executed in favor of Debtor's estate.

5      73.83. Plaintiff requests that this Court incorporate and enter its preliminary

6  injunction order entered in the 1046 Action [Dkt No. 70] attached as **Exhibit 3** and

7  incorporated by reference as if fully set forth herein, or in substantially the same form,

8  ordering Injunctive Defendants, among other things, to turn over to trustee any and all

9  client files; ACH files; ACH processing information; financial records; administrative

10  user names and log in information; accounting records; contracts; and email accounts.

11      74.84. Plaintiff also requests that this Court incorporate and enter its preliminary

12  injunction order entered in the 1046 Action [Dkt No. 70] attached as **Exhibit 3** and

13  incorporated by reference as if fully set forth herein in substantially the same form

14  ordering Injunction Defendants, among other things, to turn over all funds originating

15  from LPG client files, ACH Receivables and/or ACH transactions.

16      85.    In the event the preliminary injunction order in the 1046 Action [Dkt No.

17  70] attached as **Exhibit 3** is not entered and/or incorporated in this action, Plaintiff

18  requests that this Court enter a separate order identical to and/or substantially in the

19  same form as **Exhibit 3** as against Defendants Marich Bein, LLC, GoFi, LLC, Pacific

20  Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz,

21  Israel Reches, and Nicholas Kohlschreiber named in this action.

## **SECOND CLAIM FOR RELIEF**

**Avoidance, Recovery, and Preservation of Two-Year Actual Fraudulent**

**Transfers**

**(Against All Defendants)**

**(Against Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC,**

**CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel**

**Reches, and Nicholas Kohlschreiber)**

1                     **[11 U.S.C. §§ 548(a)(1)(A), 550, and 551]**

2      75.86. Plaintiff realleges and incorporates herein by reference each and every

3 allegation contained in Paragraphs 1 through 5485 as though set forth in full.

4      76.87. The source of the client files, ACH Receivables, and funds that are the

5 subject of the Transfers alleged herein are that of LPG, and the Debtor's Estate.

6      77.88. Defendants Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing,

7 LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel

8 Reches, and Nicholas Kohlschreiber (collectively, "Avoidance Defendants")

9 wrongfully retain possession and control of the client files, ACH Receivables, and funds

10 fraudulently transferred to others by Diab and LPG.

11      78.89. Diab made the Transfers alleged herein after LPG faced multiple lawsuits

12 including those initiated by factoring companies and in order to avoid its creditor

13 liability and abscond with assets of the Estate, including but not limited to, Validation

14 Partners' lawsuit filed on September 20, 2022 (Case No. 30-2022-01281911-CU-BC-

15 CXC) in the Superior Court of California, County of Orange; DVF II's lawsuit filed on

16 January 23, 2023 (Case No. 30-2023-01303355-CU-CO-CXC) in the Superior Court of

17 California, County of Orange; among others. The lawsuits sought the appointment of a

18 receiver to perform many of the same duties of the Trustee and obtain information, an

19 accounting of LPG funds, assets and accounts receivables and maintain the status quo,

20 among other relief, pending the outcome of the litigation. Notably, Diab admitted the

21 foregoing under oath at the hearing on Trustee's preliminary injunction.

22      79.90. The LPG client files, ACH Receivables, and funds that were subject to the

23 Transfers alleged herein constitute a substantial portion of LPG's pre-petition non-

24 exempt property and assets.

25      80.91. The Transfers and transactions alleged herein, including, but not limited

26 to, the multiple transfers of LPG client files and/or ACH Receivables were made by

27 Diab to insiders that were and/or are still under Diab's control and/or other alter egos

28 working in concert with Diab, including the Avoidance Defendants.

81.92. The Transfers and transactions alleged herein, including, but not limited to, the multiple transfers of LPG client file and/or ACH receivable transfers left LPG insolvent and according to Diab required LPG to seek emergency financing in the amount of $2.95 million dollars pre-petition. The Debtor scheduled $141,813,219.09 in total debt to pre-petition creditors. However, without LPG's client files, ACH Receivables, and funds, the fraudulent Transfers and transaction alleged herein left the Debtor with approximately $12,186,500 in assets and no income stream. Included in the assets scheduled by LPG are the approximated $12,000,000 in funds wrongfully withheld by Avoidance Defendants. Moreover, the Transfers to Marich Bein were made at a time when LPG was insolvent.

82.93. Marich Bein diverted monies due Debtor to non-Debtor entities including the GoFi Entities, Vulcan, PrimeLogixPrime Logix, BAT, Inc. dba Coast Processing, Pacific Staffing, among others who are subsequent transferees of the fraudulent Transfers.

94.    Defendants the GoFi Entities and Pacific Staffing also diverted monies due to Debtor to non-Debtor entities including by and between each other, and Marich Bein, Prime Logix, and BAT, Inc. dba Coast Processing.

95.    Debtor was operating a Ponzi scheme, and the Ponzi Scheme Presumption creates an inference of the Debtor's actual intent to defraud within the meaning of 11 U.S.C. § 548(a)(1).

96.    Avoidance Defendants' conduct relating to the Transfers and transactions alleged herein, was done with oppression, fraud and malice as defined in California Civil Code section 3294, entitling Plaintiff to exemplary and punitive damages.

83.97. Thus, the Transfers and transactions alleged herein, including, but not limited to, the fraudulent transfer of LPG client files and/or ACH Receivables were made with actual intent to hinder, delay, or defraud creditors of the Debtor.

84.98. The Transfers and transactions alleged herein, including, but not limited to, the fraudulent transfer of LPG client files and/or ACH Receivables occurred within

two years prior to the Petition Date.

85.99. Accordingly, the Transfers and transactions alleged herein, including, but not limited to, the fraudulent transfer of LPG client files and/or ACH Receivables that Diab caused the Debtor to make should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(A), and such property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

///

///

///

///

### THIRD CLAIM FOR RELIEF

**Avoidance, Recovery, and Preservation of Two-Year Constructive Fraudulent Transfers**

**(Against All Defendants)**

**(Against Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber)**

**[11 U.S.C. §§ 548(a)(1)(B), 550, and 551]**

86.100.     Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 4899 as though set forth in full.

87.101.     At the time of the Transfers and transactions alleged herein, LPG received less than reasonably equivalent value in exchange for said Transfers.

88.102.     The Transfers, transactions and retention of LPG assets, client files, ACH Receivables and funds alleged herein, among others, left LPG insolvent. LPG scheduled $141,813,219.09 in total debt to pre-petition creditors. However, without the files, accounts receivable, and funds, the Transfers left the Debtor with approximately $12,186,500 in assets and no income stream; virtually none of those alleged $12,186,500 assets have been turned over to the Trustee despite repeated request for

1  same.

2  89.103.    On or after the date that the fraudulent Transfers and transactions

3  alleged herein were made, LPG was not paying debts to the pre-petition creditors,

4  including but not limited to, Validation Partners and DVF II as they came due and,

5  based on the testimony of Diab, was forced to incur further debt obligations, including,

6  but not limited to, emergency financing through City Capital NY in the amount of $2.95

7  million dollars pre-petition.

8  90.104.    The source of LPG client files, ACH Receivables, and funds that are

9  the subject of the alleged fraudulent Transfers, are and were at all relevant times, assets

10  and property of LPG and its clients.

11  ///

12  91.105.    By transferring LPG client files, ACH Receivables, and funds to

13  Marich Bein, Diab endeavored to hide and conceal LPG client files, ACH Receivables,

14  funds, and the Transfers alleged herein.

15  92.106.    Diab made the Transfers alleged herein after LPG faced multiple

16  lawsuits including those initiated by factoring companies and in order to avoid its

17  creditor liability and abscond with assets of the Estate, including but not limited to,

18  Validation Partners lawsuit filed on September 20, 2022 (Case No. 30-2022-01281911-

19  CU-BC-CXC) in the Superior Court of California, County of Orange; DVF II lawsuit

20  filed on January 23, 2023 (Case No. 30-2023-01303355-CU-CO-CXC) in the Superior

21  Court of California, County of Orange; among others. The lawsuits sought the

22  appointment of a receiver to perform many of the same duties of the Trustee and obtain

23  information, an accounting of LPG funds, assets and accounts receivables and maintain

24  the status quo, among other relief, pending the outcome of the litigation. Notably, Diab

25  admitted the foregoing under oath at the hearing on Trustee's preliminary injunction.

26  107.  Marich Bein diverted monies due Debtor to non-Debtor entities GoFi,

27  Vulcan, PrimeLogix, BAT, Inc.including the GoFi Entities, Vulcan, Prime Logix, BAT,

28  Inc. dba Coast Processing, Pacific Staffing among others who are subsequent

1   transferees of the fraudulent Transfers.

2   93.108.   Defendants the GoFi Entities and Pacific Staffing also diverted

3   monies due to Debtor to non-Debtor entities including by and between each other, and

4   Marich Bein, Prime Logix, BAT, Inc. dba Coast Processing among others who are

5   subsequent transferees of the fraudulent Transfers.

6   94.109.   Thus, at the time of the Transfers and transactions alleged herein

7   related to LPG client files, ACH Receivables, ACH transactions and withholding of

8   funds occurred, or as a result thereof, LPG was either:

9   a.   insolvent on the date the alleged Transfers and transactions were

10  made, or became insolvent as a result thereof;

11  b.   engaged or was about to engage in a Transfer or transaction for

12  which any property remaining with LPG was of unreasonably small capital;

13  c.   intended to incur, or believed that LPG would incur, debts beyond

14  its ability to pay as such debts matured.

15  95.110.   The Transfers and transactions alleged herein were made with intent

16  to hinder, delay, or defraud creditors as Diab testified to at the preliminary injunction

17  hearing. In fact, Diab caused such Transfers to occur on the same LPG client files and

18  ACH Receivables to multiple entities to accomplish just that, including, but not limited

19  to, those purportedly transferred to Marich Bein.

20  96.111.   The Transfers and transactions alleged herein of LPG's client files,

21  ACH Receivables, and funds occurred within the two years prior to the Petition Date.

22  97.112.   Accordingly, the fraudulent Transfers and transactions alleged

23  herein that Diab caused LPG to make should be avoided as fraudulent under 11 U.S.C.

24  § 548(a)(1)(B), and such property, or the value thereof, should be recovered and

25  preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

26  **FOURTH CLAIM FOR RELIEF**

27  **Avoidance, Recovery, and Preservation of Four-Year Actual Fraudulent**

28  **Transfers**

33

1                    ~~(Against All Defendants)~~

2    **(Against Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC,**

3    **CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel**

4             **Reches, and Nicholas Kohlschreiber)**

5    **[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a) and 3439.07]**

6       ~~98.~~113.      Plaintiff realleges and incorporates herein by reference each and

7 every allegation contained in Paragraphs 1 through ~~59~~112 as though set forth in full.

8       ~~99.~~114.      At the time of the Transfers and transactions alleged herein, LPG

9 received less than reasonably equivalent value in exchange for said Transfers.

10       ~~100.~~115.      The Transfers, transactions and retention of LPG assets, client files,

11 ACH Receivables and funds alleged herein, among others, left LPG insolvent. LPG

12 scheduled $141,813,219.09 in total debt to Pre-petition creditors. However, without the

13 files, accounts receivable, and funds, the Transfers left the Debtor with approximately

14 $12,186,500 in assets and no income stream; virtually none of those alleged

15 $12,186,500 assets have been turned over to the Trustee despite repeated request for

16 same.

17       ~~101.~~116.      On or after the date that the fraudulent Transfers and transactions

18 alleged herein were made, LPG was not paying debts to the pre-petition creditors,

19 including but not limited to, Validation Partners and DVF II as they came due and,

20 based on the testimony of Diab, was forced to incur further debt obligations, including,

21 but not limited to, emergency financing through City Capital NY in the amount of $2.95

22 million dollars pre-petition.

23       ~~102.~~117.      The source of LPG client files, ACH Receivables, and funds that are

24 the subject of the alleged fraudulent Transfers are and were at all relevant times, assets

25 and property of LPG and its clients.

26       ~~103.~~118.      Diab and/or LPG retained possession and control of the files, ACH

27 receivable, and funds transferred to the alter egos or elsewhere after the alleged

28 Transfers.

104.119.    By transferring LPG client files, ACH Receivables, and funds to Marich Bein, Diab endeavored to hide and conceal LPG client files, ACH Receivables, funds, and the Transfers alleged herein.

120.    Diab made the Transfers alleged herein after LPG faced multiple lawsuits including those initiated by factoring companies and in order to avoid its creditor liability and abscond with assets of the Estate, including but not limited to, Validation Partners lawsuit filed on September 20, 2022 (Case No. 30-2022-01281911-CU-BC-CXC) in the Superior Court of California, County of Orange; DVF II lawsuit filed on January 23, 2023 (Case No. 30-2023-01303355-CU-CO-CXC) in the Superior Court of California, County of Orange; among others. The lawsuits sought the appointment of a receiver to perform many of the same duties of the Trustee and obtain information, an accounting of LPG funds, assets and accounts receivables and maintain the status quo, ///

among other relief, pending the outcome of the litigation. Notably, Diab admitted the foregoing under oath at the hearing on Trustee's preliminary injunction.

105.121.    The LPG client files, ACH Receivables, and funds that were subject to the Transfers alleged herein constitute a substantial portion of LPG's pre-petition non-exempt property and assets.

106.122.    The Transfers and transactions alleged herein, including, but not limited to, LPG client files and/or ACH receivable transfers were made by Diab to insiders that were and/or are still under Diab's control and/or others working in concert with Diab.

107.123.    The Transfers and transactions alleged herein left LPG insolvent. LPG scheduled $141,813,219.09 in total debt to pre-petition creditors. However, without the client files, ACH Receivables, and funds, the alleged Transfers left the LPG with approximately $12,186,500 in assets and no income stream; virtually none of those alleged $12,186,500 assets have been turned over to the Trustee despite repeated request for same. Included in the assets scheduled by LPG are approximately $12,000,000 or

1   more in funds held by Defendants.

2   108.124.   As such, the Transfers and transactions alleged herein left LPG with

3   remaining assets that were unreasonably small in relation to the Transfers and

4   transactions.

5   109.125.   Further, LPG was insolvent at the time of the alleged Transfers and

6   transactions alleged herein or became insolvent as a result thereof; the exact aim of

7   Diab's scheme to bankrupt LPG in the event a receiver was appointed.

8   110.126.   On or after the date that such Transfers and transactions alleged

9   herein were made, LPG was not paying debts to the pre-petition creditors, all of which

10   arose before the Transfers alleged herein were made, as they became due.

11   127.   Marich Bein diverted monies due Debtor to non-Debtor entities including

12   the GoFi Entities, Vulcan, PrimeLogix, BAT, Inc.Prime Logix, BAT, Inc. dba Coast

13   Processing, Pacific Staffing, among others who are subsequent transferees of the

14   fraudulent Transfers.

15   ///

16   111.128.   Defendants the GoFi Entities and Pacific Staffing also diverted

17   monies due to Debtor to non-Debtor entities including by and between each other, and

18   Marich Bein, Prime Logix, BAT, Inc. dba Coast Processing among others who are

19   subsequent transferees of the fraudulent Transfers.

20   112.129.   Thus, the Transfers and transactions alleged herein were made with

21   actual intent to hinder, delay, or defraud creditors of LPG, as well as any duly appointed

22   receiver.

23   113.130.   Thus, at the time of the Transfers and transactions alleged herein

24   related to LPG client files, ACH Receivables, ACH transactions and withholding of

25   funds occurred, or as a result thereof, LPG was either:

26   a.   insolvent on the date the alleged Transfers and transactions were

27   made, or became insolvent as a result thereof;

28   b.   engaged or was about to engage in a Transfer or transaction for

1  which any property remaining with LPG was of unreasonably small capital;

2         c.      intended to incur, or believed that LPG would incur, debts beyond

3  its ability to pay as such debts matured.

4         131.   Debtor was operating a Ponzi scheme, and the Ponzi Scheme Presumption

5  creates an inference of the Debtor's actual intent to defraud within the meaning of 11

6  U.S.C. § 548(a)(1).

7         132.   Avoidance Defendants' conduct relating to the Transfers and transactions

8  alleged herein, was done with oppression, fraud and malice as defined in California

9  Civil Code section 3294, entitling Plaintiff to exemplary and punitive damages.

10        ~~114.~~133.    The alleged Transfers and transactions of the LPG's client files,

11  ACH Receivables, and funds occurred within the four years prior to the Petition Date.

12        ~~115.~~134.    At all relevant times, the alleged Transfers and transactions related

13  to LPG's client files, ACH receivable, and funds are avoidable as fraudulent pursuant

14  to 11 U.S.C. § 544(b) and California Civil Code sections 3439.04(a) and 3439.07 by

15  one or more creditors who held and hold unsecured claims against the Debtor that were

16  and are allowable against his Estate under 11 U.S.C. § 502 or that were not and are not

17  allowable only under 11 U.S.C. § 502(e), including, without limitation, the pre-petition

18  creditors.

19        ~~116.~~135.    Accordingly, the fraudulent Transfers and transactions alleged

20  herein that Diab caused LPG to make should be avoided as fraudulent under 11 U.S.C.

21  §§§ 544(b) and California Civil Code sections 3439.04(a) and 3439.07, and such

22  property, or the value thereof, should be recovered and preserved for the benefit of the

23  Estate pursuant to 11 U.S.C. §§ 550 and 551 and California Civil Code section 3439.07.

24                        **FIFTH CLAIM FOR RELIEF**

25  **Avoidance, Recovery, and Preservation of Four-Year Constructive Fraudulent**

26                                  **Transfers**

27                          ~~**(Against All Defendants)**~~

28

                                       37

**(Against Defendants Marich Bein, LLC,  GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber )**

**[11 U.S.C. §§ 544(b), 550, and 551; CAL. CIV. CODE §§ 3439.05, and 3439.07]**

~~117.~~136.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through ~~78~~135 as though set forth in full.

~~118.~~137.    At the time of the Transfers and transactions alleged herein, LPG received less than reasonably equivalent value in exchange for said Transfers.

~~119.~~138.    The Transfers, transactions and retention of LPG assets, client files, ACH Receivables and funds alleged herein, among others, left LPG insolvent. LPG scheduled $141,813,219.09 in total debt to pre-petition creditors. However, without the files, accounts receivable, and funds, the Transfers left the Debtor with approximately $12,186,500 in assets and no income stream; virtually none of those alleged $12,186,500 assets have been turned over to the Trustee despite repeated request for same.

~~120.~~139.    On or after the date that the fraudulent Transfers and transactions alleged herein were made, LPG was not paying debts to the pre-petition creditors, including, but not limited to, Validation Partners and DVF II as they came due and, based on the testimony of Diab, was forced to incur further debt obligations, including, but not limited to, emergency financing through City Capital NY in the amount of $2.95 million dollars pre-petition.

~~121.~~140.    The source of LPG client files, ACH Receivables, and funds that are the subject of the alleged fraudulent Transfers, are and were at all relevant times, assets and property of LPG and its clients.

~~122.~~141.    Diab and/or LPG retained possession and control of the files, ACH Receivables, and funds transferred to the alter egos or elsewhere after the alleged Transfers.

~~123.~~142.    By transferring LPG client files, ACH Receivables, and funds to

Marich Bein, Diab endeavored to hide and conceal LPG client files, ACH Receivables, funds, and the Transfers alleged herein.

~~124.~~143.     Diab made the Transfers alleged herein after LPG faced multiple lawsuits including those initiated by factoring companies and in order to avoid its creditor liability and abscond with assets of the Estate, including but not limited to, Validation Partners lawsuit filed on September 20, 2022 (Case No. 30-2022-01281911-CU-BC-CXC) in the Superior Court of California, County of Orange; DVF II lawsuit filed on January 23, 2023 (Case No. 30-2023-01303355-CU-CO-CXC) in the Superior Court of California, County of Orange; among others. The lawsuits sought the appointment of a receiver to perform many of the same duties of the Trustee and obtain information, an accounting of LPG funds, assets and accounts receivables and maintain the status quo, among other relief, pending the outcome of the litigation. Notably, Diab admitted the foregoing under oath at the hearing on Trustee's preliminary injunction.

~~125.~~144.     The LPG client files, ACH Receivables, and funds that were subject to the Transfers alleged herein constitute a substantial portion of LPG's pre-petition non-exempt property and assets.

///

~~126.~~145.     The Transfers and transactions alleged herein, including, but not limited to, LPG client files and/or ACH receivable transfers were made by Diab to insiders that were and/or are still under Diab's control and/or others working in concert with Diab.

~~127.~~146.     The Transfers and transactions alleged herein left LPG insolvent. LPG scheduled $141,813,219.09 in total debt to pre-petition creditors. However, without the client files, ACH Receivables, and funds, the alleged Transfers left the LPG with approximately $12,186,500 in assets and no income stream; virtually none of those alleged $12,186,500 assets have been turned over to the Trustee despite repeated request for same. Included in the assets scheduled by LPG are approximately $12,000,000 or more in funds held by Defendants.

128.147.   As such, the Transfers and transactions alleged herein left LPG with remaining assets that were unreasonably small in relation to the Transfers and transactions.

129.148.   Further, LPG was insolvent at the time of the alleged Transfers and transactions alleged herein or became insolvent as a result thereof; the exact aim of Diab's scheme to bankrupt LPG in the event a receiver was appointed.

130.149.   On or after the date that such Transfers and transactions alleged herein were made, LPG was not paying debts to the pre-petition creditors, all of which arose before the Transfers alleged herein were made, as they became due.

131.150.   Marich Bein diverted monies due Debtor to non-Debtor entities including the GoFi Entities, Vulcan, PrimeLogixPrime Logix, BAT, Inc. dba Coast Processing, Pacific Staffing, and Validation Partners among others who are subsequent transferees of the fraudulent Transfers.

151.   Defendants the GoFi Entities and Pacific Staffing also diverted monies due to Debtor to non-Debtor entities including by and between each other, and Marich Bein, Prime Logix, BAT, Inc. dba Coast Processing among others who are subsequent transferees of the fraudulent Transfers.

///

132.152.   Thus, the Transfers and transactions alleged herein were made with actual intent to hinder, delay, or defraud creditors of LPG, as well as any duly appointed receiver.

133.153.   Thus, at the time of the Transfers and transactions alleged herein related to LPG client files, ACH Receivables, ACH transactions and withholding of funds occurred, or as a result thereof, LPG was either:

a.   insolvent on the date the alleged Transfers and transactions were made, or became insolvent as a result thereof;

b.   engaged or was about to engage in a Transfer or transaction for which any property remaining with LPG was of unreasonably small capital;

c.     intended to incur, or believed that LPG would incur, debts beyond its ability to pay as such debts matured.

134.154.     The alleged Transfers and transactions of the LPG's client files, ACH Receivables, and funds occurred within the four years prior to the Petition Date.

135.155.     At all relevant times, the alleged Transfers of the LPG's client files, ACH Receivables, and funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and California Civil Code sections 3439.04(a) and 3439.07 by one or more creditors who held and hold unsecured claims against the Debtor that were and are allowable against his Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the pre-petition creditors.

136.156.     Accordingly, the Transfers alleged herein that Diab caused LPG to make should be avoided as fraudulent under 11 U.S.C. §§§ 544(b) and California Civil Code sections 3439.04(a) and 3439.07, and such property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and California Civil Code section 3439.07.

///

///

///

**SIXTH CLAIM FOR RELIEF**

**Avoidance, Recovery, and Preservation of Preferential Transfer to Defendant in Preference Period**

**(Against All Defendants Marich Bein, LLC,  Heshy Deustch, Nachman Weisz, and Israel Reches)**

**[11 U.S.C. §§ 547, 550, and 551]**

137.157.     Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 97156 as though set forth in full.

138.158.     Marich Bein claims that pursuant to the ARPA, Marich Bein transferred $12,058,335.00 to Debtor to acquire Accounts Receivables (as that term is

41

defined in the ARPA), and Debtor was guaranteed payment of not less than $37,104,601.84 under the ARPA. A true and correct copy of Marich Bein's Proof of Claim is attached as **Exhibit 4**. Thus, the obligations due to Marich Bein under the ARPA represent a debt for which Marich Bein contends LPG is liable (the "Marich Debt").

~~139.~~159.   Further, the SRA allows Marich Bein to service the Accounts Receivables and provides that Marich Bein is entitled collect and withhold additional monies due to Marich Bein under the ARPA. The SRA authorizes Marich Bein to repay the Marich Debt from the collections it received under the SRA.

~~140.~~160.   Of the $37,104,601.84, Marich Bein has paid itself back $16,989,963.23 by Debtor ("Marich Debt Payments"). Debtor made the Marich Debt Payments, which were applied to the Marich Debt, during the one-year preference period ("Preference Transfers").  The Marich Debt Payments constitute payment of an antecedent debt to or for a creditor for purposes of satisfying §547(b)(1) and (b)(2).

~~141.~~161.   Marich Bein was a non-statutory insider of Debtor as Marich Bein had a close relationship with Debtor and the transactions pursuant to the SRA and ARPA were not at arm's length. Moreover, Marich Bein used the d/b/a LPG during this time.

///

///

162.  Upon information and belief, Marich Bein acted as an officer or manager of LPG and gave directions to employees as if he was an officer and/or manager of LPG.

163.  As a *de facto* officer and/or officer of LPG, Marich Bein was an insider of LPG as that term is identified in 11 U.S.C. §101(31)(B).

~~142.~~164.   The Preference Transfers happened while LPG was insolvent.

~~143.~~165.   Debtor is also entitled to the presumption of insolvency when the Preference Transfers happened pursuant to 11 U.S.C. § 547(f).

144.166.    As a result of the Preference Transfers, Defendant recovered more than it would have received if: (i) the Debtor's case was under chapter 7 of the Bankruptcy Code; (ii) the Preference Transfers had not been made; and (iii) Defendant received payments of its debts under the provisions of the Bankruptcy Code. As evidenced by the Debtor's schedules filed in the underlying Bankruptcy Case, as well as the proofs of claim that have been received to date, the Debtor's liabilities exceed its assets to the point that unsecured creditors will not receive a full payout of their claims from the Debtor's Estate.

145.167.    In accordance with the foregoing, the Preference Transfers are voidable pursuant to 11 U.S.C. § 547(b), and may be recovered and preserved for the benefit of the estate pursuant to 11 U.S.C. §§ 550 and 551.

## SEVENTH CLAIM FOR RELIEF

### Breach of Contract

**(Against Marich Bein, LLC, Heshy Deustch, Nachman Weisz, and Israel Reches)**

168.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 167 as though set forth in full.

146.169.    The ARPA identified in Paragraph 40 above were between Marich Bein as the buyer and Debtor as the seller. Each ARPA states a purchase price in Section 2.3 of each ARPA ("Purchase Price").

///

147.170.    Marich Bein claims that pursuant to the ARPA, Marich Bein transferred $12,058,335.00 to Debtor to acquire Accounts Receivables (as that term is defined in the ARPA) and Debtor was guaranteed payment of not less than $37,104,601.00 under the ARPA.

148.171.    However, the ARPA attached to Marich Bein's Proof of Claim evidence a total amount actually paid to Debtor to be $11,101,745.75.

149.172.    The Purchase Price under the ARPA were due to the Debtor as the seller of the accounts receivables that were the subject of the ARPA, and thus, should

43

have been paid to the Debtor.

150.173.    However, $5,540,000.00 of the Purchase Price of the combined ARPA due the Debtor were diverted from Debtor and wired to non-Debtor entities, including GoFi, Vulcan, PrimeLogix, BAT, Inc. dba Coast Processing among others. Specifically, per the wire instructions, $1,200,563.85 was transferred to GoFi per the wire instructions, , and $4,339,436.15 was transferred to Vulcan per the wire instructions.

151.174.    Marich Bein breached the ARPA by diverting payments due the Debtor under the ARPA to other non-Debtor entities.

152.175.    Debtor suffered damages due to Marich Bein's breach of contract in the amount transferred from Marich Bein to non-Debtor entities, *i.e.* $5,540,000.00.

## EIGHTH CLAIM FOR RELIEF

### Conversion

### (Against All Defendants)

### (Against Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber)

### [Cal. Civ. Code § 3336]

153.176.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 97175 as though set forth in full.

154.177.    Defendants'Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber (collectively, the "Conversion Defendants") exercised dominion and control over LPG client files, ACH Receivables and funds obtained by way of processing ACH transactions on LPG client files without consent or in excess of any potential consent found to exist at the time of the alleged transactions.

155.178.    LPG and its clients owned, possessed and had a lawful right to

44

possess LPG client files, ACH Receivables and funds alleged to have been processed and retained by the Conversion Defendants. Notwithstanding the alleged fraudulent transfers of LPG client files and ACH Receivables, none of the purported transfers were made with client approval.

156.179.   The Conversion Defendants were informed and knew that all or some of funds it processed on behalf of LPG were LPG assets and/or unauthorized by LPG clients.

157.180.   Marich Bein was provided with a cease and desist letter from processing ACH transactions as fraudulent and without consent on February 6, 2023 by LPG as alleged in the Marich Bein Action. BankUnited similarly received a cease and desist letter on February 10, 2023 as alleged in the Marich Bein Action. Moreover, in addition to Defendants acting without consent, outside of the scope of any consent that may be found to have existed at the time of the alleged transactions herein, consent, if it existed at all, terminated at least as early as the time Diab revoked Marich Bein's access to DPP and caused LPG client files to be transferred to LUNA.

158.181.   On information and belief, even after Marich Bein was denied access to DPP as a result of Diab causing LPG's client files to be transferred to LUNA, Defendants continued to process ACH transactions on LPG client files with outdated client information in order to ensure the accuracy of payments, client account information, debit account information, security and to avoid double ACH transactions on client files. Moreover, these subsequent ACH transactions were processed through BankUnited and, on information and belief, BCB Bancorp as its NACHA financial institutioninstitutions.

159.182.   As scheduled by LPG and as alleged by Diab, March Bein and/or, BankUnited and/or BCB Bancorp knowingly processed, retained and controlled $12,000,000 or more of ACH transactions on LPG client files which are and were LPG assets. Pre-petition and by and through the preliminary injunction attached hereto as **Exhibit 1**, LPG and Trustee have demanded the turnover of said funds. To date no funds

45

have been turned over.

160.183.    As a result of the conversion of LPG assets alleged herein and based on the testimony of Diab, LPG was forced to incur further debt obligations, including, but not limited to emergency financing through City Capital NY in the amount of $2.95 million dollars pre-petition.

161.184.    LPG and its Estate have been harmed by the foregoing conduct which was a substantial factor in causing the harm, including, but not limited to:

a.    initiating ACH transactions on LPG client files without consent and/or exceeding the scope of any potential consent found to have existed at the time of the transactions;

b.    processing ACH transactions after access to LPG client files was denied;

c.    retaining LPG assets and funds obtained by way of the foregoing ACH transactions; and

d.    failing to turnover said funds upon demand and/or order of the Court.

162.185.    As a result of the foregoing harm, LPG and its Estate have been harmed in amount to be proven at trial in accordance with California Civil Code section 3336, including, but not limited to, the value of the property at the time of conversion, with interest from that time and a fair compensation for the time and money properly expended in pursuit of the property.

///

///

///

**NINTH CLAIM FOR RELIEF**

**Turnover of Estate Property**

**(Against All Defendants)**

**(Against Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber)**

**[11 U.S.C. § 542]**

163.186.   Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 107185 as though set forth in full.

164.187.   One or all of Conversion Defendants have possession or control over property of the Estate, including, but not limited to, LPG client files, ACH Receivables, and funds; including LPG's assets totaling $12,000,000 or more based on Debtor's Bankruptcy schedules. None of the $12,000,000 or more in pre-petition payment assets have been turned over to the Trustee.

165.188.   LPG's client files, ACH Receivables, funds, and potentially other property are property of the Estate and are not of inconsequential value to the Estate.

166.189.   LPG's client files, ACH Receivables, and funds that are the subject of the transfers and transactions alleged herein were paramount to the operation of LPG and its ability to pay creditors pre-petition. As a result of the alleged transfers and transactions alleged herein and based on the testimony of Diab, LPG was forced to incur further debt obligations, including, but not limited to, emergency financing through City Capital NY in the amount of $2.95 million dollars pre-petition.

167.190.   Accordingly, the Trustee is entitled to a judgment for turnover of the files, accounts receivable, and funds pursuant to 11 U.S.C. § 542.

///
///
///
///
///

**TENTH CLAIM FOR RELIEF**

**Racketeer Influenced and Corrupt Organizations Act Violations**

47

**(Against Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber)**

**[18 U.S.C. § 1962]**

191. Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 190 as though set forth in full.

**a. The Unlawful Activity**

192. Several predicate acts underlie this claim for relief based on information known to date. First, Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Tony Diab, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber's (collectively, the "RICO Defendants") activities and transfers, as detailed herein, were done in furtherance of LPG's Ponzi scheme. Second, Marich Bein, by and through its owners, operators and/or directors Diab, Deutsch, Reches and upon information and belief, Weisz, diverted monies due Debtor pursuant to the ARPA. Third, the RICO Defendants obtained dominion and control over LPG client files, ACH Receivables and funds by way of processing ACH transactions on LPG client files without consent or in excess of any potential consent found to exist at the time of the alleged transactions. Fourth, the RICO Defendants engaged in wire fraud by directing ACH transactions described herein and movement of funds to the other Defendants.

**b. The Culpable Persons**

193. The RICO Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation or limited liability company capable of holding a legal interest in property. At all material times, RICO Defendants were persons that exist separate and distinct from the Enterprise, described below.

194. On information and belief, Marich Bein, by and through its owners, operators and/or directors Deutsch, Reches and, upon information and belief, Weisz, the

GoFi Entities and Pacific Staffing, by and through their owner, operator and/or director Kohlschreiber, Vulcan, by and through its owner, operator and/or director Cohen, and Prime Logix engaged in the activities and transfers detailed herein in furtherance of LPG's Ponzi Scheme, as well as wire fraud.

**a.  The Enterprise**

195.  RICO Defendants constitute an Enterprise (the "Enterprise) within the meaning of 18 U.S.C. §§ 1961(4) and 18 U.S.C. 1962(c).

196.  The Court's order in the 1046 Action wherein it denied the Motion of Greyson Law Center to Vacate the Preliminary Injunction previously entered, the Court stated: "…*it is clear to this Court that Debtor, since its pre-petition inception (and through the time of the appointment of the Chapter 11 Trustee) was in the Court's opinion, operating a criminal enterprise*."  (Case No. 8:23-bk-10571-SC; Adv. No. 8:23-ap-01046-SC [Bankr. Docket No. 1545, p. 3 (emphasis in original)].)

197.  RICO Defendants are associated in fact through relations with one another for the common purpose of carrying on an ongoing unlawful enterprise.  The Enterprise has a common goal of furthering LPG's Ponzi scheme.

198.  Since at least 2021, and continuing to date, the members of the Enterprise have had ongoing relations with each other through common control, ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of furthering LPG's Ponzi Scheme.

199.  The Enterprise's activity constitutes "financial institution fraud" within the meaning of 18 U.S.C. § 1343, which is "racketeering activity" as defined by 18 U.S.C. § 1961(1).  RICO Defendants' repeated and continuous use of and engaging in such conduct, including directing ACH transactions and transfers to participate in the affairs of the Enterprise constitutes a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

200.  The Enterprise's activity also constitutes "wire fraud" within the meaning of 18 U.S.C. § 1343, which is "racketeering activity" as defined by 18 U.S.C. § 1961(1).

1  The repeated and continuous use of and engaging in such conduct, including the ACH

2  transfers to participate in the affairs of the Enterprise constitutes a pattern of

3  racketeering activity in violation of 18 U.S.C. § 1962(c).

4      201. The RICO Persons have organized themselves and the Enterprise into a

5  cohesive group with specific responsibilities and a command structure to operate as a

6  unit in order to accomplish the common goals of furthering LPG's Ponzi scheme and

7  controlling and effectuating the fraudulent transfers detailed herein, including:

8      202. Marich Bein, on information and belief, maintains offices, books, records

9  and bank accounts, some independent of those of the other RICO Defendants but

10  maintained in coordination with them.

11      203. The GoFi Entities, on information and belief, maintains offices, books,

12  records and bank accounts, some independent of those of the other RICO Defendants

13  but maintained in coordination with them.

14      204. Vulcan, on information and belief, maintains offices, books, records and

15  bank accounts, some independent of those of the other RICO Defendants but maintained

16  in coordination with them.

17      205. Prime Logix, on information and belief, maintains offices, books, records

18  and bank accounts, some independent of those of the other RICO Defendants but

19  maintained in coordination with them.

20      206. Pacific Staffing, on information and belief, maintains offices, books,

21  records and bank accounts, some independent of those of the other RICO Defendants

22  but maintained in coordination with them.

23      207. Deutsch, , Cohen, Reches, Kohlschreiber, and, on information and belief,

24  Weisz and other officers, employees and investors, have operated, engaged and/or

25  conspired with Marich Bein, the GoFi Entities, Prime Logix, and Pacific Staffing.

26  ///

27      208. Pursuant to their membership in the Enterprise, Marich Bein, the Gofi

28  Entities, Vulcan, Prime Logix, and Pacific Staffing have (i) acted through Deutsch,

Reches, Weiss, Cohen, Kohlschreiber, and their officers and employees to participate in and further LPG's Ponzi scheme by controlling and effectuating the fraudulent transfers; (ii) pooled their funds with those of the investors in order to fund the Enterprise and further the Ponzi scheme; (iii) entered into various agreements detailed herein, including ARPAs and the SRA, with the fraudulent purpose of furthering the Ponzi scheme; and (iv) set up, coordinated, and implemented the fraudulent ACH withdrawals and transactions used by the Enterprise in furtherance of the Ponzi scheme.

209.  Deutsch, , Cohen, Kohlschreiber, and upon information and belief, Weisz, as owners of Marich Bein, the GoFi Entities, Vulcan, Prime Logix, and/or Pacific Staffing are the masterminds of the Enterprise.  They are responsible for the day-to-day operations and have final say on all business decisions of the Enterprise including, without limitation, directing, coordinating, facilitating and receiving the ACH transactions described herein.

210. In their capacities as masterminds of the Enterprise Deutsch, Cohen, Reches, Kohlschreiber, and upon information and belief, Weisz, are responsible for creating, approving and implementing policies, practices and instrumentalities used by the Enterprise to accomplish its goals and purposes including, the form of agreements used by the Enterprise in attempts to disguise the Ponzi scheme and unlawful transfers of money, and the form and method of collecting and transferring ACH payments.

211.  Deutsch, Cohen, Reches, Kohlschreiber, and upon information and belief, Weisz, have also taken actions and directed other members of the Enterprise, and those they employed or retained, to take action necessary to accomplish the overall goals and purposes of the Enterprise including, without limitations, funding the Enterprise, directing members of the Enterprise to further the Ponzi scheme by, among other things, coordinating, facilitating, and directing payments and transfers of monies and executing documents in furtherance of concealing the true nature of their fraudulent and criminal activity related to the Enterprise and the Ponzi scheme.

212.  Deutsch, Cohen, Reches, Kohlschreiber, and upon information and belief,

1    Weisz, benefitted from the Enterprise's foregoing conduct.

2        213.  On information and belief, Deutsch, Cohen, Reches, Kohlschreiber, and

3    upon information and belief, Weisz, employed or retained others, individually and

4    through the entity Reches & Associates, to help facilitate the Enterprise and to

5    coordinate the fraudulent transfers of money as detailed herein.

6        214.  The Enterprise is engaged in interstate commerce and uses and has used

7    the instrumentalities of interstate commerce in its daily activities. Members of the

8    Enterprise maintain offices in Florida, New York, California, Wyoming, and/or

9    Delaware and use personnel in these offices to direct, coordinate and execute transfers

10    detailed herein, and to draft, approve, and ratify the Enterprise's efforts, agreements,

11    legal proceedings, and other financial agreements in furtherance of the Enterprise made

12    with each other and other entities in throughout the United States via extensive use of

13    mail, interstate e-mails, wire transfers, and bank withdrawals processed through

14    automated clearing houses.

15        215.  In this Bankruptcy Case, communications between members of the

16    Enterprise and Debtor were by mail, interstate e-mail, wire transfers, ACH debts and

17    other interstate wire communications.

18        216.  Plaintiff and Debtor's Estate and its creditors have been and will continue

19    to be injured by reason of the Enterprise's violations of 18 U.S.C. § 1962(c).

20        217.  The injuries directly, proximately, and reasonably foreseeably resulting

21    from or caused by these violations include, without limitation, hundreds of thousands

22    of dollars in improperly transferred and acquired monies.

23        218.  Plaintiff and Debtor's Estate also have suffered damages by incurring

24    attorney's fees and costs associated with the prosecution of Defendants' unlawful

25    activities.

26    ///

27        219.  Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover triple

28    damages and costs of suit, including attorney's fees, from Defendants.

**ELEVENTH CLAIM FOR RELIEF**

**Conspiracy**

**(Against Defendants Marich Bein, LLC,  GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Isael Reches, and Nicholas Kohlschreiber)**

**[18 U.S.C. § 1962(d)]**

220.  Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 219 as though set forth in full.

221.  Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Israel Reches, Nachman Weisz, and Nicholas Kohlschreiber ("Conspiracy Defendants") have unlawfully, knowingly and willfully, combined, conspired and agreed together to engage in activities that violate 18 U.S.C. § 1962(c), as alleged above, in violation of 18 U.S.C. § 1962(d).

222.  By and through Conspiracy Defendants' business relationships with one another, their coordination with one another in the affairs of the Enterprise, and the frequent e-mail and other communications among the Conspiracy Defendants concerning the Ponzi scheme and fraudulent transfers. Each Conspiracy Defendant knew the nature of the Enterprise and each Conspiracy Defendant knew that the Enterprise extended beyond each Defendant's individual role.  Moreover, through the same connections and coordination, each Conspiracy Defendant knew that the other Defendants were engaged in a conspiracy to collect upon the unlawful debts in violation of 18 U.S.C. § 1962(c).

223.  Marich Bein, through its owners, operators, directors, and/or controllers Deustch, Reches, and Weisz, held accounts at BankUnited and BCB Bancorp in its name for the sole purpose of directing, coordinating, effectuating, and processing Debtor's fraudulent ACH transfers of client funds and money. The GoFi Entities, by and through their owner, operator, director, and/or controller Kohlschreiber, acted as an intermediary between Prime Logix, Marich Bein and LPG by receiving, controlling,

53

1    effectuating and transferring the fraudulent transfers of money.

2    224. Prime Logix also served as an intermediary between the GoFi Entities,

3    Marich Bein, and LPG by receiving, controlling, effectuating and transferring the

4    fraudulent transfers of money.

5    225. Each Conspiracy Defendant agreed to facilitate, conduct and participate in

6    the conduct, management, and/or operation of the Enterprise's affairs in order to

7    conceal, further, and perpetuate the Ponzi scheme in violation of 18 U.S.C. § 1962(c).

8    Each Conspiracy Defendant was a knowing, willing and active participant in the

9    Enterprise and its affairs, and each of the Defendants shared a common purpose, which

10    was the orchestration, planning, preparation and execution of the scheme.

11    226. Each Conspiracy Defendant agreed to facilitate, conduct and participate,

12    directly or indirectly, in the management and/or operation of the Enterprise's affairs in

13    order to commit wire fraud through a pattern of racketeering activity in violation of 18

14    U.S.C. § 1982(c).

15    227. The participation and agreement of each Conspiracy Defendant was

16    necessary to implement and perpetuate the commission of the scheme.

17    228. Plaintiff and the Debtor's Estate and its creditors have been and will

18    continue to be injured by reason of Defendants' conspiracy in violation of 18 U.S.C. §

19    1962(d), in amounts to be determined at trial.

20    229. The injuries to Plaintiff and the Debtor's Estate and to its creditors directly,

21    proximately and reasonably foreseeably resulting from and caused by these violations

22    of 18 U.S.C. § 1962(d) include, without limitation, hundreds of thousands of dollars in

23    improperly transferred and acquired monies.

24    230. Plaintiffs and the Debtor's Estate also suffered damages by incurring

25    attorney's fees and costs associated with the prosecution of Defendants' unlawful

26    activities.

27    231. Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover triple

28    damages and costs of suit, including attorney's fees, from Defendants.

# TWELFTH CLAIM FOR RELIEF

## Aiding and Abetting

### (Against Defendants Marich Bein, LLC,  GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber)

### [18 U.S.C. § 2]

232. Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 231 as though set forth in full.

233. Defendants Cohen, Reches, Deustch, Kohlschreiber, and upon information and belief, Weisz, individually and through the GoFi Entities, Vulcan, Prime Logix, and/or Pacific Staffing, (collectively, "Aiding and Abetting Defendants"), as well as Validation Partners had knowledge of the fraudulent transactions, transfers and agreements that were used to perpetuate and conceal the Ponzi scheme and fraudulent transfers.

234. Aiding and Abetting Defendants, with the foregoing knowledge, intended to, and did, help the other Defendants and Debtor in perpetuating and concealing the Ponzi scheme and fraudulent transfers of money.

235. At all material times, Aiding and Abetting Defendants had the intent to facilitate and conceal the Ponzi scheme and fraudulent transfers of money.

236. Aiding and Abetting Defendants assisted, and did actually engage in, the commission of Defendants' fraud, unlawful Enterprise, and Ponzi scheme by coordinating, facilitating, and directing payments and transfers of monies and executing documents in furtherance of concealing the true nature of their fraudulent and criminal activity related to the Enterprise and the Ponzi scheme.

237. The injuries to Plaintiff, the Debtor's Estate and to its creditors directly, proximately and reasonably foreseeably resulting from and caused by these violations of 18 U.S.C. §§ 1962(d), 1964(c), and 2 include, without limitation, hundreds of thousands of dollars in improperly transferred and acquired monies.

238. Plaintiff and the Debtor's Estate also suffered damages by incurring attorney's fees and costs associated with the prosecution of Aiding and Abetting Defendants' unlawful activities.

239. Pursuant to 18 U.S.C. §§ 1962(d), 1964(c), and 2, Plaintiff is entitled to recover triple damages and costs of suit, including attorney's fees, from Defendants.

### THIRTEENTH CLAIM FOR RELIEF

### Aiding and Abetting

### (Against Defendants BankUnited, N.A. and BCB Bancorp, Inc.)

### [18 U.S.C. § 2]

240. Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 239 as though set forth in full.

241. Defendants BankUnited and BCB Bancorp (collectively, "Bank Defendants"), through their employees, agents, and/or representatives, were aware that the monies deposited, transferred and maintained in the accounts of Defendants Marich Bein, the GoFi Entities, Vulcan, Prime Logix, and Pacific Staffing and/or their affiliates were used to perpetuate the Ponzi scheme and/or their conduct were in breach of their fiduciary duties.

242. The Bank Defendants were used independently and in conjunction to hold client funds, receivables, and operating expenses and were also leveraged for processing payments, particularly through ACH transactions, to execute the fraud, Ponzi scheme, and other illegal acts described above in furtherance of the criminal enterprise.

243. Bank Defendants knew or should have known exceptional returns for clients and comingling of significant amounts of client monies with both small and large investors involved are two hallmarks of a Ponzi scheme. *Gonzalez v. Lloyds TBS Bank, PLC*, 532 F. Supp. 2d 1200, 1207 (C.D. Cal. 2006).

///

244. Bank Defendants, with the foregoing knowledge, intended to, and did, help the other Defendants and Debtor in perpetuating and concealing the Ponzi scheme, and

the other illegal acts described above and assisted in the commission of Defendants' fraud, unlawful Enterprise, and Ponzi scheme by facilitating financial transactions and/or permitting the transfer of significant amounts of monies in and out of Defendants' bank accounts.

245.  Further, the Bank Defendants failed to perform their regulatory obligations related to account monitoring and the processing of ACH transactions, including Know Your Customer (KYC) and Bank Secrecy Act (BSA) protocols and NACHA regulations, and did not investigate the red flags raised by the numerous unusual ACH and other transactions, involved in the criminal enterprise even after receiving notice of issues related to the same.

246.  Bank Defendants also substantially assisted in the illegal acts and criminal enterprise set forth above by processing unauthorized ACH transfers and failing to investigate suspicious transactions and red flags, such as repeated transfers to the same third-party entities and transfers that deviated significantly from  typical transactional patterns, in turning a blind eye to these criminal activities the Bank Defendants directly facilitated the fraud, the Ponzi scheme and overall criminal enterprise described above.

247.  The injuries to Plaintiff and the Debtor's Estate and to its creditors directly, proximately and reasonably foreseeably resulting from and caused by these violations of 18 U.S.C. §§ 1962(d) and 1964(c), and include, without limitation, hundreds of thousands of dollars in improperly transferred and acquired monies.

248. Plaintiff and the Debtor's Estate also suffered damages by incurring attorney's fees and costs associated with the prosecution of Defendants' unlawful activities.

249. Pursuant to 18 U.S.C. §§ 1962(d), 1964(c), and 2, Plaintiff is entitled to recover triple damages and costs of suit, including attorney's fees, from the Bank Defendants.

**FOURTEENTH CLAIM FOR RELIEF**

**Declaratory Relief**

250. Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 249 as though set forth in full.

251. An actual controversy exists between Plaintiff and Defendants regarding the enforceability of the ARPA and SRA.

252. Plaintiff contends the ARPA and SRA are void and unenforceable, as detailed above. The ARPA is fraudulent as the client files were sold to other entities without client consent and with the purpose to defraud LPG creditors. The SRA was made without consideration to LPG. Additionally, Plaintiff contends the Transfers made to perpetuate the Ponzi scheme constitute wire fraud. Defendants dispute Plaintiff's contentions.

253. A judicial determination of the rights, duties and obligations of Plaintiff and Defendants, therefore, is appropriate.

## RESERVATION OF RIGHTS

~~168.~~254.    Plaintiff reserves the right to bring all other claims or causes of action that the Plaintiff may have against any of the defendants, on any and all grounds, as allowed under the law or in equity, including but not limited to, those claims not known by the Trustee at this time but that he may discover during the pendency of this adversary proceeding.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for a judgment as follows:

**On the First Claim for Relief:**

1.    Control over ACH Transfers: Entry and enforcement of the preliminary injunction ordered by the court [Dkt No. 70] prohibiting interference with any ACH Transfer being executed pursuant to documents authorizing such transfers to be executed in favor of LPG as follows:

///

a.    Covered Entities and Individuals: The following entities and individuals, and anyone acting on their behalf:  LPG, Oakstone; Greyson; Phoenix;

58

Maverick; LGS Holdco, LLC; CLG; Vulcan; Coast Processing; Prime Logix; Tony Diab; Rosa Loli aka Rosa Bianca Loli aka Bianca Loli; Lisa Cohen, Dan March, Ty Carss, Eng Heng and all other aliases, agents, or corporate entities affiliated with same shall, absent further order from this Court:

b.    Enjoined Conduct re ACH Instructions: No covered entity or individual shall initiate, cause to be initiated, or instruct any company or person that processes ACH transfers and/or their affiliated financial institution including Marich Bein and BankUnited, N.A.; and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875" or any such substantially similar ACH identification transaction, to execute any ACH EFT on any file, financial institution, or current or former client of LPG, to or for the benefit of LPG without the express written authorization of Trustee;

c.    Enjoined Conduct re Bank Accounts: No covered entity or individual shall open, or cause to be opened, any account, whether business or personal, that can receive or send money or anything of value, at any company including banking, financial, or similar institution and/or receive, directly or indirectly, any funds drawn from ACH Transfers;

2.    Execution of ACH Transfers: Entry and enforcement of the preliminary injunction ordered by the court [Dkt No. 70] prohibiting interference with any ACH Transfer being executed pursuant to documents authorizing such transfers to be executed in favor of LPG as follows:

a.    Covered Entities and Individuals: All companies capable of processing ACH transfers including Marich Bein and BankUnited, N.A.; and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875," or any such substantially similar ACH identification transaction, are enjoined absent further order of this court, from:

i.    Enjoined Conduct re ACH Transfers: No covered entity or individual shall initiate or receive funds from any ACH EFT on any file, financial

institution, or current or former client of LPG, to or for the benefit of LPG or any one or more of its alleged assignees or transferees;

   ii. <u>Injunction Mandating Turnover to Trustee</u>: All covered entities or individuals shall hold in trust any and all funds, receipts, and transfers related to any account, file, or current or former client of LPG, or any one or more of its alter egos or fraudulent transferees,  until expressly directed to release, wire or transfer such funds by the Trustee and to a bank account whose information shall be provided with any such request; and, shall upon request by the Trustee provide an accounting of any and all such funds held in trust to the Trustee upon written request within 10 days of said request;

  b. enjoining LPG, or any one or more of its alter egos or fraudulent transferees from incurring, taking out, or pledging any receivables of LPG or any one or more of its alter ego entities without seeking leave of court;

  c. enjoining LPG, or any one or more of its alter egos or fraudulent transferees from instructing any person and/or Client to cancel and/or demand a refund from LPG;

  3. For entry of an order amending the preliminary injunction order [Dkt No. 70] requiring Defendants to turnover all pre-petition client files, documents, ACH information, funds and fees for every transaction processed from March 20, 2019 to the present.

**On the Second and Third Claims for Relief:**

  4. Avoiding, recovering, and preserving the two-year transfers against all Defendants: Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber.

///

**On the Fourth and Fifth Claims for Relief:**

5.    Avoiding, recovering, and preserving the four-year transfers against all Defendants: Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber.

**On the ~~Sixth~~Second and Fourth Claim for Relief**:

6.    Awarding punitive and exemplary damages according to proof.

**On the Seventh Claim for Relief:**

7.    Awarding Plaintiff general damages in the total aggregate amount of not less than $5,540,000.

8.    For attorney's fees and costs.

**On the Eighth Claim for Relief:**

~~6.~~9.    Ordering turnover to the Trustee of all funds obtained by way of processing ACH transactions against LPG client files from March 20, 2019 through the present that have not already been remitted to LPG and/or the Trustee.

~~7.~~10.    For attorney's fees and costs expended in pursuit of the property. Cal. Civil Code § 3336.

~~8.~~11.    For pre-judgment interest from the date of conversion. Cal. Civil Code § 3336.

**On the ~~Seventh~~Ninth Claim for Relief**:

~~9.~~12.    Ordering turnover to the Trustee of the following:

a.    All Client files, including, but not limited to, names, contact information, client file management, communications, account information, letters, pleadings, communications, payment history, financial account information, credit reports, executed legal services contracts, ACH contracts, executed installment contracts, account balances, debts in dispute, payment history, file status, settlements, debt invalidations and/or any other information created, managed and stored electronically utilizing DPP software program's software license, key or account, that

1   was opened and is maintained and controlled by LPG, or any one or more of its alter

2   egos, including, but not limited to, Defendants;

3            b.    All administrative usernames and passwords that give the Trustee

4   access to any account held, maintained or controlled by LPG, or any one or more of its

5   alter egos;

6            c.    All ACH files related to Client information, details, accounts,

7   history of EFTs, payments, amounts held, interest on held amounts, penalty fees,

8   nonsufficient fund fees or other ACH related charges to the Clients stored electronically

9   or in hard copy associated with ACH processing service providers and/or affiliated

10  financial institutions, including, but not limited to, Marich Bein and BankUnited, N.A.

11  and/or any entity associated with the ACH identification transaction "LPG 949-226-

12  6262 #5 2363 RT 9 TOMS RIVER NJ 0875", or any such substantially similar ACH

13  identification transaction;

14          d.    All files, information, reports, spreadsheets, account numbers,

15  routing numbers, and databases related to transfer of funds out of any account opened,

16  maintained and controlled by LPG, or any one or more of its alter egos, that were

17  processed and executed by ACH processing service providers and/or their affiliated

18  financial institutions, including, but not limited to, Marich Bein and BankUnited, N.A.

19  and/or any entity associated with the ACH identification transaction "LPG 949-226-

20  6262 #5 2363 RT 9 TOMS RIVER NJ 0875", or any such substantially similar ACH

21  identification transaction;

22          e.    All administrative usernames and passwords that give the Trustee

23  access to any ACH processing accounts, software, database or other program at ACH

24  processing service providers and/or affiliated financial institutions, including, but not

25  limited to, Marich Bein and BankUnited, N.A. or any entity associated with the ACH

26  identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875",

27  or any such substantially similar ACH identification transaction, used to upload or input

28  Client information, initiate Client ACH EFTs, transfer Client ACH funds to outside

financial institutions or otherwise manage any account opened, maintained and controlled by LPG, or any one or more of its alter egos,;

f.     All accounting records, files, data and information obtained, received or prepared for using LPG client files and/or ACH information by Defendants, or any one or more of LPG's alter egos and stored on NetSuite; QuickBooks and Microsoft SharePoint; G-Suite or other permanent or cloud based systems;

g.     All contracts, records, reports, information, data and details regarding the transfer or sale of any client files or future Client ACH payments to Defendants and/or any other law firm, organization, corporate entity, person(s), or investment group (otherwise known as factoring companies);

h.     All contracts, records, reports, information, data, cost basis, payment information and details regarding the transfer or receipt of any Client files or future Client ACH payments from any other law firm, organization, corporate entity, person(s), investment or marketing group (otherwise known as capping companies) to LPG or any one or more of its alter egos;

i.     All ACH payments originating from LPG client files, or any one or more of its alter egos or fraudulent transferees, including, but not limited to, Defendants from March 20, 2019 to the present.

**On the Tenth and Eleventh Claim for Relief**:

13.     Awarding Plaintiff monetary damages in the amount of all funds obtained by Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber by way of processing ACH transactions against LPG client files from March 20, 2019.

14.     Awarding treble damages.

15.     Awarding costs of suit, including attorney's fees.

///

///

**On the Twelfth and Thirteenth Claims for Relief**:

16.    Awarding Plaintiff compensatory damages in an amount to be determined at trial.

**On the Fourteenth Claim for Relief**:

17.    Declaring that the ARPA and SRA are void and unenforceable, that the ARPA is fraudulent as the client files were sold to other entities without client consent and with the purpose to defraud LPG creditors, that the SRA was made without consideration to LPG, and that the Transfers made to perpetuate the Ponzi scheme constitute wire fraud.

**On All Claims for Relief:**

18.    Awarding pre-judgment interest at the maximum legal rate.

19.    Awarding post-judgment interest at the maximum rate from the date of the last Transfer until the judgment is paid in pull.

20.    Awarding costs of suit incurred herein.

~~10.~~21. Granting any other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: February 12, 2025

DINSMORE & SHOHL LLP


By:  _____
    Christopher B. Ghio
    Richik Sarkar
    Veneeta Jaswal
    Special Counsel to Richard A. Marshack, former Chapter 11 Trustee and current Liquidating Trustee

# EXHIBIT B

CHRISTOPHER B. GHIO (259094)
christopher.ghio@dinsmore.com
VENEETA JASWAL (320108)
veneeta.jaswal@dinsmore.com
DINSMORE & SHOHL LLP
655 West Broadway, Suite 800
San Diego, California 92101
Tele:  619.400.0500
Fax:   619.400.0501

RICHIK SARKAR (OH 0069993)
*Admitted pro hac vice*
richik.sarkar@dinsmore.com
Cleveland, Ohio 44114
Tele: (216) 413-3838
Fax: (216) 413-3839

Special Counsel to Richard A. Marshack, former Chapter 11 Trustee for the Bankruptcy Estate of The Litigation Practice Group P.C., and current Liquidating Trustee of the LPG Liquidating Trust

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>THE LITIGATION PRACTICE GROUP P.C.,<br><br>Debtor. | Bankr. Case No. 8:23-bk-10571-SC<br><br>Related Adv. Proceeding: 8:23-ap-01046-SC<br><br>Adv. Proc. No. 8:24-ap-011040-SC<br><br>Chapter 11 |
| RICHARD A. MARSHACK, Chapter 11 Trustee,<br><br>Plaintiff,<br><br>v.<br><br>MARICH BEIN, LLC, a New York Limited Liability Corporation; BANKUNITED, N.A., a Florida based National Banking Association; GOFI LLC, a California Limited Liability | **TRUSTEE'S FIRST AMENDED COMPLAINT FOR:**<br><br>**(1) INJUNCTIVE RELIEF;**<br><br>**(2) AVOIDANCE, RECOVERY, AND PRESERVATION OF TWO-YEAR ACTUAL FRAUDULENT TRANSFERS;**<br><br>**(3) AVOIDANCE, RECOVERY, AND PRESERVATION OF TWO-** |

1

Company; VULCAN CONSULTING
GROUP, LLC, a California Limited
Liability Company; BCB BANCORP,
INC. d/b/a BCB COMMUNITY BANK,
a New Jersey Corporation; PACIFIC
STAFFING, LLC, a Delaware Limited
Liability Corporation; CALLFI, LLC a
Delaware Limited Liability Corporation;
ACUFI, LLC, a Delaware Limited
Liability Corporation;   LISA COHEN,
individually; HESHY DEUSTCH,
individually; NACHMAN WEISZ,
individually; NICHOLAS
KOHLSCHREIBER, individually;
ISRAEL RECHES, individually; and,
DOES 1 through 10, inclusive,

Defendants.

**YEAR CONSTRUCTIVE
FRAUDULENT TRANSFERS;**

**(4)  AVOIDANCE, RECOVERY, AND
PRESERVATION OF FOUR-
YEAR ACTUAL FRAUDULENT
TRANSFERS;**

**(5)  AVOIDANCE, RECOVERY, AND
PRESERVATION OF FOUR-
YEAR CONSTRUCTIVE
FRAUDULENT TRANSFERS;**

**(6)  AVOIDANCE, RECOVERY AND
PRESERVATION OF
PREFERENTIAL TRANSFER
MADE WITHIN ONE YEAR OF
THE PETITION DATE;**

**(7)  BREACH OF CONTRACT;**

**(8)  CONVERSION;**

**(9)  TURNOVER;**

**(10) RACKETEER INFLUENCED
AND CORRUPT
ORGANIZATIONS ACT
VIOLATIONS;**

**(11) CONSPIRACY;**

**(12) AIDING AND ABETTING
AGAINST MARICH BEIN, LLC,
GOFI, LLC, PACIFIC STAFFING,
LLC, CALLFI, LLC, ACUFI, LLC,
LISA COHEN, HESHY
DEUSTCH, NACHMAN WEISZ,
ISRAEL RECHES, AND
NICHOLAS KOHLSCHREIBER;**

**(13) AIDING AND ABETTING
AGAINST BANKUNITED, N.A.
AND BCB BANCORP, INC.; AND**

**(14) DECLARATORY RELIEF**

Judge:   Hon. Scott C. Clarkson

For his *Complaint and causes of action initially filed in the main Adversary Proceeding No. 8:23-ap-01046-SC ("1046 Action") and having severed his claims from the 1046 Action, now brings this action against Defendants for (1) Injunctive Relief; (2) Avoidance, Recovery, and Preservation of Two-Year Actual Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of Two-Year Constructive Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of Four-Year Actual Fraudulent Transfers; (5) Avoidance, Recovery, and Preservation of Four-Year Constructive Fraudulent Transfers*; *(6) Avoidance, Recovery and Preservation of Preferential Transfer Made Within Ninety Dates of the Petition Date; (7) Breach of Contract; (8) Conversion; (9) Turnover; (10) Racketeer Influenced and Corrupt Organizations Act Violations (11) Conspiracy; (10) Aiding and Abetting Fraud and Conversion; (11); (12) Aiding and Abetting against Marich Bein, LLC, GoFi LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Choen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber; (13) Aiding and Abetting against BankUnited, N.A. and BCB Bancorp, Inc.; and (13) Declaratory Relief* (the "Complaint"). Plaintiff Richard A. Marshack, f o r m e r Chapter 11 Trustee ("Trustee" or "Plaintiff") for the bankruptcy estate (the "Estate") of Debtor The Litigation Practice Group, PC (the "Debtor" or "LPG") and current liquidating Trustee of the LPG Liquidating Trust ("Trustee" or "Plaintiff"), in the above-captioned bankruptcy case (the "Bankruptcy Case"), alleges and avers as follows:

**STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE**

1.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the United States District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), and which is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "Court"). Regardless of whether this proceeding is core, non-

core, or otherwise, the Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court. Defendants are hereby notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires Defendants to plead whether consent is given to the entry of a final order and judgment by the bankruptcy court. Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to the Debtor's pending Bankruptcy Case.

2. Regardless of whether this proceeding is core, non-core, or otherwise, Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court.

3. Defendants are notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires Defendants to plead whether consent is given to the entry of a final order and judgment by the Bankruptcy Court.

4. Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to Debtor's pending Bankruptcy Case.

**THE PARTIES**

5. Plaintiff Richard A. Marshack is the former Chapter 11 Trustee for the Bankruptcy Estate of The Litigation Practice Group P.C., and the current Liquidating Trustee of the LPG Liquidating Trust.

6. Debtor LPG is, and at all material times was, a professional corporation organized, existing, and in good standing under the laws of the State of California, with its principal place of business in Tustin, California.

7. Defendant Marich Bein, LLC ("Marich Bein") is, and at all material times was, a New York limited liability corporation organized, existing, and in good standing under the laws of the State of New York. Marich Bein filed its Articles of Incorporation in the State of New York on or about August 18, 2022. On August 19, 2022, the New York Department of State Records indicate Marich Bein was using the assumed name "LPG" listing LPG's Tustin, California phone number (949-299-6262) as its own. On information and belief, some or all wire transfers from Marich Bein to LPG, when they

4

occurred, were identified with the ACH transaction ID "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875." Marich Bein was retained and/or under the control of Heshy Deustch ("Deustch"), Nachman Weisz ("Weisz"), and Tony Diab ("Diab") until the relationship between Marich Bein and LPG degraded as alleged herein. Marich Bein processed and controlled LPG ACH transactions with Deustch's and Diab's authorization, however, without the authority of LPG itself or its authorized agent Daniel March. Marich Bein also obtained, was provided or misappropriated a copy of LPG client payment information prior to LPG's Bankruptcy filing which, on information and belief, it has in its possession.

8.      Defendant BankUnited, NA, ("BankUnited") is, and at all material times was, a NACHA approved financial institution insured by the FDIC with its principal place of business in Miami Lakes, Florida. Through DebtPayPro ("DPP"), LPG utilized the services of BankUnited as its NACHA compliant ACH financial institution necessary for entities, such as Marich Bein, to initiate and debit client accounts as indicated by the LPG client payment history detail screen contained in DPP.

9.      Defendant BCB Bancorp, Inc. d/b/a BCB Community Bank ("BCB Bancorp") is, and at all material times was, a New Jersey corporation with its principal place of business located in Bayonne, New Jersey. Upon information and belief, the services of BCB Bancorp as a NACHA compliant ACH financial institution were necessary for entities, such as Marich Bein, to initiate and debit client accounts and utilized to advance illegal activity.

10.     Defendant GoFi LLC ("GoFi"), also known as AcuFi, LLC ("AcuFi"), and CallFi, LLC ("CallFi"), (collectively, "GoFi Entities") is, and at all material times represented that it was, a limited liability company, existing under the laws of the State of California. GoFi Entities received monies due to LPG under purchase agreements, identified later in this pleading, from Marich Bein.

11.     Defendant Vulcan Consulting Group LLC, also known as VCG, LLC, (collectively, "Vulcan") is, and at material times was, a California limited liability

5

company organized, existing, and in good standing under the laws of the State of California. Vulcan filed its Articles of Organization on or about December 15, 2019. Vulcan was retained and/or under the control of Lisa Cohen until Diab took over control of Vulcan on or about September 23, 2023. Vulcan received monies due to LPG under purchase agreements, identified later in this pleading, from Marich Bein.

12.     Prime Logix, LLC ("Prime Logix") is, and at material times was, a Wyoming limited liability company.  Prime Logix served as an intermediary entity between the GoFi Entities and received monies due to LPG.

13.     Defendant Pacific Staffing, LLC ("Pacific Staffing") is, and at all material times was, a limited liability company existing under the laws of the State of Delaware. Pacific Staffing served as an intermediary between Prime Logix and the GoFi Entities and received monies due to LPG.

14.     Defendant Lisa Cohen ("Cohen") is, and at all material times was, an individual residing in the State of California. Cohen controlled Vulcan.

15.     Defendant Heshy Deustch ("Deustch") is, and at all material times was, an individual residing in the State of New York.  Deustch owned, operated and/or controlled Marich Bein.

16.     Upon information and belief, Defendant Nachman Weisz (on information and belief, also known as Nachmy Weisz and Max Weisz) (collectively, ("Weisz") is, and at all material times was, an individual residing in the State of New Jersey.  Weisz was the business partner of Deustch and owned, operated and/or controlled Marich Bein

17.     Defendant Nicholas Kohlschreiber ("Kohlschreiber") is, and at all material times was, an individual residing in the State of California. Kohlschreiber owned, operated and/or controlled the GoFi Entities and Pacific Staffing.

18.     Defendant Israel Reches ("Reches"), upon information and belief, was the business partner of Deustch and/or Weisz and controlled and directed transfers of money by and between Marich Bein and Debtor.

///

19.    Upon information and belief, each of the Defendants, including those fictitiously named, were the agent, servant, employee, partner, alter ego, or joint venture of the other Defendants, and in doing the things hereinafter alleged, each was acting within the scope of said agency, employment, partnership or venture, and with the knowledge, permission, consent and ratification of other Defendants in doing, or failing to do, the things alleged herein.

## RELEVANT DEFENDANTS NAMED IN THE 1046 ACTION

20.    Tony Diab is, and at all material times was, an individual residing in the State of California. Diab owned, operated, dominated and controlled LPG, a national debt relief law firm.

## GENERAL ALLEGATIONS

### A.    LPG'S BANKRUPTCY CASE

21.    On March 20, 2023 (the "Petition Date"), LPG filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing the Bankruptcy Case. Diab made the decision for LPG to file for bankruptcy in order to avoid a plethora of pending lawsuits, two of which sought an order appointing a receiver, including but not limited to: *Validation Partners, LLC v. The Litigation Practice Group, PC, et al*. Case No. 30-2022-01281911-CU-BC-CXC (Orange County Super Ct. September 20, 2022) and *Debt Validation Fund II, LLC, et al. v. The Litigation Practice Group PC, et al*. Case No. 30-2023-01303355-CU-CO-CXC (Orange County Super. Ct. January 23, 2023), among many others. In order to abscond with and delay discovery of substantial assets and continue to profit from LPG client files and client payment obligations pursuant to LPG'S client Legal Services Agreements ("ACH Receivables") prior to filing bankruptcy, Diab and other defendants devised a plan to fraudulently transfer funds, assets, client files, and ACH Receivables out of LPG to third parties. The 1046 Action deals primarily with the wholesale transfer of client files and the related ACH Receivables; this action deals primarily with the transfer of client ACH Receivables to Marich Bein, subject to the contracts and agreements attached to Marich Bein's proof

of claim [Omni Claim No. 102106-1] ("Proof of Claim").

22.    After the Office of the United States Trustee (the "UST") filed the *Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No. 44], the Court entered the *Order Directing Unites States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58] on May 4, 2021, thereby granting the UST's motion and directing the UST to appoint a Chapter 11 Trustee in the Bankruptcy Case.

23.    Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63; the *Order Approving Appointment* is 1046 Action Docket No. 65], on May 8, 2023, Plaintiff accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case. The Court approved the Trustee's appointment in its *Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee*, though he no longer serves in that capacity.  [Bankr. Docket No. 65].  Plaintiff Trustee was not appointed until after the events giving rise to this action and, therefore, bases these allegations on information and belief. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, at *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was allowed and "necessary at times"); *see also Mireskandari v. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL 12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have evidentiary support after a

8

1    reasonable opportunity for further investigation or discovery.'") (Citations omitted.)

2    24.    Pursuant to the *Order Confirming Modified First Amended Joint Chapter*

3    *11 Plan of Liquidation* entered September 9, 2024, and the *Notice of Occurrence of*

4    *Effective Date of Modified First Amended Joint Chapter 11 Plan of Liquidation* filed

5    September 24, 2024, Richard A. Marshack also became the Liquidating Trustee of the

6    LPG Liquidation Trust, effective September 24, 2024, and he continues to serve in this

7    capacity at this time.  [Bankr. Docket Nos. 1646 & 1762.]

8    25.    All claims have been transferred to the LPG Liquidation Trust pursuant to

9    the confirmed plan and Plaintiff brings this action solely in his capacity as the former

10    Chapter 11 Trustee and current Liquidating Trustee of the LPG Liquidation Trust for

11    the benefit of Debtor's Estate and its creditors.

12    **B.    LPG'S OWNERSHIP AND MANAGEMENT**

13    26.    Prior to the Petition Date, LPG operated a law firm for consumers across

14    the country who sought assistance in contesting or resolving debts. LPG services over

15    50,000 customers across the United StatesAt all relevant times, LPG was controlled and

16    operated by an individual named Tony Diab ("Diab").

17    27.    Despite having been disbarred in California and Nevada, Diab controlled

18    and operated LPG since its inception. However, Diab endeavored to conceal his control

19    over LPG, its finances, marketing, affiliates and operations. For example, Diab

20    purportedly required his LPG employees to call him "Admin," his email address was

21    "admin@lpglaw.com" and the name plate on his desk apparently read, "I don't work

22    here."

23    **C.    LPG**

24    28.    LPG operated a law firm for consumers across the country who sought

25    assistance in contesting or resolving debts they would identify.

26    29.    The consumers would pay LPG over a period of time via monthly debits

27    from their bank accounts.

28    ///

30.    The monthly payments were meant to cover all legal services LPG provided to the consumers including validation of the debts, review of documents to determine enforceability, and court appearances to halt lawsuits to obtain judgments.

31.    In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt or to prosecute affirmative claims held by the consumers.

32.    LPG mismanaged the consumers' monthly payments by failing to segregate and hold client payments in trust until fees had been earned by LPG.

33.    Diab and other defendants devised a plan to fraudulently transfer funds, client files, client funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts Receivable") out of LPG to third parties prior to the filing of bankruptcy.

34.    To obtain consumer clients, LPG contracted with marketing companies, who engaged in illegal capping and would advertise or call to solicit consumers to become clients of LPG in exchange for a percentage of the ACH Receivables collected by LPG from the consumers. The marketing affiliates went so far as to assist with the execution of an engagement letter between the consumer and LPG.

35.    In exchange, LPG agreed to pay the marketing affiliates a percentage of the ACH Receivables collected by LPG from the consumers. LPG would also enter into purchase agreements, at a discount, with various marketing affiliates in an attempt to regain control over the receiveables that marketing companies had an interest in.

36.    Because LPG received payments from consumers over time, it often sought financing against its future ACH Receivables. This borrowing was used to finance operations at LPG, to pay the fees owed to the marketing companies for providing the client referrals, and to pay creditors which had provided earlier-in-time financing in a growing Ponzi scheme, among other improper purposes.

37.    Many of the documents executed in connection with such financing described the transactions as account receivable purchase agreements.

///

**D.    DIAB'S SCHEME**

38.    As discussed above, the Debtor borrowed against its future ACH Receivables by entering into accounts receivable purchase agreements or similar transactions with marketers and factoring companies. In many instances, the ACH Receivables were sold multiple times over to different alleged purchasers or factoring companies.

39.    Given that all and/or a substantial portion of Debtor's ACH Receivables were transferred and/or sold multiple times over there were more claims for payment from any one ACH Receivable than that receivable generated. Accordingly, prior to the petition date, Debtor engaged in a scheme to defraud its creditors by transferring ownership of the ACH Receivables to various fraudulent conveyance partners as alleged herein and the various adversary proceedings brought by the Trustee, including, but not limited to, the 1046 Action.

**E.    DIAB'S CONTROL OVER LPG'S PAYMENT PROCESSING**

40.    Diab used entities he controlled including, without limitation, Validation Partners, Vulcan, Coast Processing, PrimeLogix, and/or Maverick to divert LPG consumer funds and ACH Receivables to Diab would use numerous ACH processing companies in order to easily transfer millions of dollars from Debtor to these entities he controlled, without oversight or detection, and to avoid payment disputes and complications. The money that flowed from Debtor through these bank account to Defendants consisted of Client Funds that Debtor held in its bank accounts and funneled to these entities by means of the ACH processing companies. Debtor regularly made deposits into these entities bank account such that they received Client Funds directly from Debtor in addition to future Accounts Receivable.

41.    LPG's monthly revenue from client files is primarily received via ACH payments. In order to process ACH payments, LPG is required to enlist the services of ACH payment processing companies who handle high risk transactions. In this regard,

Diab enlisted numerous ACH processing companies[1] in order to easily switch between different vendors and quickly transfer millions of dollars of LPG funds to entities he controlled, generally in less than three days from receipt of funds by the processing company. One reason for the plethora of processing company vendors was to avoid payment disputes and complications with the vendor itself, as in the case with Marich Bein. Switching between ACH processing companies further facilitated unauthorized double pulls, and made it more difficult for LPG clients to dispute, prevent or stop unauthorized ACH transactions, even where the Client disputed the transactions, had cancelled their services, and/or requested a refund. Diab used entities he controlled including, without limitation, Vulcan, Coast Processing, PrimeLogix, Marich Bein, PurchaseCo80 and/or Maverick to divert LPG consumer funds and ACH Receivables. Diab would use numerous ACH processing companies in order to easily transfer millions of dollars from Debtor to these entities he controlled, without oversight or detection, and to avoid payment disputes and complications.  The money that flowed from Debtor through these bank account to Defendants consisted of Client Funds that Debtor held in its bank accounts and funneled to these entities by means of the ACH processing companies.  Debtor regularly made deposits into these entities bank account such that they received Client Funds directly from Debtor in addition to future Accounts Receivable.

42.    LPG's monthly receipt of client payments ranged between $8.4 million to $11.2 million per month from May 2022 through September 2022. Despite this receipt of client payments, which could not be considered revenue until earned, LPG was not accumulating any cash on hand and claimed to have only $4,500 in its bank account on the Petition Date.

---

[1]    The ACH processing companies LPG used and which Diab controlled includes, but is not limited to, EPPS; EquiPay; Merit Fund; Authorize.net; World Global; Optimum Bank; BankUnited; Marich Bein; Revolv3; Maverick Bankcard; FIS; Guardian; and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875" or any such substantially similar ACH identification transaction.

**F.    MARICH BEIN'S FRAUDULENT SERVICING AND ACH RECEIVABLE PURCHASE AGREEMENTS**

43.    In an action filed in the Central District of California, Case No. 8:23-cv-00339-JWH-ADS (the "Marich Bein Action"), Marich Bein contends that on September 18, 2022, Plaintiff and LPG entered into an Assignment of Servicing Rights Agreement ("SRA") on approximately 50,000 LPG client files, pursuant to which LPG purportedly agreed to the following:

**Article I. ASSIGNMENT**

Section I.1 Assignment of Servicing Rights. [LPG], by these presents does hereby presently, unconditionally, absolutely and irrevocably assign, transfer, convey and set over to [Plaintiff] (it being intended by [LPG] that such assignments constitute present, absolute and unconditional assignments and not assignments for additional security only, but such assignment shall constitute security for [LPG]'s obligations to [Plaintiff] or its affiliates), all of [LPG]'s right, title and interest in and to the Servicing Rights, including, without limitation, any right of [LPG] or any of its affiliates (whether such rights are currently existing or arising in the future) to service collection of subscription fees, return payment fees, or any other fee or payment resulting from any Customer's engagement with [LPG] or any of its affiliates, or give notices, sue for payment under the Customer contracts or to take any action at law or in equity relating to the Customer contracts.

**Article II. SERVICING OF CONTRACTS**

Section I.2 [*sic*] Appointment as Third-Party Servicer. . . . [LPG] hereby retains [Plaintiff] to act as third party [Plaintiff] for the Receivables . . . .

Section I.3 [*sic*] Servicing of Receivables. . . . [LPG] agrees to provide [Plaintiff] and its subcontractors with such assistance in the servicing, collection and administration of any Receivable as may be requested by [Plaintiff] from time to time.

Section I.4 [*sic*] Limited Power of Attorney. [LPG] hereby irrevocably appoints and empowers [Plaintiff] as [LPG]'s true

13

and lawful attorney-in-fact, with full power of substitution, to endorse and promptly deposit on [LPG]'s behalf any checks or other instruments made payable to [LPG] and submitted by a Customer as payment on any Receivable, and to take any other action relating to the Receivables in [LPG]'s name and place that [Plaintiff] deems advisable and consistent with the terms of this Agreement. This power of attorney shall be deemed to a right coupled with an interest.

**ARTICLE III. OBLIGATIONS OF MERCHANT**

Section III.1 Access to All Digital Records, Databases, and Applications. [LPG] shall provide [Plaintiff] any information requested by [Plaintiff] with respect to its Customers and the Customer contracts. At all times, [Plaintiff] must have unfettered access to all software applications used by [LPG], including, but not limited to, Debt Pay Pro, Snowflake, or any other databases used by [LPG] in its ordinary course of business.

* * *

Section III.3 No Impairment. [LPG] will not take any action (including placing or allowing placement of a lien or security interest on any Purchased Receivable) or make any omission that has, individually or in the aggregate, an adverse effect on any Purchased Receivable or on [Plaintiff]'s ability to collect on any Purchased Receivable.

Section III.4 Amounts Received. . . . [LPG] shall not in any way encourage or cause any proceeds to be paid, processed, settled or delivered to any person or account other than the [Plaintiff]'s account, and shall take all affirmative steps at its expense and as necessary or appropriate to prevent any such occurrence from recurring. [LPG] is prohibited from instructing any Customer to pay [LPG] or any other third party on a Receivable or otherwise suggest that Customer may make a payment to [LPG] or any other third party instead of paying [Plaintiff] to satisfy its payment obligation.

* * *

**ARTICLE VI. MISCELLANEOUS**

Section I.7 [*sic*] Term and Termination. This Assignment shall commence on [September 19, 2022] and shall continue in full force and effect, until released by [Plaintiff]. [LPG] may terminate this Assignment at any time and for any reason

14

provided that the total amount of Purchased Receivables held by
[Plaintiff] and its affiliates are less than $1,000,000.00.[2]

\* \* \*

Section VI.1[*sic*] Exclusivity. [LPG]understands and
agrees that the relationship set forth in this Assignment is
exclusive. [LPG] forgoes any right to contract with other parties
for the same or similar services provided by [Plaintiff] under this
Assignment.

A true and correct copy of the SRA is attached as **Exhibit 1.**

44.     In addition to the SRA, on August 18, 2022, September 21, 2022, October 6, 2022, and November 14, 2022, LPG entered into four (4) separate Accounts Receivables Purchase Agreements (each an "ARPA") on approximately 15,000 to 20,000 client files and the associated payment information necessary to process the ACH Receivables was purportedly transferred and assigned by LPG to Marich Bein. True and complete copies of the ARPA are attached as **Exhibit 2**, and incorporated here.

45.     On information and belief, all or a substantial portion of the same client files, servicing rights and ACH Receivables were transferred multiple times to different entities between September 2022 and March 20, 2023, directly and/or indirectly through a myriad of transactions as alleged in the 1046 Action.

46.     The SRA ("Transfer") was made without consideration to LPG. Due to the lack of consideration, the SRA is fraudulent and must be set aside.

47.     Pursuant to the SRA, Diab and LPG hired Marich Bein to process its ACH transactions on most or all LPG client files, well in excess of the number of client files and payment information purportedly transferred as alleged in paragraph 44 above. On information and belief, at all material times, the NACHA bank used and necessary for Marich Bein to process such ACH transactions through DPP included, but was not limited to, Defendants BankUnited and BCB Bancorp. Upon information and belief, Marich Bein further held multiple financial accounts at BankUnited and BCB Bancorp

in order to receive ACH funds from LPG client files. On information and belief, Marich Bein is the only entity that held a financial account at BankUnited and BCB Bancorp relevant to the allegations herein.

48.     On information and belief, Diab had a close connection and insider relationship with the principals of Marich Bein, including, Deustch, Weisz and Reches prior to and at the time the ACH transactions and alleged transfer of LPG client files and/or payment information necessary for processing the ACH Receivables.  Marich Bein utilized the d/b/a LPG.

49.     At all relevant times, Marich Bein, by and through its owners, operators, directors and/or controllers Deustch, Weisz, and Reches, controlled the flow of money and transfers of Debtor related to the ACH transactions and, on information and belief, all transfers required the consent of Marich Bein.

50.     The bank accounts maintained at BankUnited and BCB Bancorp used for Debtor's ACH transactions, on information and belief, were utilized by Marich Bein and Deustch, Weisz, and Reches.

51.     Diab and Marich Bein's agreement was part of a larger pattern of fraud, where everyone was trying to outmaneuver each other.  Even though Diab seemed to be in charge at first, both sides took advantage of each other's weaknesses and shared financial connections.  For example, LPG/Diab owed money to other businesses Marich Bein's leaders owned.  They used these connections to manipulate each other, which eventually caused their partnership to fall apart.

52.     Under the SRA and ARPA schemes between Marich Bein and Diab, Marich Bein was given access to LPG's DPP account, client files and the NACHA information necessary to initiate ACH transactions. On information and belief, access to client files was provided without client consent. Based on the ACH and payment data contained in DPP, Marich Bein had all it needed to initiate ACH transactions on all LPG client files. Based on the testimony of Diab, Marich Bein was permitted to keep and hold only those ACH funds related to client files and ACH Receivables purportedly

16

Case 8:24-ap-01040-SC    Doc 53-2    Filed 02/12/25    Entered 02/12/25 10:29:52    Desc
Declaration of Veneeta Jaswal    Page 85 of 221

transferred to Marich Bein, which as alleged in the Marich Bein Action, were transferred more than once. The remaining proceeds from the ACH transactions processed on LPG client files by Marich Bein were to be remitted to LPG.

53.    The ARPA ("Transfer") was fraudulent because the client files were sold to other entities without client consent and in order to defraud LPG creditors. For example, in executing a Legal Services Agreement with LPG and executing an ACH Authorization in favor of LPG, the individual consumer clients of LPG had authorized LPG – and only LPG – to make use of their ACH Authorization and initiate payments to LPG.  There is no evidence that any consumer client of LPG authorized Marich Bein d/b/a LPG to initiate any payments at any time.

54.    According to Marich Bein's Proof of Claim, Marich Bein took – without client authorization - $16,989,963.23, from Debtor money otherwise due to the Debtor pursuant to the Debtor's consumer client's ACH Authorizations under the SRA and ARPA ("Transfer", and collectively with the SRA Transfer defined in paragraph 46, the ARPA Transfer defined in paragraph 41, "Transfers").

55.    Based on Diab's testimony, Marich Bein initially processed ACH transactions on client files and remitted payment to LPG. By approximately December 2022 and/or January 2023, and at or around the time Diab caused the same client files and/or ACH Receivables to be transferred to Oakstone Law Group, P.C. ("Oakstone"), Marich Bein started withholding ACH payments received on LPG client files, including those that had not purportedly been transferred or assigned to Marich Bein and/or Oakstone. According to Diab and as listed in Debtor's Schedule A/B [Bankr. Docket No. 33], Marich Bein withheld approximately $12 million dollars in ACH funds on LPG client files that were not associated with the foregoing fraudulent SRA and ARPA. In the Marich Bein Action, Marich Bein alleges that it is in possession of at least $1,000,000 processed via ACH from LPG clients. Pre-petition, Debtor demanded said funds be returned and that Marich Bein cease and desist from processing ACH transactions. To date, Marich Bein has refused to return and/or turnover said funds.

17

56.    In approximately February 2023, Marich Bein's ability to access LPG client's NACHA payment information through DPP was terminated. To wit, Diab caused all service contract payments to DPP to cease, DPP locked LPG's account and all of LPG's client information was transferred to Diab's proprietary platform, LUNA. In turn, Marich Bein was locked out of DPP.

57.    On information and belief, and based on the testimony of Diab, however, this did not stop Marich Bein from initiating ACH transactions on LPG clients using old data Marich Bein had usurped when it had access to DPP and without having updated client, payment or other related information in violation of NACHA and other applicable laws and regulations.

58.    The effect of the SRA and ARPA was to accomplish an unlawful purpose. Thus, the agreements may be declared illegal regardless of the intention of the parties. *Stockton Morris Plan Co. v. Cal. Tractor & Equip. Corp.*, 112 Cal. App. 2d 684, 690 (1952) (citing *Fewel & Dawes, Inc. v. Pratt*, 17 Cal. 2d 85, 91 (1941)). This remains true regardless of whether the contracts have been performed. *Stevens v. Boyes Hot Springs Co.*, 113 Cal. App. 479, 483 (1931) (A contract by a corporation to purchase its own stock has the effect of illegally withdrawing and paying to a stockholder a part of the capital stock of the corporation and is illegal and void, regardless of the fact that the contract is fully performed by the sellers and partially performed by the corporation.); *Mansfield v. Hyde*, 112 Cal. App. 2d 133, 139 (1952), overruled, *Fomco, Inc. v. Joe Maggio, Inc.*, 8 Cal. Rptr. 459 (1960) (Where object of statute requiring licenses is to prevent improper persons from engaging in particular activity, or is for purpose of regulating occupation or business for protection of public, imposition of penalty amounts to prohibition against engaging in occupation or business without license, and contract made by unlicensed person in violation of statute is invalid.); *Firpo v. Murphy*, 72 Cal. App. 249, 252 (1925) (A contract to pay commissions to a real estate broker is illegal and he is not entitled to recover thereon where he fails to secure the license required by law to carry on his business.).

59.    According to Diab, Defendants' failure to remit ACH payments due and owing to LPG caused LPG to take out a line of credit from City Capital NY (also a scheduled creditor) in the approximate amount of $2,9500,000.

### G.    BANKUNITED ACH TRANSACTIONS

60.    In order for a third party ACH processor, portal, integrated software or other non-regulated entity to process and/or receive ACH transactions, a NACHA compliant financial institution is, and at all relevant times herein was, required to complete such transactions. Based on DPP records, BankUnited was listed as the NACHA financial institution engaged to process and/or receive ACH transactions on client files through DPP. On information and belief, Marich Bein, Diab or others acting in concert with Diab and having access to LPG's DPP account and its financial controls designated BankUnited as the NACHA financial institution to which ACH Receivables on LPG client files would be deposited.

61.    On information and belief, BankUnited processed and/or received the foregoing ACH transactions at the direction of Marich Bein, and prior to Marich Bein's involvement at the direction of LPG, Diab and/or alter egos of same. On information and belief, the funds received from ACH transactions processed by and through BankUnited were initially deposited into an operating account held at BankUnited in order to ensure the funds cleared. After an initial holding period to account for insufficient funds and other charge backs, BankUnited either retained said funds in an account held at its institution and/or transferred a portion or all of the funds to an account designated by Marich Bein. Funds processed and received by Marich Bein and/or BankUnited that were to be delivered to LPG were then wired, transferred or otherwise directed to accounts designated by Diab, including those held by Vulcan, PrimeLogix, BAT, Inc. dba Coast Processing among many others. Marich Bein, at all relevant times has and continues to maintain a bank account at BankUnited which, on information and belief, was used to receive ACH Receivables from LPG client files fraudulently transferred, sold or both to Marich Bein.

62.     On information and belief, BankUnited has and/or continues to retain all or a portion of said funds and received fees and profits from engaging in such activity that were taken from wrongfully obtained funds processed against LPG client files, including, but not limited to, those LPG client files fraudulently transferred to Marich Bein. This further includes the alleged wrongful, fraudulent and/or double pulls initiated against LPG client accounts. Bank United is also in possession of all relevant records pertaining to the number of ACH transactions processed by Marich Bein and accounts where such funds not currently held in a BankUnited account were transferred.

### H.     BCB BANCORP ACH TRANSACTIONS

63.     On information and belief, BCB Bancorp also processed and/or received the foregoing ACH transactions at the direction of Deustch, Weisz, and Reches, and prior to Marich Bein's involvement, at the direction of LPG, Diab and/or alter egos of same. On information and belief, the funds received from ACH transactions processed by and through BCB Bancorp were initially deposited into an operating account held at BCB Bancorp in order to ensure the funds cleared. After an initial holding period to account for insufficient funds and other charge backs, BCB Bancorp either retained said funds in an account held at its institution and/or transferred a portion or all of the funds to an account designated by Deustch, Weisz, and Reches. Funds processed and received that were to be delivered to LPG were then wired, transferred or otherwise directed to accounts designated by Diab, including those held by Vulcan, PrimeLogix, BAT, Inc. dba Coast Processing among many others. At all relevant times, BCB Bancorp has serviced accounts which, on information and belief, was used to receive ACH Receivables from LPG client files fraudulently transferred, sold or both to Marich Bein.

64.     On information and belief, BCB Bancorp has and/or continues to retain all or a portion of said funds and receive fees and profits from engaging in such activity that were taken from wrongfully obtained funds processed against LPG client files, including, but not limited to, those LPG client files fraudulently transferred to Marich Bein, Deustch, Weisz, and Reches. This further includes the alleged wrongful,

fraudulent and/or double pulls initiated against LPG client accounts. BCB Bancorp is also in possession of all relevant records pertaining to the number of ACH transactions processed by Marich Bein, Deustch, Weisz, and Reches and accounts where such funds not currently held in a BCB Bancorp account were transferred.

## I.    THE SALE OF LPG'S ASSETS

65.    On July 7, 2023, Richard Marshack in his capacity as the Chapter 11 Trustee moved the Court for an order (A) Approving Sale, Subject to Overbid, of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests Pursuant to 11 U.S.C. § 363(b) and (B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and Other Agreements ("Sale Motion") [Bankr. Docket No. 191]. After supplemental briefing, addressing multiple oppositions, holding a lengthy hearing and auction wherein Morning Law Group was the highest bidder, the Court granted the Sale Motion entered August 2, 2023 ("Sale Order") [Bankr. Docket No. 352].

## J.    LPG'S PREPETITION CREDITORS

66.    Debtor was insolvent when each Transfer was made. This insolvency is evidenced in part by the fact that 14 separate UCC-1 statements were of record securing debts of the Debtor as of September 1, 2022. These statements remained unreleased as of the Petition Date. These statements either reflected secured liens against the Debtor's assets then owned or thereafter acquired, or provided evidence of the assignment or sale of substantial portions of the Debtor's future income.

67.    When the Transfers were made, these prior UCC-1 statements secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (i) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed on or about May 19, 2021; (ii) approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UCC statement filed on or about May 28, 2021; (iii) approximately $5,000,000 owed to Azzure Capital,

LLC as evidenced by Proof of Claim No. 127 secured by a UCC statement filed on or about May 28, 2021; and (iv) approximately $1.5 million dollars owed to Diverse Capital, LLC purportedly secured by UCC statements filed on or about September 15, 2021, and December 1, 2021.[2]

68.     As alleged above, LPG was borrowing against its assets and future income, often on unfavorable terms, not only to finance operations at LPG, but also to pay the fees owed to the marketing affiliates for providing it with consumer clients and to repay other loans to other creditors, which loans were either already in default or about to be in default, as part of Diab's scheme to keep LPG creditors at bay for as long as possible until he could transfer LPG's assets, client files and ACH Receivables to other entities under his control. Pursuant to the agreements with the marketing companies, significant percentages of future payments were already promised to be paid to the marketing affiliates from whatever future income the Debtor would receive.  And, of course, the payments LPG received in the form of ACH Receivables were also trust funds paid to LPG by its law firm clients, subject to a return of funds in the event of a request for a refund or termination of the representation before LPG had earned said funds.  In this regard, except to the extent earned, the ACH Receivables also represented a liability of the Debtor.

69.     In addition, on Debtor's Schedule E/F [Bankr. Docket No. 33], Debtor scheduled 11 unsecured creditors with priority unsecured claims totaling $374,060.04. These priority unsecured creditors include Indiana Dept. of Revenue, Dept. of Labor and Industries, Arizona Dept. of Economic Security, Arkansas Dept. of Finance & Admin., California Franchise Tax Board, Georgia Dept. of Labor, Internal Revenue Service, Mississippi Dept. of Revenue, Nevada Dept. of Taxation, Utah State Tax Commission, and Wisconsin Dept. of Revenue (collectively, "Priority Unsecured Creditors").

---

[2] Trustee reserves all rights, claims, and defenses with respect to these and any other purported secured or unsecured claims.

70.     Another group of creditors that Debtor listed on its Schedule E/F [Bankr. Docket No. 33] are nonpriority unsecured creditors. Those 58 creditors have scheduled claims totaling $141,439,158.05 and include Ajilon; Anthem Blue Cross; Azevedo Solutions Groups, Inc.; Carolina Technologies & Consulting Invoice; Collaboration Advisors; Credit Reporting Service Inc.; CT Corporation – Inv.; Debt Pay Pro; Document Fulfillment Services; EnergyCare, LLC; Exela Enterprise Solutions; First Legal Network, LLC; GHA Technologies Inc.; Harrington Electric, Inc.; Imagine Reporting; Juize, Inc.; Krisp Technologies, Inc.; Liberty Mutual; Marc Lemauviel – Allegra; MarkSYS Holdings, LLC; Netsuite-Oracle; Pitney Bowes; Rapid Credit, Inc.; SBS Leasing A Program of De Lage Landen; Security Solutions; Sharp Business Systems; Streamline Performance, Inc.; Thomson Reuters; Twilio, Inc.; Nationwide Appearance Attorneys; Executive Center, LLC; Outsource Accelerator, Ltd.; TaskUs Holdings, Inc.; Marich Bein, LLC; Validation Partners; MC DVI Fund 1, LLC; MC DVI Fund 2, LLC; Debt Validation Fund II, LLC; Tustin Executive Center; LexisNexus; JP Morgan Chase; Business Centers of America; Michael Schwartz; Anibal Colon Jr.; Kathleen Lacey; David Ulery; Kimberly Birdsong; Kevin Carpenter; Karen Suell; Gloria Eaton; Carolyn Beech; Debra Price; Kenneth Topp; Darcey Williamson, Trustee; James Hammett; Johnny Rizo; Beverly Graham; Kathleen Scarlett; and Geneve and Myranda Sheffield (collectively, "Nonpriority Unsecured Creditors" and, together with the Secured Creditors and Priority Unsecured Creditors, "Prepetition Creditors").

**K.    LPG'S PONZI SCHEME**

71.     The Ponzi Scheme Presumption exists in bankruptcy proceedings.  The Ponzi Scheme Presumption can be utilized to establish a debtor's "intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme.  Indeed, no other reasonable inference is possible. A Ponzi scheme cannot work forever.  The investor pool is a limited resource and will eventually run dry.  The perpetrator must know that the scheme will eventually collapse as a result of the

inability to attract new investors. The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law, *cf. Restatement (Second) of Torts § 8A (1963 & 1964)*, and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them. *Cf. Coleman Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.)* (Bankr.D.Kan. 1981)14 B.R. 637, 643 (intentionally carrying out a transaction with full knowledge that its effect will be detrimental to creditors is sufficient for actual intent to hinder, delay or defraud within the meaning of § 548(a)(1))." *Merrill v. Abbott (In re Independent Clearing House Co.)* (D. Utah 1987) 77 B.R. 843, 860. A trustee in bankruptcy is not required to show that an operator of a Ponzi scheme was subjectively aware his Ponzi scheme was destined to fail. *In re EPD Inv. Co., LLC*, 114 F.4th at 1153 ("[a] trustee's action to recover assets fraudulently conveyed in the course of a Ponzi scheme does not require that the trustee also prove the Ponzi-scheme operator was subjectively aware his Ponzi scheme was destined to fail.")

72. "But if all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share. In fact, by helping the debtor perpetuate his scheme, the transfers exacerbate the harm to creditors by increasing the amount of claims while diminishing the debtor's estate. In such a situation, the use of the defendant's money cannot objectively be called "reasonably equivalent value." *In re Independent Clearing House Co.*, 77 B.R. at 859. Therefore, "[t]he trustee can avoid the transfers if they were preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and fraudulent. Therefore, they constitute 'property of the estate,' and the trustee can recover them." *Id*. at 853 n.17 (citations omitted).

73.   Debtor was operating a Ponzi scheme that utilized affiliates and several other entities, including Marich Bein, the GoFi Entities, Prime Logix, and Pacific Staffing, and their owners, operators, directors, principals and/or controllers Deustch, Weisz, Reches, Cohen, and Kohlscreiber, as payment processors and intermediaries to conceal the scheme, and as investors to continue its unlawful business practices by using funds provided by current investors to attract new investors hoping for very high returns. Therefore, the Debtor was running a Ponzi scheme , and the Ponzi Scheme Presumption can be utilized to infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. § 548(a)(1).  This is evidenced by the Court in this Bankruptcy Case declaring that Debtor was operating a Ponzi scheme when it stated the following:

> It is important to note that this Court has never received any significant and trustworthy evidence that Debtor accomplished meaningful results for its clients, but only anecdotal examples of viable success for its clients. By reviewing the Estate's claims register, there is evidence of consumer claims for the fraud and demanded but undelivered refunds of approximately $500 million. There is ample evidence that the pre-petition Debtor never placed the collected funds into an attorney-client trust account, and that Debtor or its principals simply looted the payments received through the client automatic withdrawals, stiffing both the clients and outside attorneys who may have been working on client cases with the hopes of being paid. There is also evidence before the Court that Debtor was running a Ponzi scheme and paying some outside (or "network") attorneys with funds obtained from new clients. In this case, it appears that some of the "lenders" may have been serving as "investors," hoping for very high returns before "the music stopped."  The Ninth Circuit has recently explained, "[b]y definition, a Ponzi scheme is destined to fail because the pool of available investors is not limitless. When the Ponzi scheme operator's pool of investors inevitably runs dry, the scheme collapses and the swindler and their entities often end up in bankruptcy or equitable receivership. See generally David R. Hague, Expanding the Ponzi Scheme Presumption, 64 DePaul L. Rev. 867 (2015). In bankruptcy, the court-appointed trustee is tasked with taking immediate control of the entity, ceasing ongoing fraudulent activity, locating and collecting assets for the bankruptcy or receivership estate, and achieving a final, equitable distribution of the remaining assets. See 11 U.S.C. § 704." *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 2024 U.S. App. LEXIS 21363, at *15 (9th Cir. Aug. 23, 2024). Finally, there is evidence that Debtor was encumbering (or as some creditors assert, "double or triple selling") their accounts or receivables to multiple lenders. With respect to Greyson's requested Administrative Claim [Dk. 676], and as more fully described in the concurrently entered order denying the claim, there has been no evidence presented that any

1    work allegedly performed by Greyson assisted any clients or
     added any value to the Estate.

2  *See,* Case No. 8:23-bk-10571-SC [Bankr. Docket No. 1545 Fn. 5].

3      74.    Moreover, since the transfers were made with the intent to further the

4  Ponzi scheme, the Debtor did not receive an objectively reasonable equivalent value for

5  the Transfers, and the Trustee can avoid the Transfers because they were fraudulent.

6      **L.    THE CRIMINAL ENTERPRISE**

7      75.    Debtor's operations, activities and transfers done in furtherance of the

8  Ponzi scheme, including those in conjunction with its affiliates and its dealings with

9  Defendants, also constituted a criminal enterprise.

10     76.    This, too, is evidenced by the Court's order in the 1046 Action wherein it

11 denied the Motion of Greyson Law Center to Vacate the Preliminary Injunction

12 previously entered in Debtor's main case, and the Court offered the opinion:

13          Through the various proceedings and evidence produced in both
            the main case and the various adversary proceedings, including
14          but not limited to various Motions for Temporary Restraining
            Orders, Preliminary Injunctions, Motions to Dismiss, a Motion
15          for Appointment of a Chapter 11 Trustee, a Motion to Sell
            Assets, a multitude of pleadings filed by both secured and
16          unsecured creditors (supported by evidence presented under
            oath) in support of their claims, and especially the pleadings and
17          evidence presented by the "Watchdog of the Bankruptcy
            System" aka the Office of the United States Trustee (an arm of
18          the United States Department of Justice), *it is clear to this Court
            that Debtor, since its pre-petition inception (and through the time
19          of the appointment of the Chapter 11 Trustee) was in the Court's
            opinion, operating a criminal enterprise.*

20

21 (Case No. 8:23-bk-10571-SC; Adv. No. 8:23-ap-01046-SC [Bankr. Docket No. 1545,

22 p.3 (emphasis in original)].)

23     77.    As part of this criminal enterprise, Debtor and Defendants engaged in

24 fraudulent transfers of its accounts receivables pursuant to various agreements, including

25 the ARPAs.

26     78.    On information and belief, Marich Bein performed payment processing for

27 Debtor. The money was then passed through the various Defendant entities, including

28

Prime Logix, Pacific Staffing, and ultimately to the GoFi Entities.  This was done to conceal the criminal enterprise and the Defendants' involvement therein.

79.     Defendants Deustch, Weisz and Reches, as the owners, operators, directors and/or controllers of Marich Bein, received and further directed the fraudulent ACH transactions and transfers by manipulating Marich Bein.

80.     Similarly, Defendant Kohlscreiber, as the owner, operator, director and/or controller of the GoFi Entities and Pacific Staffing, served as the intermediary of the fraudulent ACH transactions and transfers through the manipulation of the GoFi Entities and Pacific Staffing.

## **FIRST CLAIM FOR RELIEF**

### **Injunctive Relief**

**(Against Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber)**

81.     Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 80 as though set forth in full.

82.     Plaintiff requests that this Court incorporate and enter its preliminary injunction order entered in the 1046 Action [Dkt No. 70] attached as **Exhibit 3** and incorporated by reference as if fully set forth herein, or in substantially the same form enjoining Defendants Marich Bein, LLC,  GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, Nicholas Kohlschreiber (collectively, "Injunction Defendants"), and each of them from processing or interfering with any ACH transfer being executed in favor of Debtor's estate.

83.     Plaintiff requests that this Court incorporate and enter its preliminary injunction order entered in the 1046 Action [Dkt No. 70] attached as **Exhibit 3** and incorporated by reference as if fully set forth herein, or in substantially the same form, ordering Injunctive Defendants, among other things, to turn over to trustee any and all

client files; ACH files; ACH processing information; financial records; administrative user names and log in information; accounting records; contracts; and email accounts.

84.    Plaintiff also requests that this Court incorporate and enter its preliminary injunction order entered in the 1046 Action [Dkt No. 70] attached as **Exhibit 3** and incorporated by reference as if fully set forth herein in substantially the same form ordering Injunction Defendants, among other things, to turn over all funds originating from LPG client files, ACH Receivables and/or ACH transactions.

85.    In the event the preliminary injunction order in the 1046 Action [Dkt No. 70] attached as **Exhibit 3** is not entered and/or incorporated in this action, Plaintiff requests that this Court enter a separate order identical to and/or substantially in the same form as **Exhibit 3** as against Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber named in this action.

## SECOND CLAIM FOR RELIEF

**Avoidance, Recovery, and Preservation of Two-Year Actual Fraudulent Transfers**

**(Against Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber)**

**[11 U.S.C. §§ 548(a)(1)(A), 550, and 551]**

86.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 85 as though set forth in full.

87.    The source of the client files, ACH Receivables, and funds that are the subject of the Transfers alleged herein are that of LPG, and the Debtor's Estate.

88.    Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber (collectively, "Avoidance Defendants") wrongfully retain possession and control of the client files, ACH Receivables, and funds fraudulently

1  transferred to others by Diab and LPG.

2      89.    Diab made the Transfers alleged herein after LPG faced multiple lawsuits

3  including those initiated by factoring companies and in order to avoid its creditor

4  liability and abscond with assets of the Estate, including but not limited to, Validation

5  Partners' lawsuit filed on September 20, 2022 (Case No. 30-2022-01281911-CU-BC-

6  CXC) in the Superior Court of California, County of Orange; DVF II's lawsuit filed on

7  January 23, 2023 (Case No. 30-2023-01303355-CU-CO-CXC) in the Superior Court of

8  California, County of Orange; among others. The lawsuits sought the appointment of a

9  receiver to perform many of the same duties of the Trustee and obtain information, an

10  accounting of LPG funds, assets and accounts receivables and maintain the status quo,

11  among other relief, pending the outcome of the litigation. Notably, Diab admitted the

12  foregoing under oath at the hearing on Trustee's preliminary injunction.

13      90.    The LPG client files, ACH Receivables, and funds that were subject to the

14  Transfers alleged herein constitute a substantial portion of LPG's pre-petition non-

15  exempt property and assets.

16      91.    The Transfers and transactions alleged herein, including, but not limited

17  to, the multiple transfers of LPG client files and/or ACH Receivables were made by

18  Diab to insiders that were and/or are still under Diab's control and/or other alter egos

19  working in concert with Diab, including the Avoidance Defendants.

20      92.    The Transfers and transactions alleged herein, including, but not limited

21  to, the multiple transfers of LPG client file and/or ACH receivable transfers left LPG

22  insolvent and according to Diab required LPG to seek emergency financing in the

23  amount of $2.95 million dollars pre-petition. The Debtor scheduled $141,813,219.09 in

24  total debt to pre-petition creditors. However, without LPG's client files, ACH

25  Receivables, and funds, the fraudulent Transfers and transaction alleged herein left the

26  Debtor with approximately $12,186,500 in assets and no income stream. Included in

27  the assets scheduled by LPG are the approximated $12,000,000 in funds wrongfully

28  withheld by Avoidance Defendants. Moreover, the Transfers to Marich Bein were made

1  at a time when LPG was insolvent.

2      93.    Marich Bein diverted monies due Debtor to non-Debtor entities including

3  the GoFi Entities, Vulcan, Prime Logix, BAT, Inc. dba Coast Processing, Pacific

4  Staffing, among others who are subsequent transferees of the fraudulent Transfers.

5      94.    Defendants the GoFi Entities and Pacific Staffing also diverted monies due

6  to Debtor to non-Debtor entities including by and between each other, and Marich Bein,

7  Prime Logix, and BAT, Inc. dba Coast Processing.

8      95.    Debtor was operating a Ponzi scheme, and the Ponzi Scheme Presumption

9  creates an inference of the Debtor's actual intent to defraud within the meaning of 11

10  U.S.C. § 548(a)(1).

11      96.    Avoidance Defendants' conduct relating to the Transfers and transactions

12  alleged herein, was done with oppression, fraud and malice as defined in California

13  Civil Code section 3294, entitling Plaintiff to exemplary and punitive damages.

14      97.    Thus, the Transfers and transactions alleged herein, including, but not

15  limited to, the fraudulent transfer of LPG client files and/or ACH Receivables were

16  made with actual intent to hinder, delay, or defraud creditors of the Debtor.

17      98.    The Transfers and transactions alleged herein, including, but not limited

18  to, the fraudulent transfer of LPG client files and/or ACH Receivables occurred within

19  two years prior to the Petition Date.

20      99.    Accordingly, the Transfers and transactions alleged herein, including, but

21  not limited to, the fraudulent transfer of LPG client files and/or ACH Receivables that

22  Diab caused the Debtor to make should be avoided as fraudulent under 11 U.S.C. §

23  548(a)(1)(A), and such property, or the value thereof, should be recovered and

24  preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

25  ///

26  ///

27  ///

28  ///

## THIRD CLAIM FOR RELIEF

**Avoidance, Recovery, and Preservation of Two-Year Constructive Fraudulent Transfers**

**(Against Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber)**

**[11 U.S.C. §§ 548(a)(1)(B), 550, and 551]**

100.   Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 99 as though set forth in full.

101.   At the time of the Transfers and transactions alleged herein, LPG received less than reasonably equivalent value in exchange for said Transfers.

102.   The Transfers, transactions and retention of LPG assets, client files, ACH Receivables and funds alleged herein, among others, left LPG insolvent. LPG scheduled $141,813,219.09 in total debt to pre-petition creditors. However, without the files, accounts receivable, and funds, the Transfers left the Debtor with approximately $12,186,500 in assets and no income stream; virtually none of those alleged $12,186,500 assets have been turned over to the Trustee despite repeated request for same.

103.   On or after the date that the fraudulent Transfers and transactions alleged herein were made, LPG was not paying debts to the pre-petition creditors, including but not limited to, Validation Partners and DVF II as they came due and, based on the testimony of Diab, was forced to incur further debt obligations, including, but not limited to, emergency financing through City Capital NY in the amount of $2.95 million dollars pre-petition.

104.   The source of LPG client files, ACH Receivables, and funds that are the subject of the alleged fraudulent Transfers, are and were at all relevant times, assets and property of LPG and its clients.

///

105.   By transferring LPG client files, ACH Receivables, and funds to Marich Bein, Diab endeavored to hide and conceal LPG client files, ACH Receivables, funds, and the Transfers alleged herein.

106.   Diab made the Transfers alleged herein after LPG faced multiple lawsuits including those initiated by factoring companies and in order to avoid its creditor liability and abscond with assets of the Estate, including but not limited to, Validation Partners lawsuit filed on September 20, 2022 (Case No. 30-2022-01281911-CU-BC-CXC) in the Superior Court of California, County of Orange; DVF II lawsuit filed on January 23, 2023 (Case No. 30-2023-01303355-CU-CO-CXC) in the Superior Court of California, County of Orange; among others. The lawsuits sought the appointment of a receiver to perform many of the same duties of the Trustee and obtain information, an accounting of LPG funds, assets and accounts receivables and maintain the status quo, among other relief, pending the outcome of the litigation. Notably, Diab admitted the foregoing under oath at the hearing on Trustee's preliminary injunction.

107.   Marich Bein diverted monies due Debtor to non-Debtor entities including the GoFi Entities, Vulcan, Prime Logix, BAT, Inc. dba Coast Processing, Pacific Staffing among others who are subsequent transferees of the fraudulent Transfers.

108.   Defendants the GoFi Entities and Pacific Staffing also diverted monies due to Debtor to non-Debtor entities including by and between each other, and Marich Bein, Prime Logix, BAT, Inc. dba Coast Processing among others who are subsequent transferees of the fraudulent Transfers.

109.   Thus, at the time of the Transfers and transactions alleged herein related to LPG client files, ACH Receivables, ACH transactions and withholding of funds occurred, or as a result thereof, LPG was either:

a.      insolvent on the date the alleged Transfers and transactions were made, or became insolvent as a result thereof;

b.      engaged or was about to engage in a Transfer or transaction for which any property remaining with LPG was of unreasonably small capital;

c.    intended to incur, or believed that LPG would incur, debts beyond its ability to pay as such debts matured.

110.    The Transfers and transactions alleged herein were made with intent to hinder, delay, or defraud creditors as Diab testified to at the preliminary injunction hearing. In fact, Diab caused such Transfers to occur on the same LPG client files and ACH Receivables to multiple entities to accomplish just that, including, but not limited to, those purportedly transferred to Marich Bein.

111.    The Transfers and transactions alleged herein of LPG's client files, ACH Receivables, and funds occurred within the two years prior to the Petition Date.

112.    Accordingly, the fraudulent Transfers and transactions alleged herein that Diab caused LPG to make should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(B), and such property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

### FOURTH CLAIM FOR RELIEF

**Avoidance, Recovery, and Preservation of Four-Year Actual Fraudulent Transfers**

**(Against Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber)**

**[11 U.S.C. §§ 544(b), 550, and 551; Cal. Civ. Code §§ 3439.04(a) and 3439.07]**

113.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 112 as though set forth in full.

114.    At the time of the Transfers and transactions alleged herein, LPG received less than reasonably equivalent value in exchange for said Transfers.

115.    The Transfers, transactions and retention of LPG assets, client files, ACH Receivables and funds alleged herein, among others, left LPG insolvent. LPG scheduled $141,813,219.09 in total debt to Pre-petition creditors. However, without the files, accounts receivable, and funds, the Transfers left the Debtor with approximately

$12,186,500 in assets and no income stream; virtually none of those alleged $12,186,500 assets have been turned over to the Trustee despite repeated request for same.

116.    On or after the date that the fraudulent Transfers and transactions alleged herein were made, LPG was not paying debts to the pre-petition creditors, including but not limited to, Validation Partners and DVF II as they came due and, based on the testimony of Diab, was forced to incur further debt obligations, including, but not limited to, emergency financing through City Capital NY in the amount of $2.95 million dollars pre-petition.

117.    The source of LPG client files, ACH Receivables, and funds that are the subject of the alleged fraudulent Transfers are and were at all relevant times, assets and property of LPG and its clients.

118.    Diab and/or LPG retained possession and control of the files, ACH receivable, and funds transferred to the alter egos or elsewhere after the alleged Transfers.

119.    By transferring LPG client files, ACH Receivables, and funds to Marich Bein, Diab endeavored to hide and conceal LPG client files, ACH Receivables, funds, and the Transfers alleged herein.

120.    Diab made the Transfers alleged herein after LPG faced multiple lawsuits including those initiated by factoring companies and in order to avoid its creditor liability and abscond with assets of the Estate, including but not limited to, Validation Partners lawsuit filed on September 20, 2022 (Case No. 30-2022-01281911-CU-BC-CXC) in the Superior Court of California, County of Orange; DVF II lawsuit filed on January 23, 2023 (Case No. 30-2023-01303355-CU-CO-CXC) in the Superior Court of California, County of Orange; among others. The lawsuits sought the appointment of a receiver to perform many of the same duties of the Trustee and obtain information, an accounting of LPG funds, assets and accounts receivables and maintain the status quo, ///

among other relief, pending the outcome of the litigation. Notably, Diab admitted the foregoing under oath at the hearing on Trustee's preliminary injunction.

121.   The LPG client files, ACH Receivables, and funds that were subject to the Transfers alleged herein constitute a substantial portion of LPG's pre-petition non-exempt property and assets.

122.   The Transfers and transactions alleged herein, including, but not limited to, LPG client files and/or ACH receivable transfers were made by Diab to insiders that were and/or are still under Diab's control and/or others working in concert with Diab.

123.   The Transfers and transactions alleged herein left LPG insolvent. LPG scheduled $141,813,219.09 in total debt to pre-petition creditors. However, without the client files, ACH Receivables, and funds, the alleged Transfers left the LPG with approximately $12,186,500 in assets and no income stream; virtually none of those alleged $12,186,500 assets have been turned over to the Trustee despite repeated request for same. Included in the assets scheduled by LPG are approximately $12,000,000 or more in funds held by Defendants.

124.   As such, the Transfers and transactions alleged herein left LPG with remaining assets that were unreasonably small in relation to the Transfers and transactions.

125.   Further, LPG was insolvent at the time of the alleged Transfers and transactions alleged herein or became insolvent as a result thereof; the exact aim of Diab's scheme to bankrupt LPG in the event a receiver was appointed.

126.   On or after the date that such Transfers and transactions alleged herein were made, LPG was not paying debts to the pre-petition creditors, all of which arose before the Transfers alleged herein were made, as they became due.

127.   Marich Bein diverted monies due Debtor to non-Debtor entities including the GoFi Entities, Vulcan, Prime Logix, BAT, Inc. dba Coast Processing, Pacific Staffing, among others who are subsequent transferees of the fraudulent Transfers.

///

128.    Defendants the GoFi Entities and Pacific Staffing also diverted monies due to Debtor to non-Debtor entities including by and between each other, and Marich Bein, Prime Logix, BAT, Inc. dba Coast Processing among others who are subsequent transferees of the fraudulent Transfers.

129.    Thus, the Transfers and transactions alleged herein were made with actual intent to hinder, delay, or defraud creditors of LPG, as well as any duly appointed receiver.

130.    Thus, at the time of the Transfers and transactions alleged herein related to LPG client files, ACH Receivables, ACH transactions and withholding of funds occurred, or as a result thereof, LPG was either:

a.    insolvent on the date the alleged Transfers and transactions were made, or became insolvent as a result thereof;

b.    engaged or was about to engage in a Transfer or transaction for which any property remaining with LPG was of unreasonably small capital;

c.    intended to incur, or believed that LPG would incur, debts beyond its ability to pay as such debts matured.

131.    Debtor was operating a Ponzi scheme, and the Ponzi Scheme Presumption creates an inference of the Debtor's actual intent to defraud within the meaning of 11 U.S.C. § 548(a)(1).

132.    Avoidance Defendants' conduct relating to the Transfers and transactions alleged herein, was done with oppression, fraud and malice as defined in California Civil Code section 3294, entitling Plaintiff to exemplary and punitive damages.

133.    The alleged Transfers and transactions of the LPG's client files, ACH Receivables, and funds occurred within the four years prior to the Petition Date.

134.    At all relevant times, the alleged Transfers and transactions related to LPG's client files, ACH receivable, and funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and California Civil Code sections 3439.04(a) and 3439.07 by one or more creditors who held and hold unsecured claims against the Debtor that were and

are allowable against his Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the pre-petition creditors.

135.   Accordingly, the fraudulent Transfers and transactions alleged herein that Diab caused LPG to make should be avoided as fraudulent under 11 U.S.C. § 544(b) and California Civil Code sections 3439.04(a) and 3439.07, and such property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and California Civil Code section 3439.07.

## FIFTH CLAIM FOR RELIEF

**Avoidance, Recovery, and Preservation of Four-Year Constructive Fraudulent Transfers**

**(Against Defendants Marich Bein, LLC,  GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber )**

**[11 U.S.C. §§ 544(b), 550, and 551; CAL. CIV. CODE §§ 3439.05 and 3439.07]**

136.   Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 135 as though set forth in full.

137.   At the time of the Transfers and transactions alleged herein, LPG received less than reasonably equivalent value in exchange for said Transfers.

138.   The Transfers, transactions and retention of LPG assets, client files, ACH Receivables and funds alleged herein, among others, left LPG insolvent. LPG scheduled $141,813,219.09 in total debt to pre-petition creditors. However, without the files, accounts receivable, and funds, the Transfers left the Debtor with approximately $12,186,500 in assets and no income stream; virtually none of those alleged $12,186,500 assets have been turned over to the Trustee despite repeated request for same.

139.   On or after the date that the fraudulent Transfers and transactions alleged herein were made, LPG was not paying debts to the pre-petition creditors, including,

but not limited to, Validation Partners and DVF II as they came due and, based on the testimony of Diab, was forced to incur further debt obligations, including, but not limited to, emergency financing through City Capital NY in the amount of $2.95 million dollars pre-petition.

140.   The source of LPG client files, ACH Receivables, and funds that are the subject of the alleged fraudulent Transfers, are and were at all relevant times, assets and property of LPG and its clients.

141.   Diab and/or LPG retained possession and control of the files, ACH Receivables, and funds transferred to the alter egos or elsewhere after the alleged Transfers.

142.   By transferring LPG client files, ACH Receivables, and funds to Marich Bein, Diab endeavored to hide and conceal LPG client files, ACH Receivables, funds, and the Transfers alleged herein.

143.   Diab made the Transfers alleged herein after LPG faced multiple lawsuits including those initiated by factoring companies and in order to avoid its creditor liability and abscond with assets of the Estate, including but not limited to, Validation Partners lawsuit filed on September 20, 2022 (Case No. 30-2022-01281911-CU-BC-CXC) in the Superior Court of California, County of Orange; DVF II lawsuit filed on January 23, 2023 (Case No. 30-2023-01303355-CU-CO-CXC) in the Superior Court of California, County of Orange; among others. The lawsuits sought the appointment of a receiver to perform many of the same duties of the Trustee and obtain information, an accounting of LPG funds, assets and accounts receivables and maintain the status quo, among other relief, pending the outcome of the litigation. Notably, Diab admitted the foregoing under oath at the hearing on Trustee's preliminary injunction.

144.   The LPG client files, ACH Receivables, and funds that were subject to the Transfers alleged herein constitute a substantial portion of LPG's pre-petition non-exempt property and assets.

///

145.   The Transfers and transactions alleged herein, including, but not limited to, LPG client files and/or ACH receivable transfers were made by Diab to insiders that were and/or are still under Diab's control and/or others working in concert with Diab.

146.   The Transfers and transactions alleged herein left LPG insolvent. LPG scheduled $141,813,219.09 in total debt to pre-petition creditors. However, without the client files, ACH Receivables, and funds, the alleged Transfers left the LPG with approximately $12,186,500 in assets and no income stream; virtually none of those alleged $12,186,500 assets have been turned over to the Trustee despite repeated request for same. Included in the assets scheduled by LPG are approximately $12,000,000 or more in funds held by Defendants.

147.   As such, the Transfers and transactions alleged herein left LPG with remaining assets that were unreasonably small in relation to the Transfers and transactions.

148.   Further, LPG was insolvent at the time of the alleged Transfers and transactions alleged herein or became insolvent as a result thereof; the exact aim of Diab's scheme to bankrupt LPG in the event a receiver was appointed.

149.   On or after the date that such Transfers and transactions alleged herein were made, LPG was not paying debts to the pre-petition creditors, all of which arose before the Transfers alleged herein were made, as they became due.

150.   Marich Bein diverted monies due Debtor to non-Debtor entities including the GoFi Entities, Vulcan, Prime Logix, BAT, Inc. dba Coast Processing, Pacific Staffing, and Validation Partners among others who are subsequent transferees of the fraudulent Transfers.

151.   Defendants the GoFi Entities and Pacific Staffing also diverted monies due to Debtor to non-Debtor entities including by and between each other, and Marich Bein, Prime Logix, BAT, Inc. dba Coast Processing among others who are subsequent transferees of the fraudulent Transfers.

///

152.   Thus, the Transfers and transactions alleged herein were made with actual intent to hinder, delay, or defraud creditors of LPG, as well as any duly appointed receiver.

153.   Thus, at the time of the Transfers and transactions alleged herein related to LPG client files, ACH Receivables, ACH transactions and withholding of funds occurred, or as a result thereof, LPG was either:

a.    insolvent on the date the alleged Transfers and transactions were made, or became insolvent as a result thereof;

b.    engaged or was about to engage in a Transfer or transaction for which any property remaining with LPG was of unreasonably small capital;

c.    intended to incur, or believed that LPG would incur, debts beyond its ability to pay as such debts matured.

154.   The alleged Transfers and transactions of the LPG's client files, ACH Receivables, and funds occurred within the four years prior to the Petition Date.

155.   At all relevant times, the alleged Transfers of the LPG's client files, ACH Receivables, and funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and California Civil Code sections 3439.04(a) and 3439.07 by one or more creditors who held and hold unsecured claims against the Debtor that were and are allowable against his Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the pre-petition creditors.

156.   Accordingly, the Transfers alleged herein that Diab caused LPG to make should be avoided as fraudulent under 11 U.S.C. § 544(b) and California Civil Code sections 3439.04(a) and 3439.07, and such property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and California Civil Code section 3439.07.

///

///

///

## SIXTH CLAIM FOR RELIEF

**Avoidance, Recovery, and Preservation of Preferential Transfer to Defendant in**

**Preference Period**

**(Against Defendants Marich Bein, LLC,  Heshy Deustch, Nachman Weisz, and**

**Israel Reches)**

**[11 U.S.C. §§ 547, 550, and 551]**

157.  Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 156 as though set forth in full.

158.  Marich Bein claims that pursuant to the ARPA, Marich Bein transferred $12,058,335.00 to Debtor to acquire Accounts Receivables (as that term is defined in the ARPA), and Debtor was guaranteed payment of not less than $37,104,601.84 under the ARPA. A true and correct copy of Marich Bein's Proof of Claim is attached as **Exhibit 4**. Thus, the obligations due to Marich Bein under the ARPA represent a debt for which Marich Bein contends LPG is liable (the "Marich Debt").

159.  Further, the SRA allows Marich Bein to service the Accounts Receivables and provides that Marich Bein is entitled collect and withhold additional monies due to Marich Bein under the ARPA. The SRA authorizes Marich Bein to repay the Marich Debt from the collections it received under the SRA.

160.  Of the $37,104,601.84, Marich Bein has paid itself back $16,989,963.23 by Debtor ("Marich Debt Payments"). Debtor made the Marich Debt Payments, which were applied to the Marich Debt, during the one-year preference period ("Preference Transfers").  The Marich Debt Payments constitute payment of an antecedent debt to or for a creditor for purposes of satisfying §547(b)(1) and (b)(2).

161.  Marich Bein was a non-statutory insider of Debtor as Marich Bein had a close relationship with Debtor and the transactions pursuant to the SRA and ARPA were not at arm's length. Moreover, Marich Bein used the d/b/a LPG during this time.

///

///

41

162. Upon information and belief, Marich Bein acted as an officer or manager of LPG and gave directions to employees as if he was an officer and/or manager of LPG.

163. As a *de facto* officer and/or officer of LPG, Marich Bein was an insider of LPG as that term is identified in 11 U.S.C. §101(31)(B).

164. The Preference Transfers happened while LPG was insolvent.

165. Debtor is also entitled to the presumption of insolvency when the Preference Transfers happened pursuant to 11 U.S.C. § 547(f).

166. As a result of the Preference Transfers, Defendant recovered more than it would have received if: (i) the Debtor's case was under chapter 7 of the Bankruptcy Code; (ii) the Preference Transfers had not been made; and (iii) Defendant received payments of its debts under the provisions of the Bankruptcy Code. As evidenced by the Debtor's schedules filed in the underlying Bankruptcy Case, as well as the proofs of claim that have been received to date, the Debtor's liabilities exceed its assets to the point that unsecured creditors will not receive a full payout of their claims from the Debtor's Estate.

167. In accordance with the foregoing, the Preference Transfers are voidable pursuant to 11 U.S.C. § 547(b), and may be recovered and preserved for the benefit of the estate pursuant to 11 U.S.C. §§ 550 and 551.

## SEVENTH CLAIM FOR RELIEF

### Breach of Contract

**(Against Marich Bein, LLC, Heshy Deustch, Nachman Weisz, and Israel Reches)**

168. Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 167 as though set forth in full.

169. The ARPA identified in Paragraph 40 above were between Marich Bein as the buyer and Debtor as the seller. Each ARPA states a purchase price in Section 2.3 of each ARPA ("Purchase Price").

///

170.  Marich Bein claims that pursuant to the ARPA, Marich Bein transferred $12,058,335.00 to Debtor to acquire Accounts Receivables (as that term is defined in the ARPA) and Debtor was guaranteed payment of not less than $37,104,601.00 under the ARPA.

171.  However, the ARPA attached to Marich Bein's Proof of Claim evidence a total amount actually paid to Debtor to be $11,101,745.75.

172.  The Purchase Price under the ARPA were due to the Debtor as the seller of the accounts receivables that were the subject of the ARPA, and thus, should have been paid to the Debtor.

173.  However, $5,540,000.00 of the Purchase Price of the combined ARPA due the Debtor were diverted from Debtor and wired to non-Debtor entities, including GoFi, Vulcan, PrimeLogix, BAT, Inc. dba Coast Processing among others. Specifically, per the wire instructions, $1,200,563.85 was transferred to GoFi, and $4,339,436.15 was transferred to Vulcan.

174.  Marich Bein breached the ARPA by diverting payments due the Debtor under the ARPA to other non-Debtor entities.

175.  Debtor suffered damages due to Marich Bein's breach of contract in the amount transferred from Marich Bein to non-Debtor entities, *i.e.* $5,540,000.00.

### EIGHTH CLAIM FOR RELIEF

**Conversion**

**(Against Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber)**

**[Cal. Civ. Code § 3336]**

176.  Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 175 as though set forth in full.

177.  Defendants Marich Bein, LLC,  GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and

43

Nicholas Kohlschreiber (collectively, the "Conversion Defendants") exercised dominion and control over LPG client files, ACH Receivables and funds obtained by way of processing ACH transactions on LPG client files without consent or in excess of any potential consent found to exist at the time of the alleged transactions.

178. LPG and its clients owned, possessed and had a lawful right to possess LPG client files, ACH Receivables and funds alleged to have been processed and retained by the Conversion Defendants. Notwithstanding the alleged fraudulent transfers of LPG client files and ACH Receivables, none of the purported transfers were made with client approval.

179. The Conversion Defendants were informed and knew that all or some of funds it processed on behalf of LPG were LPG assets and/or unauthorized by LPG clients.

180. Marich Bein was provided with a cease and desist letter from processing ACH transactions as fraudulent and without consent on February 6, 2023 by LPG as alleged in the Marich Bein Action. BankUnited similarly received a cease and desist letter on February 10, 2023 as alleged in the Marich Bein Action. Moreover, in addition to Defendants acting without consent, outside of the scope of any consent that may be found to have existed at the time of the alleged transactions herein, consent, if it existed at all, terminated at least as early as the time Diab revoked Marich Bein's access to DPP and caused LPG client files to be transferred to LUNA.

181. On information and belief, even after Marich Bein was denied access to DPP as a result of Diab causing LPG's client files to be transferred to LUNA, Defendants continued to process ACH transactions on LPG client files with outdated client information in order to ensure the accuracy of payments, client account information, debit account information, security and to avoid double ACH transactions on client files. Moreover, these subsequent ACH transactions were processed through BankUnited and, on information and belief, BCB Bancorp as its NACHA financial institutions.

182.   March Bein, BankUnited and/or BCB Bancorp knowingly processed, retained and controlled $12,000,000 or more of ACH transactions on LPG client files which are and were LPG assets. Pre-petition and by and through the preliminary injunction attached hereto as **Exhibit 1**, LPG and Trustee have demanded the turnover of said funds. To date no funds have been turned over.

183.   As a result of the conversion of LPG assets alleged herein and based on the testimony of Diab, LPG was forced to incur further debt obligations, including, but not limited to emergency financing through City Capital NY in the amount of $2.95 million dollars pre-petition.

184.   LPG and its Estate have been harmed by the foregoing conduct which was a substantial factor in causing the harm, including, but not limited to:

a.   initiating ACH transactions on LPG client files without consent and/or exceeding the scope of any potential consent found to have existed at the time of the transactions;

b.   processing ACH transactions after access to LPG client files was denied;

c.   retaining LPG assets and funds obtained by way of the foregoing ACH transactions; and

d.   failing to turnover said funds upon demand and/or order of the Court.

185.   As a result of the foregoing harm, LPG and its Estate have been harmed in amount to be proven at trial in accordance with California Civil Code section 3336, including, but not limited to, the value of the property at the time of conversion, with interest from that time and a fair compensation for the time and money properly expended in pursuit of the property.

///

///

///

## NINTH CLAIM FOR RELIEF

### Turnover of Estate Property

### (Against Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber)

### [11 U.S.C. § 542]

186. Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 185 as though set forth in full.

187. One or all of Conversion Defendants have possession or control over property of the Estate, including, but not limited to, LPG client files, ACH Receivables, and funds; including LPG's assets totaling $12,000,000 or more based on Debtor's Bankruptcy schedules. None of the $12,000,000 or more in pre-petition payment assets have been turned over to the Trustee.

188. LPG's client files, ACH Receivables, funds, and potentially other property are property of the Estate and are not of inconsequential value to the Estate.

189. LPG's client files, ACH Receivables, and funds that are the subject of the transfers and transactions alleged herein were paramount to the operation of LPG and its ability to pay creditors pre-petition. As a result of the alleged transfers and transactions alleged herein and based on the testimony of Diab, LPG was forced to incur further debt obligations, including, but not limited to, emergency financing through City Capital NY in the amount of $2.95 million dollars pre-petition.

190. Accordingly, the Trustee is entitled to a judgment for turnover of the files, accounts receivable, and funds pursuant to 11 U.S.C. § 542.

///

///

///

///

///

46

## TENTH CLAIM FOR RELIEF

**Racketeer Influenced and Corrupt Organizations Act Violations**

**(Against Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber)**

**[18 U.S.C. § 1962]**

191. Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 190 as though set forth in full.

### a. The Unlawful Activity

192. Several predicate acts underlie this claim for relief based on information known to date. First, Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Tony Diab, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber's (collectively, the "RICO Defendants") activities and transfers, as detailed herein, were done in furtherance of LPG's Ponzi scheme. Second, Marich Bein, by and through its owners, operators and/or directors Diab, Deutsch, Reches and upon information and belief, Weisz, diverted monies due Debtor pursuant to the ARPA. Third, the RICO Defendants obtained dominion and control over LPG client files, ACH Receivables and funds by way of processing ACH transactions on LPG client files without consent or in excess of any potential consent found to exist at the time of the alleged transactions. Fourth, the RICO Defendants engaged in wire fraud by directing ACH transactions described herein and movement of funds to the other Defendants.

### b. The Culpable Persons

193. The RICO Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation or limited liability company capable of holding a legal interest in property. At all material times, RICO Defendants were persons that exist separate and distinct from the Enterprise, described below.

194.  On information and belief, Marich Bein, by and through its owners, operators and/or directors Deutsch, Reches and,upon information and belief, Weisz, the GoFi Entities and Pacific Staffing, by and through their owner, operator and/or director Kohlschreiber, Vulcan, by and through its owner, operator and/or director Cohen, and Prime Logix engaged in the activities and transfers detailed herein in furtherance of LPG's Ponzi Scheme, as well as wire fraud.

### a. The Enterprise

195.  RICO Defendants constitute an Enterprise (the "Enterprise) within the meaning of 18 U.S.C. §§ 1961(4) and 18 U.S.C. 1962(c).

196.  The Court's order in the 1046 Action wherein it denied the Motion of Greyson Law Center to Vacate the Preliminary Injunction previously entered, the Court stated: "*…it is clear to this Court that Debtor, since its pre-petition inception (and through the time of the appointment of the Chapter 11 Trustee) was in the Court's opinion, operating a criminal enterprise*."  (Case No. 8:23-bk-10571-SC; Adv. No. 8:23-ap-01046-SC [Bankr. Docket No. 1545, p. 3 (emphasis in original)].)

197.  RICO Defendants are associated in fact through relations with one another for the common purpose of carrying on an ongoing unlawful enterprise.  The Enterprise has a common goal of furthering LPG's Ponzi scheme.

198.  Since at least 2021, and continuing to date, the members of the Enterprise have had ongoing relations with each other through common control, ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of furthering LPG's Ponzi Scheme.

199.  The Enterprise's activity constitutes "financial institution fraud" within the meaning of 18 U.S.C. § 1343, which is "racketeering activity" as defined by 18 U.S.C. § 1961(1).  RICO Defendants' repeated and continuous use of and engaging in such conduct, including directing ACH transactions and transfers to participate in the affairs of the Enterprise constitutes a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

200.  The Enterprise's activity also constitutes "wire fraud" within the meaning of 18 U.S.C. § 1343, which is "racketeering activity" as defined by 18 U.S.C. § 1961(1). The repeated and continuous use of and engaging in such conduct, including the ACH transfers to participate in the affairs of the Enterprise constitutes a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

201.  The RICO Persons have organized themselves and the Enterprise into a cohesive group with specific responsibilities and a command structure to operate as a unit in order to accomplish the common goals of furthering LPG's Ponzi scheme and controlling and effectuating the fraudulent transfers detailed herein, including:

202.  Marich Bein, on information and belief, maintains offices, books, records and bank accounts, some independent of those of the other RICO Defendants but maintained in coordination with them.

203.  The GoFi Entities, on information and belief, maintains offices, books, records and bank accounts, some independent of those of the other RICO Defendants but maintained in coordination with them.

204.  Vulcan, on information and belief, maintains offices, books, records and bank accounts, some independent of those of the other RICO Defendants but maintained in coordination with them.

205.  Prime Logix, on information and belief, maintains offices, books, records and bank accounts, some independent of those of the other RICO Defendants but maintained in coordination with them.

206.  Pacific Staffing, on information and belief, maintains offices, books, records and bank accounts, some independent of those of the other RICO Defendants but maintained in coordination with them.

207.  Deutsch, , Cohen, Reches, Kohlschreiber, and, on information and belief, Weisz and other officers, employees and investors, have operated, engaged and/or conspired with Marich Bein, the GoFi Entities, Prime Logix, and Pacific Staffing.

///

49

208. Pursuant to their membership in the Enterprise, Marich Bein, the Gofi Entities, Vulcan, Prime Logix, and Pacific Staffing have (i) acted through Deutsch, Reches, Weiss, Cohen, Kohlschreiber, and their officers and employees to participate in and further LPG's Ponzi scheme by controlling and effectuating the fraudulent transfers; (ii) pooled their funds with those of the investors in order to fund the Enterprise and further the Ponzi scheme; (iii) entered into various agreements detailed herein, including ARPAs and the SRA, with the fraudulent purpose of furthering the Ponzi scheme; and (iv) set up, coordinated, and implemented the fraudulent ACH withdrawals and transactions used by the Enterprise in furtherance of the Ponzi scheme.

209. Deutsch, , Cohen, Kohlschreiber, and upon information and belief, Weisz, as owners of Marich Bein, the GoFi Entities, Vulcan, Prime Logix, and/or Pacific Staffing are the masterminds of the Enterprise.  They are responsible for the day-to-day operations and have final say on all business decisions of the Enterprise including, without limitation, directing, coordinating, facilitating and receiving the ACH transactions described herein.

210. In their capacities as masterminds of the Enterprise Deutsch, Cohen, Reches, Kohlschreiber, and upon information and belief, Weisz, are responsible for creating, approving and implementing policies, practices and instrumentalities used by the Enterprise to accomplish its goals and purposes including, the form of agreements used by the Enterprise in attempts to disguise the Ponzi scheme and unlawful transfers of money, and the form and method of collecting and transferring ACH payments.

211. Deutsch, Cohen, Reches, Kohlschreiber, and upon information and belief, Weisz, have also taken actions and directed other members of the Enterprise, and those they employed or retained, to take action necessary to accomplish the overall goals and purposes of the Enterprise including, without limitations, funding the Enterprise, directing members of the Enterprise to further the Ponzi scheme by, among other things, coordinating, facilitating, and directing payments and transfers of monies and executing documents in furtherance of concealing the true nature of their fraudulent and criminal

1    activity related to the Enterprise and the Ponzi scheme.

2    212.  Deutsch, Cohen, Reches, Kohlschreiber, and upon information and belief,
3    Weisz, benefitted from the Enterprise's foregoing conduct.

4    213.  On information and belief, Deutsch, Cohen, Reches, Kohlschreiber, and
5    upon information and belief, Weisz, employed or retained others, individually and
6    through the entity Reches & Associates, to help facilitate the Enterprise and to
7    coordinate the fraudulent transfers of money as detailed herein.

8    214.  The Enterprise is engaged in interstate commerce and uses and has used
9    the instrumentalities of interstate commerce in its daily activities. Members of the
10   Enterprise maintain offices in Florida, New York, California, Wyoming, and/or
11   Delaware and use personnel in these offices to direct, coordinate and execute transfers
12   detailed herein, and to draft, approve, and ratify the Enterprise's efforts, agreements,
13   legal proceedings, and other financial agreements in furtherance of the Enterprise made
14   with each other and other entities in throughout the United States via extensive use of
15   mail, interstate e-mails, wire transfers, and bank withdrawals processed through
16   automated clearing houses.

17   215. In this Bankruptcy Case, communications between members of the
18   Enterprise and Debtor were by mail, interstate e-mail, wire transfers, ACH debts and
19   other interstate wire communications.

20   216.  Plaintiff and Debtor's Estate and its creditors have been and will continue
21   to be injured by reason of the Enterprise's violations of 18 U.S.C. § 1962(c).

22   217.  The injuries directly, proximately, and reasonably foreseeably resulting
23   from or caused by these violations include, without limitation, hundreds of thousands
24   of dollars in improperly transferred and acquired monies.

25   218. Plaintiff and Debtor's Estate also have suffered damages by incurring
26   attorney's fees and costs associated with the prosecution of Defendants' unlawful
27   activities.

28   ///

219. Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover triple damages and costs of suit, including attorney's fees, from Defendants.

### ELEVENTH CLAIM FOR RELIEF

**Conspiracy**

**(Against Defendants Marich Bein, LLC,  GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Isael Reches, and Nicholas Kohlschreiber)**

**[18 U.S.C. § 1962(d)]**

220. Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 219 as though set forth in full.

221. Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Israel Reches, Nachman Weisz, and Nicholas Kohlschreiber ("Conspiracy Defendants") have unlawfully, knowingly and willfully, combined, conspired and agreed together to engage in activities that violate 18 U.S.C. § 1962(c), as alleged above, in violation of 18 U.S.C. § 1962(d).

222. By and through Conspiracy Defendants' business relationships with one another, their coordination with one another in the affairs of the Enterprise, and the frequent e-mail and other communications among the Conspiracy Defendants concerning the Ponzi scheme and fraudulent transfers. Each Conspiracy Defendant knew the nature of the Enterprise and each Conspiracy Defendant knew that the Enterprise extended beyond each Defendant's individual role.  Moreover, through the same connections and coordination, each Conspiracy Defendant knew that the other Defendants were engaged in a conspiracy to collect upon the unlawful debts in violation of 18 U.S.C. § 1962(c).

223. Marich Bein, through its owners, operators, directors, and/or controllers Deustch, Reches, and Weisz, held accounts at BankUnited and BCB Bancorp in its name for the sole purpose of directing, coordinating, effectuating, and processing Debtor's fraudulent ACH transfers of client funds and money.The GoFi Entities, by and

through their owner, operator, director, and/or controller Kohlschreiber, acted as an intermediary between Prime Logix, Marich Bein and LPG by receiving, controlling, effectuating and transferring the fraudulent transfers of money.

224. Prime Logix also served as an intermediary between the GoFi Entities, Marich Bein, and LPG by receiving, controlling, effectuating and transferring the fraudulent transfers of money.

225. Each Conspiracy Defendant agreed to facilitate, conduct and participate in the conduct, management, and/or operation of the Enterprise's affairs in order to conceal, further, and perpetuate the Ponzi scheme in violation of 18 U.S.C. § 1962(c). Each Conspiracy Defendant was a knowing, willing and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, which was the orchestration, planning, preparation and execution of the scheme.

226. Each Conspiracy Defendant agreed to facilitate, conduct and participate, directly or indirectly, in the management and/or operation of the Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. § 1982(c).

227. The participation and agreement of each Conspiracy Defendant was necessary to implement and perpetuate the commission of the scheme.

228. Plaintiff and the Debtor's Estate and its creditors have been and will continue to be injured by reason of Defendants' conspiracy in violation of 18 U.S.C. § 1962(d), in amounts to be determined at trial.

229. The injuries to Plaintiff and the Debtor's Estate and to its creditors directly, proximately and reasonably foreseeably resulting from and caused by these violations of 18 U.S.C. § 1962(d) include, without limitation, hundreds of thousands of dollars in improperly transferred and acquired monies.

230. Plaintiffs and the Debtor's Estate also suffered damages by incurring attorney's fees and costs associated with the prosecution of Defendants' unlawful activities.

231. Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover triple damages and costs of suit, including attorney's fees, from Defendants.

## TWELFTH CLAIM FOR RELIEF

### Aiding and Abetting

### (Against Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber)

### [18 U.S.C. § 2]

232. Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 231 as though set forth in full.

233. Defendants Cohen, Reches, Deustch, Kohlschreiber, and upon information and belief, Weisz, individually and through the GoFi Entities, Vulcan, Prime Logix, and/or Pacific Staffing, (collectively, "Aiding and Abetting Defendants"), as well as Validation Partners had knowledge of the fraudulent transactions, transfers and agreements that were used to perpetuate and conceal the Ponzi scheme and fraudulent transfers.

234. Aiding and Abetting Defendants, with the foregoing knowledge, intended to, and did, help the other Defendants and Debtor in perpetuating and concealing the Ponzi scheme and fraudulent transfers of money.

235. At all material times, Aiding and Abetting Defendants had the intent to facilitate and conceal the Ponzi scheme and fraudulent transfers of money.

236. Aiding and Abetting Defendants assisted, and did actually engage in, the commission of Defendants' fraud, unlawful Enterprise, and Ponzi scheme by coordinating, facilitating, and directing payments and transfers of monies and executing documents in furtherance of concealing the true nature of their fraudulent and criminal activity related to the Enterprise and the Ponzi scheme.

237. The injuries to Plaintiff, the Debtor's Estate and to its creditors directly, proximately and reasonably foreseeably resulting from and caused by these violations

of 18 U.S.C. §§ 1962(d), 1964(c), and 2 include, without limitation, hundreds of thousands of dollars in improperly transferred and acquired monies.

238. Plaintiff and the Debtor's Estate also suffered damages by incurring attorney's fees and costs associated with the prosecution of Aiding and Abetting Defendants' unlawful activities.

239. Pursuant to 18 U.S.C. §§ 1962(d), 1964(c), and 2, Plaintiff is entitled to recover triple damages and costs of suit, including attorney's fees, from Defendants.

## THIRTEENTH CLAIM FOR RELIEF

### Aiding and Abetting

### (Against Defendants BankUnited, N.A. and BCB Bancorp, Inc.)

### [18 U.S.C. § 2]

240. Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 239 as though set forth in full.

241. Defendants BankUnited and BCB Bancorp (collectively, "Bank Defendants"), through their employees, agents, and/or representatives, were aware that the monies deposited, transferred and maintained in the accounts of Defendants Marich Bein, the GoFi Entities, Vulcan, Prime Logix, and Pacific Staffing and/or their affiliates were used to perpetuate the Ponzi scheme and/or their conduct were in breach of their fiduciary duties.

242. The Bank Defendants were used independently and in conjunction to hold client funds, receivables, and operating expenses and were also leveraged for processing payments, particularly through ACH transactions, to execute the fraud, Ponzi scheme, and other illegal acts described above in furtherance of the criminal enterprise.

243. Bank Defendants knew or should have known exceptional returns for clients and comingling of significant amounts of client monies with both small and large investors involved are two hallmarks of a Ponzi scheme. *Gonzalez v. Lloyds TBS Bank, PLC*, 532 F. Supp. 2d 1200, 1207 (C.D. Cal. 2006).

///

244.  Bank Defendants, with the foregoing knowledge, intended to, and did, help the other Defendants and Debtor in perpetuating and concealing the Ponzi scheme, and the other illegal acts described above and assisted in the commission of Defendants' fraud, unlawful Enterprise, and Ponzi scheme by facilitating financial transactions and/or permitting the transfer of significant amounts of monies in and out of Defendants' bank accounts.

245.  Further, the Bank Defendants failed to perform their regulatory obligations related to account monitoring and the processing of ACH transactions, including Know Your Customer (KYC) and Bank Secrecy Act (BSA) protocols and NACHA regulations, and did not investigate the red flags raised by the numerous unusual ACH and other transactions, involved in the criminal enterprise even after receiving notice of issues related to the same.

246.  Bank Defendants also substantially assisted in the illegal acts and criminal enterprise set forth above by processing unauthorized ACH transfers and failing to investigate suspicious transactions and red flags, such as repeated transfers to the same third-party entities and transfers that deviated significantly from  typical transactional patterns, in turning a blind eye to these criminal activities the Bank Defendants directly facilitated the fraud, the Ponzi scheme and overall criminal enterprise described above.

247.  The injuries to Plaintiff and the Debtor's Estate and to its creditors directly, proximately and reasonably foreseeably resulting from and caused by these violations of 18 U.S.C. §§ 1962(d) and 1964(c), and include, without limitation, hundreds of thousands of dollars in improperly transferred and acquired monies.

248. Plaintiff and the Debtor's Estate also suffered damages by incurring attorney's fees and costs associated with the prosecution of Defendants' unlawful activities.

249.  Pursuant to 18 U.S.C. §§ 1962(d), 1964(c), and 2, Plaintiff is entitled to recover triple damages and costs of suit, including attorney's fees, from the Bank Defendants.

## **FOURTEENTH CLAIM FOR RELIEF**

### **Declaratory Relief**

250. Plaintiff realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 249 as though set forth in full.

251. An actual controversy exists between Plaintiff and Defendants regarding the enforceability of the ARPA and SRA.

252. Plaintiff contends the ARPA and SRA are void and unenforceable, as detailed above. The ARPA is fraudulent as the client files were sold to other entities without client consent and with the purpose to defraud LPG creditors.  The SRA was made without consideration to LPG.   Additionally, Plaintiff contends the Transfers made to perpetuate the Ponzi scheme constitute wire fraud. Defendants dispute Plaintiff's contentions.

253. A judicial determination of the rights, duties and obligations of Plaintiff and Defendants, therefore, is appropriate.

## **RESERVATION OF RIGHTS**

254. Plaintiff reserves the right to bring all other claims or causes of action that the Plaintiff may have against any of the defendants, on any and all grounds, as allowed under the law or in equity, including but not limited to, those claims not known by the Trustee at this time but that he may discover during the pendency of this adversary proceeding.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for a judgment as follows:

**On the First Claim for Relief:**

1.    <u>Control over ACH Transfers</u>: Entry and enforcement of the preliminary injunction ordered by the court [Dkt No. 70] prohibiting interference with any ACH Transfer being executed pursuant to documents authorizing such transfers to be executed in favor of LPG as follows:

///

a.    <u>Covered Entities and Individuals</u>: The following entities and individuals, and anyone acting on their behalf:  LPG, Oakstone; Greyson; Phoenix; Maverick; LGS Holdco, LLC; CLG; Vulcan; Coast Processing; Prime Logix; Tony Diab; Rosa Loli aka Rosa Bianca Loli aka Bianca Loli; Lisa Cohen, Dan March, Ty Carss, Eng Heng and all other aliases, agents, or corporate entities affiliated with same shall, absent further order from this Court:

b.    <u>Enjoined Conduct re ACH Instructions</u>: No covered entity or individual shall initiate, cause to be initiated, or instruct any company or person that processes ACH transfers and/or their affiliated financial institution including Marich Bein and BankUnited, N.A.; and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875" or any such substantially similar ACH identification transaction, to execute any ACH EFT on any file, financial institution, or current or former client of LPG, to or for the benefit of LPG without the express written authorization of Trustee;

c.    <u>Enjoined Conduct re Bank Accounts</u>: No covered entity or individual shall open, or cause to be opened, any account, whether business or personal, that can receive or send money or anything of value, at any company including banking, financial, or similar institution and/or receive, directly or indirectly, any funds drawn from ACH Transfers;

2.    <u>Execution of ACH Transfers</u>: Entry and enforcement of the  preliminary injunction ordered by the court [Dkt No. 70] prohibiting interference with any ACH Transfer being executed pursuant to documents authorizing such transfers to be executed in favor of LPG as follows:

a.    <u>Covered Entities and Individuals</u>: All companies capable of processing ACH transfers including Marich Bein and BankUnited, N.A.; and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875," or any such substantially similar ACH identification transaction, are enjoined absent further order of this court, from:

i. <u>Enjoined Conduct re ACH Transfers</u>: No covered entity or individual shall initiate or receive funds from any ACH EFT on any file, financial institution, or current or former client of LPG, to or for the benefit of LPG or any one or more of its alleged assignees or transferees;

ii. <u>Injunction Mandating Turnover to Trustee</u>: All covered entities or individuals shall hold in trust any and all funds, receipts, and transfers related to any account, file, or current or former client of LPG, or any one or more of its alter egos or fraudulent transferees,  until expressly directed to release, wire or transfer such funds by the Trustee and to a bank account whose information shall be provided with any such request; and, shall upon request by the Trustee provide an accounting of any and all such funds held in trust to the Trustee upon written request within 10 days of said request;

b. enjoining LPG, or any one or more of its alter egos or fraudulent transferees from incurring, taking out, or pledging any receivables of LPG or any one or more of its alter ego entities without seeking leave of court;

c. enjoining LPG, or any one or more of its alter egos or fraudulent transferees from instructing any person and/or Client to cancel and/or demand a refund from LPG;

3. For entry of an order amending the preliminary injunction order [Dkt No. 70] requiring Defendants to turnover all pre-petition client files, documents, ACH information, funds and fees for every transaction processed from March 20, 2019 to the present.

**On the Second and Third Claims for Relief:**

4. Avoiding, recovering, and preserving the two-year transfers against all Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber.

///

**On the Fourth and Fifth Claims for Relief:**

5.      Avoiding, recovering, and preserving the four-year transfers against all Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber.

**On the Second and Fourth Claim for Relief**:

6.      Awarding punitive and exemplary damages according to proof.

**On the Seventh Claim for Relief:**

7.      Awarding Plaintiff general damages in the total aggregate amount of not less than $5,540,000.

8.      For attorney's fees and costs.

**On the Eighth Claim for Relief:**

9.      Ordering turnover to the Trustee of all funds obtained by way of processing ACH transactions against LPG client files from March 20, 2019 through the present that have not already been remitted to LPG and/or the Trustee.

10.    For attorney's fees and costs expended in pursuit of the property. Cal. Civil Code § 3336.

11.    For pre-judgment interest from the date of conversion. Cal. Civil Code § 3336.

**On the Ninth Claim for Relief**:

12.    Ordering turnover to the Trustee of the following:

a.      All Client files, including, but not limited to, names, contact information, client file management, communications, account information, letters, pleadings, communications, payment history, financial account information, credit reports, executed legal services contracts, ACH contracts, executed installment contracts, account balances, debts in dispute, payment history, file status, settlements, debt invalidations and/or any other information created, managed and stored electronically utilizing DPP software program's software license, key or account, that

was opened and is maintained and controlled by LPG, or any one or more of its alter egos, including, but not limited to, Defendants;

b.      All administrative usernames and passwords that give the Trustee access to any account held, maintained or controlled by LPG, or any one or more of its alter egos;

c.      All ACH files related to Client information, details, accounts, history of EFTs, payments, amounts held, interest on held amounts, penalty fees, nonsufficient fund fees or other ACH related charges to the Clients stored electronically or in hard copy associated with ACH processing service providers and/or affiliated financial institutions, including, but not limited to, Marich Bein and BankUnited, N.A. and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875", or any such substantially similar ACH identification transaction;

d.      All files, information, reports, spreadsheets, account numbers, routing numbers, and databases related to transfer of funds out of any account opened, maintained and controlled by LPG, or any one or more of its alter egos, that were processed and executed by ACH processing service providers and/or their affiliated financial institutions, including, but not limited to, Marich Bein and BankUnited, N.A. and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875", or any such substantially similar ACH identification transaction;

e.      All administrative usernames and passwords that give the Trustee access to any ACH processing accounts, software, database or other program at ACH processing service providers and/or affiliated financial institutions, including, but not limited to, Marich Bein and BankUnited, N.A. or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875", or any such substantially similar ACH identification transaction, used to upload or input Client information, initiate Client ACH EFTs, transfer Client ACH funds to outside

1   financial institutions or otherwise manage any account opened, maintained and

2   controlled by  LPG, or any one or more of its alter egos,;

3          f.      All accounting records, files, data and information obtained,

4   received or prepared for using LPG client files and/or ACH information by Defendants,

5   or any one or more of LPG's alter egos and stored on NetSuite; QuickBooks and

6   Microsoft SharePoint; G-Suite or other permanent or cloud based systems;

7          g.      All contracts, records, reports, information, data and details

8   regarding the transfer or sale of any client files or future Client ACH payments to

9   Defendants and/or any other law firm, organization, corporate entity, person(s), or

10  investment group (otherwise known as factoring companies);

11         h.      All contracts, records, reports, information, data, cost basis,

12  payment information and details regarding the transfer or receipt of any Client files or

13  future Client ACH payments from any other law firm, organization, corporate entity,

14  person(s), investment or marketing group (otherwise known as capping companies) to

15  LPG or any one or more of its alter egos;

16         i.      All ACH payments originating from LPG client files or any one or

17  more of its alter egos or fraudulent transferees, including, but not limited to, Defendants

18  from March 20, 2019 to the present.

19  **On the Tenth and Eleventh Claim for Relief**:

20         13.     Awarding Plaintiff monetary damages in the amount of all funds obtained

21  by Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC,

22  AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas

23  Kohlschreiber by way of processing ACH transactions against LPG client files from

24  March 20, 2019.

25         14.     Awarding treble damages.

26         15.     Awarding costs of suit, including attorney's fees.

27  ///

28  ///

**On the Twelfth and Thirteenth Claims for Relief**:

16.    Awarding Plaintiff compensatory damages in an amount to be determined at trial.

**On the Fourteenth Claim for Relief**:

17.    Declaring that the ARPA and SRA are void and unenforceable, that the ARPA is fraudulent as the client files were sold to other entities without client consent and with the purpose to defraud LPG creditors, that the SRA was made without consideration to LPG, and that the Transfers made to perpetuate the Ponzi scheme constitute wire fraud.

**On All Claims for Relief:**

18.    Awarding pre-judgment interest at the maximum legal rate.

19.    Awarding post-judgment interest at the maximum rate from the date of the last Transfer until the judgment is paid in pull.

20.    Awarding costs of suit incurred herein.

21.    Granting any other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: February 12, 2025

DINSMORE & SHOHL LLP

By: _____

Christopher B. Ghio
Richik Sarkar
Veneeta Jaswal
Special Counsel to Richard A. Marshack, former Chapter 11 Trustee and current Liquidating Trustee

Exhibit 1

EXHIBIT 1

**ASSIGNMENT OF SERVICING RIGHTS**

This Assignment of Servicing Rights, dated as of September 19th, 2022 (the "**Effective Date**"), is made by and between LITIGATION PRACTICE GROUP PC, a California professional stock corporation ("**Merchant**"), and MARICH BEIN LLC, a New York limited liability company ("**Servicer**"), for themselves and their respective successors and permitted assigns.

**RECITALS**

A. In the ordinary course of its business Merchant generates Receivables (as defined below) arising from the provision of goods and/or services by or on behalf of Merchant to its Customers (as defined below);

B. Servicer (or an entity affiliated with Servicer) has acquired (or will acquire) certain Receivables from Merchant;

C. Merchant wishes to assign all of its rights in the servicing, collection and administration of any Receivable to Servicer (the "**Servicing Rights**"), and, subject to the terms of this Assignment, Merchant desires to engage Servicer to act as third-party servicer of the Receivables (as defined below) on behalf of Merchant, and Servicer desires to accept such engagement and act as servicer of the Receivables.

NOW, THEREFORE, in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties, the parties hereby agree as follows:

**Article I. ASSIGNMENT**

Section I.1 Assignment of Servicing Rights. Merchant, by these presents does hereby presently, unconditionally, absolutely and irrevocably assign, transfer, convey and set over to Servicer (it being intended by Merchant that such assignments constitute present, absolute and unconditional assignments and not assignments for additional security only, but such assignment shall constitute security for Merchant's obligations to Servicer or its affiliates), all of Merchant's right, title and interest in and to the Servicing Rights, including, without limitation, any right of Merchant or any of its affiliates (whether such rights are currently existing or arising in the future) to service collection of subscription fees, return payment fees, or any other fee or payment resulting from any Customer's engagement with Merchant or any of its affiliates, or give notices, sue for payment under the Customer contracts or to take any action at law or in equity relating to the Customer contracts.

**Article II. SERVICING OF CONTRACTS**

Section I.2 Appointment as Third-Party Servicer. Subject to the terms and conditions of this Assignment, Merchant hereby retains Servicer to act as third-party servicer for the Receivables. Merchant hereby agrees to perform the Services for the Receivables. Merchant and

EXHIBIT 1

1

Servicer agree that Servicer is not responsible for ensuring that the terms and conditions of the Customer contracts comply with applicable law or are legally enforceable.

Section I.3 Serving of Receivables. Servicer may use any subcontractors it deems reasonably necessary to assist in the performance of any of Servicer's obligations and duties under this Assignment. Merchant agrees to provide Servicer and its subcontractors with such assistance in the servicing, collection and administration of any Receivable as may be requested by Servicer from time to time. Notwithstanding any other provision of this Assignment, Servicer may determine at any time to cease or to suspend, temporarily or permanently, servicing or ᐧcollection activity with respect to any Receivable at any time and for any reason or no reason.

Section I.4 Limited Power of Attorney. Merchant hereby irrevocably appoints and empowers Servicer as Merchant's true and lawful attorney-in-fact, with full power of substitution, to endorse and promptly deposit on Merchant's behalf any checks or other instruments made payable to Merchant and submitted by a Customer as payment on any Receivable, and to take any other action relating to the Receivables in Merchant's name and place that Servicer deems advisable and consistent with the terms of this Assignment. This power of attorney shall be deemed to be a right coupled with an interest.

Section I.5 Servicing Fees. Merchant agrees to pay Servicer a minimum fee of $4.00 per debit transaction and $9.00 per returned transaction as Servicer's compensation for performing the Services (the "**Servicing Fees**"). On a monthly basis, Servicer will withhold the total of all Servicing Fees due for the month (or any prior month, if not previously collected) from all amounts otherwise required to be remitted to Merchant from Servicer.

Section I.6 Remittance. Following final and indefeasible receipt by Servicer of payment on a given Receivable (other than a Purchased Receivable), Servicer shall remit to Merchant the amount of such payment, minus (a) any amount owing to Servicer (or any of its affiliates) in respect of any Purchased Receivable, (b) any Servicing Fees permitted to be withheld pursuant to Section 2.05 of this Assignment and (c) any amounts owing to any other party required that are required to be withheld or which Merchant has otherwise instructed Servicer to remit to such other party.

## Article III. OBLIGATIONS OF MERCHANT

Section III.1 Access to all Digital Records, Databases, and Applications. Merchant shall provide Servicer any information requested by Servicer with respect to its Customers and the Customer contracts. At all times Servicer must have unfettered access to all software applications used by Merchant, including, but not limited to, Debt Pay Pro, Snowflake, or any other databases used by Merchant in its ordinary course of business. All Customer contracts, correspondence or other files of Merchant relating to the Receivables will be retained and held in the possession or control of Merchant, and complete and accurate copies of which shall be provided by Merchant at Merchant's expense to Servicer within one (1) Business Day following Merchant's receipt of a request from Servicer for any such documentation or records.

Section III.2 Facilitating the Transition. Merchant and Servicer shall work in good faith to create a plan for the accomplishment of the conversion of the servicing of the Receivables and related electronic files to Servicer, including, to the extent required, notifying Customers of the

EXHIBIT 1

change in Servicer.

2

Section III.3 No Impairment. Merchant will not take any action (including placing or allowing placement of a lien or security interest on any Purchased Receivable) or make any omission that has, individually or in the aggregate, an adverse effect on any Purchased Receivable or on Servicer's ability to collect on any Purchased Receivable.

Section III.4 Amounts Received. If Merchant or any employee, agent or representative of Merchant (other than Servicer) receives any payment on any Receivable, or any payment on any Receivable is processed or deposited by or for Merchant, then such funds shall be deem to be held in trust for Servicer's benefit. Merchant shall notify Servicer immediately of any such payment and shall remit or cause to be remitted the full amount of such payment as directed by Servicer within one (1) Business Day of its receipt or deposit. Merchant shall not in any way encourage or cause any proceeds to be paid, processed, settled or delivered to any person or account other than the Servicer's account, and shall take all affirmative steps at its expense and as necessary or appropriate to prevent any such occurrence from recurring. Merchant is prohibited from instructing any Customer to pay Merchant or any other third party on a Receivable or otherwise suggest that Customer may make a payment to Merchant or any other third party instead of paying Servicer to satisfy its payment obligation.

Section III.5 Receivables Data. Merchant hereby authorizes and directs Servicer to perform the Services with respect to the Receivables in accordance with the information and data relating to the Receivables as provided by Merchant to Servicer (collectively, the **Merchant Provided Contract Data**"). Servicer may accept and rely on the Merchant Provided Contract Data without audit or any other examination thereof, and Servicer shall have no duty, responsibility, obligation, or liability for acting in reliance on the accuracy of the Merchant Provided Contract Data. If Merchant becomes aware of any errors, inaccuracies, or material omissions in the Merchant Provided Contract Data (collectively, **"Data Errors"**), Merchant shall notify the other party of the existence of such Data Errors, and Merchant shall be responsible for providing any additional or corrected information with respect to the Receivables needed to resolve such Data Errors.

## Article IV. REPRESENTATIONS AND WARRANTIES

Section IV.1 Representations and Warranties. As of the Effective Date and throughout the term of this Assignment, Merchant represents and warrants to Servicer that:

i. Merchant is duly organized or formed, validly existing and in good standing under the laws of the state in which it is organized

ii. Merchant has all necessary power and authority to enter into this Assignment and to perform its obligations under this Assignment or formed;

iii. Merchant conducts and shall conduct its business in accordance with, and not in violation of, any Applicable Law applicable to such business or the provision thereof;

iv. Each of Merchant, its affiliates and each of their respective employees, officers, directors, subcontractors, representatives and agents have all licenses, registrations and authorizations necessary or appropriate to own, operate and conduct its and their

EXHIBIT 1

businesses;

v. Any materials, data, information, content or documents Merchant directly or indirectly
provides to Servicer, are true, correct and complete in all respects, and

3

contain no materially false or misleading statement;

vi. Merchant shall not materially change the goods or services it sells, or otherwise materially
change the nature of its business, without first notifying Servicer and obtaining the prior
written consent of Servicer; and

vii. Other than pursuant to this Assignment, Merchant has not sold, transferred, conveyed,
pledged, assigned, or encumbered the Servicing Rights to any other person.

### Article V. INDEMNIFICATION AND LIMITATION OF LIABILITY

Section V.1 Merchant Indemnification. Merchant agrees to defend, indemnify, and hold
Servicer and all of its affiliates, and each of their respective officers, directors, employees,
representatives, subcontractors and agents, harmless from and against any and all claims, causes of
action, lawsuits, arbitrations or other proceedings, costs, liabilities, expenses, damages, losses,
penalties, fines, forfeitures, amounts paid in settlement, judgments, fees (including reasonable
attorneys' and legal experts' fees and related investigations, accounting and litigation costs, fees and
expenses) which result or arise from:

(a) any act or omission by or on behalf of Merchant, or any of its officers, directors,
employees, representatives, subcontractors or agents (other than Servicer) which is in violation of or
not permitted by this Assignment, or Merchant's agreement with a Customer;

(b) any act or omission by or on behalf of Merchant, or any of its officers, directors,
employees, representatives, subcontractors or agents (other than Servicer) arising out of or alleged to
have arisen out of or in connection with the conduct of Merchant's business;

(c) Servicer's reliance on the accuracy of the Merchant Provided Contract Data in providing
Services for the Receivables;

(d) any act or omission constituting negligence or willful misconduct by an officer, director,
agent, representative, subcontractor or employee of Merchant (other than Servicer); or

(e) any act or omission by Servicer and/or any of its officers, directors, employees,
representatives, subcontractors, affiliates and agents which act or omission was specifically directed
by Merchant.

The obligations of this Section will survive the termination of this Assignment

Section V.2 Limitation of Liability. THE SERVICES ARE PROVIDED BY SERVICER ON
AN "AS IS" AND "AS AVAILABLE" BASIS. EXCEPT AS OTHERWISE EXPRESSLY
CONTAINED IN THIS ASSIGNMENT, SERVICER MAKES NO REPRESENTATIONS OR
WARRANTIES, AND HEREBY EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS,
IMPLIED, STATUTORY, OR OTHERWISE, RELATING TO OR ARISING OUT OF THE
SERVICES OR THESE TERMS AND CONDITIONS, INCLUDING WITHOUT LIMITATION,
ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR

EXHIBIT 1

PURPOSE AND IMPLIED WARRANTIES ARISING FROM COURSE OF DEALING OR OF
PERFORMANCE. The parties agree that Servicer's liability to Merchant or any other person for
damages, whether arising due to a breach of this Assignment, tortious acts (including negligence) or
under any other theory, shall be limited to Merchant's actual direct, provable damages in an amount
not to exceed: $100,000. The parties acknowledge that (i) fees and other charges contemplated under
this Assignment are based on the

4

limitation of liability specified herein and (ii) such fees and other charges would be higher if this
limited liability provision was not included or was unenforceable.

**Article VI. MISCELLANEOUS**

Section I.7 Term and Termination. This Assignment shall commence on the Effective Date
and shall continue in full force and effect, until released by Servicer. Merchant may terminate this
Assignment at any time and for any reason provided that the total amount of Purchased Receivables
held by Servicer and its affiliates are less than $1,000,000.00.

Section I.8 Confidentiality. The parties will each keep confidential and not disclose this
Assignment or any of the terms and conditions of this Assignment to any third party other than a
party's attorneys, accountants, external auditors, regulatory authorities or potential or actual acquirers
or investors or professional advisors who have signed an acceptable non
disclosure agreement.

Section VI.1 Exclusivity. Merchant understands and agrees that the relationship set forth in
this Assignment is exclusive. Merchant forgoes any right to contract with other parties for the same
or similar services provided by Servicer under this Assignment.

Section VI.2 Amendment. The terms of this Assignment may be amended, modified or
supplemented from time to time provided that such amendment, modification or supplement is in
writing and signed by the parties hereto.

Section VI.3 Notices. All notices and other communications provided for hereunder shall,
unless otherwise stated herein, be in writing and shall be delivered at such other address (or email
address) as shall be designated by such party in a written notice to the other party hereto.

Section VI.4 Severability. If one or more of the provisions of this Assignment shall be for any
reason held invalid or unenforceable, such provisions shall be deemed severable from the remaining
covenants, agreements and provisions of this Assignment and such invalidity or unenforceability
shall in no way affect the validity or enforceability of such remaining provisions or the rights of the
parties hereto. To the extent permitted by applicable law, the parties hereto waive any provision of
law which renders any provision of this Assignment invalid or unenforceable in any respect.

Section VI.5 GOVERNING LAW; WAIVER OF JURY TRIAL. THIS ASSIGNMENT
SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF
THE STATE OF NEW YORK, WITHOUT REGARD TO THE CONFLICT OF LAW
PROVISIONS THEREOF. EACH PARTY HERETO WAIVES THE RIGHT TO TRIAL BY JURY
IN ANY CLAIM, ACTION, SUIT, PROCEEDING, OR COUNTERCLAIM OF ANY KIND
ARISING OUT OF OR RELATED TO THIS ASSIGNMENT.

EXHIBIT 1

Section VI.6 Counterparts. This Assignment may be executed by facsimile or PDF signature, in any number of counterparts and by different parties hereto on separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement.

### Article VII. DEFINITIONS

5

For purposes of this Assignment, each of the following terms shall have the meaning specified with respect thereto:

"**Assignment**" means this Assignment of Servicing Rights, as the same may be amended from time to time.

"**Business Day**" shall mean any day other than Saturdays, Sundays or other day on which banks in New York are required to close.

"**Customer**" means a person, business entity, association, sole proprietorship, or any other similar organization or individual to whom Merchant provides, agrees to provide, or arranges to be provided goods and/or services in exchange for compensation and who is an obligor under any Receivable, including any guarantor of a Receivable.

"**Purchased Receivable**" means and includes a Receivable, or the applicable percentage portion thereof, which has been purchased by Servicer or any of its affiliates.

"**Receivable**" means the account receivable, including the contractual and equitable rights to payment thereof, from a Customer located in the United States, generated and arising out of the provision of, or agreement to provide or to arrange for the provision of, product(s) and/or service(s) by or on behalf of Merchant to such Customer or to its designee, and any and all other account receivable-related rights. In addition, "Receivable" means and includes: (i) all collections, finance charge, late payment fees, insufficient fund fees or other amounts paid or payable by a Customer, and all proceeds received or obtained arising from or related to such Receivable (regardless of form of payment, and whether received from a Customer, for the benefit of a Customer, or on behalf of a Customer); (iii) all books and records, invoices, documents, disclosures, notices, contract rights, contractual agreements and terms and conditions, claims, chattel paper (whether tangible or electronic), instruments (including any promissory notes), rights to payment of money, general intangibles, and deposit accounts evidencing, related to or arising from such account receivable; and (iv) all other rights and information relating to the foregoing, in each case whether now owned or hereafter acquired, and wherever located.

"**Services**" shall mean the billing and collection services, which Servicer agrees to provide Merchant hereunder, including debiting Customer accounts.

*(Signature page follows)*

EXHIBIT 1

6

**IN WITNESS WHEREOF,** the parties hereto have caused this Assignment to be duly executed by their respective officers hereunto duly authorized as of the Effective Date.

**MERCHANT:**

**LITIGATION PRACTICE GROUP PC,**
a California professional stock corporation

By: Daniel S. March
Name: _____
Title: MANAGING SHAREHOLDER

**LITIGATION PRACTICE GROUP PC,**
a California professional stock corporation

By: Tony Diab
Name: _____
Title: _____

**SERVICER:**

**MARICH BEIN LLC,** a limited liability company

By: _____
Name: HERSHY DELLBER
Title: managing Pueger

EXHIBIT 1

Exhibit 2

EXHIBIT 2

**ACCOUNTS RECEIVABLE PURCHASE AGREEMENT**

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of August 18, 2022 (the "**Agreement Date**"), by and between Marich Bein LLC (collectively the "**Buyer**"), and The Litigation Practice Group PC (the "**Seller**" or "**LPG**", and together with the Buyer, the "**Parties**"), and The Litigation Practice Group PC ("LPG").

**RECITALS**

WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which The Litigation Practice Group PC ("LPG") shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

**ARTICLE 1.**
**DEFINITIONS**

Section 1.1    Certain Definitions. Certain defined terms used in this Agreement are set forth on **Exhibit A**.

**ARTICLE 2.**
**ASSIGNMENT AND TRANSFER AND CONSIDERATION**

Section 2.1    Assignment of the Purchased Accounts to the Buyer. Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens. Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    No Assumption of Liabilities. The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    Payment of Purchase Price. Buyer shall pay $500,000.00 for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**"). The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4    Guarantee of LPG. If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement. The replacement file shall yield no less than the receivable of the failed file. In addition, if any any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file

EXHIBIT 2

package as a whole equals 80%. This guarantee shall continue until the completion of the 24th month following execution of this agreement.

## ARTICLE 3.
### REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    Organization; Good Standing.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    Power and Authority.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby. This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3    Title to, and Sufficiency of, the Purchased Accounts.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4    Consents.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5    No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

EXHIBIT 2

Section 3.6    Compliance with Laws.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7    Legal Proceedings.  There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8    Condition of Purchased Accounts.  Each Purchased Account shall have received no less than one processed payment.

Section 3.9    Confidentiality.  Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the **"Confidential Information"**).  Seller will at all times keep the Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

**ARTICLE 4.**
**REPRESENTATIONS AND WARRANTIES OF THE BUYER**

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1    Organization; Good Standing.  The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2    Power and Authority.  The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

EXHIBIT 2

Section 4.3    No Conflicts. The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    Sufficient Funds. The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1    Appropriate Actions.

(a)    General. Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1    Closing. The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing. The date on which the Closing occurs is hereinafter referred to as the "**Closing Date.**" The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    Closing Deliverables of the Seller. At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer: (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    Closing Deliverables of the Buyer. At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to Section 6.2, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    Indemnification by the Seller. Subject to the limitations set forth in this Article 6, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of,

EXHIBIT 2

arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5    Indemnification by the Buyer.  Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6    Indemnification Procedures.

(a)    No Restraints.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party

EXHIBIT 2

Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)    If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a **"Direct Claim"**), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a **"Notice of Claim"**). Such Notice of Claim shall specify the basis for such Direct Claim. The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c). If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined. In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

### ARTICLE 7.
### MISCELLANEOUS

Section 7.1    Entire Agreement; Amendment.  This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof. This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2    Waivers.  The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3    Notices.  All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

EXHIBIT 2

Section 7.4    Successors and Assigns. This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns. Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties. This Agreement will be binding upon any permitted assignee of any Party. No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    Public Disclosure. Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    Expenses and Fees. Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7    Specific Performance. The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    Governing Law. This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10    Severability. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11    Construction. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

EXHIBIT 2

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER:**

_____ marich Bein LLc

By: _____

Name: HANSAH OULISH
Title: managing Partner

**SELLER:**

**The Litigation Practice Group P.C.**

By: _____

Name: Daniel S. March
Title: Managing Shareholder

By: _____

Name: Tony M. Diab, an individual

EXHIBIT 2

**EXHIBIT A**

**DEFINITIONS**

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a) **"Action"** shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b) **"Agreement"** shall have the meaning set forth in the preamble to this Agreement.

(c) **"Agreement Date"** shall have the meaning set forth in the preamble to this Agreement.

(d) **"Affiliate"** shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals. For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e) **"Bill of Sale and Assignment and Assumption Agreement"** shall have the meaning set forth in Section 6.2.

(f) **"Business"** shall mean the business of the Seller as conducted on the Agreement Date.

(g) **"Buyer"** shall have the meaning set forth in the preamble to this Agreement.

(h) **"Buyer Indemnified Parties"** shall have the meaning set forth in Section 6.4.

(i) **"Closing"** shall have the meaning set forth in Section 6.1.

(j) **"Closing Date"** shall have the meaning set forth in Section 6.1.

(k) **"Direct Claim"** shall have the meaning set forth in Section 6.6(c).

(l) **"Excluded Assets"** shall have the meaning set forth in Section 2.1.

(m) **"Excluded Liabilities"** shall have the meaning set forth in Section 2.2.

(n) **"Governmental Body"** shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

EXHIBIT 2

(o)  **"Indebtedness"** means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)  **"Indemnified Party"** shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)  **"Indemnifying Party"** shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)  **"Knowledge"** shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)  **"Law"** shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)  **"Liabilities"** shall mean any direct or indirect liability, indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)  **"Lien"** shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)  **"Losses"** shall have the meaning set forth in Section 6.4.

(w)  **"Notice of Claim"** shall have the meaning set forth in Section 6.6(c).

(x)  **"Organizational Documents"** shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)  **"Party"** or **"Parties"** shall have the meaning set forth in the preamble to this Agreement.

(z)  **"Permitted Liens"** shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)  **"Person"** shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

EXHIBIT 2

(bb)     **"Purchase Price"** shall have the meaning set forth in <u>Section 2.3</u>.

(cc)     **"Purchased Accounts"** shall have the meaning set forth in the Recitals.

(dd)     **"Seller"** shall have the meaning set forth in the preamble to this Agreement.

(ee)     **"Seller Indemnified Parties"** shall have the meaning set forth in <u>Section 6.5</u>.

(ff)     **"Tax"** or **"Taxes"** shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)     **"Tax Returns"** means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)     **"Third Party"** or **"Third Parties"** shall mean any Person other than the Parties or their respective Affiliates.

(ii)     **"Third-party Claim"** shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)     **"Transaction Agreements"** shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)     **"Upfront Cash Payment"** shall have the meaning set forth in <u>Section 2.3</u>.

(ll)     **"Wire Instructions"** shall have the meaning set forth in <u>Section 2.3</u>.

EXHIBIT 2

**EXHIBIT B**

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between **Buyer, and Seller.** Each of the Seller and the Buyer are sometimes referred to herein, individually, as a **"Party"** and, collectively, as the **"Parties."**

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the **"Purchase Agreement"**), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    Defined Terms. Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.    Sale of Purchased Accounts; Assignment. The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.    Further Assurances. Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.    Terms of the Purchase Agreement. This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference. The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

Accounts Receivable Purchase Agreement
Exhibit B – Bill of Sale

EXHIBIT 2

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

Marich Bein LLC

By: _____
    Name: Heroini Olubu
    Title: Managing Partner

**SELLER:**

**The Litigation Practice Group P.C.**

By: _____
    Name: Daniel S. March
    Title: Managing Shareholder

By: _____
    Name: Tony M. Diab, an individual

*[Signature Page to Accounts Receivable Purchase Agreement]*

EXHIBIT 2

**Schedule 2.3**
**Wire Instructions**

Account Holder Name:  GoFi LLC

Address: 3345 Michelson Dr., Ste 400, Irvine, CA 92612

Routing Number: 026009593

Account Number: 325172243289

EXHIBIT 2

# EXHIBIT 2.1

EXHIBIT 2

## ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this **"Agreement"**) is made as of September 21, 2022 (the **"Agreement Date"**), by and between Marich Bein LLC (collectively the **"Buyer"**), and The Litigation Practice Group PC (the **"Seller"** or **"LPG"**, and together with the Buyer, the **"Parties"**), and The Litigation Practice Group PC ("LPG").

### RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from LPG in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which The Litigation Practice Group PC ("LPG") shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the **"Purchased Accounts"**).

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

### ARTICLE 1.
### DEFINITIONS

Section 1.1    Certain Definitions.   Certain defined terms used in this Agreement are set forth on **Exhibit A.**

### ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1    Assignment of the Purchased Accounts to the Buyer.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens. Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the **"Excluded Assets"**).

Section 2.2    No Assumption of Liabilities.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the **"Excluded Liabilities"**).

Section 2.3    Payment of Purchase Price.  Buyer shall pay $2,740,000.00 for the Purchased Accounts (the **"Purchase Price"**) by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the **"Wire Instructions"**). The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4    Guarantee of LPG.  If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement. The replacement file shall yield no less than the receivable of the failed file. In addition, if any any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file

EXHIBIT 2

package as a whole equals 80%. This guarantee shall continue until the completion of the 24ᵗʰ month following execution of this agreement.

## ARTICLE 3.
### REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1      Organization; Good Standing.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2      Power and Authority.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3      Title to, and Sufficiency of, the Purchased Accounts.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4      Consents.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5      No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

EXHIBIT 2

Section 3.6    <u>Compliance with Laws</u>. The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7    <u>Legal Proceedings</u>. There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements. No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8    <u>Condition of Purchased Accounts</u>. Each Purchased Account shall have received no less than one processed payment.

Section 3.9    <u>Confidentiality</u>. Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the **"Confidential Information"**). Seller will at all times keep the Confidential Information in confidence and trust. Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer. Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions. Seller agrees that violation of this Section 3.9. The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

### ARTICLE 4.
### REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1    <u>Organization; Good Standing</u>. The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2    <u>Power and Authority</u>. The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby. This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Accounts Receivable Purchase Agreement
Page 3 of 7

EXHIBIT 2

Section 4.3    No Conflicts. The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    Sufficient Funds. The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1    Appropriate Actions.

(a)    General. Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1    Closing. The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing. The date on which the Closing occurs is hereinafter referred to as the "**Closing Date.**" The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    Closing Deliverables of the Seller. At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer: (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "Bill of Sale and Assignment and Assumption **Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    Closing Deliverables of the Buyer. At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to Section 6.2, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    Indemnification by the Seller. Subject to the limitations set forth in this Article 6, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result

EXHIBIT 2

of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5    Indemnification by the Buyer.  Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6    Indemnification Procedures.

(a)    No Restraints.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party

EXHIBIT 2

Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)       If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**"). Such Notice of Claim shall specify the basis for such Direct Claim. The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c). If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined. In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

### ARTICLE 7.
### MISCELLANEOUS

Section 7.1       Entire Agreement; Amendment. This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof. This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2       Waivers. The rights and remedies of the Parties to this Agreement are cumulative and not alternative. To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3       Notices. All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

EXHIBIT 2

Section 7.4    Successors and Assigns. This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns. Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    Public Disclosure. Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    Expenses and Fees. Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7    Specific Performance. The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    Governing Law. This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10   Severability. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11   Construction. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

EXHIBIT 2

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

Marich Bein LLC

By: _____

Name: Hershy Deutsch
Title: Managing Partner

**SELLER:**

**The Litigation Practice Group P.C.**

By: _____

Name: Daniel S. March
Title: Managing Shareholder

By: _____

Name: Tony M. Diab, an individual

EXHIBIT 2

**EXHIBIT A**

**DEFINITIONS**

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)  **"Action"** shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)  **"Agreement"** shall have the meaning set forth in the preamble to this Agreement.

(c)  **"Agreement Date"** shall have the meaning set forth in the preamble to this Agreement.

(d)  **"Affiliate"** shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals. For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)  **"Bill of Sale and Assignment and Assumption Agreement"** shall have the meaning set forth in Section 6.2.

(f)  **"Business"** shall mean the business of the Seller as conducted on the Agreement Date.

(g)  **"Buyer"** shall have the meaning set forth in the preamble to this Agreement.

(h)  **"Buyer Indemnified Parties"** shall have the meaning set forth in Section 6.4.

(i)  **"Closing"** shall have the meaning set forth in Section 6.1.

(j)  **"Closing Date"** shall have the meaning set forth in Section 6.1.

(k)  **"Direct Claim"** shall have the meaning set forth in Section 6.6(c).

(l)  **"Excluded Assets"** shall have the meaning set forth in Section 2.1.

(m)  **"Excluded Liabilities"** shall have the meaning set forth in Section 2.2.

(n)  **"Governmental Body"** shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

EXHIBIT 2

(o)      "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)      "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)      "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)      "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)      "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)      "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)      "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)      "**Losses**" shall have the meaning set forth in Section 6.4.

(w)      "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)      "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)      "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)      "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)      "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

EXHIBIT 2

(bb)    **"Purchase Price"** shall have the meaning set forth in <u>Section 2.3</u>.

(cc)    **"Purchased Accounts"** shall have the meaning set forth in the Recitals.

(dd)    **"Seller"** shall have the meaning set forth in the preamble to this Agreement.

(ee)    **"Seller Indemnified Parties"** shall have the meaning set forth in <u>Section 6.5</u>.

(ff)    **"Tax"** or **"Taxes"** shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)    **"Tax Returns"** means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)    **"Third Party"** or **"Third Parties"** shall mean any Person other than the Parties or their respective Affiliates.

(ii)    **"Third-party Claim"** shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)    **"Transaction Agreements"** shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)    **"Upfront Cash Payment"** shall have the meaning set forth in <u>Section 2.3</u>.

(ll)    **"Wire Instructions"** shall have the meaning set forth in <u>Section 2.3</u>.

EXHIBIT 2

**EXHIBIT B**

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between **Buyer**, and **Seller**. Each of the Seller and the Buyer are sometimes referred to herein, individually, as a **"Party"** and, collectively, as the **"Parties."**

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the **"Purchase Agreement"**), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.      Defined Terms. Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.      Sale of Purchased Accounts; Assignment. The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.      Further Assurances. Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.      Terms of the Purchase Agreement. This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference. The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.      Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

EXHIBIT 2

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER:**

Maricit Bern LLc

By: _____

Name: Hersh-i Occaser

Title: Managing Partner

**SELLER:**

**The Litigation Practice Group P.C.**

By: _____

Name: Daniel S. March

Title: Managing Shareholder

By: _____

Name: Tony M. Diab, an individual

Accounts Receivable Purchase Agreement
Exhibit C – Bill of Sale

EXHIBIT 2

**Schedule 2.3**
**Wire Instructions**

$700,563.85

Account Holder Name:  GoFi LLC

Address:  3345 Michelson Dr., Ste 400, Irvine, CA 92612

Routing Number:  026009593

Account Number:  325172243289


$2,039,436.15

Account Holder Name: Vulcan Consulting Group LLC

Address: 20101 SW Cypress St, Newport Beach, CA 92660

Routing Number: 026009593

Account Number: 325135219551

EXHIBIT 2

# EXHIBIT 2.2

EXHIBIT 2

DocuSign Envelope ID: AF8E46FE-01E4-4924-AC81-56BD61526E06

## ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of October 6, 2022 (the "**Agreement Date**"), by and between Marich Bein LLC (collectively the "**Buyer**"), and The Litigation Practice Group PC (the "**Seller**" or "**LPG**", and together with the Buyer, the "**Parties**"), and The Litigation Practice Group PC ("LPG").

### RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

### ARTICLE 1.
### DEFINITIONS

Section 1.1    Certain Definitions. Certain defined terms used in this Agreement are set forth on **Exhibit A**.

### ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1    Assignment of the Purchased Accounts to the Buyer. Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens. Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    No Assumption of Liabilities. The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    Payment of Purchase Price. Buyer shall pay $3,161,745.75 for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**"). The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4    Guarantee of LPG. If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement. The replacement file shall yield no less than the receivable of the failed file. In addition, if any any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file

EXHIBIT 2

DocuSign Envelope ID: AF8E46FE-01E4-4924-AC81-56BD61526E06

package as a whole equals 80%. This guarantee shall continue until the completion of the 24ᵗʰ month following execution of this agreement.

### ARTICLE 3.
### REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    Organization; Good Standing.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    Power and Authority.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3    Title to, and Sufficiency of, the Purchased Accounts.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4    Consents.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5    No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

EXHIBIT 2

DocuSign Envelope ID: AF8E46FE-01E4-4924-AC81-56BD61526E06

Section 3.6   Compliance with Laws.   The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7   Legal Proceedings.   There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements. No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8   Condition of Purchased Accounts.   Each Purchased Account shall have received no less than one processed payment.

Section 3.9   Confidentiality.   Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**"). Seller will at all times keep the Confidential Information in confidence and trust. Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer. Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions. Seller agrees that violation of this Section 3.9. The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1   Organization; Good Standing.   The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2   Power and Authority.   The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby. This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

EXHIBIT 2

DocuSign Envelope ID: AF8E46FE-01E4-4924-AC81-56BD61526E06

Section 4.3    No Conflicts. The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    Sufficient Funds. The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1    Appropriate Actions.

(a)    General. Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1    Closing. The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing. The date on which the Closing occurs is hereinafter referred to as the "**Closing Date.**" The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    Closing Deliverables of the Seller. At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer: (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    Closing Deliverables of the Buyer. At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to Section 6.2, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    Indemnification by the Seller. Subject to the limitations set forth in this Article 6, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of,

EXHIBIT 2

DocuSign Envelope ID: AF8E46FE-01E4-4924-AC81-56BD61526E06

arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5    Indemnification by the Buyer.  Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6    Indemnification Procedures.

(a)    No Restraints.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim. The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred. In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense. The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim. An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party

EXHIBIT 2

DocuSign Envelope ID: AF8E46FE-01E4-4924-AC81-56BD61526E06

Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)    If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**"). Such Notice of Claim shall specify the basis for such Direct Claim. The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c). If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined. In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

### ARTICLE 7.
### MISCELLANEOUS

Section 7.1    Entire Agreement; Amendment. This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof. This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2    Waivers. The rights and remedies of the Parties to this Agreement are cumulative and not alternative. To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3    Notices. All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

EXHIBIT 2

DocuSign Envelope ID: AF8E46FE-01E4-4924-AC81-56BD61526E06

Section 7.4     Successors and Assigns.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5     Public Disclosure.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6     Expenses and Fees.  Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7     Specific Performance.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8     Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9     Governing Law.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10     Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11     Construction.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

EXHIBIT 2

DocuSign Envelope ID: AF8E46FE-01E4-4924-AC81-56BD61526E06

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

Marich Bein LLC

By: _____

Name: Hersian Oulsis

Title: Managing Partner

**SELLER:**

**The Litigation Practice Group P.C.**

By: _Daniel S March_   10/6/2022

Name: Daniel S. March

Title: Managing Shareholder

## APPROVAL OF ASSIGNMENT AND GUARANTEE

The assignment of the Purchased Accounts set forth in this Agreement as well as the guarantee included therein is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: _Daniel S March_   10/6/2022

Name: Daniel S. March

Title: Managing Shareholder

By: _Tony Diab_   10/6/2022

Name: Tony M. Diab

*[Signature Page to Accounts Receivable Purchase Agreement]*

EXHIBIT 2

DocuSign Envelope ID: AF8E46FE-01E4-4924-AC81-56BD61526E06

## EXHIBIT A

## DEFINITIONS

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)    "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)    "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)    "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)    "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)    "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)    "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)    "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)    "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)    "**Closing**" shall have the meaning set forth in Section 6.1.

(j)    "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)    "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)    "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)    "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)    "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

EXHIBIT 2

DocuSign Envelope ID: AF8E46FE-01E4-4924-AC81-56BD61526E06

(o)    **"Indebtedness"** means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)    **"Indemnified Party"** shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)    **"Indemnifying Party"** shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)    **"Knowledge"** shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)    **"Law"** shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)    **"Liabilities"** shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)    **"Lien"** shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)    **"Losses"** shall have the meaning set forth in Section 6.4.

(w)    **"Notice of Claim"** shall have the meaning set forth in Section 6.6(c).

(x)    **"Organizational Documents"** shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)    **"Party"** or **"Parties"** shall have the meaning set forth in the preamble to this Agreement.

(z)    **"Permitted Liens"** shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)    **"Person"** shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

EXHIBIT 2

DocuSign Envelope ID: AF8E46FE-01E4-4924-AC81-56BD61526E06

(bb)    **"Purchase Price"** shall have the meaning set forth in <u>Section 2.3</u>.

(cc)    **"Purchased Accounts"** shall have the meaning set forth in the Recitals.

(dd)    **"Seller"** shall have the meaning set forth in the preamble to this Agreement.

(ee)    **"Seller Indemnified Parties"** shall have the meaning set forth in <u>Section 6.5</u>.

(ff)    **"Tax"** or **"Taxes"** shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)    **"Tax Returns"** means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)    **"Third Party"** or **"Third Parties"** shall mean any Person other than the Parties or their respective Affiliates.

(ii)    **"Third-party Claim"** shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)    **"Transaction Agreements"** shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)    **"Upfront Cash Payment"** shall have the meaning set forth in <u>Section 2.3</u>.

(ll)    **"Wire Instructions"** shall have the meaning set forth in <u>Section 2.3</u>.

EXHIBIT 2

DocuSign Envelope ID: AF8E46FE-01E4-4924-AC81-56BD61526E06

## EXHIBIT B

### FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between **Buyer**, and **Seller**. Each of the Seller and the Buyer are sometimes referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties.**"

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the **"Purchase Agreement"**), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    Defined Terms.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.    Sale of Purchased Accounts; Assignment.  The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.    Further Assurances.  Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.    Terms of the Purchase Agreement. This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement.   The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference. The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.    Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

EXHIBIT 2

DocuSign Envelope ID: AF8E46FE-01E4-4924-AC81-56BD61526E06

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER:**

Marich Being LLC

By: _____

Name: HRSHI DELGH

Title: managing Partner

**SELLER:**

The Litigation Practice Group P.C.

By: _____   10/6/2022

Name: Daniel S. March

Title: Managing Shareholder

Accounts Receivable Purchase Agreement

EXHIBIT 2

DocuSign Envelope ID: AF8E46FE-01E4-4924-AC81-56BD61526E06

## Schedule 2.3
## Wire Instructions

**$3,161,745.75**

**Account Holder Name:** The Litigation Practice Group PC

**Address:** 17542 E 17th Street, Ste 100, Tustin, CA 92780

**Routing Number:** 322271627

**Account Number:** 735863158

EXHIBIT 2

# EXHIBIT 2.3

EXHIBIT 2

## ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of November 14, 2022 (the "**Agreement Date**"), by and between Marich Bein LLC (collectively the "**Buyer**"), and The Litigation Practice Group PC (the "**Seller**" or "**LPG**", and together with the Buyer, the "**Parties**"), and The Litigation Practice Group PC ("**LPG**").

### RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

### ARTICLE 1.
### DEFINITIONS

Section 1.1       Certain Definitions. Certain defined terms used in this Agreement are set forth on **Exhibit A**.

### ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1       Assignment of the Purchased Accounts to the Buyer. Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens. Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2       No Assumption of Liabilities. The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3       Payment of Purchase Price. Buyer shall pay $4,700,000.00 for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**"). The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4       Guarantee of LPG. If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement. The replacement file shall yield no less than the receivable of the failed file. In addition, if in any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file package as

EXHIBIT 2

a whole equals 80%. This guarantee shall continue until the completion of the 24th month following execution of this agreement.

### ARTICLE 3.
### REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    Organization; Good Standing. The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    Power and Authority. The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby. This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3    Title to, and Sufficiency of, the Purchased Accounts. The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4    Consents. The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5    No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

EXHIBIT 2

Section 3.6    <u>Compliance with Laws</u>.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7    <u>Legal Proceedings</u>.  There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8    <u>Condition of Purchased Accounts</u>.  Each Purchased Account shall have received no less than one processed payment.

Section 3.9    <u>Confidentiality</u>. Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the **"Confidential Information"**).  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

### ARTICLE 4.
### REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1    <u>Organization; Good Standing</u>.  The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2    <u>Power and Authority</u>.  The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

EXHIBIT 2

Section 4.3    No Conflicts. The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    Sufficient Funds. The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

**ARTICLE 5.**
**COVENANTS**

Section 5.1    Appropriate Actions.

(a)    General. Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

**ARTICLE 6.**
**CLOSING**

Section 6.1    Closing. The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing. The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**." The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    Closing Deliverables of the Seller. At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    Closing Deliverables of the Buyer. At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to Section 6.2, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    Indemnification by the Seller. Subject to the limitations set forth in this Article 6, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of,

EXHIBIT 2

arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5    Indemnification by the Buyer.  Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

· Section 6.6    Indemnification Procedures.

(a)    No Restraints.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim. The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party

EXHIBIT 2

Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)    If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**"). Such Notice of Claim shall specify the basis for such Direct Claim. The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c). If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined. In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

### ARTICLE 7.
### MISCELLANEOUS

Section 7.1    Entire Agreement; Amendment.  This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof. This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2    Waivers.  The rights and remedies of the Parties to this Agreement are cumulative and not alternative. To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3    Notices.  All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (I) upon delivery, if delivered by hand; (II) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (III) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

EXHIBIT 2

Section 7.4    <u>Successors and Assigns</u>. This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns. Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties. This Agreement will be binding upon any permitted assignee of any Party. No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    <u>Public Disclosure</u>. Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    <u>Expenses and Fees</u>. Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7    <u>Specific Performance</u>. The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    <u>Governing Law</u>. This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10    <u>Severability</u>. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11    <u>Construction</u>. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

EXHIBIT 2

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

Marich Bein LLC

By: _____

    Name: Hersh Deulgh
    Title: Managing Partner

**SELLER:**

The Litigation Practice Group P.C.

By: _____

    Name: Daniel S. March
    Title: Managing Shareholder

## APPROVAL OF ASSIGNMENT AND GUARANTEE

The assignment of the Purchased Accounts set forth in this Agreement as well as the guarantee included therein is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

The Litigation Practice Group P.C.

By: _____

    Name: Daniel S. March
    Title: Managing Shareholder

By: _____

    Name: Tony M. Diab, an individual

Vulcan Consulting Group LLC

By: _____

    Name: Lisa Cohen
    Title: Managing Member

Gallant Law Group P.C.

By: _____

    Name: Robert Tobia
    Title: Chief Executive Officer

[*Signature Page to Accounts Receivable Purchase Agreement*]

EXHIBIT 2

<u>**EXHIBIT A**</u>

<u>**DEFINITIONS**</u>

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)    **"Action"** shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)    **"Agreement"** shall have the meaning set forth in the preamble to this Agreement.

(c)    **"Agreement Date"** shall have the meaning set forth in the preamble to this Agreement.

(d)    **"Affiliate"** shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals. For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)    **"Bill of Sale and Assignment and Assumption Agreement"** shall have the meaning set forth in <u>Section 6.2</u>.

(f)    **"Business"** shall mean the business of the Seller as conducted on the Agreement Date.

(g)    **"Buyer"** shall have the meaning set forth in the preamble to this Agreement.

(h)    **"Buyer Indemnified Parties"** shall have the meaning set forth in <u>Section 6.4</u>.

(i)    **"Closing"** shall have the meaning set forth in <u>Section 6.1</u>.

(j)    **"Closing Date"** shall have the meaning set forth in <u>Section 6.1</u>.

(k)    **"Direct Claim"** shall have the meaning set forth in <u>Section 6.6(c)</u>.

(l)    **"Excluded Assets"** shall have the meaning set forth in <u>Section 2.1</u>.

(m)    **"Excluded Liabilities"** shall have the meaning set forth in <u>Section 2.2</u>.

(n)    **"Governmental Body"** shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

EXHIBIT 2

(o)  **"Indebtedness"** means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)  **"Indemnified Party"** shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)  **"Indemnifying Party"** shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)  **"Knowledge"** shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)  **"Law"** shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)  **"Liabilities"** shall mean any direct or indirect liability, indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)  **"Lien"** shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)  **"Losses"** shall have the meaning set forth in Section 6.4.

(w)  **"Notice of Claim"** shall have the meaning set forth in Section 6.6(c).

(x)  **"Organizational Documents"** shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)  **"Party"** or **"Parties"** shall have the meaning set forth in the preamble to this Agreement.

(z)  **"Permitted Liens"** shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)  **"Person"** shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

EXHIBIT 2

(bb)    **"Purchase Price"** shall have the meaning set forth in Section 2.3.

(cc)    **"Purchased Accounts"** shall have the meaning set forth in the Recitals.

(dd)    **"Seller"** shall have the meaning set forth in the preamble to this Agreement.

(ee)    **"Seller Indemnified Parties"** shall have the meaning set forth in Section 6.5.

(ff)    **"Tax"** or **"Taxes"** shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)    **"Tax Returns"** means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)    **"Third Party"** or **"Third Parties"** shall mean any Person other than the Parties or their respective Affiliates.

(ii)    **"Third-party Claim"** shall have the meaning set forth in Section 6.6(a).

(jj)    **"Transaction Agreements"** shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)    **"Upfront Cash Payment"** shall have the meaning set forth in Section 2.3.

(ll)    **"Wire Instructions"** shall have the meaning set forth in Section 2.3.

EXHIBIT 2

**EXHIBIT B**

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between **Buyer**, and **Seller**. Each of the Seller and the Buyer are sometimes referred to herein, individually, as a **"Party"** and, collectively, as the **"Parties."**

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the **"Purchase Agreement"**), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    Defined Terms. Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.    Sale of Purchased Accounts; Assignment. The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.    Further Assurances. Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.    Terms of the Purchase Agreement. This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference. The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

Accounts Receivable Purchase Agreement
Exhibit B – Bill of Sale

EXHIBIT 2

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER:**

Marich Bein LLC

By: _____
     Name: HERSHY DCUUECH
     Title: Munuging Partner

**SELLER:**

**The Litigation Practice Group P.C.**

By: _____
     Name: Daniel S. March
     Title: Managing Shareholder

By: _____
     Name: Tony M. Diab, an individual

**Vulcan Consulting Group LLC**

By: _____
     Name: Lisa Cohen
     Title: Managing Member

**Gallant Law Group P.C.**

By: _____
     Name: Robert Tobia
     Title: Chief Executive Officer

Accounts Receivable Purchase Agreement

EXHIBIT 2

**Schedule 2.3**
**Wire Instructions**

$2,400,000.00

**Account Holder Name:** The Litigation Practice Group PC

**Address:** 17542 E 17th Street, Ste 100, Tustin, CA 92780

**Routing Number:** 322271627

**Account Number:** 735863158

$2,300,000.00

**Account Holder Name:** Vulcan Consulting Group LLC

**Address:** 20101 SW Cypress St., Newport Beach, CA 92660

**Routing Number:** 026009593

**Account Number:** 325135219551

Accounts Receivable Purchase Agreement
Schedule 2.3 – Wire Instructions

EXHIBIT 2

Exhibit 3

EXHIBIT 3

1   Christopher B. Ghio (State Bar No. 259094)
    Christopher Celentino (State Bar No. 131688)
2   Jeremy B. Freedman (State Bar No. 308752)
    **DINSMORE & SHOHL LLP**
3   655 West Broadway, Suite 800
    San Diego, CA 92101
4   Telephone:  619.400.0500
    Facsimile:  619.400.0501
5   christopher.ghio@dinsmore.com
    christopher.celentino@dinsmore.com
6   Jeremy.freedman@dinsmore.com

7   Proposed Special Counsel to Richard A. Marshack,
    Chapter 11 Trustee for the Bankruptcy Estate of
8   The Litigation Practice Group P.C.

9

10                  **UNITED STATES BANKRUPTCY COURT**

11         **CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**

12

13   In re:                                    Case No. 8:23-bk-10571-SC

14   THE LITIGATION PRACTICE GROUP P.C.,       Adv. Proc. No. 8:23-ap-01046-SC

15          Debtor.                            Chapter 11

16   ─────────────────────────────

17   RICHARD A. MARSHACK,                      **ORDER ON TRUSTEE, RICHARD**
     Chapter 11 Trustee,                       **MARSHACK'S OMNIBUS MOTION**
                                               **GRANTING :**
18                  Plaintiff,                 **1) TURNOVER OF ESTATE PROPERTY**
                                               **AND RECORDED INFORMATION**
19          v.                                 **PURSUANT TO 11 U.S.C. § 542;**
                                               **2) PRELIMINARY INJUNCTION;**
20   TONY DIAB, an individual; DANIEL S.       **3) LOCK-OUT;**
     MARCH, an individual; ROSA BIANCA LOLI,   **4) RE-DIRECTION OF UNITED STATES**
21   an individual; LISA COHEN, an individual; **PARCEL SERVICES MAIL;**
     WILLIAM TAYLOR CARSS, an individual;      **5) ORDER TO SHOW CAUSE RE**
22   ENG TAING, an individual; HENG TAING, an  **COMPLIANCE WITH COURT ORDER;**
     individual; MARIA EEYA TAN, an individual;**AND**
23   JAKE AKERS, an individual; HAN TRINH, an  **6) OTHER RELIEF AS NECESSARY TO**
     individual; JAYDE TRINH, an individual; WES **EFFICIENT ADMINISTRATION OF THE**
24   THOMAS, an individual; SCOTT JAMES        **MATTER**
     EADIE, an individual; JIMMY CHHOR, an
25   individual; DONGLIANG JIANG, an individual; Date:   June 12, 2023
     MAX CHOU, an individual; OAKSTONE LAW     Time:   **1:30 P.M.**
26   GROUP PC; GREYSON LAW CENTER PC;          Judge:  Hon. Scott C. Clarkson
     PHOENIX LAW, PC; MAVERICK                 Place:  Courtroom 5C
27   MANAGEMENT GROUP, LLC; LGS                        411 W. Fourth Street
     HOLDCO, LLC; CONSUMER LEGAL GROUP                 Santa Ana, CA  92701
28   P.C.; VULCAN CONSULTING GROUP LLC;
     BAT INC. d/b/a COAST PROCESSING; PRIM

                                                                    EXHIBIT 3

1  | LOGIX, LLC; TERACEL BLOCKCHAIN
   | FUND II LLC; EPPS; EQUIPAY;
2  | AUTHORIZE.NET; WORLD GLOBAL;
   | OPTIMUMBANK HOLDINGS, INC. d/b/a
3  | OPTIMUM BANK; MARICH BEIN, LLC;
   | BANKUNITED, N.A.; REVOLV3, INC.;
4  | FIDELITY NATIONAL INFORMATION
   | SERVICES, INC. d/b/a FIS; WORLDPAY, LLC
5  | WORLDPAY GROUP; MERIT FUND, LLC;
   | GUARDIAN PROCESSING, LLC;
6  | PAYLIANCE, LLC; TOUZI CAPITAL, LLC;
   | SEAMLESS CHEX INC; DWOLLA, INC.;
7  | STRIPE, INC.; and DOES 1 through 100,
   | inclusive,
8  |
9  |                    Defendants.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT 3

1   In his capacity as the duly appointed and acting Chapter 11 Trustee, Richard Mar

2   ("Trustee") filed an Omnibus Emergency Motion for Turnover of Estate Property and Re

3   Information Pursuant to 11 U.S.C. § 542; Preliminary Injunction; Court, Redirection of United

4   States Postal Service Mail; Setting an Order To Show Cause re Compliance with the Court'

5   as to Tony Diab, Rosa Loli aka Rosa Bianca Loli aka Bianca Loli ("Rosa Loli"), Lisa Cohen,

6   March and William Taylor "Ty" Carss; and As and As Necessary to the Efficient Administration of

7   this Matter under seal on May 25, 2023, which matter was heard on May 25, 2023, pursuant t

8   Bankruptcy Rule 9075. The Court, having considered the pleadings on file and the discussio

9   the parties at the hearing, and having placed its findings of fact and conclusions of law in supp

10  this order orally on the record at the hearing, and finding that exigent circumstances exist an

11  cause appearing therefor, hereby **ORDERS AS FOLLOWS**:

12  **TURNOVER ORDER OF ESTATE PROPERTY AND RECORDED INFORMATIO**

13  **A.** **RECORDED INFORMATION**

14  Within twenty-four (24) hours from the date of this Order or notice thereof, whicheve

15  later, the following information regarding any and all persons who signed a Legal Services Contract

16  with LPG or whose file was purchased or otherwise transferred to LPG; Oakstone Law Gro

17  ("Oakstone"); Greyson Law, P.C. ("Greyson"); Gallant Law Group, PC ("Gallant") and its a

18  Center Pointe; Phoenix Law, PC (Phoenix"); LGS, LLC.,; Consumer Legal Group, PC

19  ("CLG"); Maverick Management, LLC ("Maverick"); Vulcan Consulting Group, LLC ("Vu

20  BAT Inc. d/b/a Coast Processing ("Coast Processing"); Strategic Consulting Solutions

21  ("SCS"); Prime Logix, LLC ("Prime Logix"); Touzi Capital, LLC ("Touzi"); Tony Diab; Rosa Lol

22  aka Rosa Bianca Loli aka Bianca Loli ("Rosa Loli"); Lisa Cohen; Eng Taing; Heng Taing

23  Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie, Jimmy Chhor; Do

24  Jiang; Max Chou; and/or any other alias', agents or corporate entities affiliated with same, for w

25  the client's file remains open and/or continues to make payments under an agreed upon inst

26  contract, except those clients who signed a Legal Services Contract post-petition (hereinafter

27  "Client") shall be turned over to the Trustee by Debtor:

28  ///

EXHIBIT 3

1

1. All Client files, including but not limited to names, contact information, client file management, communications, account information, letters, pleadings, communications, payment history, financial account information, credit reports, executed legal services contracts, automated clearing house ("ACH") contracts, executed installment contracts, account balances, debts in dispute, payment history, file status, settlements, debt invalidations and/or any other information created, managed and stored electronically utilizing DebtPayPro, a Forth, Inc. ("DPP") software program's software license, key or account, that was opened and is maintained and controlled by LPG; Oakstone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG; Maverick; Vulcan; Coast Processing; SCS; Prime Logix; Touzi; Tony Diab; Rosa Loli; Lisa Cohen; Eng Taing; Heng Taing; Maria Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie, Jimmy Chhor; Dongliang Jiang; Max Chou; and/or any other alias', agents or corporate entities affiliated with same (the "DPP Data");

2. All administrative usernames and passwords that give the Trustee access to any DPP account held, maintained or controlled by LPG; Oakstone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG; Maverick; Vulcan; SCS; Coast Processing; Prime Logix; Touzi; Tony Diab; Rosa Loli; Lisa Cohen; Eng Taing; Heng Taing; Maria Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie, Jimmy Chhor; Dongliang Jiang; Max Chou; and/or any other alias', agents or corporate entities affiliated with same;

3. All Client files, including but not limited to names, contact information, client file management, communications, account information, letters, pleadings, communications, payment history, financial account information, credit reports, executed legal services contracts, ACH contracts, executed installment contracts, account balances, debts in dispute, payment history, file status, settlements, debt invalidations and/or any other information created, managed and stored electronically utilizing proprietary software program "LUNA" hosted on Amazon Web Services ("AWS") and located at the current domain "lunapp.com" that is maintained and controlled by LPG; Oakstone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG; Maverick; Vulcan; SCS; Coast Processing; Prime Logix; Touzi; Tony Diab; Rosa Loli; Lisa Cohen; Eng Taing; Heng Taing; Maria Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie, Jimmy Chhor; Dongliang

1  Jiang; Max Chou and/or any other alias', agents or corporate entities affiliated with same (the "Luna
2  Data");

3        4. All administrative usernames and passwords that give the Trustee access to any AWS
4  account where Luna, its software program, databases and client information is held, stored and hosted
5  that is maintained or controlled by LPG; Oakstone; Greyson; Gallant; Phoenix; LGS Holdco., LLC;
6  CLG; Maverick; SCS; Vulcan; Coast Processing; Prime Logix; Touzi; Tony Diab; Rosa Loli; Lisa
7  Cohen; Eng Taing; Heng Taing; Maria Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott
8  James; Eadie, Jimmy Chhor; Dongliang Jiang; Max Chou and/or any other alias', agents or corporate
9  entities affiliated with same;

10       5. All ACH files related to Client information, details, accounts, history of electronic fund
11  transfers ("EFT"), payments, amounts held, interest on held amounts, penalty fees, nonsufficient fund
12  fees or other ACH related charges to the Clients stored electronically or in hard copy associated with
13  ACH processing service providers and/or affiliated financial institutions, including but not limited to
14  EPPS; EquiPay, LLC ("EquiPay"); Merit Fund, LLC ("Merit Fund"); Authorize.net a subsidiary of
15  Visa, Inc. ("Authorize.net"); World Global; OptimumBank Holdings, Inc. dba Optimum Bank
16  ("Optimum Bank"); BankUnited, Inc. ("BankUnited"); Marich Bein, LLC ("Marich Bein");
17  Revolv3, Inc. ("Revolv3"); Fidelity National Information Services, Inc. dba FIS , including but not
18  limited to its subsidiaries Worldpay, LLC , Worldpay Group or any other subsidiaries providing ACH
19  processing services ("FIS"); Guardian Processing, LLC ("Guardian"); Payliance, LLC ("Payliance");
20  Seamless Chex, Inc. ("Seamless"); Dwolla, Inc. ("Dwolla")Stripe, Inc. ("Stripe"); and/or any entity
21  associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER
22  NJ 0875" or any such substantially similar ACH identification transaction (hereinafter the "ACH
23  Data");

24       6. All files, information, reports, spreadsheets, account numbers, routing numbers, and
25  databases related to transfer of funds out of any account opened, maintained and controlled by LPG;
26  Oakstone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG; Maverick; SCS; Vulcan;Coast
27  Processing; Prime Logix; Touzi; Tony Diab; Rosa Loli; Lisa Cohen; Eng Taing; Heng Taing; Maria
28  Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie, Jimmy Chhor; Dongliang

Jiang; Max Chou; and/or any other alias', agents or corporate entities affiliated with same that were processed and executed by ACH processing service providers and/or their affiliated financial institutions, including but not limited to EPPS; EquiPay; Merit Fund; Authorize.net; World Global; Optimum Bank; BankUnited; Marich Bein; Revolv3; FIS; Guardian; Payliance; Seamless; Dwolla; Stripe; and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875" or any such substantially similar ACH identification transaction (hereinafter the "ACH Transfer Data");

     7. All administrative usernames and passwords that give the Trustee access to any ACH processing accounts, software, database or other program at ACH processing service providers and/or affiliated financial institutions, including but not limited to EPPS; EquiPay; Merit Fund; Authorize.net; World Global; Optimum Bank; BankUnited; Marich Bein; Revolv3; FIS; Guardian; Payliance; Seamless; Dwolla; Stripe; and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875" or any such substantially similar ACH identification transaction used to upload or input Client information, initiate Client ACH EFTs, transfer Client ACH funds to outside financial institutions or otherwise manage any account opened, maintained and controlled by LPG; Oakstone; Greyson; Phoenix; LGS Holdco., LLC; CLG; SCS; Vulcan; Coast Processing; Prime Logix; Touzi; Tony Diab; Rosa Loli; Lisa Cohen; Eng Taing; Heng Taing; Maria Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie; Jimmy Chhor; Dongliang Jiang; Max Chou; and/or any other alias', agents or corporate entities affiliated with same;

     8. All accounting records, files, data and information for LPG; Oakstone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG; SCS; Vulcan; Coast Processing; and Prime Logix stored on NetSuite, Quickbooks and Microsoft SharePoint, Suite or other permanent, cloud based systems (hereinafter the "Accounting Data");

     9. All contracts, records, reports, information, data and details regarding the transfer or sale of any Client files or future Client ACH payments to any other law firm, organization, corporate entity, person(s), or investment group (otherwise known as factoring companies) by LPG; Oakstone; Greyson; Phoenix; LGS Holdco., LLC; and/or CLG (hereinafter the "Client Transfer Data");

EXHIBIT 3

10. All contracts, records, reports, information, data, cost basis, payment information and details regarding the transfer or receipt of any Client files or future Client ACH payments from any other law firm, organization, corporate entity, person(s), investment or marketing group (otherwise known as capping companies) to LPG; Oakstone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; Maverick; and/or CLG (hereinafter the "Client Transfer-In Data");

11. All information, data, tables, spreadsheets and reports regarding Client information stored on Formgrid, Inc. dba Airtable's ("Airtable") cloud based data management system used by LPG; Oakstone; Greyson; Phoenix; LGS Holdco., LLC; and/or CLG to manage the aforementioned information (hereinafter the "Airtable Data"); and

12. All administrative usernames and passwords that give the Trustee access to any Airtable account opened, maintained or controlled by LPG; Oakstone; Greyson, Phoenix; LGS Holdco., LLC; Maverick; and/or CLG; and

13. All email accounts related to LPG; Oakstone; Greyson; Gallant;  Phoenix; LGS Holdco., LLC; and/or CLG stored maintained and/or hosted on Office 365, gsuite or any other email server, whether physical or cloud based servers (hereinafter "Email Data").

14. Nothing herein is intended to require Greyson or its owner, Scott Eadie, or Greyson employees Jayde Trinh or Han Trinh to turn over: (a) any files for Clients which Greyson did not obtain from or through access to data or personnel, including affiliated attorneys, from LPG, Phoenix, Oakstone, LGS Holdco, LLC, CLG, or Gallant; (b) any accounting records, files, data and information for Clients which Greyson did not obtain from or through any access to data or personnel, including affiliated attorneys, from LPG, Phoenix, Oakstone, LGS Holdco, LLC, CLG, or Gallant; (c) contracts, records, reports, information, data and details regarding the transfer or sale of any Client files or future Client ACH payments to any other law firm, organization, corporate entity, person(s), or investment group for Clients which Greyson did not obtain from or through any access to data or personnel, including affiliated attorneys, from LPG, Phoenix, Oakstone, LGS Holdco, LLC, CLG, or Gallant.  Further, nothing herein is intended to prevent Greyson from storing, maintaining, and/or hosting email accounts and domains on Office 365, g-suite or any other email server, whether physical or cloud based, that is unrelated to LPG, Phoenix, Oakstone, LGS Holdco, LLC, CLG, or

Gallant, and provided that such email accounts and domains were not funded through, acquired or developed by funds the genesis of which was the legacy files of LPG, including but not limited to any funds delivered after January 1, 2019, from, through or affiliated with Maverick, Vulcan. Coast Processing; SCS, Prime Logix, Oakstone, Gallant, Touzi, and/or any the ACH payment processors or financial institutions named in this Order.

**B. <u>ESTATE FUNDS</u>**

Within five (5) calendar days from the date of this order or notice thereof, whichever is later, the following shall be turned over to the Trustee:

1. All post-petition Client ACH payments processed on or after March 20, 2023, and received by LPG; Oakstone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG; Maverick; SCS; Vulcan; Coast Processing; Prime Logix; Touzi; Tony Diab; Rosa Loli; Lisa Cohen; Eng Taing; Heng Taing; Maria Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie, Jimmy Chhor; Dongliang Jiang; Max Chou; and/or any other alias', agents or corporate entities affiliated with same related to LPG Clients who entered into a Legal Services Agreement pre-petition and who have received the services provided in the contract;

2. The $6,308,702.72 million dollars in post-petition ACH EFTs processed through LPG's Revolv3, Inc. merchant account from March 2023 to the present, including any amount that have been transferred, wired or otherwise withdrawn from LPG's Revolv3, Inc. merchant account to Oakstone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG; Maverick; SCS; Vulcan; Coast Processing; Prime Logix; Touzi; Tony Diab; Rosa Loli; Lisa Cohen, Eng Taing; Heng Taing; Maria Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie, Jimmy Chhor; Dongliang Jiang; Max Chou; and/or any other alias', agents or corporate entities affiliated with same;

3. Nothing herein is intended to require Greyson to turnover any post-petition Client ACH payments related to the approximate 48 LPG clients who are contemplated to be serviced by Greyson and for whom Greyson provides the Chapter 11 Trustee with signed retention agreement to the extent such funds were processed or received after the date of the signed retention agreement with Greyson.

///

///

## **PRELIMINARY INJUNCTION**

From the date of this **ORDER** and until further Ordered by this Court:

**1. Control Over ACH Transfers.** All covered entities and individuals (defined below) are hereby enjoined and shall not interfere with any ACH electronic funds transfer being executed pursuant to documents authorizing such transfers to be executed in favor of LPG as follows:

a) Covered Entities and Individuals. The following entities and individuals, and anyone acting on their behalf: LPG; Oakstone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG; Maverick; Vulcan; Coast Processing; Prime Logix; SCS; Touzi; Tony Diab; Rosa Loli; Lisa Cohen; Eng Taing; Heng Taing; Maria Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie; Jimmy Chhor; Dongliang Jiang; Max Chou; and/or any other alias', agents or corporate entities affiliated with same shall, absent further order from this Court, are Preliminary Enjoin as follows:

i) Enjoined Conduct re ACH Instructions. No covered entity or individual shall initiate, cause to be initiated, or instruct any company or person that processes ACH transfers and/or their affiliated financial institutions, including EPPS; EquiPay; Merit Fund; Authorize.net; World Global; Optimum Bank; BankUnited; Marich Bein; Revolv3; FIS; Guardian; Payliance; Seamless; Dwolla; Stripe; and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875" or any such substantially similar ACH identification transaction, to execute any ACH EFT on any file, financial institution, or current or former client of LPG, to or for the benefit of LPG, including but not limited to Oakstone; Greyson; Phoenix; CLG; Prime Logix; SCS; Maverick;  and/or Vulcan without the express authorization of Trustee;

ii) Enjoined Conduct re Bank Accounts. No covered entity or individual shall open, or cause to be opened, any account, whether business or personal, that can receive or send money or anything of value, at any company including banking, financial, or similar institutions and/or receive, directly or indirectly, any funds drawn from ACH electronic fund transfers;

**2. Enjoined Execution of ACH Transfer.** All covered entities and individuals (defined below) are hereby enjoined and prohibited from interfering with any ACH electronic funds transfer

///

7                                    EXHIBIT 3

1  being executed pursuant to documents authorizing such transfers to be executed in favor of LPG as

2  follows:

3       a) <u>Covered Entities and Individuals</u> All companies capable of processing ACH

4  electronic funds transfers, including EPPS; EquiPay; Merit Fund; Authorize.net; World Global;

5  Optimum Bank; BankUnited; Marich Bein; Revolv3; FIS; Guardian; Payliance, Seamless; Dwolla;

6  Stripe; and/or any entity associated with the ACH identification transaction "LPG 94 226-6262 #5

7  2363 RT 9 TOMS RIVER NJ 0875" or any such substantially similar ACH identification transaction

8  are enjoined absent further order of this court, from:

9       i) <u>Enjoined Conduct re ACH Transfers</u> No covered entity or individual shall

10  transfer, wire, divert or otherwise permit the withdraw any funds received from any ACH electronic

11  funds transfer on any client file, financial institution, or current or former client of LPG, to or for the

12  benefit of LPG or any or more of its alleged assignees or transferees, including but not limited to

13  Oakstone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG and/or Maverick to any financial

14  account maintained, owned or controlled by Vulcan; Coast Processing; Prime Logix; SCS; Touzi

15  Tony Diab; Rosa Loli; Lisa Cohen; Eng Taing; Heng Taing; Maria Eeya Tan; Jake Akers; Jayde

16  Trinh; Wes Thomas; Scott James; Eadie, Jimmy Chhor; Dongliang Jiang; Max Chou; and/or any

17  other alias', agents or corporate entities affiliated with same. All ACH funds held by any covered

18  entity or individual shall be held in trust until such time as written authorization and instruction is

19  provided by Trustee;

20       ii) <u>Preliminary Injunction Mandating Turnover to Trustee</u> all covered entities

21  and individuals shall hold in trust any and all funds, receipts, and transfers related to any account,

22  file, or current or former client of LPG; Oakstone; Greyson; Phoenix; LGS Holdco., LLC; CLG;

23  Maverick; Vulcan; Coast Processing; Prime Logix; SCS; Touzi; Tony Diab; Rosa Loli; Lisa Cohen;

24  Eng Taing; Heng Taing; Maria Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie,

25  Jimmy Chhor; Dongliang Jiang; Max Chou and/or other alias', agents or corporate entities affiliated

26  with same until expressly directed to release, wire or transfer such funds by the Trustee and to a bank

27  account whose information shall be provided with any such request; and, shall upon request by the

28  ///

1  Trustee provide an accounting of any and all such funds held in trust to the Trustee upon written

2  request within 10 days of said request;

3      3. LPG; Oakstone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG; SCS; Vulcan; Coast

4  Processing; Prime Logix; SCS; Touzi; Tony Diab; Rosa Loli; Lisa Cohen; Eng Taing; Heng Taing;

5  Maria Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie, Jimmy Chhor;

6  Dongliang Jiang; Max Chou and/or any other alias', agents or corporate entities affiliated with same

7  are hereby enjoined and shall not incur, take out or pledge any receivables of LPG; Oakstone;

8  Greyson; Gallant; Phoenix; Prime Logix; SCS; Touzi; Maverick; and/or CLG without seeking leave

9  of court;

10     4. Any and all funds held at Bank of America on behalf of Prime Logix and/or Vulcan,

11  including but not limited to account Nos. ending in xxx951 and xxx9021 and/or any other financial

12  accounts having received funds originating from LPG; Oakstone; Greyson; Gallant; Phoenix; LGS

13  HoldCo., LLC; CLG; and/or Maverick shall be held in trust and shall not be with withdrawn, wired,

14  drawn against, moved, or otherwise transferred without the express consent of the Trustee in writing

15  and to a financial account identified by the Trustee at the time the authorization is provided.

16     5. Nothing herein is intended to prevent Greyson or its owner, Scott Eadie, or Greyson

17  employees Jayde Trinh or Han Trinh from initiating, causing to be initiated, or instructing any

18  company or person that process ACH transfers to execute any ACH EFT on any file or financial

19  institution related to any Clients which Greyson did not obtain from or through access to data or

20  personnel, including affiliated attorneys, from LPG, Phoenix, Oakstone, LGS Holdco, LLC, CLG,

21  or Gallant, or related to the approximate 48 LPG clients who are contemplated to be serviced by

22  Greyson, or whom Greyson provides the Chapter 11 Trustee with signed retention agreement, and as

23  to which such processing occurs from and after the date of the signed retention agreement.

24                                    **LOCKOUT ORDER**

25     From the date of this **ORDER** until further order of this Court:

26     1. All persons identified below are enjoined and shall not access or attempt to gain access

27  whether physically, remotely, electronically, or virtually to the following locations associated with

28  LPG; Oakstone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG; Maverick; Vulcan; Coast

1  Processing; Prime Logix; SCS; Touzi; Tony Diab; Rosa Loli; Lisa Cohen; Eng Taing; Heng Taing;

2  Maria Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie, Jimmy Chhor;

3  Dongliang Jiang; Max Chou; and/or any other alias', agents or corporate entities affiliated with same:

4  a) 3347 Michelson Drive, Suites 400, 410 & 420, Irvine, California 92612; b) 17542 17th St Suite

5  100, Tustin, California 92780; b) Luna's domain located on AWS; c) DPP Data or accounts; d)

6  Accounting Data and/or accounts on NetSuite, Quickbooks and Microsoft SharePoint, G Suite or

7  other permanent or cloud based systems; e) ACH processing accounts, whether individual, merchant

8  or business, held at any ACH processing or affiliated financial institution, including but not limited

9  to EPPS; EquiPay; Merit Fund; Authorize.net; World Global; Optimum Bank; BankUnited; March

10  Bein; Revolv3; FIS; Guardian; Payliance; Seamless; Dwolla; Stripe; and/or any entity associated

11  with the ACH identification transaction "LPG 949 926-6262 #5 2363 RT 9 TOMS RIVER NJ 0875"

12  or any such substantially similar ACH identification transaction; f) Vulcan and/or PrimeLogix'

13  financial accounts at Bank of America, including but not limited to Account Nos. ending in xxx951

14  and xxx9021; and g) the Email Data, as follows:

15         i) Tony Diab;

16         ii) Rosa Loli aka Rosa Bianca Loli aka Bianca Loli;

17         iii) Lisa Cohen;

18         iv) Daniel March;

19         v) Eng Taing;

20         vi) Maria Eeya Tan (except as may be authorized by the Trustee in the exercise of

21  his business judgment)

22         vii) Jake Akers;

23         viii) Han Trinh;

24         ix) Jayde Trinh;

25         x) Wes Thomas;

26         xi) William Taylor "Ty" Carss (except at may be authorized by the Trustee in the

27  exercise of his business judgment);

28         x)  Scott James Eadie;

EXHIBIT 3

1          xi) Jimmy Chhor;

2          xii) Brad Lee;

3          xiii) Dongliang Jiang;

4          xiv) Heng Taing; and

5          xiiv) Max Chou.

6        Nothing herein is intended to prevent Greyson or its owner or employees from accessing or

7 attempting to gain access whether physically, remotely, electronically, or virtually to 3347 Michelson

8 Drive, Suites 400B, Irvine, California 92612 (but, for the sake of clarity, nothing herein confers any

9 legal right to possession of access to such suite, which possession or access is governed by applicable

10 law) or from accessing or attempting to gain access whether physically, remotely, electronically, or

11 virtually to ACH processing accounts with Revolv3 so long as Greyson or its owner or employees do

12 not access or attempt to access any ACH processing account at Revolv3 or otherwise held by LPG;

13 Prime Logix; Guardian; Oakstone; Phoenix; and/or any other account previously used to processes

14 LPG client ACH transfers that is not in Greyson's own name and established by or through funds the

15 source of which is unrelated to legacy LPG clients and established in Greyson's own name after the

16 date of this Order.

17                        **<u>ORDER TO RE-DIRECT MAIL</u>**

18        From the date of this **ORDER** until further order of this Court:

19        1. Trustee is hereby authorized to instruct the United States Postal Service to redirect any

20 and all mail processed by the United States Postal Service Directed to: a) LPG, 17542 17th St Suite

21 100, Tustin, California 92780; b) Oakstone, 888 Prospect Street, Suite 200 La Jolla, California

22 92037; c) Phoenix, 3347 Michelson Drive, Suites 400, 410 & 420, Irvine, California 92612; d) Prime

23 Logix, 3347 Michelson Drive, Suites 400, 410 & 420, Irvine, California 92612; e) CLG, PO Box 412

24 Elmsford, NY 10523; f) Greyson, 3347 Michelson Drive, Suites 400, 410 & 420, Irvine, California

25 92612; and/or any other address associated with such entities, shall be forwarded and redirected to

26 an address provided by the Trustee until such time as ordered by the Court.  To the extent that the

27 Trustee receives any mail addressed to Greyson, the Trustee shall .pdf a copy of the correspondence

28 to Greyson's counsel, Doug Plazak of Reid & Hellyer at dplazak@rhlaw.com, within 24 hours of

EXHIBIT 3

1   said receipt, unless receipt falls on a Friday or a day preceding any Federal or State holiday and/or

2   emergency requiring Trustee's office to close, in which case any mail received by Trustee and

3   addressed to Greyson shall be forwarded to Greyson's counsel the next business day.

4

5                              **NOTICE TO LPG CLIENTS**

6           Trustee is hereby authorized to provide notice to any and all LPG clients, including those

7   transferred and/or assigned to Oakstone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CG;

8   and/or Maverick regarding: i) LPG's Bankruptcy filing; ii) pending evaluation of their file; and iii)

9   status prior to assuming or rejecting their contract in substantially the same form of notice attached

10  to this Order as Exhibit 1.

                                        # # #

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Date: June 23, 2023

                                        Scott C. Clarkson
                                        United States Bankruptcy Judge

25

26

27

28

                                        12                          EXHIBIT 3

Exhibit 1

[Client Name]
  [Date]
[Address Line 1]
[Address Line 2]
[Address Line 3]
Tel:
Email:


**RE: STATUS REGARDING YOUR MATTER WITH THE LITIGATION PRACTICE GROUP**

Dear [Name],

Please be advised that on May 20, 2023, The Litigation Practice Group ("LPG") filed for protection under Chapter 11 of the Bankruptcy Code. On May 8, 2023, the United States Bankruptcy Court—Central District of California, Case No. 8:23-bk-10571, appointed Richard Marshack, Esq. as the duly appointed Chapter 11 Trustee to oversee the administration of LPG's Bankruptcy matter. See Docket No. 65.

Subsequently, the United States Bankruptcy Court authorized Trustee to obtain information in order to review and evaluate the status of your file at LPG and/or any other debt relief law firm your file may have been transferred or assigned to at or around the time LPG filed for Bankruptcy, including but not limited to Oakstone Law Group, P.C.; Greyson Law Center, P.C.; Gallant Law Group, PC; Phoenix Law, P.C.; LGS Holdco., LLC; Consumer Legal Group, P.C. and/or Maverick Management Group, LLC.

Over the coming weeks, Trustee Richard Marshack will provide status of your file and continuation of legal services pursuant to the Legal Services Agreement with LPG.

We greatly appreciate your patience and cooperation while we work on your behalf.

Sincerely,


[Signatory name]

13

EXHIBIT 3

Exhibit 4

EXHIBIT 4

P

Case 8:24-ap-01040-SC   Doc 53-2   Filed 02/12/25   Entered 02/12/25 10:29:52   Desc
Declaration of Veneeta Jaswal   Page 217 of 221

4828

UNITED STATES BANKRUPTCY COURT CENTRAL DISTRICT OF CALIFORNIA

**Fill in the information to identify the case (Select only one Debtor per form):**

[X] The Litigation Practice Group P.C. (Case No. 23-10571)

**FILED**

FEB 2 2 2024

By Omni Agent Solutions, Claims Agent
For U.S. Bankruptcy Court
Central District of California

Official Form 410

# Proof of Claim

04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

Carefully read instructions included with this Proof of Claim before completing. In order to have your claim considered for payment and/or voting purposes, complete ALL applicable questions.

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

Marich Bein LLC

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

[X] No
[ ] Yes    From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

David Kupetz
Name

300 S. Grand Ave., Suite 2600
Number    Street

Los Angeles, CA 90071
City        State        ZIP Code

Contact Phone  213-687-6774

Contact email  david.kupetz@lockelord.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one)

Where should payments to the creditor be sent? (if different)

Hershy Deutsch
Name

99 Wall Street, Number 2613
Number    Street

New York, NY 10005
City        State        ZIP Code

Contact Phone _____

Contact email _____

**4. Does this claim amend one already filed?**

[X] No
[ ] Yes    Claim Number on court claims registry (if known) _____    Filed On _____
                                                                                   MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

[X] No
[ ] Yes    Who made the earlier filing? _____

102106-1 SCK

Official Form 410                          Proof of Claim                          Page 1

EXHIBIT 4

**Part 2:    Give Information About the Claim as of the Date the Case Was Filed**

| | | |
|---|---|---|
| 6. | Do you have any number you use to identify the debtor? | ☒ No<br>☐ Yes    Last 4 digits of the debtor's account or any number you use to identify the debtor: |

7. How much is the claim?    $ **22,304,093.25**

Does this amount include interest or other charges?

☐ No

■ Yes    Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. What is the basis of the claim?

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information

Contracts with debtor (Assignment of Servicing Rights agreement and 4 Accounts Receivable Purchase Agreements)

9. Is all or part of the claim secured?

☒ No

☐ Yes    The claim is secured by a lien on property

**Nature of property:**

☐ Real Estate    If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*

☐ Motor Vehicle

☐ Other    Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.

| | |
|---|---|
| Value of Property: | $ _____ |
| Amount of the claim that is secured: | $ _____ |
| Amount of the claim that is unsecured: | $ _____ |

(The sum of the secured and unsecured amounts should match the amount in line 7).

Amount necessary to cure any default as of the date of the petition:    $ _____

Annual Interest Rate:    (when case was filed)    _____ %

☐ Fixed

☐ Variable

10. Is this claim based on a lease?

☒ No

☐ Yes    Amount necessary to cure any default as of the date of the petition.    $ _____

11. Is this claim subject to a right of setoff?

☒ No

☐ Yes    Identify the property: _____

12. Is this claim for the value of goods received by the debtor within 20 days before the commencement date of this case (11 U.S.C. §503(b)(9))?

☒ No

☐ Yes    Amount of 503(b)(9) Claim:  $ _____

EXHIBIT 4

| 13. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☒ No ☐ Yes    *Check all that apply* | Amount entitled to priority |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| | ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| | ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| | ☐ Contributions to an employee benefit plan 11 U.S.C. § 507(a)(5). | $ _____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $ _____ |
| | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | |

---

## Part 3:    Sign Below

**The person completing this proof of claim must sign and date it.**

**FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.
**18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am the guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date **02/20/2024**
                MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

| Name | **Hershy Deutsch** | | |
|---|---|---|---|
| | First Name | Middle Name | Last Name |
| Title | **Managing Member** | | |
| Company | **Marich Bein LLC** | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | **99 Wall Street, Number 2613** | | |
| | Number        Street | | |
| | **New York, NY 10005** | | |
| | City | State | ZIP Code |
| Contact Phone | | Email | |

EXHIBIT 4

## Attachment to Proof of Claim

1.  Marich Bein LLC ("MB"), a New York limited liability company, entered business transactions with The Litigation Practice Group, P.C. ("LPG").

2.  In connection with and evidencing the business transactions between MB and LPG, MB and LPG executed contracts.

3.  The contracts between MB and LPG include: (1) Assignment of Servicing Rights ("Servicing Agreement") dated September 19, 2022; (2) Accounts Receivable Purchase Agreement entered on August 18, 2022 ("MB1"); (3) Accounts Receivable Purchase Agreement entered September 21, 2022 ("MB2"); (4) Accounts Receivable Purchase Agreement entered October 6, 2022 ("MB3"); and (5) Accounts Receivable Purchase Agreement entered November 14, 2022 ("MB4"). MB1, MB2, MB3, and MB4 are collectively referred to as the "AR Purchase Agreements".

4.  A true and correct copy of the Servicing Agreement is attached hereto as Exhibit 1.

5.  True and correct copies of MB1, MB2, MB3, and MB4 are attached hereto as Exhibits 2, 3, 4, and 5, respectively. The spreadsheets of Purchased Accounts (as that term is defined in the AR Purchase Agreements) connected to each AR Purchase Agreement is omitted from the Exhibits to protect the privacy of the account debtors. The spreadsheets can be made available to the trustee for LPG upon request.

6.  Pursuant to MB1, MB2, MB3, and MB4, MB paid LPG $12,058,335 to purchase and acquire specified accounts receivables (defined in the AR Purchase Agreements).

7.  Under the Servicing Agreement, LPG unconditionally, absolutely and irrevocably assigned to MB all of its rights in the servicing, collection and administration of accounts receivables. As set forth in the Servicing Agreement, MB was entitled to and earned Servicing Fees (as defined in the Servicing Agreement).

8.  Pursuant to the AR Purchase Agreements, LPG was guaranteed payment of not less than $37,104,601.

9.  LPG breached its obligations to MB under the Servicing Agreement and the AR Purchase Agreements. MB complied with and performed its obligations under the AR Purchase Agreements and the Servicing Agreement.

10. Under the Servicing Agreement and the AR Purchase Agreements, LPG has indemnification obligations to MB.

11. Pursuant to the AR Purchase Agreements, LPG is liable to MB for expenses, including (without limitation) legal fees. MB continues to incur such expenses as a result of LPG's defaults.

EXHIBIT 4

12.  As of January 31, 2024 (expenses, including legal fees continue to accrue), MB's claim against LPG is calculated as follows:

| Total Contractual Obligations | |
| --- | --- |
| Servicing Fees: | $1,085,638.00 |
| Expenses\Legal Fees\Indemnification: | $1,103,816.64 |
| Guaranteed Payment: | $37,104,601.84 |

| Payments Received to Date | |
| --- | --- |
| Funds Collected and Applied to Claim | $16,989,963.23 |

| Claim | |
| --- | --- |
| Total Claim Amount (as of 1/31/24) | $22,304,093.25 |

13.  MB reserves all, rights, claims, and defenses, and submission of this Proof of Claim is not intended as a waiver or release of MB's rights, claims, or defenses, including, without limitation, any rights of setoff and/or recoupment.

14.  MB reserves its right to amend and/or supplement this Proof of Claim for any purpose and to the extent permitted by applicable law.

15.  MB expressly reserves, any and all rights that it has or may have against LPG's officers, directors, members, managers, controlling persons, and non-debtor affiliates.

16.  The filing of this Proof of Claim is not and shall not be deemed or construed as: (a) a waiver, release, or limitation of MB's rights against any person, entity, or property; (b) consent by MB or any of its officers, members, or managers to the jurisdiction or venue of this Court or any other court with respect to proceedings, if any, commenced against MB or otherwise involving its officers, members, or managers; (c) a waiver, release, or limitation of the right of MB and/or its officers, members, or managers to trial by jury; (d) consent by MB or any of its officers, members, or managers to a jury trial in this Court pursuant to 28 U.S.C. § 157(e) or otherwise; (e) a waiver, release, or limitation of the right of MB or any of its officers, members, or managers to have any final orders in any non-core matters or proceedings entered only after de novo review by a U.S. District Court Judge; or (f) consent to this Court hearing or deciding any matter or proceeding, to the extent this Court lacks the constitutional authority to do so.

136466519v.1

EXHIBIT 4