YOSINA M. LISSEBECK (SBN 201654)
yosina.lissebeck@dinsmore.com
CHRISTOPHER B. GHIO (SBN 259094)
christopher.ghio@dinsmore.com
**DINSMORE & SHOHL LLP**
655 West Broadway, Suite 800
San Diego, CA 92101
Tel: (619) 400-0500
Fax: (619) 400-0501

Attorneys for Richard A. Marshack,
Trustee for the LPG Liquidation Trust

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SANTA ANA DIVISION**

| | |
|---|---|
| In re:<br><br>The Litigation Practice Group P.C.,<br><br>Debtor. | Chapter 11<br><br>Case No. 8:23-bk-10571-SC<br>Adv. No. 8:24-ap-01040-SC<br><br>(Related Adv. No. 8:23-ap-01046-SC) |
| Richard A. Marshack, Chapter 11 Trustee,<br><br>Plaintiff,<br><br>v.<br><br>MARICH BEIN, LLC, a New York Limited Liability Corporation; BANKUNITED, N.A., a Florida based National Banking Association; GOFI LLC, a California Limited Liability Company; VULCAN CONSULTING GROUP, LLC, a California Limited Liability Company; LISA COHEN, individually and, DOES 1 through 10, inclusive,<br><br>Defendants. | **TRUSTEE'S FOURTH AMENDED COMPLAINT FOR:**<br><br>**(1) INJUNCTIVE RELIEF;**<br><br>**(2) AVOIDANCE, RECOVERY, AND PRESERVATION OF TWO-YEAR ACTUAL FRAUDULENT TRANSFERS;**<br><br>**(3) AVOIDANCE, RECOVERY, AND PRESERVATION OF TWO-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;**<br><br>**(4) AVOIDANCE, RECOVERY, AND PRESERVATION OF FOUR-YEAR ACTUAL FRAUDULENT TRANSFERS;**<br><br>**(5) AVOIDANCE, RECOVERY, AND PRESERVATION OF FOUR-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS;**<br><br>**(6) AVOIDANCE, RECOVERY AND PRESERVATION OF PREFERENTIAL TRANSFER MADE WITHIN ONE YEAR OF THE PETITION DATE;**<br><br>**(7) BREACH OF CONTRACT;** |

**(8) CONVERSION;**

**(9) TURNOVER;**

**(10) DEEPENING INSOLVENCY;**

**(11) RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT VIOLATIONS;**

**(12) CONSPIRACY;**

**(13) AIDING AND ABETTING AGAINST MARICH BEIN, LLC, GOFI, LLC, PACIFIC STAFFING, LLC, CALLFI, LLC, ACUFI, LLC, LISA COHEN, HESHY DEUSTCH, NACHMAN WEISZ, ISRAEL RECHES, AND NICHOLAS KOHLSCHREIBER;**

Honorable Scott C. Clarkson
Dept. 5C

For his *Complaint and causes of action initially filed in the main Adversary Proceeding No. 8:23-ap-01046-SC ("1046 Action") and having severed his claims from the 1046 Action, now brings this action against Defendants for (1) Injunctive Relief; (2) Avoidance, Recovery, and Preservation of Two-Year Actual Fraudulent Transfers; (3) Avoidance, Recovery, and Preservation of Two-Year Constructive Fraudulent Transfers; (4) Avoidance, Recovery, and Preservation of Four-Year Actual Fraudulent Transfers; (5) Avoidance, Recovery, and Preservation of Four-Year Constructive Fraudulent Transfers*; *(6) Avoidance, Recovery and Preservation of Preferential Transfer Made Within Ninety Dates of the Petition Date; (7) Breach of Contract; (8) Conversion; (9) Turnover;(10) Deepening Insolvency (11) Racketeer Influenced and Corrupt Organizations Act Violations; (12) Conspiracy; (13) Aiding and Abetting Fraud, Conversion and Deepening Insolvency against Marich Bein, LLC, GoFi LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber* (the "Complaint"). Plaintiff Richard A. Marshack, former Chapter 11 Trustee ("Trustee" or "Plaintiff") for the bankruptcy estate (the "Estate") of Debtor The Litigation Practice Group, PC (the "Debtor" or "LPG") and current liquidating Trustee of the LPG Liquidating Trust ("Trustee" or "Plaintiff") in the above-captioned bankruptcy case (the "Bankruptcy Case"), alleges and avers as follows:

## STATEMENT OF JURISDICTION, NATURE OF PROCEEDING, AND VENUE

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H) and (O), 1334(b), and General Order No. 13-05 of the United States District Court for the Central District of California because this is a core proceeding arising in and/or related to the Bankruptcy Case, which is a case under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), and which is pending in the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "Court"). Regardless of whether this proceeding is core, non-core, or otherwise, the Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court. Defendants are hereby notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires Defendants to plead whether consent is given to the entry of a final order and judgment by the bankruptcy court. Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to the Debtor's pending Bankruptcy Case.

2. Regardless of whether this proceeding is core, non-core, or otherwise, Plaintiff consents to the entry of a final order and judgment by the Bankruptcy Court.

3. Defendants are notified that Rule 7008 of the Federal Rules of Bankruptcy Procedure requires Defendants to plead whether consent is given to the entry of a final order and judgment by the Bankruptcy Court.

4. Venue of this adversary proceeding properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to Debtor's pending Bankruptcy Case.

## THE PARTIES

5. Plaintiff Richard A. Marshack is the former Chapter 11 Trustee for the Bankruptcy Estate of The Litigation Practice Group P.C., and the current Liquidating Trustee of the LPG Liquidating Trust.

6. Debtor LPG is, and at all material times was, a professional corporation organized, existing, and in good standing under the laws of the State of California, with its principal place of business in Tustin, California.

/ / /

7. Defendant Marich Bein, LLC ("Marich Bein") is, and at all material times was, a New York limited liability corporation organized, existing, and in good standing under the laws of the State of New York. Marich Bein filed its Articles of Incorporation in the State of New York on or about August 18, 2022. On August 19, 2022, the New York Department of State Records indicate Marich Bein was using the assumed name "LPG" listing LPG's Tustin, California phone number (949-299-6262) as its own. In all, Defendant Marich Bein was doing business as, "LPG 949-229-6262"; "GALLANT 215-804-3333"; and "CENTER POINTE 215-664-9000". On information and belief, some or all wire transfers from Marich Bein to LPG, when they occurred, were identified with the ACH transaction ID "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875." Marich Bein was retained and/or under the control of Heshy Deustch ("Deustch"), Nachman Weisz ("Weisz"), and Tony Diab ("Diab") until the relationship between Marich Bein and LPG degraded as alleged herein. Marich Bein processed and controlled LPG ACH transactions with Deustch's and Diab's authorization, however, without the authority of LPG itself or its authorized agent Daniel March. Marich Bein also obtained, was provided or misappropriated a copy of LPG client payment information prior to LPG's Bankruptcy filing which, on information and belief, it has in its possession.

8. Defendant GoFi LLC ("GoFi"), also known as AcuFi, LLC ("AcuFi"), and CallFi, LLC ("CallFi"), (collectively, "GoFi Entities") is, and at all material times represented that it was, a limited liability company, existing under the laws of the State of California. GoFi Entities received monies due to LPG under purchase agreements, identified later in this pleading, from Marich Bein.

9. Defendant Vulcan Consulting Group LLC, also known as VCG, LLC, (collectively, "Vulcan") is, and at material times was, a California limited liability company organized, existing, and in good standing under the laws of the State of California. Vulcan filed its Articles of Organization on or about December 15, 2019. Vulcan was retained and/or under the control of Lisa Cohen until Diab took over control of Vulcan on or about September 23, 2023. Vulcan received monies due to LPG under purchase agreements, identified later in this pleading, from Marich Bein.

10. Prime Logix, LLC ("Prime Logix") is, and at material times was, a Wyoming limited liability company. Prime Logix served as an intermediary entity between the GoFi Entities and received monies due to LPG.

11. Defendant Pacific Staffing, LLC ("Pacific Staffing") is, and at all material times was, a limited liability company existing under the laws of the State of Delaware. Pacific Staffing served as an intermediary between Prime Logix and the GoFi Entities and received monies due to LPG.

12. Defendant Lisa Cohen ("Cohen") is, and at all material times was, an individual residing in the State of California. Cohen controlled Vulcan.

13. Defendant Heshy Deustch ("Deustch") is, and at all material times was, an individual residing in the State of New York. Deustch owned, operated and/or controlled Marich Bein.

14. Upon information and belief, Defendant Nachman Weisz (on information and belief, also known as Nachmy Weisz and Max Weisz) (collectively, "Weisz") is, and at all material times was, an individual residing in the State of New Jersey. Weisz was the business partner of Deustch and owned, operated and/or controlled Marich Bein.

15. Defendant Nicholas Kohlschreiber ("Kohlschreiber") is, and at all material times was, an individual residing in the State of California. Kohlschreiber owned, operated and/or controlled the GoFi Entities and Pacific Staffing.

16. Defendant Israel Reches ("Reches"), upon information and belief, was the business partner of Deustch and/or Weisz and controlled and directed transfers of money by and between Marich Bein and Debtor.

17. Upon information and belief, each of the Defendants, including those fictitiously named, were the agent, servant, employee, partner, alter ego, or joint venture of the other Defendants, and in doing the things hereinafter alleged, each was acting within the scope of said agency, employment, partnership or venture, and with the knowledge, permission, consent and ratification of other Defendants in doing, or failing to do, the things alleged herein.

## RELEVANT DEFENDANTS NAMED IN THE 1046 ACTION

18. Tony Diab is, and at all relevant times was, an individual who operated, dominated, and controlled LPG. Diab and other defendants devised a plan to fraudulently transfer funds, client files, Client Funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Account Receivables") out of LPG to third parties prior to the filing of bankruptcy.

/ / /

## GENERAL ALLEGATIONS

### A. LPG's Bankruptcy Case

19. On March 20, 2023 (the "Petition Date"), LPG filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, commencing the Bankruptcy Case. Diab made the decision for LPG to file for bankruptcy in order to avoid a plethora of pending lawsuits, two of which sought an order appointing a receiver, including but not limited to: *Validation Partners, LLC v. The Litigation Practice Group, PC, et al*. Case No. 30-2022-01281911-CU-BC-CXC (Orange County Super Ct. September 20, 2022) and *Debt Validation Fund II, LLC, et al. v. The Litigation Practice Group PC, et al*. Case No. 30-2023-01303355-CU-CO-CXC (Orange County Super. Ct. January 23, 2023), among many others. In order to abscond with and delay discovery of substantial assets and continue to profit from LPG client files and client payment obligations pursuant to LPG'S client Legal Services Agreements ("ACH Receivables") prior to filing bankruptcy, Diab and other defendants devised a plan to fraudulently transfer funds, assets, client files, and ACH Receivables out of LPG to third parties. The 1046 Action deals primarily with the wholesale transfer of client files and the related ACH Receivables; this action deals primarily with the transfer of client ACH Receivables to Marich Bein, subject to the contracts and agreements attached to Marich Bein's proof of claim [Omni Claim No. 102106-1] ("Proof of Claim").

20. After the Office of the United States Trustee (the "UST") filed the *Motion by United States Trustee to Dismiss or Convert Case Pursuant to 11 U.S.C. § 1112(b)* [Bankr. Docket No. 21] and creditors Debt Validation Fund II, LLC; MC DVI Fund 1, LLC; and MC DVI Fund 2, LLC filed the *Motion by DVF and MC DVI to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. §§ 105, 305, 349, & 1112, or in the Alternative Convert This Case to Chapter 7 or Appoint a Trustee* [Bankr. Docket No. 44], the Court entered the *Order Directing Unites States Trustee to Appoint Chapter 11 Trustee* [Bankr. Docket No. 58] on May 4, 2021, thereby granting the UST's motion and directing the UST to appoint a Chapter 11 Trustee in the Bankruptcy Case.

21. Pursuant to the *Acceptance of Appointment as Chapter 11 Trustee* [Bankr. Docket No. 63; the *Order Approving Appointment* is 1046 Action Docket No. 65], on May 8, 2023, Plaintiff accepted his appointment as the Chapter 11 Trustee in the Bankruptcy Case. The Court approved the

Trustee's appointment in its *Order Approving the U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee*, though he no longer serves in that capacity. [Bankr. Docket No. 65]. Plaintiff Trustee was not appointed until after the events giving rise to this action and, therefore, bases these allegations on information and belief, including information provided by Diab. *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."); *Miller v. City of Los Angeles*, 2014 U.S. Dist. LEXIS 198871, 2014 WL 12610195, at *5 (C.D. Cal. Aug. 7, 2014) (recognizing that the plaintiff's "information and belief" pleading was allowed and "necessary at times"); *see also Mireskandari v. Daily Mail and General Trust PLC*, 2013 U.S. Dist. LEXIS 194437, 2013 WL 12129642, at *4 (C.D. Cal. July 31, 2013) ("The Federal Rules of Civil Procedure allow parties to plead facts on 'information and belief' if the facts 'will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.'") (Citations omitted.)

22. Pursuant to the *Order Confirming Modified Joint Chapter 11 Plan of Liquidation* entered September 9, 2024, and the *Notice of Occurrence of Effective Date of Modified First Amended Joint Chapter 11 Plan of Liquidation* filed September 24, 2024, Richard A. Marshack also became the Liquidating Trustee of the LPG Liquidation Trust, effective September 24, 2024, and he continues to serve in this capacity at this time. [Bankr. Docket Nos. 1646 & 1762.]

23. All claims have been transferred to the LPG Liquidation Trust pursuant to the confirmed plan and Plaintiff brings this action solely in his capacity as the former Chapter 11 Trustee and current Liquidating Trustee of the LPG Liquidation Trust for the benefit of Debtor's Estate and its creditors.

**B. <u>LPG's Ownership And Management</u>**

24. Prior to the Petition Date, LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts. LPG services over 50,000 customers across the United States. At all relevant times, LPG was controlled and operated by an individual named Tony Diab ("Diab").

25. Despite having been disbarred in California and Nevada, Diab controlled and operated LPG since its inception. However, Diab endeavored to conceal his control over LPG, its finances, marketing, affiliates and operations. For example, Diab purportedly required his LPG employees to call him "Admin," his email address was "admin@lpglaw.com" and the name plate on his desk apparently read, "I don't work here."

**C. <u>LPG</u>**

26. LPG operated a law firm for consumers across the country who sought assistance in contesting or resolving debts they would identify.

27. The consumers would pay LPG over a period of time via monthly debits from their bank accounts.

28. The monthly payments were meant to cover all legal services LPG provided to the consumers including validation of the debts, review of documents to determine enforceability, and court appearances to halt lawsuits to obtain judgments.

29. In certain instances, LPG would file a lawsuit in an effort to eliminate a disputed debt or to prosecute affirmative claims held by the consumers.

30. LPG mismanaged the consumers' monthly payments by failing to segregate and hold client payments in trust until fees had been earned by LPG.

31. Diab and other defendants devised a plan to fraudulently transfer funds, client files, client funds and assets in the form of ACH Receivables (the "ACH Receivables" or "Accounts Receivable") out of LPG to third parties prior to the filing of bankruptcy.

32. To obtain consumer clients, LPG contracted with marketing companies, who engaged in illegal capping and would advertise or call to solicit consumers to become clients of LPG in exchange for a percentage of the ACH Receivables collected by LPG from the consumers. The marketing affiliates went so far as to assist with the execution of an engagement letter between the consumer and LPG.

/ / /

/ / /

/ / /

33. In exchange, LPG agreed to pay the marketing affiliates a percentage of the ACH Receivables collected by LPG from the consumers. LPG would also enter into purchase agreements, at a discount, with various marketing affiliates in an attempt to regain control over the receivables that marketing companies had an interest in.

34. Because LPG received payments from consumers over time, it often sought financing against its future ACH Receivables. This borrowing was used to finance operations at LPG, to pay the fees owed to the marketing companies for providing the client referrals, and to pay creditors which had provided earlier-in-time financing in a growing Ponzi scheme, among other improper purposes.

35. Many of the documents executed in connection with such financing described the transactions as account receivable purchase agreements.

**D. Diab's Scheme**

36. As discussed above, the Debtor borrowed against its future ACH Receivables by entering into accounts receivable purchase agreements or similar transactions with marketers and factoring companies. In many instances, the ACH Receivables were sold multiple times over to different alleged purchasers or factoring companies.

37. Given that all and/or a substantial portion of Debtor's ACH Receivables were transferred and/or sold multiple times over there were more claims for payment from any one ACH Receivable than that receivable generated. Accordingly, prior to the petition date, Debtor engaged in a scheme to defraud its creditors by transferring ownership of the ACH Receivables to various fraudulent conveyance partners as alleged herein and the various adversary proceedings brought by the Trustee, including but not limited to the 1046 Action.

**E. Diab's Control Over LPG's Payment Processing**

38. Diab used entities he controlled including, without limitation, Validation Partners, Vulcan, Coast Processing, PrimeLogix, and/or Maverick to divert LPG consumer funds and ACH Receivables to Diab would use numerous ACH processing companies in order to easily transfer millions of dollars from Debtor to these entities he controlled, without oversight or detection, and to avoid payment disputes and complications. The money that flowed from Debtor through these bank accounts to Defendants consisted of Client Funds that Debtor funneled to these entities by means of

the ACH processing companies. Debtor regularly made deposits into these entities bank account such that they received Client Funds directly from Debtor in addition to future Accounts Receivable.

39. LPG's monthly revenue from client files is primarily received via ACH payments. In order to process ACH payments, LPG is required to enlist the services of ACH payment processing companies who handle high risk transactions. In this regard, Diab enlisted numerous ACH processing companies[1] in order to easily switch between different vendors and quickly transfer millions of dollars of LPG funds to entities he controlled, generally in less than three days from receipt of funds by the processing company. One reason for the plethora of processing company vendors was to avoid payment disputes and complications with the vendor itself, as in the case with Marich Bein. Switching between ACH processing companies further facilitated unauthorized double pulls, and made it more difficult for LPG clients to dispute, prevent or stop unauthorized ACH transactions, even where the Client disputed the transactions, had cancelled their services, and/or requested a refund.

40. LPG's monthly receipt of client payments ranged between $8.4 million to $11.2 million per month from May 2022 through September 2022. Despite this receipt of client payments, which could not be considered revenue until earned, LPG was not accumulating any cash on hand and claimed to have only $4,500 in its bank account on the Petition Date.

41. Tony Diab was acting adversely to LPG's corporate interests. Diab interfered with LPG's fiduciary duty to its' customer/clients by failing to safeguard client trust funds. Diab, created a system to siphon the rights to payment for these trust funds to other entities to enrich himself, the marketing affiliates and investors at the expense of LPG/its customer/clients.

42. Innocent insiders, with authority and ability to stop Diab's scheme, were unaware of his actions. For example, Daniel March, the CEO of LPG, had authority to stop Diab, but was unaware that Diab was fraudulently executing agreements under March's name and in turn, executing agreements on LPG's behalf without authorization.

/ / /

[1] The ACH processing companies LPG used and which Diab controlled includes, but is not limited to, EPPS; EquiPay; Merit Fund; Authorize.net; World Global; Optimum Bank; BankUnited; Marich Bein; Revolv3; Maverick Bankcard; FIS; Guardian; and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875" or any such substantially similar ACH identification transaction.

**F. Marich Bein's Fraudulent Servicing and ACH Receivable Purchase Agreements**

43. Marich Bein is, and at all material times was, a New York limited liability corporation organized, existing, and in good standing under the laws of the State of New York. Marich Bein filed its Articles of Incorporation in the State of New York on or about August 18, 2022. On August 19, 2022, the New York Department of State Records indicate Marich Bein was using the assumed name "LPG" listing LPG's Tustin, California phone number (949-299-6262) as its own. In all, Marich Bein was doing business as, "LPG 949-229-6262"; "GALLANT 215-804-3333"; and "CENTER POINTE 215-664-9000".

44. On information and belief, some or all wire transfers from Marich Bein to LPG, when they occurred, were identified with the ACH transaction ID "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875."

45. Marich Bein was retained and/or under the control of Heshy Deustch, Nachman Weisz, Israel Reches, and others, as well as Tony Diab, until the relationship between Marich Bein and LPG degraded as alleged herein. Marich Bein processed and controlled LPG ACH transactions without the authority of LPG itself or its authorized agent Daniel March. Marich Bein also obtained, was provided or misappropriated a copy of LPG client payment information prior to LPG's Bankruptcy filing which, on information and belief, it has in its possession.

46. In an action filed in the Central District of California, Case No. 8:23-cv-00339-JWH-ADS (the "Marich Bein Action"), Marich Bein contends that on September 18, 2022, Plaintiff and LPG entered into an Assignment of Servicing Rights Agreement ("SRA") on approximately 50,000 LPG client files, pursuant to which LPG purportedly agreed to the following:

> **Article I. ASSIGNMENT**
> Section I.1 Assignment of Servicing Rights. [LPG], by these presents does hereby presently, unconditionally, absolutely and irrevocably assign, transfer, convey and set over to [Plaintiff] (it being intended by [LPG] that such assignments constitute present, absolute and unconditional assignments and not assignments for additional security only, but such assignment shall constitute security for [LPG]'s obligations to [Plaintiff] or its affiliates), all of [LPG]'s right, title and interest in and to the Servicing Rights, including, without limitation, any right of [LPG] or any of its affiliates (whether such rights are currently existing or arising in the future) to service collection of subscription fees, return payment fees, or any other fee or payment resulting from any Customer's engagement with [LPG] or any of its affiliates, or give notices, sue for payment under the Customer

contracts or to take any action at law or in equity relating to the Customer contracts.

**Article II. SERVICING OF CONTRACTS**

Section I.2 [*sic*] Appointment as Third-Party Servicer. . . . [LPG] hereby retains [Plaintiff] to act as third party [Plaintiff] for the Receivables . . . .

Section I.3 [*sic*] Servicing of Receivables. . . . [LPG] agrees to provide [Plaintiff] and its subcontractors with such assistance in the servicing, collection and administration of any Receivable as may be requested by [Plaintiff] from time to time.

Section I.4 [*sic*] Limited Power of Attorney. [LPG] hereby irrevocably appoints and empowers [Plaintiff] as [LPG]'s true and lawful attorney-in-fact, with full power of substitution, to endorse and promptly deposit on [LPG]'s behalf any checks or other instruments made payable to [LPG] and submitted by a Customer as payment on any Receivable, and to take any other action relating to the Receivables in [LPG]'s name and place that [Plaintiff] deems advisable and consistent with the terms of this Agreement. This power of attorney shall be deemed to a right coupled with an interest.

**ARTICLE III. OBLIGATIONS OF MERCHANT**

Section III.1 Access to All Digital Records, Databases, and Applications. [LPG] shall provide [Plaintiff] any information requested by [Plaintiff] with respect to its Customers and the Customer contracts. At all times, [Plaintiff] must have unfettered access to all software applications used by [LPG], including, but not limited to, Debt Pay Pro, Snowflake, or any other databases used by [LPG] in its ordinary course of business.

* * *

Section III.3 No Impairment. [LPG] will not take any action (including placing or allowing placement of a lien or security interest on any Purchased Receivable) or make any omission that has, individually or in the aggregate, an adverse effect on any Purchased Receivable or on [Plaintiff]'s ability to collect on any Purchased Receivable.

Section III.4 Amounts Received. . . . [LPG] shall not in any way encourage or cause any proceeds to be paid, processed, settled or delivered to any person or account other than the [Plaintiff]'s account, and shall take all affirmative steps at its expense and as necessary or appropriate to prevent any such occurrence from recurring. [LPG] is prohibited from instructing any Customer to pay [LPG] or any other third party on a Receivable or otherwise suggest that Customer may make a payment to [LPG] or any other third party instead of paying [Plaintiff] to satisfy its payment obligation.

* * *

**ARTICLE VI. MISCELLANEOUS**

Section I.7 [*sic*] Term and Termination. This Assignment shall commence on [September 19, 2022] and shall continue in full force and effect, until released by [Plaintiff]. [LPG] may terminate this Assignment at any time and for any reason provided that the total amount of Purchased Receivables held by [Plaintiff] and its affiliates are less than $1,000,000.00.[2]

* * *

> Section VI.1[*sic*] Exclusivity. [LPG]understands and agrees that the relationship set forth in this Assignment is exclusive. [LPG] forgoes any right to contract with other parties for the same or similar services provided by [Plaintiff] under this Assignment.

A true and correct copy of the SRA is attached as **Exhibit 1.**

47. According to Tony Diab, the SRA conveyed to Marich Bein the right to process LPG client payments and remit such funds to LPG. Although it was styled broadly as an agreement that related to "servicing rights", the only services called for the by the Agreement was payment processing services.

48. In addition to the SRA, on August 18, 2022, September 21, 2022, October 6, 2022, and November 14, 2022, LPG entered into four (4) separate Accounts Receivables Purchase Agreements (each an "ARPA") on approximately 15,000 to 20,000 client files and the associated payment information necessary to process the ACH Receivables was purportedly transferred and assigned by LPG to Marich Bein. True and complete copies of the ARPA are attached as **Exhibit 2** and incorporated here.

49. According to Tony Diab, all or a substantial portion of the same client files, servicing rights and ACH Receivables were transferred multiple times to different entities between September 2022 and March 20, 2023, directly and/or indirectly through a myriad of transactions as alleged in the 1046 Action.

50. Per Tony Diab's account, Marich Bein was familiar with and understood that the receivables it was purchasing had previously been sold. Marich Bein was aware of the dispute LPG had with World Global and Optimum Bank, and later became aware of the dispute LPG had with Validation Partners. It was explicitly informed of the fact that the receivables it was purchasing had previously been sold to other entities.

51. The SRA was made without consideration to LPG. Due to the lack of consideration, the SRA is fraudulent and must be set aside.

/ / /

/ / /

/ / /

/ / /

52. Pursuant to the SRA, Diab and LPG hired Marich Bein to process its ACH transactions on most or all LPG client files, well in excess of the number of client files and payment information purportedly transferred as alleged in Paragraph 49 above. On information and belief, at all material times, the NACHA bank used and necessary for Marich Bein to process such ACH transactions through DPP included, but was not limited to, BankUnited and BCB Bancorp.

53. According to Tony Diab, Marich Bein further held multiple financial accounts at BankUnited and BCB Bancorp in order to receive ACH funds from LPG client files. On information and belief, Marich Bein is the only entity that held a financial account at BankUnited and BCB Bancorp relevant to the allegations herein.

54. On information and belief, Diab had a close connection and insider relationship with the principals of Marich Bein, including, Deustch, Weisz, and Reches prior to and at the time the ACH transactions and alleged transfer of LPG client files and/or payment information necessary for processing the ACH Receivables.

55. Per Tony Diab, Marich Bein utilized the d/b/a LPG to disguise their payment processing and avoid the use of the name of their entity despite the legal requirement that the entity pulling an ACH debit identify itself to the consumer from which it is pulling the debit.

56. According to the New York Secretary of State website, Marich Bein was doing business as LPG 949-229-6262. In doing so, Marich Bein was fraudulently pulling ACH debits from LPG clients and fraudulently misrepresenting itself as LPG.

57. BankUnited and BCB knew Marich Bein, not LPG, was the account holder. Despite this, BankUnited and BCB permitted Marich Bein to disguise its name by utilizing the d/b/a LPG. In doing so, they prevented LPG consumers from knowing that it was Marich Bein behind the ACH debit pulls, not LPG. If Marich Bein had shown on LPG consumers' statement, it would have triggered chargebacks since LPG consumers never authorized Marich Bein to debit them. Thus, both the banks, BankUnited and BCB, worked in conjunction with Marich Bein to defraud LPG consumers.

/ / /

/ / /

/ / /

58. At all relevant times, Marich Bein, by and through its owners, operators, directors and/or controllers Deustch, Weisz, and Reches, controlled the flow of money and transfers of Debtor related to the ACH transactions and, on information and belief, all transfers required the consent of Marich Bein.

59. Tony Diab stated that Marich Bein, not LPG clients – appeared to control the sequence of payments. Thus, Marich Bein made unauthorized pulls from client accounts and decided what vendors and it received.

60. Per Tony Diab, Marich Bein diverted and/or obscured the flow of client money. Thus, Marich Bein operated more like a self-dealing intermediary than an agent. Defendants Deustch, Weisz, and Reches authorized and directed the unauthorized pulls.

61. The bank accounts maintained at BankUnited and BCB Bancorp used for Debtor's ACH transactions, on information and belief, were utilized by Marich Bein and Deustch, Weisz, and Reches.

62. Diab and Marich Bein's agreement was part of a larger pattern of fraud, where everyone was trying to outmaneuver each other. Even though Diab seemed to be in charge at first, both sides took advantage of each other's weaknesses and shared financial connections. For example, LPG/Diab owed money to other businesses Marich Bein's leaders owned. They used these connections to manipulate each other, which eventually caused their partnership to fall apart.

63. Under the SRA and ARPA schemes between Marich Bein and Diab, Marich Bein was given access to LPG's DPP account, client files and the NACHA information necessary to initiate ACH transactions. On information and belief, access to client files was provided without client consent. Based on the ACH and payment data contained in DPP, Marich Bein had all it needed to initiate ACH transactions on all LPG client files.

64. Based on the testimony of Diab, Marich Bein was permitted to keep and hold only those ACH funds related to client files and ACH Receivables purportedly transferred to Marich Bein, which as alleged in the Marich Bein Action, were transferred more than once. The remaining proceeds from the ACH transactions processed on LPG client files by Marich Bein were to be remitted to LPG.

/ / /

65. The ARPA was fraudulent because the client files were sold to other entities without client consent and in order to defraud LPG creditors. For example, in executing a Legal Services Agreement with LPG and executing an ACH Authorization in favor of LPG, the individual consumer clients of LPG had authorized LPG – and only LPG – to make use of their ACH Authorization and initiate payments to LPG. There is no evidence that any consumer client of LPG authorized Marich Bein d/b/a LPG to initiate any payments at any time.

66. According to Marich Bein's Proof of Claim, Marich Bein took – without client authorization – $16,989,963.23, from Debtor money otherwise due to the Debtor pursuant to the Debtor's consumer client's ACH Authorizations under the SRA and ARPA

67. Marich Bein collected more than $50,000,000.00 in LPG client payments from September 2022 to March 2023 and retained $16,989,963.23 more than what it was owed in terms of ACH Receivables it had purchased. Marich Bein continues to hold this sum.

68. According to Tony Diab, Marich Bein initially processed ACH transactions on client files and remitted payment to LPG less the ACH Receivables Marich Bein had purchased. On approximately January 31, 2023, Diab caused certain client files and/or ACH Receivables to be transferred to Oakstone Law Group, P.C. ("Oakstone"),

69. Among the 15,000 client files transferred to Oakstone were receivables in which Marich Bein had a junior security interest (junior to the interest of the creditor that was managing Oakstone).

70. Upset with the transfer of ACH Receivables to Oakstone, Marich Bein began withholding ACH payments received on LPG client files, including roughly 50,000 LPG clients that were not transferred to Oakstone.

71. According to Diab and as listed in Debtor's Schedule A/B [Bankr. Docket No. 33], Marich Bein withheld approximately $16.9 million dollars in ACH funds on LPG client files that were not associated with the foregoing fraudulent SRA and ARPA.

/ / /

/ / /

/ / /

72. In the Marich Bein Action, Marich Bein alleges that it is in possession of at least $1,000,000 processed via ACH from LPG clients. Pre-petition, Debtor demanded said funds be returned and that Marich Bein cease and desist from processing ACH transactions. To date, Marich Bein has refused to return and/or turnover said funds.

73. On approximately February 2023, Marich Bein's ability to access LPG client's NACHA payment information through DPP was terminated in response to a threat by Marich Bein that it would process LPG client payments regardless of which law firm was servicing those client payments.

74. To wit, Diab caused all service contract payments to DPP to cease, DPP locked LPG's account and all of LPG's client information was transferred to Diab's proprietary platform, LUNA. In turn, Marich Bein was locked out of DPP.

75. Although Marich Bein was locked out of DPP, LPG continued to send accurate NACHA files to Marich Bein to process. Marich Bein refused and instead processed NACHA files from December 2022 despite the fact that a number of LPG clients had cancelled, paused their payments, or completed their payment plans between December 2022 and February 2023.

76. According to Tony Diab, however, this did not stop Marich Bein from initiating ACH transactions on LPG clients using old data Marich Bein had usurped when it had access to DPP and without having updated client, payment or other related information in violation of NACHA and other applicable laws and regulations.

77. Tony Diab has indicated, Brad Lee, an employee of LPG, was instructed to continue to send accurate NACHA files to Marich Bein, but after several days of Marich Bein's refusal to process accurate NACHA files and insistence on processing old NACHA files, LPG stopped providing NACHA files to Marich Bein.

78. The effect of the SRA and ARPA was to accomplish an unlawful purpose. Thus, the agreements may be declared illegal regardless of the intention of the parties. *Stockton Morris Plan Co. v. Cal. Tractor & Equip. Corp.*, 112 Cal. App. 2d 684, 690 (1952) (citing *Fewel & Dawes, Inc. v. Pratt*, 17 Cal. 2d 85, 91 (1941)). This remains true regardless of whether the contracts have been performed. *Stevens v. Boyes Hot Springs Co.*, 113 Cal. App. 479, 483 (1931) (A contract by a

corporation to purchase its own stock has the effect of illegally withdrawing and paying to a stockholder a part of the capital stock of the corporation and is illegal and void, regardless of the fact that the contract is fully performed by the sellers and partially performed by the corporation.); *Mansfield v. Hyde*, 112 Cal. App. 2d 133, 139 (1952), overruled, *Fomco, Inc. v. Joe Maggio, Inc.*, 8 Cal. Rptr. 459 (1960) (Where object of statute requiring licenses is to prevent improper persons from engaging in particular activity, or is for purpose of regulating occupation or business for protection of public, imposition of penalty amounts to prohibition against engaging in occupation or business without license, and contract made by unlicensed person in violation of statute is invalid.); *Firpo v. Murphy*, 72 Cal. App. 249, 252 (1925) (A contract to pay commissions to a real estate broker is illegal and he is not entitled to recover thereon where he fails to secure the license required by law to carry on his business.).

79. According to Diab, Defendants' failure to remit ACH payments due and owing to LPG caused LPG to take out a line of credit from City Capital NY (also a scheduled creditor) in the approximate amount of $2,9500,000.

**G. <u>BankUnited ACH Transactions</u>**

80. Tony Diab has indicated that Marich Bein primarily processed NACHA filed through Bank United, a bank with which it had a close relationship.

81. According to Diab. Defendant Deutsch had an insider relationship with BankUnited. Thus, BankUnited continued to process LPG client files despite a temporary restraining order issued by a Texas State Court Judge, and despite repeated complaint from LPG and from LPG clients that the payments being pulled were unauthorized (which, in this context, meant that LPG did not authorize Marich Bein to run the client payments and LPG clients themselves did not authorize the payment that was being run without regard to who was running the payment).

82. According to Tony Diab, Marich Bein was nested under Clearfund's Bank United account to exploit Clearfund's large ACH debit limit.

83. This allowed Marich Bein to process $12–13 million/month in ACH pulls from LPG clients in late 2022.

/ / /

84. Despite a temporary restraining order, and direct notices to Bank United's CEO, General Counsel and registered agent, Bank United continued processing unauthorized debits until March 13, 2023, when it finally cut them off.

85. In order for a third party ACH processor, portal, integrated software or other non-regulated entity to process and/or receive ACH transactions, a NACHA compliant financial institution is, and at all relevant times herein was, required to complete such transactions.

86. Based on DPP records, BankUnited was listed as the NACHA financial institution engaged to process and/or receive ACH transactions on client files through DPP.

87. On information and belief, Marich Bein, Diab or others acting in concert with Diab and having access to LPG's DPP account and its financial controls designated BankUnited as the NACHA financial institution to which ACH Receivables on LPG client files would be deposited.

88. On information and belief, BankUnited processed and/or received the foregoing ACH transactions at the direction of Marich Bein, even after LPG had made it clear its objection to the continued payment processing.

89. Per Tony Diab, Marich Bein utilized the d/b/a LPG. to disguise its payment processing and avoid the use of the name of their entity despite the legal requirement that the entity pulling an ACH debit identify itself to the consumer from which it is pulling the debit.

90. BankUnited actually knew Marich Bein, not LPG, was the account holder. Despite this, BankUnited permitted Marich Bein to disguise its name by utilizing the d/b/a LPG. In doing so, BankUnited prevented LPG consumers from knowing it was Marich Bein behind the ACH debit pulls, not LPG.

91. If Marich Bein had shown on LPG consumers statements, it would have triggered chargebacks since LPG consumers never authorized Marich Bein to debit them.

92. Thus, BankUnited worked in conjunction with Marich Bein to defraud LPG consumers.

93. The funds received from ACH transactions processed by and through BankUnited were initially deposited into an operating account held at BankUnited in order to ensure the funds cleared. After an initial holding period to account for insufficient funds and other charge backs.

/ / /

94. BankUnited retained said funds in an account held at its institution under the control of Marich Bein or its related entities, Cobalt Funding Solutions and Clearfund Solution, and permitted Marich Bein to transfer a portion or all of the funds to an account designated by Marich Bein.

95. Prior to the dispute with Marich Bein, funds processed and received by Marich Bein and/or BankUnited that were to be delivered to LPG were then wired, transferred or otherwise directed to accounts designated by Diab, including those held by Vulcan, PrimeLogix, BAT, Inc. dba Coast Processing or others.

96. Marich Bein, at all relevant times has and continues to maintain a bank account at BankUnited. After the dispute, Marich Bein retained such funds and refused to send any funds to LPG or any related entity.

97. On information and belief, Bank United processed and/or held funds being siphoned in ways inconsistent with ordinary commercial practice. The repeated unauthorized ACH pulls, unexplained self-payments, and commingled transfers should have triggered enhanced monitoring under the Bank Secrecy Act, Anti-Money Laundering, and suspicious activity reporting rules. However, BankUnited failed to detect or stop the activity.

98. On information and belief, BankUnited has and/or continues to retain all or a portion of said funds and received fees and profits from engaging in such activity that were taken from wrongfully obtained funds processed against LPG client files, including but not limited to those LPG client files fraudulently transferred to Marich Bein. This further includes the alleged wrongful, fraudulent and/or double pulls initiated against LPG client accounts by Marich Bein

99. Bank United is also in possession of all relevant records pertaining to the number of ACH transactions processed by Marich Bein and accounts where such funds not currently held in a BankUnited account were transferred.

100. BankUnited in allowing millions in ACH debits to run for entities in a high-risk industry, under regulatory orders, and after formal service of court orders, demonstrates reckless disregard.

/ / /

/ / /

101. On information and belief, BankUnited had actual knowledge, at all times relevant, that its conduct with respect to these ACH transactions was assisting and enabling Marich Bein and others in committing fraudulent and/or tortious conduct, as set forth more fully below.

**H. <u>BCB Bancorp ACH Transactions</u>**

102. According to Tony Diab, BCB Bancorp also processed and/or received the foregoing ACH transactions at the direction of Deustch, Weisz, Reches, and others associated with Marich Bein (such as Solomon Feig and Sam Geiger).

103. The funds received from ACH transactions processed by and through BCB Bancorp were initially deposited into an operating account held at BCB Bancorp in order to ensure the funds cleared.

104. After an initial holding period to account for insufficient funds and other charge backs, BCB Bancorp either retained said funds in an account held at its institution and/or transferred a portion or all of the funds to an account designated by Deustch, Weisz, and Reches.

105. Funds processed and received that were to be delivered to LPG were then wired, transferred or otherwise directed to accounts designated by Diab, including those held by Vulcan, PrimeLogix, BAT, Inc. dba Coast Processing among many others.

106. At all relevant times, BCB Bancorp has serviced accounts which were used to receive ACH Receivables from LPG client files fraudulently transferred, sold or both to Marich Bein.

107. Following BankUnited's shutdown in March 2023 due to unauthorized debiting of LPG clients in which a temporary restraining order was granted, Marich Bein sought new banking relationships. Consequently, BCB Bancorp processed debits from approximately 8,000 LPG client files between March and June 2023, despite the actual account ownership being concealed.

108. Per Tony Diab, Marich Bein utilized the d/b/a LPG to disguise its payment processing and avoid the use of the name of their entity despite the legal requirement that the entity pulling an ACH debit identify itself to the consumer from which it is pulling the debit.

109. BCB Bancorp actually knew Marich Bein, not LPG, was the account holder.

110. Despite this, BCB Bancorp permitted Marich Bein to disguise its name by utilizing the d/b/a LPG.

111. In doing so, BCB Bancorp prevented LPG consumers from knowing it was Marich Bein behind the ACH debit pulls, not LPG.

112. If Marich Bein had appeared on LPG consumers' statements, it would have triggered chargebacks since LPG consumers never authorized Marich Bein to debit them. Thus, BCB Bancorp worked in conjunction with Marich Bein to defraud LPG and its consumers.

113. BCB Bancorp processed or held funds being siphoned in ways inconsistent with ordinary commercial practice.

114. The repeated ACH pulls, unexplained self-payments, and commingled transfers should have triggered enhanced monitoring under the Bank Secrecy Act, Anti Money Laundering and suspicious activity reporting rules. However, BCB Bancorp failed to stop the activity. Moreover, given BCB's affirmative obligations under the Bank Secrecy Act's know your customer ("KYC") requirements, would have known that LPG and not Marich Bein (in its own name or d/b/a LPG) was ever authorized to initiate a single one of the over 8,000 ACH transactions that BCB improperly processed on MB's behalf.

115. In an interview with Trustee on January 24, 2025, Defendant Diab revealed that BCB Bancorp closed Defendant Prime Logix's and Consumer Legal Group's ("CLG") bank accounts for suspicious transactions.

116. BCB Bancorp has and/or continues to retain all or a portion of said funds and receive fees and profits from engaging in such activity that were taken from wrongfully obtained funds processed against LPG client files, including but not limited to those LPG client files fraudulently transferred to Marich Bein, Deustch, Weisz, and Reches. This further includes the alleged wrongful, fraudulent and/or double pulls initiated against LPG client accounts.

117. BCB Bancorp is also in possession of all relevant records pertaining to the number of ACH transactions processed by Marich Bein, Deustch, Weisz, and Reches and accounts where such funds not currently held in a BCB Bancorp account were transferred.

118. On January 14, 2025, Richard Marshack, in his capacity as the Chapter 11 Trustee, served a subpoena upon BCB Bancorp for documents related to financial transactions from January 1, 2022 to present by:

a. Tony Diab;

b. BAT, Inc. d/b/a Coast Processing;

c. PrimeLogix, LLC and its principal, Rosa Bianca Loli;

d. GoFi, LLC, AcuFi Financing, LLC, and Pacific Staffing, LLC, and their principal, Defendant Nicholas Kohlschreiber;

e. Maverick Management Group, LLC;

f. Vulcan Consulting Group, LLC and its principal, Defendant Lisa Cohen;

g. Guardian Processing, LLC;

h. Marich Bein, LLC and its principals, Defendants Hershey "Heshy" Deutsch and Nachmy Weisz;

i. Reches and Associates and its principal, Defendant Israel Reches.

119. On January 14, 2025, Richard Marshack served another subpoena upon BCB Bancorp for documents related to financial transactions from January 1, 2022, to present made by a CallFi, LLC, a newly discovered defendant entity owned by Defendant Kohlschreiber.

120. On January 27, 2025, BCB Bancorp sent a letter to Trustee stating that BCB Bancorp did not have any records related to the individuals and entities detailed in the subpoenas.

121. However, during a phone call on January 29, 2025 between counsel for Trustee and Brandon Baetz, an agent for BCB Bancorp, it was revealed that BCB Bancorp was, in fact, in possession of documents directly responsive to the subpoenas.

122. During this phone call, Baetz stated that a new search would be conducted and BCB Bancorp's response to the subpoena would be supplemented.

123. On February 14, 2025, after not having received any further response from BCB Bancorp, counsel for the Trustee sent BCB Bancorp a letter requesting its supplemented response to the subpoenas by February 19, 2025.

124. On February 19, 2025, Trustee served BCB Bancorp with another subpoena for documents related to a newly discovered entity owned by Diab, LGS Holdco, LLC.

/ / /

/ / /

125. On March 14, 2025, in response only to the third subpoena sent by Trustee, BCB Bancorp produced two minimally responsive Excel spreadsheets detailing a total of five transactions by LGS Holdco between April 21, 2023, and May 25, 2023.

126. The first spreadsheet contained details for four transactions between LGS Holdco, LLC and Prime Logix totaling $480,000 between April 28, 2023, and May 25, 2023. The second spreadsheet detailed one $300,000 transaction between LGS Holdco, LLC and Maverick Management Group, LLC on April 21, 2023.

127. On January 24, 2025, counsel for Trustee conferred with Defendant Diab.

128. During this conference, Diab informed counsel for Trustee that BCB Bancorp was used by Prime Logix and CLG to receive and process their ACH receivables from LPG files fraudulently transferred or sold (or both) to Marich Bein, further belying BCB Bancorp's position that they were only in possession of five transaction records responsive to the subpoenas.

129. Diab also informed counsel for Trustee that BCB Bancorp closed LGS Holdco and Consumer Legal Group's bank accounts for suspicious transactions. Specifically, BCB Bancorp had actual knowledge of the fraudulent pulls by LGS Holdco and/or Consumer Legal Group on behalf of Marich Bein.

130. BCB Bancorp remains in possession of the wrongfully retained funds.

131. BCB Bancorp processed ACH debits for thousands of clients whose receivables originated from the same network under investigation, presumably until June 2, 2023.

132. Further, BCB Bancorp knowingly overrode fraud alerts and customized services for the fraud. In fact, BCB Bancorp processed debits from approximately 8,000 LPG client files in a short period of time, between March and June 2023, not customary in conventional banking.

133. Additionally, Marich Bein continued using the d/b/a LPG 949-229-6262 to fraudulently induce LPG clients to believing LPG was making the pulls. Despite this, BCB Bancorp failed to halt the unauthorized and fraudulent debiting. Instead, they permitted Marich Bein to do so.

134. BCB Bancorp had actual knowledge, at all times relevant, that its conduct with respect to these ACH transactions was assisting and enabling Marich Bein and others in committing fraudulent and/or tortious conduct, as set forth more fully below.

**I. The Sale of LPG's Assets**

135. On July 7, 2023, Richard Marshack in his capacity as the Chapter 11 Trustee moved the Court for an order (A) Approving Sale, Subject to Overbid, of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests Pursuant to 11 U.S.C. § 363(b) and (B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and Other Agreements ("Sale Motion") [Bankr. Docket No. 191.] After supplemental briefing, addressing multiple oppositions, holding a lengthy hearing and auction wherein Morning Law Group was the highest bidder, the Court granted the Sale Motion entered August 2, 2023 ("Sale Order") [Bankr. Docket No. 352.]

**J. LPG'S Prepetition Creditors**

136. Debtor was insolvent when each transfer was made. This insolvency is evidenced in part by the fact that 14 separate UCC-1 statements were of record securing debts of the Debtor as of September 1, 2022. These statements remained unreleased as of the Petition Date. These statements either reflected secured liens against the Debtor's assets then owned or thereafter acquired, or provided evidence of the assignment or sale of substantial portions of the Debtor's future income.

137. When the transfers were made, these prior UCC-1 statements secured the repayment of the following claimed amounts that are currently known to Trustee and are allegedly owed by the Debtor: (i) $2,374,004.82 owed to Fundura Capital Group as evidenced by Proof of Claim No. 335 purportedly secured by a UCC statement filed on or about May 19, 2021; (ii) approximately $15 million dollars owed to MNS Funding, LLC as evidenced by Proof of Claim No. 1060 purportedly secured by a UCC statement filed on or about May 28, 2021; (iii) approximately $5,000,000 owed to Azzure Capital, LLC as evidenced by Proof of Claim No. 127 secured by a UCC statement filed on or about May 28, 2021; and (iv) approximately $1.5 million dollars owed to Diverse Capital, LLC purportedly secured by UCC statements filed on or about September 15, 2021, and December 1, 2021.[2]

138. As alleged above, LPG was borrowing against its assets and future income, often on unfavorable terms, not only to finance operations at LPG, but also to pay the fees owed to the marketing affiliates for providing it with consumer clients and to repay other loans to other creditors,

---

[2] Trustee reserves all rights, claims, and defenses with respect to these and any other purported secured or unsecured claims.

which loans were either already in default or about to be in default, as part of Diab's scheme to keep LPG creditors at bay for as long as possible until he could transfer LPG's assets, client files and ACH Receivables to other entities under his control. Pursuant to the agreements with the marketing companies, significant percentages of future payments were already promised to be paid to the marketing affiliates from whatever future income the Debtor would receive. And, of course, the payments LPG received in the form of ACH Receivables were also trust funds paid to LPG by its law firm clients, subject to a return of funds in the event of a request for a refund or termination of the representation before LPG had earned said funds. In this regard, except to the extent earned, the ACH Receivables also represented a liability of the Debtor.

139. In addition, on Debtor's Schedule E/F [Bankr. Docket No. 33], Debtor scheduled 11 unsecured creditors with priority unsecured claims totaling $374,060.04. These priority unsecured creditors include Indiana Dept. of Revenue, Dept. of Labor and Industries, Arizona Dept. of Economic Security, Arkansas Dept. of Finance & Admin., California Franchise Tax Board, Georgia Dept. of Labor, Internal Revenue Service, Mississippi Dept. of Revenue, Nevada Dept. of Taxation, Utah State Tax Commission, and Wisconsin Dept. of Revenue (collectively, "Priority Unsecured Creditors").

140. Another group of creditors that Debtor listed on its Schedule E/F [Bankr. Docket No. 33] are nonpriority unsecured creditors. Those 58 creditors have scheduled claims totaling $141,439,158.05 and include Ajilon; Anthem Blue Cross; Azevedo Solutions Groups, Inc.; Carolina Technologies & Consulting Invoice; Collaboration Advisors; Credit Reporting Service Inc.; CT Corporation – Inv.; Debt Pay Pro; Document Fulfillment Services; EnergyCare, LLC; Exela Enterprise Solutions; First Legal Network, LLC; GHA Technologies Inc.; Harrington Electric, Inc.; Imagine Reporting; Juize, Inc.; Krisp Technologies, Inc.; Liberty Mutual; Marc Lemauviel – Allegra; MarkSYS Holdings, LLC; Netsuite-Oracle; Pitney Bowes; Rapid Credit, Inc.; SBS Leasing A Program of De Lage Landen; Security Solutions; Sharp Business Systems; Streamline Performance, Inc.; Thomson Reuters; Twilio, Inc.; Nationwide Appearance Attorneys; Executive Center, LLC; Outsource Accelerator, Ltd.; TaskUs Holdings, Inc.; Marich Bein, LLC; Validation Partners; MC DVI Fund 1, LLC; MC DVI Fund 2, LLC; Debt Validation Fund II, LLC; Tustin Executive Center; LexisNexus; JP Morgan Chase; Business Centers of America; Michael Schwartz; Anibal Colon Jr.;

Kathleen Lacey; David Ulery; Kimberly Birdsong; Kevin Carpenter; Karen Suell; Gloria Eaton; Carolyn Beech; Debra Price; Kenneth Topp; Darcey Williamson, Trustee; James Hammett; Johnny Rizo; Beverly Graham; Kathleen Scarlett; and Geneve and Myranda Sheffield (collectively, "Nonpriority Unsecured Creditors" and, together with the Secured Creditors and Priority Unsecured Creditors, "Prepetition Creditors").

**K. LPG's Ponzi Scheme**

141. The Ponzi Scheme Presumption exists in bankruptcy proceedings. The Ponzi Scheme Presumption can be utilized to establish a debtor's "intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible. A Ponzi scheme cannot work forever. The investor pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors. The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law, *cf. Restatement (Second) of Torts § 8A (1963 & 1964)*, and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them. *Cf. Coleman Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.)* (Bankr. D. Kan. 1981) 14 B.R. 637, 643 (intentionally carrying out a transaction with full knowledge that its effect will be detrimental to creditors is sufficient for actual intent to hinder, delay or defraud within the meaning of § 548(a)(1))." *Merrill v. Abbott (In re Independent Clearing House Co.)* (D. Utah 1987) 77 B.R. 843, 860. A trustee in bankruptcy is not required to show that an operator of a Ponzi scheme was subjectively aware his Ponzi scheme was destined to fail. *In re EPD Inv. Co., LLC*, 114 F.4th at 1153 ("[a] trustee's action to recover assets fraudulently conveyed in the course of a Ponzi scheme does not require that the trustee also prove the Ponzi-scheme operator was subjectively aware his Ponzi scheme was destined to fail.")

142. "But if all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share. In fact, by helping the debtor perpetuate his scheme, the transfers exacerbate the harm to creditors by increasing

the amount of claims while diminishing the debtor's estate. In such a situation, the use of the defendant's money cannot objectively be called "reasonably equivalent value." *In re Independent Clearing House Co.* 77 B.R. at 859. Therefore, "[t]he trustee can avoid the transfers if they were preferential or fraudulent. Transfers to investors in a Ponzi scheme are preferential and fraudulent. Therefore, they constitute 'property of the estate,' and the trustee can recover them." *Id*. at 853 n.17 (citations omitted).

143. Diab used Debtor to operate a Ponzi scheme that utilized affiliates and several other entities, including Marich Bein, the GoFi Entities, Prime Logix, and Pacific Staffing, and their owners, operators, directors, principals and/or controllers Deustch, Weisz, Reches, Cohen, and Kohlscreiber, as payment processors and intermediaries to conceal the scheme, and as investors to continue its unlawful business practices by using funds provided by current investors to attract new investors hoping for very high returns. Therefore, the Debtor was running a Ponzi scheme and the Ponzi Scheme Presumption can be utilized to infer that the Debtor had the intent to defraud investors within the meaning of 11 U.S.C. section 548(a)(1). This is evidenced by the Court in this Bankruptcy Case declaring that Debtor was operating a Ponzi scheme when it stated the following:

> It is important to note that this Court has never received any significant and trustworthy evidence that Debtor accomplished meaningful results for its clients, but only anecdotal examples of viable success for its clients. By reviewing the Estate's claims register, there is evidence of consumer claims for the fraud and demanded but undelivered refunds of approximately $500 million. There is ample evidence that the pre-petition Debtor never placed the collected funds into an attorney-client trust account, and that Debtor or its principals simply looted the payments received through the client automatic withdrawals, stiffing both the clients and outside attorneys who may have been working on client cases with the hopes of being paid. There is also evidence before the Court that Debtor was running a Ponzi scheme and paying some outside (or "network") attorneys with funds obtained from new clients. In this case, it appears that some of the "lenders" may have been serving as "investors," hoping for very high returns before "the music stopped." The Ninth Circuit has recently explained, "[b]y definition, a Ponzi scheme is destined to fail because the pool of available investors is not limitless. When the Ponzi scheme operator's pool of investors inevitably runs dry, the scheme collapses and the swindler and their entities often end up in bankruptcy or equitable receivership. See generally David R. Hague, Expanding the Ponzi Scheme Presumption, 64 DePaul L. Rev. 867 (2015). In bankruptcy, the court-appointed trustee is tasked with taking immediate control of the entity, ceasing ongoing fraudulent activity, locating and collecting assets for the bankruptcy or receivership estate, and achieving a final, equitable distribution of the remaining assets. See 11 U.S.C. § 704." *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 2024 U.S. App. LEXIS 21363, at *15 (9th Cir. Aug. 23, 2024). Finally, there is evidence that Debtor was

> encumbering (or as some creditors assert, "double or triple selling") their accounts or receivables to multiple lenders. With respect to Greyson's requested Administrative Claim [Dk. 676], and as more fully described in the concurrently entered order denying the claim, there has been no evidence presented that any work allegedly performed by Greyson assisted any clients or added any value to the Estate.

(*See* Case No. 8:23-bk-10571-SC [Bankr. Docket No. 1545 Fn. 5].)

144. Moreover, since the transfers were made with the intent to further the Ponzi scheme, the Debtor did not receive an objectively reasonable equivalent value for the transfers, and the Trustee can avoid the transfers because they were fraudulent.

**L. <u>The Criminal Enterprise</u>**

145. Debtor's operations, activities and transfers done in furtherance of the Ponzi scheme, including those in conjunction with its affiliates and its dealings with Defendants, also constituted a criminal enterprise.

146. This, too, is evidenced by the Court's order in the 1046 Action wherein it denied the Motion of Greyson Law Center to Vacate the Preliminary Injunction previously entered in Debtor's main case, and the Court offered the opinion:

> Through the various proceedings and evidence produced in both the main case and the various adversary proceedings, including but not limited to various Motions for Temporary Restraining Orders, Preliminary Injunctions, Motions to Dismiss, a Motion for Appointment of a Chapter 11 Trustee, a Motion to Sell Assets, a multitude of pleadings filed by both secured and unsecured creditors (supported by evidence presented under oath) in support of their claims, and especially the pleadings and evidence presented by the "Watchdog of the Bankruptcy System" aka the Office of the United States Trustee (an arm of the United States Department of Justice), *it is clear to this Court that Debtor, since its pre-petition inception (and through the time of the appointment of the Chapter 11 Trustee) was in the Court's opinion, operating a criminal enterprise.*

(Case No. 8:23-bk-10571-SC; Adv. No. 8:23-ap-01046-SC [Bankr. Docket No. 1545, p.3 (emphasis in original)].)

147. As part of this criminal enterprise, Debtor and Defendants engaged in fraudulent transfers of its accounts receivables pursuant to various agreements, including the ARPAs.

/ / /

/ / /

/ / /

148. On information and belief, Marich Bein performed payment processing for Debtor. The money was then passed through the various Defendant entities, including Prime Logix, Pacific Staffing, and ultimately to the GoFi Entities. This was done to conceal the criminal enterprise and the Defendants' involvement therein.

149. Defendants Deustch, Weisz and Reches, as the owners, operators, directors and/or controllers of Marich Bein, received and further directed the fraudulent ACH transactions and transfers by manipulating Marich Bein.

150. Similarly, Defendant Kohlscreiber, as the owner, operator, director and/or controller of the GoFi Entities and Pacific Staffing, served as the intermediary of the fraudulent ACH transactions and transfers through the manipulation of the GoFi Entities and Pacific Staffing.

**M. Defendants' Knowledge and Substantial Assistance in Diab's Ponzi Scheme**

151. Defendants Duestch, Weisz, Reches, Cohen, Kohlschreiber, became involved with LPG through ARPA and SRA agreements and knew that LPG was a law firm and they were aware of the differences between LPG – as a law firm – and its potential legal ramifications for operating in the debt purchase space with LPG's client funds.

152. Defendants Deutsch, Weisz, Reches, Cohen, and Kohlschreiber were familiar with industry standards and norms, including how to operate in compliance with applicable laws and regulations. Based upon their familiarity, Plaintiff is informed and believes that Deutsch, Weisz, Reches, Cohen, and Kohlschreiber knew and should have known that the scheme they engaged in with Diab was unlawful and fraudulent, and that the Debtor would be harmed as a result.

153. Defendants Deutsch, Weisz, Reches, Cohen, and Kohlschreiber knew that LPG's operations were unlawful based on their personal knowledge and experience in the industry and the information provided directly to them by Diab and other representatives of LPG during these meetings. Some of the meetings between Deutsch and LPG representatives took place in person in Florida.

154. Defendants Deutsch, Weisz, Reches, Cohen, and Kohlschreiber nevertheless decided to continue a business relationship with LPG and entered into illegal agreements and/or received funds from LPG with and through Marich Bein, GoFi, Vulcan, Prime Logix, and Pacific Staffing.

/ / /

155. Defendants Deutsch, Weisz, Reches, Cohen, and Kohlschreiber knew Diab was using LPG to run a Ponzi Scheme and they directed and/or approved of Marich Bein, GoFi, Vulcan, Prime Logix, and Pacific Staffing's participation in the Ponzi Scheme for the reasons mentioned herein.

156. Defendants Deutsch, Weisz, and Reches directed and/or approved Marich Bein's entry into the Agreements with LPG.

157. Defendants Deutsch, Weisz, and Reches directed and/or approved Marich Bein's participation in Diab's Ponzi scheme.

158. Defendant Cohen directed and/or approved Vulcan's participation in Diab's Ponzi scheme.

159. Defendant Kohlschreiber directed and/or approved GoFi, Prime Logix and Pacific Staffing's participation in the Ponzi scheme.

160. Defendants Deutsch, Weisz, Reches, Cohen, and Kohlschreiber directed and/or approved of LPG funneling money through related entities, such as GoFi, Prime Logix, Vulcan, Pacific Staffing, to operate as a passthrough to conceal and avoid detection of the LPG funds which were unlawfully transferred to Marich Bein.

161. Defendants Deutsch, Weisz, and Reches knew Marich Bein was engaging in tortious conduct through the Agreements and other business dealings with LPG but failed to take any action to stop the tortious conduct. Rather, Deutch, Weisz, and Reches directed and approved of Marich Bein's participation in the tortious conduct described herein.

162. Defendant Cohen knew Vulcan was engaging in tortious conduct through the Agreements, transfers, and other business dealings with LPG but failed to take any action to stop the tortious conduct. Rather, Cohen directed and approved of Vulcan's participation in the tortious conduct described herein.

163. Defendant Kohlschreiber knew GoFi, Prime Logix, and Pacific Staffing was engaging in tortious conduct through the Agreements, transfers, and other business dealings with LPG but failed to take any action to stop the tortious conduct. Rather, Kohlschreiber directed and approved of GoFi, Prime Logix, and Pacific Staffing's participation in the tortious conduct described herein.

/ / /

164. Defendants Deutsch, Weisz, Reches, Cohen, and Kohlschreiber's status as corporate officers does not insulate them from liability for aiding and abetting Marich Bein, GoFi, Vulcan, Pacific Staffing, and Prime Logix tortious conduct. The "corporate director or officer status neither immunizes a person from personal liability for tortious conduct nor subjects him or her to vicarious liability for such acts." *PMC, Inc. v. Kadisha*, 78 Cal. App. 4th 1368, 1379 (Ct. App. 2000)(citing *Frances T. v. Village Green Owners Assn.,* 723 P.2d 573, 581 (Cal. App. 1986). The California Supreme Court has been explicit in stating that directors or officers of a corporation may be held personally liable for torts committed by the company when the officer knowingly consented to or approved the action. *United States Liab. Ins. Co. v. Haidinger-Hayes, Inc*., 463 P.2d 770, 775 (Cal. 1970). "A corporate director or officer's participation in tortious conduct may be shown not solely by direct action but also by knowing consent to or approval of unlawful acts." *Kadisha,* 78 Cal. App. 4th at 1380. A corporate officer or director may also be liable for tortious actions of the corporation if the officer knew or reasonably should have known of the tortious conduct and negligently failed to take action to avoid the harm. *Id.* Deutsch, Weisz, Reches, Cohen, and Kohlschreiber's liability for aiding and abetting is not based on their title as officers of the company but rather based on their direction, consent, and approval of the corporation's actions. Deutsch, Weisz, Reches, Cohen, and Kohlschreiber's exerted control over Marich Bein, GoFi, Vulcan, Pacific Staffing, and Prime Logix in furtherance of Diab's Ponzi Scheme and are therefore liable. Deutsch, Weisz, Reches, Cohen, and Kohlschreiber had actual knowledge of, and substantially assisted, the tortious actions described in this fourth amended complaint.

## FIRST CLAIM FOR RELIEF

**Injunctive Relief**

**(Against Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber)**

165. Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 164 as though set forth in full.

166. Plaintiff requests that this Court incorporate and enter its preliminary injunction order entered in the 1046 Action [Dkt. No. 70] attached as **Exhibit 3** and incorporated by reference as if

fully set forth herein, or in substantially the same form enjoining Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, Nicholas Kohlschreiber (collectively, "Injunction Defendants"), and each of them from processing or interfering with any ACH transfer being executed in favor of Debtor's estate.

167. Plaintiff requests that this Court incorporate and enter its preliminary injunction order entered in the 1046 Action [Dkt. No. 70] attached as **Exhibit 3** and incorporated by reference as if fully set forth herein, or in substantially the same form, ordering Injunctive Defendants, among other things, to turn over to trustee any and all client files; ACH files; ACH processing information; financial records; administrative user names and log in information; accounting records; contracts; and email accounts.

168. Plaintiff also requests that this Court incorporate and enter its preliminary injunction order entered in the 1046 Action [Dkt. No. 70] attached as **Exhibit 3** and incorporated by reference as if fully set forth herein in substantially the same form ordering Injunction Defendants, among other things, to turn over all funds originating from LPG client files, ACH Receivables and/or ACH transactions.

169. In the event the preliminary injunction order in the 1046 Action [Dkt. No. 70] attached as **Exhibit 3** is not entered and/or incorporated in this action, Plaintiff requests that this Court enter a separate order identical to and/or substantially in the same form as **Exhibit 3** as against Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber named in this action.

## SECOND CLAIM FOR RELIEF

**Avoidance, Recovery, and Preservation of Two-Year Actual Fraudulent Transfers**

**(Against Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber)**

**[11 U.S.C. §§ 548(a)(1)(A), 550, and 551]**

170. Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 169 as though set forth in full.

171. The source of the client files, ACH Receivables, and funds that are the subject of the transfers alleged herein are that of LPG, and the Debtor's Estate.

172. Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber (collectively, "Avoidance Defendants") wrongfully retain possession and control of the client files, ACH Receivables, and funds fraudulently transferred to others by Diab and LPG.

173. Diab made the transfers of LPG client files, ACH receivables, and funds alleged herein after LPG faced multiple lawsuits including those initiated by factoring companies and in order to avoid its creditor liability and abscond with assets of the Estate, including but not limited to, Validation Partners' lawsuit filed on September 20, 2022 (Case No. 30-2022-01281911-CU-BC-CXC) in the Superior Court of California, County of Orange; DVF II's lawsuit filed on January 23, 2023 (Case No. 30-2023-01303355-CU-CO-CXC) in the Superior Court of California, County of Orange; among others. The lawsuits sought the appointment of a receiver to perform many of the same duties of the Trustee and obtain information, an accounting of LPG funds, assets and accounts receivables and maintain the status quo, among other relief, pending the outcome of the litigation. Notably, Diab admitted the foregoing under oath at the hearing on Trustee's preliminary injunction.

174. The LPG client files, ACH Receivables, and funds that were subject to the Transfers alleged herein constitute a substantial portion of LPG's pre-petition non-exempt property and assets.

175. The transfers and transactions alleged herein, including, but not limited to, the multiple transfers of LPG client files and/or ACH Receivables were made by Diab to insiders that were and/or are still under Diab's control and/or other alter egos working in concert with Diab, including the Avoidance Defendants.

176. The transfers and transactions alleged herein, including but not limited to the multiple transfers of LPG client file and/or ACH receivable transfers left LPG insolvent and according to Diab required LPG to seek emergency financing in the amount of $2.95 million dollars pre-petition. The Debtor scheduled $141,813,219.09 in total debt to pre-petition creditors. However, without LPG's client files, ACH Receivables, and funds, the fraudulent transfers and transaction alleged herein left the Debtor with approximately $12,186,500 in assets and no income stream. Included in the assets

scheduled by LPG are the approximated $12,000,000 in funds wrongfully withheld by Avoidance Defendants. Moreover, the transfers to Marich Bein were made at a time when LPG was insolvent.

177. Marich Bein (under the control and/or at the direction of Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber and others) diverted monies due Debtor to non-Debtor entities including the GoFi Entities, Vulcan, Prime Logix, BAT, Inc. dba Coast Processing, Pacific Staffing, among others who are subsequent transferees of the fraudulent Transfers.

178. Defendants the GoFi Entities and Pacific Staffing also diverted monies due to Debtor to non-Debtor entities including by and between each other, and Marich Bein, Prime Logix, and BAT, Inc. dba Coast Processing.

179. Debtor was operating a Ponzi scheme and the Ponzi Scheme Presumption creates an inference of the Debtor's actual intent to defraud within the meaning of 11 U.S.C. section 548(a)(1).

180. Avoidance Defendants' conduct relating to the transfers and transactions alleged herein, was done with oppression, fraud and malice as defined in California Civil Code section 3294, entitling Plaintiff to exemplary and punitive damages.

181. Thus, the transfers and transactions alleged herein, including but not limited to the fraudulent transfer of LPG client files and/or ACH Receivables were made with actual intent to hinder, delay, or defraud creditors of the Debtor. Further, LPG received less than reasonably equivalent value since Marich Bein's purposed services at the behest of Defendants Heshy Deustch, Nachman Weisz, and Israel Reches were illusory.

182. The transfers and transactions alleged herein, including but not limited to the fraudulent transfer of LPG client files and/or ACH Receivables occurred within two years prior to the Petition Date.

183. According to Tony Diab, Marich Bein (under the control and/or at the direction of Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber and others) was doing business as LPG 949-229-6262. In doing so, Marich Bein was fraudulently pulling ACH debits from LPG clients and fraudulently misrepresenting itself as LPG.

184. Marich Bein (under the control and/or at the direction of Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber and others) collected more than

$50,000,000.00 in LPG client payments from September 2022 to March 2023 and retained $16,989,963.23 more than what it was owed in terms of ACH Receivables it had purchased. Marich Bein (under the control and/or at the direction of Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber and others) continues to hold this sum.

185. Accordingly, the transfers and transactions alleged herein, including but not limited to the fraudulent transfer of LPG client files and/or ACH Receivables that Diab caused the Debtor to make should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(A), and such property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

**<u>THIRD CLAIM FOR RELIEF</u>**

**Avoidance, Recovery, and Preservation of Two-Year Constructive Fraudulent Transfers (Against Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber)**

**[11 U.S.C. §§ 548(a)(1)(B), 550, and 551]**

186. Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 185 as though set forth in full.

187. At the time of the transfers and transactions alleged herein, LPG received less than reasonably equivalent value in exchange for said transfers since Marich Bein's purposed services at the behest of Defendants Heshy Deustch, Nachman Weisz, and Israel Reches were illusory.

188. The transfers, transactions and retention of LPG assets, client files, ACH Receivables and funds alleged herein, among others, left LPG insolvent. LPG scheduled $141,813,219.09 in total debt to pre-petition creditors. However, without the files, accounts receivable, and funds, the transfers left the Debtor with approximately $12,186,500 in assets and no income stream; virtually none of those alleged $12,186,500 assets have been turned over to the trustee despite repeated request for same.

189. On or after the date that the fraudulent transfers and transactions alleged herein were made, LPG was not paying debts to the pre-petition creditors, including but not limited to, Validation

Partners and DVF II as they came due and, based on the testimony of Diab, was forced to incur further debt obligations, including but not limited to emergency financing through City Capital NY in the amount of $2.95 million dollars pre-petition.

190. The source of LPG client files, ACH Receivables, and funds that are the subject of the alleged fraudulent transfers, are and were at all relevant times, assets and property of LPG and its clients.

191. By transferring LPG client files, ACH Receivables, and funds to Marich Bein, Diab endeavored to hide and conceal LPG client files, ACH Receivables, funds, and the Transfers alleged herein.

192. Diab made the transfers alleged herein after LPG faced multiple lawsuits including those initiated by factoring companies and in order to avoid its creditor liability and abscond with assets of the Estate, including but not limited to, Validation Partners lawsuit filed on September 20, 2022 (Case No. 30-2022-01281911-CU-BC-CXC) in the Superior Court of California, County of Orange; DVF II lawsuit filed on January 23, 2023 (Case No. 30-2023-01303355-CU-CO-CXC) in the Superior Court of California, County of Orange; among others. The lawsuits sought the appointment of a receiver to perform many of the same duties of the Trustee and obtain information, an accounting of LPG funds, assets and accounts receivables and maintain the status quo, among other relief, pending the outcome of the litigation. Notably, Diab admitted the foregoing under oath at the hearing on Trustee's preliminary injunction.

193. Marich Bein (under the control and/or at the direction of Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber and others) diverted monies due Debtor to non-Debtor entities including the GoFi Entities, Vulcan, Prime Logix, BAT, Inc. dba Coast Processing, Pacific Staffing among others who are subsequent transferees of the fraudulent transfers.

194. Defendants the GoFi Entities and Pacific Staffing also diverted monies due to Debtor to non-Debtor entities including by and between each other, and Marich Bein, Prime Logix, BAT, Inc. dba Coast Processing among others who are subsequent transferees of the fraudulent Transfers.

/ / /

/ / /

195. Thus, at the time of the transfers and transactions alleged herein related to LPG client files, ACH Receivables, ACH transactions and withholding of funds occurred, or as a result thereof, LPG was either:

a. insolvent on the date the alleged Transfers and transactions were made, or became insolvent as a result thereof;

b. engaged or was about to engage in a Transfer or transaction for which any property remaining with LPG was of unreasonably small capital;

c. intended to incur, or believed that LPG would incur, debts beyond its ability to pay as such debts matured.

196. The transfers and transactions alleged herein were made with intent to hinder, delay, or defraud creditors as Diab testified to at the preliminary injunction hearing. In fact, Diab caused such transfers to occur on the same LPG client files and ACH Receivables to multiple entities to accomplish just that, including but not limited to those purportedly transferred to Marich Bein.

197. According to Tony Diab, Marich Bein (under the control and/or at the direction of Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber and others) was doing business as LPG 949-229-6262. In doing so, Marich Bein was fraudulently pulling ACH debits from LPG clients and fraudulently misrepresenting itself as LPG.

198. The transfers and transactions alleged herein of LPG's client files, ACH Receivables, and funds occurred within the two years prior to the Petition Date.

199. Marich Bein (under the control and/or at the direction of Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber and others) collected more than $50,000,000.00 in LPG client payments from September 2022 to March 2023 and retained $16,989,963.23 more than what it was owed in terms of ACH Receivables it had purchased. Marich Bein (under the control and/or at the direction of Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber and others) continues to hold this sum.

/ / /

/ / /

/ / /

200. Accordingly, the fraudulent transfers and transactions alleged herein that Diab caused LPG to make should be avoided as fraudulent under 11 U.S.C. § 548(a)(1)(B), and such property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551.

**FOURTH CLAIM FOR RELIEF**

**Avoidance, Recovery, and Preservation of Four-Year Actual Fraudulent Transfers**

**(Against Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber)**

**[11 U.S.C. §§ 544(b), 550, and 551; CAL. CIV. CODE §§ 3439.04(a) and 3439.07]**

201. Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 200 as though set forth in full.

202. At the time of the transfers and transactions alleged herein, LPG received less than reasonably equivalent value in exchange for said transfers since Marich Bein's purposed services at the behest of Defendants Heshy Deustch, Nachman Weisz, and Israel Reches were illusory.

203. The transfers, transactions and retention of LPG assets, client files, ACH Receivables and funds alleged herein, among others, left LPG insolvent. LPG scheduled $141,813,219.09 in total debt to Pre-petition creditors. However, without the files, accounts receivable, and funds, the transfers left the Debtor with approximately $12,186,500 in assets and no income stream; virtually none of those alleged $12,186,500 assets have been turned over to the Trustee despite repeated request for same.

204. On or after the date that the fraudulent transfers and transactions alleged herein were made, LPG was not paying debts to the pre-petition creditors, including but not limited to, Validation Partners and DVF II as they came due and, based on the testimony of Diab, was forced to incur further debt obligations, including but not limited to emergency financing through City Capital NY in the amount of $2.95 million dollars pre-petition.

/ / /

/ / /

205. The source of LPG client files, ACH Receivables, and funds that are the subject of the alleged fraudulent transfers are and were at all relevant times, assets and property of LPG and its clients.

206. Diab and/or LPG retained possession and control of the files, ACH receivable, and funds transferred to the alter egos or elsewhere after the alleged transfers.

207. By transferring LPG client files, ACH Receivables, and funds to Marich Bein, Diab endeavored to hide and conceal LPG client files, ACH Receivables, funds, and the transfers alleged herein.

208. Diab made the transfers alleged herein after LPG faced multiple lawsuits including those initiated by factoring companies and in order to avoid its creditor liability and abscond with assets of the Estate, including but not limited to, Validation Partners lawsuit filed on September 20, 2022 (Case No. 30-2022-01281911-CU-BC-CXC) in the Superior Court of California, County of Orange; DVF II lawsuit filed on January 23, 2023 (Case No. 30-2023-01303355-CU-CO-CXC) in the Superior Court of California, County of Orange; among others. The lawsuits sought the appointment of a receiver to perform many of the same duties of the Trustee and obtain information, an accounting of LPG funds, assets and accounts receivables and maintain the status quo, among other relief, pending the outcome of the litigation. Notably, Diab admitted the foregoing under oath at the hearing on Trustee's preliminary injunction.

156. The LPG client files, ACH Receivables, and funds that were subject to the transfers alleged herein constitute a substantial portion of LPG's pre-petition non-exempt property and assets.

157. The transfers and transactions alleged herein, including but not limited to LPG client files and/or ACH receivable transfers were made by Diab to insiders that were and/or are still under Diab's control and/or others working in concert with Diab.

/ / /

/ / /

/ / /

/ / /

/ / /

158. The transfers and transactions alleged herein left LPG insolvent. LPG scheduled $141,813,219.09 in total debt to pre-petition creditors. However, without the client files, ACH Receivables, and funds, the alleged transfers left LPG with approximately $12,186,500 in assets and no income stream; virtually none of those alleged $12,186,500 assets have been turned over to the Trustee despite repeated request for same. Included in the assets scheduled by LPG are approximately $12,000,000 or more in funds held by Defendants.

159. As such, the transfers and transactions alleged herein left LPG with remaining assets that were unreasonably small in relation to the transfers and transactions.

160. Further, LPG was insolvent at the time of the alleged transfers and transactions alleged herein or became insolvent as a result thereof; the exact aim of Diab's scheme to bankrupt LPG in the event a receiver was appointed.

161. On or after the date that such transfers and transactions alleged herein were made, LPG was not paying debts to the pre-petition creditors, all of which arose before the transfers alleged herein were made, as they became due.

162. Marich Bein (under the control and/or at the direction of Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber and others) diverted monies due Debtor to non-Debtor entities including the GoFi Entities, Vulcan, Prime Logix, BAT, Inc. dba Coast Processing, Pacific Staffing, among others who are subsequent transferees of the fraudulent transfers.

163. Defendants the GoFi Entities and Pacific Staffing also diverted monies due to Debtor to non-Debtor entities including by and between each other, and Marich Bein, Prime Logix, BAT, Inc. dba Coast Processing among others who are subsequent transferees of the fraudulent transfers.

164. Thus, the transfers and transactions alleged herein were made with actual intent to hinder, delay, or defraud creditors of LPG, as well as any duly appointed receiver.

165. Thus, at the time of the transfers and transactions alleged herein related to LPG client files, ACH Receivables, ACH transactions and withholding of funds occurred, or as a result thereof, LPG was either:

a. insolvent on the date the alleged Transfers and transactions were made, or became insolvent as a result thereof;

b. engaged or was about to engage in a Transfer or transaction for which any property remaining with LPG was of unreasonably small capital;

c. intended to incur, or believed that LPG would incur, debts beyond its ability to pay as such debts matured.

166. Debtor was operating a Ponzi scheme and the Ponzi Scheme Presumption creates an inference of the Debtor's actual intent to defraud within the meaning of 11 U.S.C. section 548(a)(1).

167. Avoidance Defendants' conduct relating to the ransfers and transactions alleged herein, was done with oppression, fraud and malice as defined in California Civil Code section 3294, entitling Plaintiff to exemplary and punitive damages.

168. The alleged transfers and transactions of LPG's client files, ACH Receivables, and funds occurred within the four years prior to the Petition Date.

169. At all relevant times, the alleged transfers and transactions related to LPG's client files, ACH receivable, and funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and California Civil Code sections 3439.04(a) and 3439.07 by one or more creditors who held and hold unsecured claims against the Debtor that were and are allowable against his Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the pre-petition creditors.

170. According to Tony Diab, Marich Bein (under the control and/or at the direction of Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber and others) was doing business as LPG 949-229-6262. In doing so, Marich Bein (under the control and/or at the direction of Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber and others) was fraudulently pulling ACH debits from LPG clients and fraudulently misrepresenting itself as LPG.

/ / /

/ / /

/ / /

/ / /

/ / /

171. Marich Bein (under the control and/or at the direction of Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber and others) collected more than $50,000,000.00 in LPG client payments from September 2022 to March 2023 and retained $16,989,963.23 more than what it was owed in terms of ACH Receivables it had purchased. Marich Bein (under the control and/or at the direction of Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber and others) continues to hold this sum.

172. Accordingly, the fraudulent transfers and transactions alleged herein that Diab caused LPG to make should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and California Civil Code sections 3439.04(a) and 3439.07, and such property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and California Civil Code section 3439.07.

## FIFTH CLAIM FOR RELIEF

**Avoidance, Recovery, and Preservation of Four-Year Constructive Fraudulent Transfers**

**(Against Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber )**

**[11 U.S.C. §§ 544(b), 550, and 551; CAL. CIV. CODE §§ 3439.05, and 3439.07]**

173. Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 172 as though set forth in full.

174. At the time of the transfers and transactions alleged herein, LPG received less than reasonably equivalent value in exchange for said transfers since Marich Bein's purposed services at the behest of Defendants Heshy Deustch, Nachman Weisz, and Israel Reches were illusory.

175. The transfers, transactions and retention of LPG assets, client files, ACH Receivables and funds alleged herein, among others, left LPG insolvent. LPG scheduled $141,813,219.09 in total debt to pre-petition creditors. However, without the files, accounts receivable, and funds, the transfers left the Debtor with approximately $12,186,500 in assets and no income stream; virtually none of those alleged $12,186,500 assets have been turned over to the Trustee despite repeated request for same.

176. On or after the date that the fraudulent transfers and transactions alleged herein were made, LPG was not paying debts to the pre-petition creditors, including but not limited to, Validation Partners and DVF II as they came due and, based on the testimony of Diab, was forced to incur further debt obligations, including but not limited to emergency financing through City Capital NY in the amount of $2.95 million dollars pre-petition.

177. The source of LPG client files, ACH Receivables, and funds that are the subject of the alleged fraudulent transfers, are and were at all relevant times, assets and property of LPG and its clients.

178. Diab and/or LPG retained possession and control of the files, ACH Receivables, and funds transferred to the alter egos or elsewhere after the alleged transfers.

179. By transferring LPG client files, ACH Receivables, and funds to Marich Bein, Diab endeavored to hide and conceal LPG client files, ACH Receivables, funds, and the transfers alleged herein.

180. Diab made the transfers alleged herein after LPG faced multiple lawsuits including those initiated by factoring companies and in order to avoid its creditor liability and abscond with assets of the Estate, including but not limited to, Validation Partners lawsuit filed on September 20, 2022 (Case No. 30-2022-01281911-CU-BC-CXC) in the Superior Court of California, County of Orange; DVF II lawsuit filed on January 23, 2023 (Case No. 30-2023-01303355-CU-CO-CXC) in the Superior Court of California, County of Orange; among others. The lawsuits sought the appointment of a receiver to perform many of the same duties of the Trustee and obtain information, an accounting of LPG funds, assets and accounts receivables and maintain the status quo, among other relief, pending the outcome of the litigation. Notably, Diab admitted the foregoing under oath at the hearing on Trustee's preliminary injunction.

181. The LPG client files, ACH Receivables, and funds that were subject to the transfers alleged herein constitute a substantial portion of LPG's pre-petition non-exempt property and assets.

182. The transfers and transactions alleged herein, including but not limited to LPG client files and/or ACH receivable transfers were made by Diab to insiders that were and/or are still under Diab's control and/or others working in concert with Diab.

183. The transfers and transactions alleged herein left LPG insolvent. LPG scheduled $141,813,219.09 in total debt to pre-petition creditors. However, without the client files, ACH Receivables, and funds, the alleged transfers left LPG with approximately $12,186,500 in assets and no income stream; virtually none of those alleged $12,186,500 assets have been turned over to the trustee despite repeated request for same. Included in the assets scheduled by LPG are approximately $12,000,000 or more in funds held by Defendants.

184. As such, the transfers and transactions alleged herein left LPG with remaining assets that were unreasonably small in relation to the transfers and transactions.

185. Further, LPG was insolvent at the time of the alleged transfers and transactions alleged herein or became insolvent as a result thereof; the exact aim of Diab's scheme to bankrupt LPG in the event a receiver was appointed.

186. On or after the date that such tand transactions alleged herein were made, LPG was not paying debts to the pre-petition creditors, all of which arose before the transfers alleged herein were made, as they became due.

187. Marich Bein (under the control and/or at the direction of Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber and others) diverted monies due Debtor to non-Debtor entities including the GoFi Entities, Vulcan, Prime Logix, BAT, Inc. dba Coast Processing, Pacific Staffing, and Validation Partners among others who are subsequent transferees of the fraudulent transfers.

188. Defendants the GoFi Entities and Pacific Staffing also diverted monies due to Debtor to non-Debtor entities including by and between each other, and Marich Bein, Prime Logix, BAT, Inc. dba Coast Processing among others who are subsequent transferees of the fraudulent transfers.

189. Thus, the transfers and transactions alleged herein were made with actual intent to hinder, delay, or defraud creditors of LPG, as well as any duly appointed receiver.

190. Thus, at the time of the transfers and transactions alleged herein related to LPG client files, ACH Receivables, ACH transactions and withholding of funds occurred, or as a result thereof, LPG was either:

/ / /

a. insolvent on the date the alleged Transfers and transactions were made, or became insolvent as a result thereof;

b. engaged or was about to engage in a Transfer or transaction for which any property remaining with LPG was of unreasonably small capital;

c. intended to incur, or believed that LPG would incur, debts beyond its ability to pay as such debts matured.

191. The alleged Transfers and transactions of LPG's client files, ACH Receivables, and funds occurred within the four years prior to the Petition Date.

192. At all relevant times, the alleged transfers of LPG's client files, ACH Receivables, and funds are avoidable as fraudulent pursuant to 11 U.S.C. § 544(b) and California Civil Code sections 3439.04(a) and 3439.07 by one or more creditors who held and hold unsecured claims against the Debtor that were and are allowable against his Estate under 11 U.S.C. § 502 or that were not and are not allowable only under 11 U.S.C. § 502(e), including, without limitation, the pre-petition creditors.

193. According to Tony Diab, Marich Bein (under the control and/or at the direction of Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber, and others) was doing business as LPG 949-229-6262. In doing so, Marich Bein (under the control and/or at the direction of Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber and others) was fraudulently pulling ACH debits from LPG clients and fraudulently misrepresenting itself as LPG.

194. Marich Bein (under the control and/or at the direction of Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber, and others) collected more than $50,000,000.00 in LPG client payments from September 2022 to March 2023 and retained $16,989,963.23 more than what it was owed in terms of ACH Receivables it had purchased. Marich Bein (under the control and/or at the direction of Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber and others) continues to hold this sum.

/ / /

/ / /

/ / /

195. Accordingly, the transfers alleged herein that Diab caused LPG to make should be avoided as fraudulent under 11 U.S.C. §§ 544(b) and California Civil Code sections 3439.04(a) and 3439.07, and such property, or the value thereof, should be recovered and preserved for the benefit of the Estate pursuant to 11 U.S.C. §§ 550 and 551 and California Civil Code section 3439.07.

**SIXTH CLAIM FOR RELIEF**

**Avoidance, Recovery, and Preservation of Preferential Transfer to Defendant in Preference Period**

**(Against Defendants Marich Bein, LLC, Heshy Deustch, Nachman Weisz, and Israel Reches)**

**[11 U.S.C. §§ 547, 550, and 551]**

196. Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 195 as though set forth in full.

197. Marich Bein claims that pursuant to the ARPA, Marich Bein transferred $12,058,335.00 to Debtor to acquire Accounts Receivables (as that term is defined in the ARPA), and Debtor was guaranteed payment of not less than $37,104,601.84 under the ARPA. A true and correct copy of Marich Bein's Proof of Claim is attached as **Exhibit 4**. Thus, the obligations due to Marich Bein under the ARPA represent a debt for which Marich Bein contends LPG is liable (the "Marich Debt").

198. Further, the SRA allows Marich Bein to service the Accounts Receivables and provides that Marich Bein is entitled collect and withhold additional monies due to Marich Bein under the ARPA. The SRA authorizes Marich Bein to repay the Marich Debt from the collections it received under the SRA.

199. Of the $37,104,601.84, Marich Bein (under the control and/or at the direction of Heshy Deustch, Nachman Weisz, Israel Reches and others) has paid itself back $16,989,963.23 by Debtor ("Marich Debt Payments"). Debtor made the Marich Debt Payments, which were applied to the Marich Debt, during the one-year preference period ("Preference Transfers"). The Marich Debt Payments constitute payment of an antecedent debt to or for a creditor for purposes of satisfying 11 U.S.C. § 547(b)(1) and (b)(2).

/ / /

200. Marich Bein was a non-statutory insider of Debtor as Marich Bein had a close relationship with Debtor and the transactions pursuant to the SRA and ARPA were not at arm's length. Moreover, Marich Bein used a d/b/a containing LPG's name during this time.

201. Upon information and belief, Heshy Deustch, Nachman Weisz, and Israel Reches acted as officers or managers of LPG and gave directions to employees as if they were officers and/or managers of LPG.

202. As *de facto* officers and/or officers of LPG, Heshy Deustch, Nachman Weisz, and Israel Recheswere insiders of LPG as that term is identified in 11 U.S.C. § 101(31)(B).

203. The Preference Transfers happened while LPG was insolvent.

204. Debtor is also entitled to the presumption of insolvency when the Preference Transfers happened pursuant to 11 U.S.C. § 547(f).

205. As a result of the Preference Transfers, Heshy Deustch, Nachman Weisz, and Israel Reches recovered more than they would have received if: (i) the Debtor's case was under chapter 7 of the Bankruptcy Code; (ii) the Preference Transfers had not been made; and (iii) Defendant received payments of its debts under the provisions of the Bankruptcy Code. As evidenced by the Debtor's schedules filed in the underlying Bankruptcy Case, as well as the proofs of claim that have been received to date, the Debtor's liabilities exceed its assets to the point that unsecured creditors will not receive a full payout of their claims from the Debtor's Estate.

206. According to Tony Diab, Marich Bein (under the control and/or at the direction of Heshy Deustch, Nachman Weisz, Israel Reches and others) was doing business as LPG 949-229-6262. In doing so, Marich Bein (under the control and/or at the direction of Heshy Deustch, Nachman Weisz, Israel Reches and others) was fraudulently pulling ACH debits from LPG clients and fraudulently misrepresenting itself as LPG.

207. Marich Bein (under the control and/or at the direction of Heshy Deustch, Nachman Weisz, Israel Reches and others) collected more than $50,000,000.00 in LPG client payments from September 2022 to March 2023 and retained $16,989,963.23 more than what it was owed in terms of ACH Receivables it had purchased. Marich Bein (under the control and/or at the direction of Heshy Deustch, Nachman Weisz, Israel Reches and others) continues to hold this sum.

208. In accordance with the foregoing, the Preference Transfers are voidable pursuant to 11 U.S.C. § 547(b) and may be recovered and preserved for the benefit of the estate pursuant to 11 U.S.C. §§ 550 and 551.

**SEVENTH CLAIM FOR RELIEF**

**Breach of Contract**

**(Against Marich Bein, LLC, Heshy Deustch, Nachman Weisz, and Israel Reches)**

209. Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 208 as though set forth in full.

210. The ARPAs identified in Paragraph 50 above were between Marich Bein as the buyer and Debtor as the seller. Each ARPA states a purchase price in Section 2.3 of each ARPA ("Purchase Price").

211. Marich Bein claims that pursuant to the ARPA, Marich Bein transferred $12,058,335.00 to Debtor to acquire Accounts Receivables (as that term is defined in the ARPA) and Debtor was guaranteed payment of not less than $37,104,601.00 under the ARPA.

212. However, the ARPA attached to Marich Bein's Proof of Claim evidence a total amount actually paid to Debtor to be $11,101,745.75.

213. The Purchase Price under the ARPA were due to the Debtor as the seller of the accounts receivables that were the subject of the ARPA, and thus, should have been paid to the Debtor.

214. However, $5,540,000.00 of the Purchase Price of the combined ARPA due the Debtor were diverted from Debtor and wired to non-Debtor entities, including GoFi, Vulcan, PrimeLogix, BAT, Inc. dba Coast Processing among others. Specifically, per the wire instructions, $1,200,563.85 was transferred to GoFi, and $4,339,436.15 was transferred to Vulcan.

215. Marich Bein (under the control and/or at the direction of Heshy Deustch, Nachman Weisz, Israel Reches and others) breached the ARPA by diverting payments due the Debtor under the ARPA to other non-Debtor entities.

216. According to Tony Diab, Marich Bein (under the control and/or at the direction of Heshy Deustch, Nachman Weisz, Israel Reches and others) was doing business as LPG 949-229-6262. In doing so, Marich Bein (under the control and/or at the direction of Heshy Deustch, Nachman Weisz,

Israel Reches and others) was fraudulently pulling ACH debits from LPG clients and fraudulently misrepresenting itself as LPG.

217. Debtor suffered damages due to Marich Bein's and/or Heshy Deustch, Nachman Weisz, Israel Reches's breach of contract in the amount transferred from Marich Bein to non-Debtor entities, *i.e.* $5,540,000.00.

**<u>EIGHTH CLAIM FOR RELIEF</u>**

**Conversion**

**(Against Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber)**

**[11 U.S.C. § 541; California Common Law]**

218. Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 217 as though set forth in full.

219. Defendants have possession or control over property of Debtor in the form of the Transfers and other property of Debtor, made pursuant to illegal and unenforceable agreements.

220. The Transfers are not of inconsequential value to the Estate.

221. As discussed in para 57-59, Defendants made unauthorized and fraudulent ACH debit pulls, that were assets of debtor under 11 U.S.C. § 108 and property of the Estate under 11 U.S.C. § 541.

222. At all material times, Debtor had rightful ownership and a right to possession and control its assets.

223. Defendants unlawfully converted Debtor's assets in the form of the Transfers and Subsequent Transfers, and other property of the Debtor, by their wrongful execution of unlawful agreements and fraudulent transfers of assets resulting in a disposition of Debtor's possession and control over these assets.

224. According to Tony Diab, Marich Bein (under the control and/or at the direction of Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber and others) was doing business as LPG 949-229-6262. In doing so, Marich Bein (under the control and/or at the

direction of Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber and others) was fraudulently pulling ACH debits from LPG clients and fraudulently misrepresenting itself as LPG.

225. Debtor, sustained damages as a result of Defendants unlawful dominion and control over assets to which Debtor had a right of possession.

226. Marich Bein was provided with a cease and desist letter from processing ACH transactions as fraudulent and without consent on February 6, 2023, by LPG as alleged in the Marich Bein Action. BankUnited similarly received a cease and desist letter on February 10, 2023, as alleged in the Marich Bein Action. Moreover, in addition to Marich Bein (under the control and/or at the direction of Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber and others) acting without consent, outside of the scope of any consent that may be found to have existed at the time of the alleged transactions herein, consent, if it existed at all, terminated at least as early as the time Diab revoked Marich Bein's access to DPP and caused LPG client files to be transferred to LUNA.

227. On information and belief, even after Marich Bein was denied access to DPP as a result of Diab causing LPG's client files to be transferred to LUNA, Defendants continued to process ACH transactions on LPG client files with outdated client information in order to ensure the accuracy of payments, client account information, debit account information, security and to avoid double ACH transactions on client files. Moreover, these subsequent ACH transactions were processed through BankUnited and, on information and belief, BCB Bancorp as its NACHA financial institutions.

228. Further, although Marich Bein was locked out of DPP, LPG continued to send accurate NACHA files to Marich Bein to process. Marich Bein (under the control and/or at the direction of Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber and others) refused, and instead processed NACHA files from December 2022 despite the fact that number LPG clients had cancelled, paused their payments, or completed their payment plans between December 2022 and February 2023.

229. March Bein, BankUnited and/or BCB Bancorp knowingly processed, retained and controlled $12,000,000 or more of ACH transactions on LPG client files which are and were LPG

assets. Pre-petition and by and through the preliminary injunction attached hereto as **Exhibit 3**, LPG and Trustee have demanded the turnover of said funds. To date no funds have been turned over.

230. As a result of the conversion of LPG assets alleged herein and based on the testimony of Diab, LPG was forced to incur further debt obligations, including but not limited to emergency financing through City Capital NY in the amount of $2.95 million dollars pre-petition.

231. LPG and its Estate have been harmed by the foregoing conduct which was a substantial factor in causing the harm, including but not limited to:

a. initiating ACH transactions on LPG client files without consent and/or exceeding the scope of any potential consent found to have existed at the time of the transactions;

b. processing ACH transactions after access to LPG client files was denied;

c. retaining LPG assets and funds obtained by way of the foregoing ACH transactions; and

d. failing to turnover said funds upon demand and/or order of the Court.

232. Accordingly, Trustee is entitled to a judgment for conversion of the Transfers, and any other property belonging to the Debtor which Defendants unlawfully converted to their own use, pursuant to 11 U.S.C. § 541 and California common law.

**NINTH CLAIM FOR RELIEF**

**Turnover of Estate Property**

**(Against Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber)**

**[11 U.S.C. § 542]**

233. Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 232 as though set forth in full.

234. Defendants have possession or control over property of the Estate in the form of the Transfers made pursuant to illegal, unenforceable, and avoidable agreements.

235. One or all of Conversion Defendants have possession or control over property of the Estate, including but not limited to LPG client files, ACH Receivables, and funds; including LPG's

assets totaling $12,000,000 or more based on Debtor's Bankruptcy schedules. None of the $12,000,000 or more in pre-petition payment assets have been turned over to the Trustee.

236. LPG's client files, ACH Receivables, funds, and potentially other property are property of the Estate and are not of inconsequential value to the Estate.

237. LPG's client files, ACH Receivables, and funds that are the subject of the transfers and transactions alleged herein were paramount to the operation of LPG and its ability to pay creditors pre-petition. As a result of the alleged transfers and transactions alleged herein and based on the testimony of Diab, LPG was forced to incur further debt obligations, including but not limited to emergency financing through City Capital NY in the amount of $2.95 million dollars pre-petition.

238. Accordingly, the Trustee is entitled to a judgment for turnover of the files, accounts receivable, and funds pursuant to 11 U.S.C. § 542.

## TENTH CLAIM FOR RELIEF

**Deepening Insolvency**

**(Against Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber)**

**[11 U.S.C. § 541; California common law.]**

239. Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 238 as though set forth in full.

240. As set forth in, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber and entities controlled and/or directed by them were recruited by Diab and representatives of LPG to participate, further, and advance the Diab Ponzi scheme designed and orchestrated to deplete the assets of LPG and deepen LPG's continuing insolvency.

241. Deepening Insolvency Defendants have engaged in a pattern and course of conduct, including the execution and entry into unlawful agreements and the receipt of transfers of assets of the Debtor, which resulted in direct harm to Debtor.

242. Deepening Insolvency Defendants acted in furtherance of the Ponzi scheme by causing entities under their control to enter and re-enter into a series of contractual agreements with LPG

through Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber and entities under their control would receive and continue to receive a stream of money from the Debtor thereby facilitating the prolonged operation of the Ponzi scheme. These actions converted assets of LPG to Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber and others, and significantly contributed to the deepening insolvency of Debtor, resulting in exacerbating damage claims of third parties vis-à-vis LPG.

243. Deepening Insolvency Defendants have possession or control over property of the Estate including but not limited to the Transfers made pursuant to illegal and unenforceable agreements that were used to perpetuate and conceal the Ponzi Scheme and fraudulent transfers, and secondary transfers of LPG funds from entities under his control which received fraudulent transfers of LPG assets.

244. Accordingly, Trustee is entitled to a judgment for deepening insolvency of the Debtor in the amount of at least the sum of the Transfers, Preference Transfers, and any other property belonging to the Debtor which Defendants unlawfully converted to their own use, pursuant to 11 U.S.C. § 541 and California common law.

## ELEVENTH CLAIM FOR RELIEF

**Racketeer Influenced and Corrupt Organizations Act Violations**

**(Against Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber)**

**[18U.S.C. § 1962]**

245. Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 244 as though set forth in full.

### a. The Unlawful Activity

246. Several predicate acts underlie this claim for relief based on information known to date. First, Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Tony Diab, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber's (collectively, the "RICO Defendants") activities and transfers, as detailed herein,

were done in furtherance of LPG's Ponzi scheme. Second, Marich Bein, by and through its owners, operators and/or directors Diab, Deutsch, Reches and upon information and belief, Weisz, diverted monies due Debtor pursuant to the ARPA. Third, the RICO Defendants Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber personally and/or through Marich Bein obtained dominion and control over LPG client files, ACH Receivables and funds by way of processing ACH transactions on LPG client files without consent or in excess of any potential consent found to exist at the time of the alleged transactions. Particularly, Marich Bein at the direction of Deutsch, Wesisz, and Reches began pulling ACH Debits from LPG clients without authorization. Fourth, the RICO Defendants engaged in wire fraud by directing ACH transactions described herein and movement of funds to the other Defendants.

**b. The Culpable Persons**

247. The RICO Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation or limited liability company capable of holding a legal interest in property. At all material times, RICO Defendants were persons that exist separate and distinct from the Enterprise, described below.

248. On information and belief, Marich Bein, by and through its owners, operators and/or directors Deutsch, Reches and, upon information and belief, Weisz, the GoFi Entities and Pacific Staffing, by and through their owner, operator and/or director Kohlschreiber, Vulcan, by and through its owner, operator and/or director Cohen, and Prime Logix engaged in the activities and transfers detailed herein in furtherance of LPG's Ponzi Scheme, as well as wire fraud.

**c. The Enterprise**

249. RICO Defendants constitute an Enterprise (the "Enterprise) within the meaning of 18 U.S.C. §§ 1961(4) and 18 U.S.C. 1962(c).

250. The Court's order in the 1046 Action wherein it denied the Motion of Greyson Law Center to Vacate the Preliminary Injunction previously entered, the Court stated: "*…it is clear to this Court that Debtor, since its pre-petition inception (and through the time of the appointment of the Chapter 11 Trustee) was in the Court's opinion, operating a criminal enterprise*." Case No. 8:23-bk-10571-SC; Adv. No. 8:23-ap-01046-SC [Bankr. Docket No. 1545, p. 3 (emphasis in original)].

251. RICO Defendants are associated in fact through relations with one another for the common purpose of carrying on an ongoing unlawful enterprise. The Enterprise has a common goal of furthering LPG's Ponzi scheme and receiving fraudulent transfers.

252. Since at least 2021 and continuing to date, the members of the Enterprise have had ongoing relations with each other through common control, ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of furthering LPG's Ponzi Scheme.

253. The Enterprise's activity constitutes "financial institution fraud" within the meaning of 18 U.S.C. § 1343, which is "racketeering activity" as defined by 18 U.S.C. § 1961(1). RICO Defendants' repeated and continuous use of and engaging in such conduct, including directing ACH transactions and transfers to participate in the affairs of the Enterprise constitutes a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). This also includes the unauthorized ACH debit pulls from LPG clients at the behest of Defendants.

254. The Enterprise's activity also constitutes "wire fraud" within the meaning of 18 U.S.C. § 1343, which is "racketeering activity" as defined by 18 U.S.C. § 1961(1). The repeated and continuous use of and engaging in such conduct, including the ACH transfers to participate in the affairs of the Enterprise constitutes a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

255. The RICO Persons have organized themselves and the Enterprise into a cohesive group with specific responsibilities and a command structure to operate as a unit in order to accomplish the common goals of furthering LPG's Ponzi scheme and controlling and effectuating the fraudulent transfers detailed herein, including:

256. Marich Bein, on information and belief, maintains offices, books, records and bank accounts, some independent of those of the other RICO Defendants but maintained in coordination with them.

257. The GoFi Entities, on information and belief, maintains offices, books, records and bank accounts, some independent of those of the other RICO Defendants but maintained in coordination with them.

/ / /

258. Vulcan, on information and belief, maintains offices, books, records and bank accounts, some independent of those of the other RICO Defendants but maintained in coordination with them.

259. Prime Logix, on information and belief, maintains offices, books, records and bank accounts, some independent of those of the other RICO Defendants but maintained in coordination with them.

260. Pacific Staffing, on information and belief, maintains offices, books, records and bank accounts, some independent of those of the other RICO Defendants but maintained in coordination with them.

261. Deutsch, , Cohen, Reches, Kohlschreiber, and, on information and belief, Weisz, and other officers, employees and investors, have operated, engaged and/or conspired with Marich Bein, the GoFi Entities, Prime Logix, and Pacific Staffing to conceal and further the Ponzi scheme, direct and authorize dealings and be in receipt of fraudulent transfers from LPG, including fraudulent ACH debit pulls from LPG clients without their authorization

262. Pursuant to their membership in the Enterprise, Marich Bein, the Gofi Entities, Vulcan, Prime Logix, and Pacific Staffing have (i) acted through Deutsch, Reches, Weiss, Cohen, Kohlschreiber, and their officers and employees to participate in and further LPG's Ponzi scheme by controlling and effectuating the fraudulent transfers; (ii) pooled their funds with those of the investors in order to fund the Enterprise and further the Ponzi scheme; (iii) entered into various agreements detailed herein, including ARPAs and the SRA, with the fraudulent purpose of furthering the Ponzi scheme; and (iv) set up, coordinated, and implemented the fraudulent ACH withdrawals and transactions used by the Enterprise in furtherance of the Ponzi scheme.

263. Deutsch, Cohen, Kohlschreiber, and upon information and belief, Weisz, as owners of Marich Bein, the GoFi Entities, Vulcan, Prime Logix, and/or Pacific Staffing are the masterminds of the Enterprise. They are responsible for the day-to-day operations and have final say on all business decisions of the Enterprise including, without limitation, directing, coordinating, facilitating and receiving the ACH transactions described herein.

264. In their capacities as masterminds of the Enterprise Deutsch, Cohen, Reches, Kohlschreiber, and upon information and belief, Weisz, are responsible for creating, approving and

implementing policies, practices and instrumentalities used by the Enterprise to accomplish its goals and purposes including, the form of agreements used by the Enterprise in attempts to disguise the Ponzi scheme and unlawful transfers of money, and the form and method of collecting and transferring ACH payments.

265. Deutsch, Cohen, Reches, Kohlschreiber, and upon information and belief, Weisz have also taken actions and directed other members of the Enterprise, and those they employed or retained, to take action necessary to accomplish the overall goals and purposes of the Enterprise including, without limitations, funding the Enterprise, directing members of the Enterprise to further the Ponzi scheme by, among other things, coordinating, facilitating, and directing payments and transfers of monies and executing documents in furtherance of concealing the true nature of their fraudulent and criminal activity related to the Enterprise and the Ponzi scheme.

266. Deutsch, Cohen, Reches, Kohlschreiber, and upon information and belief, Weisz, benefitted from the Enterprise's foregoing conduct.

267. On information and belief, Deutsch, Cohen, Reches, Kohlschreiber, and upon information and belief, Weisz, employed or retained others, individually and through the entity Reches & Associates, to help facilitate the Enterprise and to coordinate the fraudulent transfers of money as detailed herein.

268. The Enterprise is engaged in interstate commerce and uses and has used the instrumentalities of interstate commerce in its daily activities. Members of the Enterprise maintain offices in Florida, New York, California, Wyoming, and/or Delaware and use personnel in these offices to direct, coordinate and execute transfers detailed herein, and to draft, approve, and ratify the Enterprise's efforts, agreements, legal proceedings, and other financial agreements in furtherance of the Enterprise made with each other and other entities in throughout the United States via extensive use of mail, interstate e-mails, wire transfers, and bank withdrawals processed through automated clearing houses.

269. In this Bankruptcy Case, communications between members of the Enterprise and Debtor were by mail, interstate e-mail, wire transfers, ACH debts and other interstate wire communications.

270. Plaintiff and Debtor's Estate and its creditors have been and will continue to be injured by reason of the Enterprise's violations of 18 U.S.C. section 1962(c).

271. The injuries directly, proximately, and reasonably foreseeably resulting from or caused by these violations include, without limitation, hundreds of thousands of dollars in improperly transferred and acquired monies.

272. Plaintiff and Debtor's Estate also have suffered damages by incurring attorney's fees and costs associated with the prosecution of Defendants' unlawful activities.

273. Pursuant to 18 U.S.C. section 1964(c), Plaintiff is entitled to recover triple damages and costs of suit, including attorney's fees, from Defendants.

**TWELFTH CLAIM FOR RELIEF**

**Conspiracy**

**(Against Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Isael Reches, and Nicholas Kohlschreiber)**

**[18 U.S.C. § 1962(d)]**

274. Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 272 as though set forth in full.

275. Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Israel Reches, Nachman Weisz,and Nicholas Kohlschreiber ("Conspiracy Defendants") have unlawfully, knowingly and willfully, combined, conspired and agreed together to engage in activities that violate 18 U.S.C. section 1962(c), as alleged above, in violation of 18 U.S.C. section 1962(d).

276. By and through Conspiracy Defendants' business relationships with one another, their coordination with one another in the affairs of the Enterprise, and the frequent e-mail and other communications among the Conspiracy Defendants concerning the Ponzi scheme and fraudulent transfers. Each Conspiracy Defendant knew the nature of the Enterprise and each Conspiracy Defendant knew that the Enterprise extended beyond each Defendant's individual role. Moreover, through the same connections and coordination, each Conspiracy Defendant knew that the other

Defendants were engaged in a conspiracy to collect upon the unlawful debts in violation of 18 U.S.C. section 1962(c).

277. Marich Bein, through its owners, operators, directors, and/or controllers Deustch, Reches, and Weisz, held accounts at BankUnited and BCB Bancorp in its name for the sole purpose of directing, coordinating, effectuating, and processing Debtor's fraudulent ACH transfers of client funds and money. The GoFi Entities, by and through their owner, operator, director, and/or controller Kohlschreiber, acted as an intermediary between Prime Logix, Marich Bein and LPG by receiving, controlling, effectuating and transferring the fraudulent transfers of money.

278. Prime Logix also served as an intermediary between the GoFi Entities, Marich Bein, and LPG by receiving, controlling, effectuating and transferring the fraudulent transfers of money.

279. Each Conspiracy Defendant agreed to facilitate, conduct and participate in the conduct, management, and/or operation of the Enterprise's affairs in order to conceal, further, and perpetuate the Ponzi scheme in violation of 18 U.S.C. section 1962(c). Each Conspiracy Defendant was a knowing, willing and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, which was the orchestration, planning, preparation and execution of the scheme.

280. Each Conspiracy Defendant agreed to facilitate, conduct and participate, directly or indirectly, in the management and/or operation of the Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. section 1982(c).

281. The participation and agreement of each Conspiracy Defendant was necessary to implement and perpetuate the commission of the scheme.

282. Plaintiff and the Debtor's Estate and its creditors have been and will continue to be injured by reason of Defendants' conspiracy in violation of 18 U.S.C. section 1962(d), in amounts to be determined at trial.

283. The injuries to Plaintiff and the Debtor's Estate and to its creditors directly, proximately and reasonably foreseeably resulting from and caused by these violations of 18 U.S.C. section 1962(d) include, without limitation, hundreds of thousands of dollars in improperly transferred and acquired monies.

284. Plaintiffs and the Debtor's Estate also suffered damages by incurring attorney's fees and costs associated with the prosecution of Defendants' unlawful activities.

285. Pursuant to 18 U.S.C. section 1964(c), Plaintiff is entitled to recover triple damages and costs of suit, including attorney's fees, from Defendants.

**THIRTEENTH CLAIM FOR RELIEF**

**Aiding and Abetting**

**(Against Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber)**

**[11 U.S.C. § 541; Cal. Civ. Code §§ 3439.04(a) and 3439.07; California Common Law]**

286. Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 285 as though set forth in full.

287. Defendants Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber have control over property of the Estate, including but not limited to the transfers made pursuant to the illegal and unenforceable agreements that were used to perpetuate and conceal the Ponzi Scheme and fraudulent transfers, and secondary transfers of LPG funds from entities under their control which received fraudulent transfers of LPG assets.

288. Defendants Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber had knowledge of the fraudulent transactions, transfers, and agreements that were used to perpetuate and conceal the Ponzi scheme and fraudulent transfers. Defendants' knowledge is evidenced by, among other things, the facts described in Paragraphs 153 through 166 herein and as otherwise alleged in this Fourth Amended Complaint.

289. Defendants Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber with the foregoing knowledge, intended to, and did, help Diab and other scheme participants in perpetuating and concealing the Ponzi scheme and fraudulent transfers of money, causing injury to Debtor. Defendants' knowledge is evidenced by, among other things, the facts described in Paragraphs 153 through 166 herein and as otherwise alleged in this complaint.

/ / /

290. Defendants Cohen, Reches, Deustch, Kohlschreiber, and upon information and belief, Weisz, individually and through the GoFi Entities, Vulcan, Prime Logix, and/or Pacific Staffing, (collectively, "Aiding and Abetting Defendants") did actually engage in, Diab's commission of fraud and Ponzi scheme by coordinating, facilitating, and directing payments and transfers of LPG monies and executing documents in furtherance of concealing the true nature of their fraudulent and criminal activity related to the Ponzi scheme, causing injury to Debtor.

291. Aiding and Abetting Defendants, as well as Validation Partners had knowledge of the fraudulent transactions, transfers and agreements that were used to perpetuate and conceal the Ponzi scheme and fraudulent transfers.

292. Aiding and Abetting Defendants, with the foregoing knowledge, intended to, and did, help the other Defendants and Debtor in perpetuating and concealing the Ponzi scheme and fraudulent transfers of money.

293. At all material times, Aiding and Abetting Defendants had the intent to facilitate and conceal the Ponzi scheme and fraudulent transfers of money.

294. Concealing the true nature of the Ponzi scheme was paramount to being able to continue to rely on its operation to receive fraudulent transfers of money at Debtor's expense.

295. Without an intent to facilitate and conceal the Ponzi scheme and fraudulent transfers of money by aiding and abetting the illegal scheme, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber would no longer receive the benefits of said transfers and had a vested interest in keeping the Ponzi scheme moving forward for as long as they possibly could.

296. Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber assisted, and did actually engage in, Diab's commission of fraud and Ponzi scheme by coordinating, facilitating, and directing payments and transfers of LPG monies and executing documents in furtherance of concealing the true nature of their fraudulent and criminal activity related to the Ponzi scheme, causing injury to Debtor.

297. Aiding and Abetting Defendants assisted, and did actually engage in, the commission of Defendants' fraud, unlawful Enterprise, Ponzi scheme, and other intentionally tortious conduct (as set forth in the Second, Third, Fourth, Fifth, Sixth, Eighth, Ninth,Tenth, Eleventh, and Twelfth Claims

for Relief above) by coordinating, facilitating, and directing payments and transfers of monies and executing documents in furtherance of concealing the true nature of their fraudulent and criminal activity related to the Enterprise and the Ponzi scheme.

298. The injuries to the Debtor directly, proximately and reasonably foreseeably resulting from and caused by these fraudulent transfers and Ponzi scheme include, without limitation, hundreds of thousands of dollars in improperly transferred and acquired monies and the continuation of the criminal enterprise.

299. Defendants Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber furthered the deepening insolvency of LPG by engaging in the Ponzi Scheme. Defendants did so with knowledge that LPG was likely already insolvent. This knowledge is evidenced by, among other things, Defendants' knowledge that LPG was failing to pay its clients and customers whose accounts were being looted. By aiding and abetting Diab's Ponzi Scheme, the Defendants delayed LPG's filing for bankruptcy and caused direct injury to LPG by deepening its insolvency.

300. Defendants Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber continued actions in furtherance of the Ponzi scheme specifically resulted in the deepening insolvency of LPG based on the specific funds which were diverted to Deutch and Weiss and entities controlled by them without any benefit received by LPG.

301. The deepening insolvency of LPG caused by Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber, and other entities affiliated with Diab, resulted in LPG incurring a direct harm independent of the harm to its creditors as the harm was not limited to an inability to pay its creditors, but extended far deeper into a larger inability to operate as a going concern and continue business operations of any kind whatsoever due to the depletion of resources caused by the Diab Ponzi scheme, and Deutch and Weiss' aiding and abetting in the same.

302. Due to Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber's aiding and abetting Diab's Ponzi Scheme, Diab caused LPG to engage in the wrongful expenditure of corporate assets thereby prolonging LPG's life through bad debt and causing the dissipation of corporate assets.

303. The property including but not limited to the transfers are not of inconsequential value to the Debtor and recovering these funds is paramount to rectifying Debtor's injury.

304. LPG incurred an overwhelming amount of debt resulting from the Ponzi Scheme. The payments LPG made to the Aiding and Abetting Defendants, and their demands for further payments, caused LPG to seek out additional streams of income and investments, thereby perpetuating the fraud and deepening LPG's insolvency. Due to the involvement of the Aiding and Abetting Defendants in the Ponzi Scheme, LPG continued to incur far greater debt than it could possibly repay.

305. Aiding and Abetting Defendants furthered the deepening insolvency of LPG by engaging in the Ponzi Scheme. Aiding and Abetting Defendants did so with knowledge that LPG was likely already insolvent. This knowledge is evidenced by, among other things, Aiding and Abetting Defendants' knowledge that LPG was failing to pay its clients and customers whose accounts were being looted. By aiding and abetting Diab's Ponzi Scheme, the Aiding and Abetting Defendants delayed LPG's filing for bankruptcy and caused direct injury to LPG by deepening its insolvency.

306. Due to Aiding and Abetting Defendants' aiding and abetting Diab's Ponzi Scheme, Diab caused LPG to engage in the wrongful expenditure of corporate assets thereby prolonging LPG's life through bad debt and causing the dissipation of corporate assets. Plaintiff and the Debtor's Estate also suffered damages by incurring attorney's fees and costs associated with the prosecution of Aiding and Abetting Defendants' unlawful activities.

307. Defendants Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber assisted, and did actually engage in, the commission of fraud and the scheme by coordinating, facilitating, and directing the specific payments and transfers of monies referenced herein and executing documents in furtherance of concealing the true nature of their fraudulent and criminal activity related to the scheme.

308. "Under the Bankruptcy Code, 'all legal or equitable interests to the debtor in property as of the commencement of [a bankruptcy] case' belong to the bankruptcy estate created at the debtor's filing of a bankruptcy petition." *Bercy v. City of Phx.*, 103 F.4th 591, 594 (9th Cir. 2024) (citing 11 U.S.C. § 541(a)(1)). "A claim belonging to the debtor at the time of the bankruptcy filing is such a property interest." *Id.* "The scope of section 541 is broad, and includes causes of action*." Sierra*

*Switchboard Co. v. Westinghouse Elec. Corp.,* 789 F.2d 705, 707 (9th Cir. 1986) (citing *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 & n.9 (1983)).

309. California courts enforce aiding and abetting, conspiracy, and secondary liability when fraudulent transfers underlie RICO criminal enterprises. Under California law, "a debtor and those who conspire with him to conceal his assets for the purpose of defrauding creditors are guilty of committing a tort and each is liable in damages." *Taylor v. S & M Lamp Co*., 190 Cal. App. 2d 700, 706, 12 Cal. Rptr. 323 (1961); *see also Berger v. Varum*, 35 Cal. App. 5th 1013, 1025 (2019) (same); *Monastra v. Konica Bus. Machs., U.S.A., Inc*., 43 Cal. App. 4th 1628, 1644–45, 51 Cal. Rptr. 2d 528 (1996).

310. Additionally, California imposes liability "on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person." *Casey v. U.S. Bank Nat. Assn.* 127 Cal.App.4th 1138, 1144, 26 Cal. Rptr. 3d 401, 405 (2005).

311. California recognizes fraud as an intentional tort. *See, e.g.*, *Hensley v. McSweeney*, 90 Cal. App. 4th 1081, 1085 (2001) ("Fraud is an intentional tort; it is the element of fraudulent intent, or intent to deceive, that distinguishes it from actionable negligent misrepresentation and form nonactionable innocent misrepresentation.").

312. California also recognizes the intentional tort of fraudulent transfer. *See, e.g.*, *Berger*, 35 Cal. App. 5th 1013, 1025 ("Because transferring funds in order to evade creditors constitutes an intentional tort."). *See also*, Cal. Civ. Code §§ 3439.04(a), 3439.04(b), and 3439.07.

313. California also recognizes the intentional tort of conversion. See, e.g., Multani v. Knight, 23 Cal. App. 5th 837, 853; 223 Cal. Rptr. 3d 537 (2018) ("Conversion is an intentional tort.").

314. To be clear, the Trustee is alleging that Defendants Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber aided and abetted in commission of the following intentional torts: (1) fraud; (2) commission of a fraudulent transfer; (3) conversion, and (4) deepening insolvency.

315. Defendants Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber knew that Diab was committing these intentional torts. Based on communications with Diab and other co-conspirators, despite having an understanding that the basis of LPG's business operations as postured by Diab and others working in concert with him were unlawful based on multiple conversations with Diab and other co-conspirators within LPG, nevertheless determined to continue their business dealings with LPG in furtherance of the Diab Ponzi scheme in place within LPG.

316. Every transfer made to Defendants, pursuant to Defendants Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber's continued business dealings with LPG were with their express knowledge that they constituted a fraudulent transfer of LPG's assets in furtherance of the scheme.

317. The harm alleged herein was to the Debtor and the result of Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber's participation, direction, and concerted effort with Diab to advance the Ponzi scheme and the fraudulent conduct outlined herein to the detriment of the Debtor. Stated differently, the Trustee alleges that Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber's participation, direction, and concerted effort with Diab in furtherance of the Ponzi scheme aided and abetted fraudulent Ponzi scheme orchestrated by Diab.

318. Defendants Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber substantially assisted Diab in the tort of fraudulent transfer as the transfers of Debtor's assets to them directly, or indirectly through entities under their control, pursuant to the unlawful agreements entered into at the direction of Diab constitute fraudulent transfers.

319. Defendants Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber substantially assisted Diab in the tort of conversion as Diab exercised wrongful dominion of assets belonging to Debtor by unlawfully transferring these assets to Defendants, and entities controlled and directed by them, pursuant to the terms of the unlawful agreements entered into by Defendants Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber and entities controlled by them,

320. The conduct of Defendants Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber in continuing to execute the illegal agreements and/or investments set forth herein provided the groundwork for Diab to carry out the continued operation of his Ponzi scheme and siphon funds away from LPG to its detriment.

321. But for Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber and other similarly situated business partners of Diab, the unlawful Ponzi scheme would not and could not continue to operate as intended by Diab.

322. With the entry of each agreement and investment, Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber actions directly and specifically deepened the insolvency of the Debtor as each fraudulent transfer of LPG's assets to them, and entities controlled by them further deepened the insolvency of the Debtor into a position where Debtor could no longer carry out ordinary business functions and operate as a going concern. Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber's participation in the Diab Ponzi Scheme thereby resulted in a direct harm to the Debtor which could be specifically traced back to them based on the amount of each fraudulent transfers received by Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber and entities controlled by them.

323. Because the instant claim for aiding and abetting alleges direct harm to the debtor, and is not a derivative state law creditor claim, pursuant to 11 U.S.C. § 541(a)(1)), the Trustee has standing to pursue this claim against the Defendants in this Adversary. See e.g., *Huntsberger v. Umpqua Holdings Corp*. (In re Berjac of Or.), 538 B.R. 67, 82 (D. Or. 2015) ("Here, plaintiff argues that by aiding and abetting, acting in concert with, and/or conspiring with the Holcombs and others, the bank defendants caused debtor to incur indebtedness to new investors that it had no ability to pay. Consequently, because the Ninth Circuit recognizes that prolonging a debtor's life through bad debt constitutes a cognizable harm to debtor, and plaintiff alleges that the bank defendants caused debtor to incur indebtedness to new investors that it could not pay, thereby, prolonging debtor's life through bad debt, this Court finds that plaintiff has standing to bring its third claim.").

/ / /

/ / /

324. There are no claims of Debtor's claims generally and are specific to Debtor as they foreclosed Debtor's ability to continue business operations in any capacity due to depletion of its business assets through the unlawful agreements and transfers orchestrated by Diab and carried out by Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber and entities under their control, which is a harm caused to the Debtor independent of any harm to its creditors.

325. . The Trustee bases the foregoing claims on the standing conferred under 11 U.S.C. § 541(a)(1) and does not assert any basis for these claims under 11 U.S.C. §§ 544(b), 550, or 551.

## RESERVATION OF RIGHTS

326. Plaintiff reserves the right to bring all other claims or causes of action that the Plaintiff may have against any of the defendants, on any and all grounds, as allowed under the law or in equity, including but not limited to, those claims not known by the Trustee at this time but that he may discover during the pendency of this adversary proceeding.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for a judgment as follows:

**On the First Claim for Relief:**

1. Control over ACH Transfers: Entry and enforcement of the preliminary injunction ordered by the court [Dkt. No. 70] prohibiting interference with any ACH Transfer being executed pursuant to documents authorizing such transfers to be executed in favor of LPG as follows:

a. Covered Entities and Individuals: The following entities and individuals, and anyone acting on their behalf: LPG, Oakstone; Greyson; Phoenix; Maverick; LGS Holdco, LLC; CLG; Vulcan; Coast Processing; Prime Logix; Tony Diab; Rosa Loli aka Rosa Bianca Loli aka Bianca Loli; Lisa Cohen, Dan March, Ty Carss, Eng Heng and all other aliases, agents, or corporate entities affiliated with same shall, absent further order from this Court:

b. Enjoined Conduct re ACH Instructions: No covered entity or individual shall initiate, cause to be initiated, or instruct any company or person that processes ACH transfers and/or their affiliated financial institution including Marich Bein and BankUnited, N.A.; and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875" or any such substantially similar ACH identification transaction, to execute any ACH EFT

on any file, financial institution, or current or former client of LPG, to or for the benefit of LPG without the express written authorization of Trustee;

c. Enjoined Conduct re Bank Accounts: No covered entity or individual shall open, or cause to be opened, any account, whether business or personal, that can receive or send money or anything of value, at any company including banking, financial, or similar institution and/or receive, directly or indirectly, any funds drawn from ACH Transfers;

2. Execution of ACH Transfers: Entry and enforcement of the preliminary injunction ordered by the court [Dkt. No. 70] prohibiting interference with any ACH Transfer being executed pursuant to documents authorizing such transfers to be executed in favor of LPG as follows:

a. Covered Entities and Individuals: All companies capable of processing ACH transfers including Marich Bein and BankUnited, N.A.; and/or any entity associated with the ACH identification transaction “LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875,” or any such substantially similar ACH identification transaction, are enjoined absent further order of this court, from:

i. Enjoined Conduct re ACH Transfers: No covered entity or individual shall initiate or receive funds from any ACH EFT on any file, financial institution, or current or former client of LPG, to or for the benefit of LPG or any one or more of its alleged assignees or transferees;

ii. Injunction Mandating Turnover to Trustee: All covered entities or individuals shall hold in trust any and all funds, receipts, and transfers related to any account, file, or current or former client of LPG, or any one or more of its alter egos or fraudulent transferees, until expressly directed to release, wire or transfer such funds by the Trustee and to a bank account whose information shall be provided with any such request; and, shall upon request by the Trustee provide an accounting of any and all such funds held in trust to the Trustee upon written request within 10 days of said request;

b. enjoining LPG, or any one or more of its alter egos or fraudulent transferees from incurring, taking out, or pledging any receivables of LPG or any one or more of its alter ego entities without seeking leave of court;

/ / /

c. enjoining LPG, or any one or more of its alter egos or fraudulent transferees from instructing any person and/or Client to cancel and/or demand a refund from LPG;

3. For entry of an order amending the preliminary injunction order [Dkt. No. 70] requiring Defendants to turn over all pre-petition client files, documents, ACH information, funds and fees for every transaction processed from March 20, 2019 to the present.

**On the Second and Third Claims for Relief:**

4. Avoiding, recovering, and preserving the two-year transfers against all Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber.

**On the Fourth and Fifth Claims for Relief:**

5. Avoiding, recovering, and preserving the four-year transfers against all Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber**.**

**On the Second and Fourth Claim for Relief**:

6. Awarding punitive and exemplary damages according to proof.

**On the Seventh Claim for Relief:**

7. Awarding Plaintiff general damages in the total aggregate amount of not less than $5,540,000.

8. For attorney's fees and costs.

**On the Eighth Claim for Relief:**

9. Ordering turnover to the Trustee of all funds obtained by way of processing ACH transactions against LPG client files from March 20, 2019 through the present that have not already been remitted to LPG and/or the Trustee.

10. For attorney's fees and costs expended in pursuit of the property. Cal. Civil Code § 3336.

11. For pre-judgment interest from the date of conversion. Cal. Civil Code § 3336.

**On the Ninth and Tenth Claims for Relief**:

12. Ordering turnover to the Trustee of the following:

a. All Client files, including but not limited to names, contact information, client file management, communications, account information, letters, pleadings, communications, payment history, financial account information, credit reports, executed legal services contracts, ACH contracts, executed installment contracts, account balances, debts in dispute, payment history, file status, settlements, debt invalidations and/or any other information created, managed and stored electronically utilizing DPP software program's software license, key or account, that was opened and is maintained and controlled by LPG, or any one or more of its alter egos, including but not limited to Defendants;

b. All administrative usernames and passwords that give the Trustee access to any account held, maintained or controlled by LPG, or any one or more of its alter egos;

c. All ACH files related to Client information, details, accounts, history of EFTs, payments, amounts held, interest on held amounts, penalty fees, nonsufficient fund fees or other ACH related charges to the Clients stored electronically or in hard copy associated with ACH processing service providers and/or affiliated financial institutions, including but not limited to Marich Bein and BankUnited, N.A. and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875", or any such substantially similar ACH identification transaction;

d. All files, information, reports, spreadsheets, account numbers, routing numbers, and databases related to transfer of funds out of any account opened, maintained and controlled by LPG, or any one or more of its alter egos, that were processed and executed by ACH processing service providers and/or their affiliated financial institutions, including but not limited to Marich Bein and BankUnited, N.A. and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875", or any such substantially similar ACH identification transaction;

e. All administrative usernames and passwords that give the Trustee access to any ACH processing accounts, software, database or other program at ACH processing service providers and/or affiliated financial institutions, including but not limited to Marich Bein and BankUnited, N.A. or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9

TOMS RIVER NJ 0875", or any such substantially similar ACH identification transaction, used to upload or input Client information, initiate Client ACH EFTs, transfer Client ACH funds to outside financial institutions or otherwise manage any account opened, maintained and controlled by LPG, or any one or more of its alter egos,;

f. All accounting records, files, data and information obtained, received or prepared for using LPG client files and/or ACH information by Defendants, or any one or more of LPG's alter egos and stored on NetSuite; QuickBooks and Microsoft SharePoint; G-Suite or other permanent or cloud based systems;

g. All contracts, records, reports, information, data and details regarding the transfer or sale of any client files or future Client ACH payments to Defendants and/or any other law firm, organization, corporate entity, person(s), or investment group (otherwise known as factoring companies);

h. All contracts, records, reports, information, data, cost basis, payment information and details regarding the transfer or receipt of any Client files or future Client ACH payments from any other law firm, organization, corporate entity, person(s), investment or marketing group (otherwise known as capping companies) to LPG or any one or more of its alter egos;

i. All ACH payments originating from LPG client files, or any one or more of its alter egos or fraudulent transferees, including but not limited to Defendants from March 20, 2019 to the present.

**On the Eleventh and Twelfth Claims for Relief**:

13. Awarding Plaintiff monetary damages in the amount of all funds obtained by Defendants Marich Bein, LLC, GoFi, LLC, Pacific Staffing, LLC, CallFi, LLC, AcuFi, LLC, Lisa Cohen, Heshy Deustch, Nachman Weisz, Israel Reches, and Nicholas Kohlschreiber by way of processing ACH transactions against LPG client files from March 20, 2019.

14. Awarding treble damages.

15. Awarding costs of suit, including attorney's fees.

**On the Thirteenth Claim for Relief**:

16. Award Plaintiff compensatory damages in an amount to be determined at trial

**On All Claims for Relief:**

17. Awarding pre-judgment interest at the maximum legal rate.

18. Awarding post-judgment interest at the maximum rate from the date of the last Transfer until the judgment is paid in pull.

19. Awarding costs of suit incurred herein.

20. Granting any other and further relief as the Court deems just and proper.

Dated: March 3, 2026

DINSMORE & SHOHL LLP

By: */s/ Christopher Ghio*_____________
Christopher Ghio
Attorneys for Richard A. Marshack, Trustee for the LPG Liquidation Trust

# Exhibit 1

**ASSIGNMENT OF SERVICING RIGHTS**

This Assignment of Servicing Rights, dated as of September 19th, 2022 (the "**Effective Date**"), is made by and between LITIGATION PRACTICE GROUP PC, a California professional stock corporation ("**Merchant**"), and MARICH BEIN LLC, a New York limited liability company ("**Servicer**"), for themselves and their respective successors and permitted assigns.

**RECITALS**

A. In the ordinary course of its business Merchant generates Receivables (as defined below) arising from the provision of goods and/or services by or on behalf of Merchant to its Customers (as defined below);

B. Servicer (or an entity affiliated with Servicer) has acquired (or will acquire) certain Receivables from Merchant;

C. Merchant wishes to assign all of its rights in the servicing, collection and administration of any Receivable to Servicer (the "**Servicing Rights**"), and, subject to the terms of this Assignment, Merchant desires to engage Servicer to act as third-party servicer of the Receivables (as defined below) on behalf of Merchant, and Servicer desires to accept such engagement and act as servicer of the Receivables.

NOW, THEREFORE, in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties, the parties hereby agree as follows:

**Article I. ASSIGNMENT**

Section I.1 Assignment of Servicing Rights. Merchant, by these presents does hereby presently, unconditionally, absolutely and irrevocably assign, transfer, convey and set over to Servicer (it being intended by Merchant that such assignments constitute present, absolute and unconditional assignments and not assignments for additional security only, but such assignment shall constitute security for Merchant's obligations to Servicer or its affiliates), all of Merchant's right, title and interest in and to the Servicing Rights, including, without limitation, any right of Merchant or any of its affiliates (whether such rights are currently existing or arising in the future) to service collection of subscription fees, return payment fees, or any other fee or payment resulting from any Customer's engagement with Merchant or any of its affiliates, or give notices, sue for payment under the Customer contracts or to take any action at law or in equity relating to the Customer contracts.

**Article II. SERVICING OF CONTRACTS**

Section I.2 Appointment as Third-Party Servicer. Subject to the terms and conditions of this Assignment, Merchant hereby retains Servicer to act as third-party servicer for the Receivables. Merchant hereby agrees to perform the Services for the Receivables. Merchant and

1
Servicer agree that Servicer is not responsible for ensuring that the terms and conditions of the Customer contracts comply with applicable law or are legally enforceable.

Section I.3 Serving of Receivables. Servicer may use any subcontractors it deems reasonably necessary to assist in the performance of any of Servicer's obligations and duties under this Assignment. Merchant agrees to provide Servicer and its subcontractors with such assistance in the servicing, collection and administration of any Receivable as may be requested by Servicer from time to time. Notwithstanding any other provision of this Assignment, Servicer may determine at any time to cease or to suspend, temporarily or permanently, servicing or collection activity with respect to any Receivable at any time and for any reason or no reason.

Section I.4 Limited Power of Attorney. Merchant hereby irrevocably appoints and empowers Servicer as Merchant's true and lawful attorney-in-fact, with full power of substitution, to endorse and promptly deposit on Merchant's behalf any checks or other instruments made payable to Merchant and submitted by a Customer as payment on any Receivable, and to take any other action relating the Receivables in Merchant's name and place that Servicer deems advisable and consistent with the terms of this Assignment. This power of attorney shall be deemed to be a right coupled with an interest.

Section I.5 Servicing Fees. Merchant agrees to pay Servicer a minimum fee of $4.00 per debit transaction and $9.00 per returned transaction as Servicer's compensation for performing the Services (the "**Servicing Fees**"). On a monthly basis, Servicer will withhold the total of all Servicing Fees due for the month (or any prior month, if not previously collected) from all amounts otherwise required to be remitted to Merchant from Servicer.

Section I.6 Remittance. Following final and indefeasible receipt by Servicer of payment on a given Receivable (other than a Purchased Receivable), Servicer shall remit to Merchant the amount of such payment, minus (a) any amount owing to Servicer (or any of its affiliates) in respect of any Purchased Receivable, (b) any Servicing Fees permitted to be withheld pursuant to Section 2.05 of this Assignment and (c) any amounts owing to any other party required that are required to be withheld or which Merchant has otherwise instructed Servicer to remit to such other party.

**Article III. OBLIGATIONS OF MERCHANT**

Section III.1 Access to all Digital Records, Databases, and Applications. Merchant shall provide Servicer any information requested by Servicer with respect to its Customers and the Customer contracts. At all times Servicer must have unfettered access to all software applications used by Merchant, including, but not limited to, Debt Pay Pro, Snowflake, or any other databases used by Merchant in its ordinary course of business. All Customer contracts, correspondence or other files of Merchant relating to the Receivables will be retained and held in the possession or control of Merchant, and complete and accurate copies of which shall be provided by Merchant at Merchant's expense to Servicer within one (1) Business Day following Merchant's receipt of a request from Servicer for any such documentation or records.

Section III.2 Facilitating the Transition. Merchant and Servicer shall work in good faith to create a plan for the accomplishment of the conversion of the servicing of the Receivables and related electronic files to Servicer, including, to the extent required, notifying Customers of the

change in Servicer.

2

Section III.3 No Impairment. Merchant will not take any action (including placing or allowing placement of a lien or security interest on any Purchased Receivable) or make any omission that has, individually or in the aggregate, an adverse effect on any Purchased Receivable or on Servicer's ability to collect on any Purchased Receivable.

Section III.4 Amounts Received. If Merchant or any employee, agent or representative of Merchant (other than Servicer) receives any payment on any Receivable, or any payment on any Receivable is processed or deposited by or for Merchant, then such funds shall be deem to be held in trust for Servicer's benefit. Merchant shall notify Servicer immediately of any such payment and shall remit or cause to be remitted the full amount of such payment as directed by Servicer within one (1) Business Day of its receipt or deposit. Merchant shall not in any way encourage or cause any proceeds to be paid, processed, settled or delivered to any person or account other than the Servicer's account, and shall take all affirmative steps at its expense and as necessary or appropriate to prevent any such occurrence from recurring. Merchant is prohibited from instructing any Customer to pay Merchant or any other third party on a Receivable or otherwise suggest that Customer may make a payment to Merchant or any other third party instead of paying Servicer to satisfy its payment obligation.

Section III.5 Receivables Data. Merchant hereby authorizes and directs Servicer to perform the Services with respect to the Receivables in accordance with the information and data relating to the Receivables as provided by Merchant to Servicer (collectively, the "**Merchant Provided Contract Data**"). Servicer may accept and rely on the Merchant Provided Contract Data without audit or any other examination thereof, and Servicer shall have no duty, responsibility, obligation, or liability for acting in reliance on the accuracy of the Merchant Provided Contract Data. If Merchant becomes aware of any errors, inaccuracies, or material omissions in the Merchant Provided Contract Data (collectively, "**Data Errors**"), Merchant shall notify the other party of the existence of such Data Errors, and Merchant shall be responsible for providing any additional or corrected information with respect to the Receivables needed to resolve such Data Errors.

**Article IV. REPRESENTATIONS AND WARRANTIES**

Section IV.1 Representations and Warranties. As of the Effective Date and throughout the term of this Assignment, Merchant represents and warrants to Servicer that:

i. Merchant is duly organized or formed, validly existing and in good standing under the laws of the state in which it is organized

ii. Merchant has all necessary power and authority to enter into this Assignment and to perform its obligations under this Assignment or formed;

iii. Merchant conducts and shall conduct its business in accordance with, and not in violation of, any Applicable Law applicable to such business or the provision thereof;

iv. Each of Merchant, its affiliates and each of their respective employees, officers, directors, subcontractors, representatives and agents have all licenses, registrations and authorizations necessary or appropriate to own, operate and conduct its and their

businesses;

v. Any materials, data, information, content or documents Merchant directly or indirectly provides to Servicer, are true, correct and complete in all respects, and



contain no materially false or misleading statement;

vi. Merchant shall not materially change the goods or services it sells, or otherwise materially change the nature of its business, without first notifying Servicer and obtaining the prior written consent of Servicer; and

vii. Other than pursuant to this Assignment, Merchant has not sold, transferred, conveyed, pledged, assigned, or encumbered the Servicing Rights to any other person.

**Article V. INDEMNIFICATION AND LIMITATION OF LIABILITY**

Section V.1 Merchant Indemnification. Merchant agrees to defend, indemnify, and hold Servicer and all of its affiliates, and each of their respective officers, directors, employees, representatives, subcontractors and agents, harmless from and against any and all claims, causes of action, lawsuits, arbitrations or other proceedings, costs, liabilities, expenses, damages, losses, penalties, fines, forfeitures, amounts paid in settlement, judgments, fees (including reasonable attorneys' and legal experts' fees and related investigations, accounting and litigation costs, fees and expenses) which result or arise from:

(a) any act or omission by or on behalf of Merchant, or any of its officers, directors, employees, representatives, subcontractors or agents (other than Servicer) which is in violation of or not permitted by this Assignment, or Merchant's agreement with a Customer;

(b) any act or omission by or on behalf of Merchant, or any of its officers, directors, employees, representatives, subcontractors or agents (other than Servicer) arising out of or alleged to have arisen out of or in connection with the conduct of Merchant's business;

(c) Servicer's reliance on the accuracy of the Merchant Provided Contract Data in providing Services for the Receivables;

(d) any act or omission constituting negligence or willful misconduct by an officer, director, agent, representative, subcontractor or employee of Merchant (other than Servicer); or

(e) any act or omission by Servicer and/or any of its officers, directors, employees, representatives, subcontractors, affiliates and agents which act or omission was specifically directed by Merchant.

The obligations of this Section will survive the termination of this Assignment

Section V.2 Limitation of Liability. THE SERVICES ARE PROVIDED BY SERVICER ON AN "AS IS" AND "AS AVAILABLE" BASIS. EXCEPT AS OTHERWISE EXPRESSLY CONTAINED IN THIS ASSIGNMENT, SERVICER MAKES NO REPRESENTATIONS OR WARRANTIES, AND HEREBY EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE, RELATING TO OR ARISING OUT OF THE SERVICES OR THESE TERMS AND CONDITIONS, INCLUDING WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR

PURPOSE AND IMPLIED WARRANTIES ARISING FROM COURSE OF DEALING OR OF PERFORMANCE. The parties agree that Servicer's liability to Merchant or any other person for damages, whether arising due to a breach of this Assignment, tortious acts (including negligence) or under any other theory, shall be limited to Merchant's actual direct, provable damages in an amount not to exceed: $100,000. The parties acknowledge that (i) fees and other charges contemplated under this Assignment are based on the

4

limitation of liability specified herein and (ii) such fees and other charges would be higher if this limited liability provision was not included or was unenforceable.

**Article VI. MISCELLANEOUS**

Section I.7 Term and Termination. This Assignment shall commence on the Effective Date and shall continue in full force and effect, until released by Servicer. Merchant may terminate this Assignment at any time and for any reason provided that the total amount of Purchased Receivables held by Servicer and its affiliates are less than $1,000,000.00.

Section I.8 Confidentiality. The parties will each keep confidential and not disclose this Assignment or any of the terms and conditions of this Assignment to any third party other than a party's attorneys, accountants, external auditors, regulatory authorities or potential or actual acquirers or investors or professional advisors who have signed an acceptable non
disclosure agreement.

Section VI.1 Exclusivity. Merchant understands and agrees that the relationship set forth in this Assignment is exclusive. Merchant forgoes any right to contract with other parties for the same or similar services provided by Servicer under this Assignment.

Section VI.2 Amendment. The terms of this Assignment may be amended, modified or supplemented from time to time provided that such amendment, modification or supplement is in writing and signed by the parties hereto.

Section VI.3 Notices. All notices and other communications provided for hereunder shall, unless otherwise stated herein, be in writing and shall be delivered at such other address (or email address) as shall be designated by such party in a written notice to the other party hereto.

Section VI.4 Severability. If one or more of the provisions of this Assignment shall be for any reason held invalid or unenforceable, such provisions shall be deemed severable from the remaining covenants, agreements and provisions of this Assignment and such invalidity or unenforceability shall in no way affect the validity or enforceability of such remaining provisions or the rights of the parties hereto. To the extent permitted by applicable law, the parties hereto waive any provision of law which renders any provision of this Assignment invalid or unenforceable in any respect.

Section VI.5 GOVERNING LAW; WAIVER OF JURY TRIAL. THIS ASSIGNMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE CONFLICT OF LAW PROVISIONS THEREOF. EACH PARTY HERETO WAIVES THE RIGHT TO TRIAL BY JURY IN ANY CLAIM, ACTION, SUIT, PROCEEDING, OR COUNTERCLAIM OF ANY KIND ARISING OUT OF OR RELATED TO THIS ASSIGNMENT.

Section VI.6 Counterparts. This Assignment may be executed by facsimile or PDF signature, in any number of counterparts and by different parties hereto on separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement.

**Article VII. DEFINITIONS**

5

For purposes of this Assignment, each of the following terms shall have the meaning specified with respect thereto:

**"Assignment"** means this Assignment of Servicing Rights, as the same may be amended from time to time.

**"Business Day"** shall mean any day other than Saturdays, Sundays or other day on which banks in New York are required to close.

**"Customer"** means a person, business entity, association, sole proprietorship, or any other similar organization or individual to whom Merchant provides, agrees to provide, or arranges to be provided goods and/or services in exchange for compensation and who is an obligor under any Receivable, including any guarantor of a Receivable.

**"Purchased Receivable"** means and includes a Receivable, or the applicable percentage portion thereof, which has been purchased by Servicer or any of its affiliates.

**"Receivable"** means the account receivable, including the contractual and equitable rights to payment thereof, from a Customer located in the United States, generated and arising out of the provision of, or agreement to provide or to arrange for the provision of, product(s) and/or service(s) by or on behalf of Merchant to such Customer or to its designee, and any and all other account receivable-related rights. In addition, "Receivable" means and includes: (i) all collections, finance charge, late payment fees, insufficient fund fees or other amounts paid or payable by a Customer, and all proceeds received or obtained arising from or related to such Receivable (regardless of form of payment, and whether received from a Customer, for the benefit of a Customer, or on behalf of a Customer); (iii) all books and records, invoices, documents, disclosures, notices, contract rights, contractual agreements and terms and conditions, claims, chattel paper (whether tangible or electronic), instruments (including any promissory notes), rights to payment of money, general intangibles, and deposit accounts evidencing, related to or arising from such account receivable; and (iv) all other rights and information relating to the foregoing, in each case whether now owned or hereafter acquired, and wherever located.

**"Services"** shall mean the billing and collection services, which Servicer agrees to provide Merchant hereunder, including debiting Customer accounts.

*(Signature page follows)*

6

**IN WITNESS WHEREOF,** the parties hereto have caused this Assignment to be duly executed by their respective officers hereunto duly authorized as of the Effective Date.

**MERCHANT:**

**LITIGATION PRACTICE GROUP PC,**
a California professional stock corporation

By: Daniel S. March
Name: ______________________
Title: MANAGING SHAREHOLDER

**LITIGATION PRACTICE GROUP PC,**
a California professional stock corporation

By: Tony Diab
Name: ______________________
Title: ______________________

**SERVICER:**

**MARICH BEIN LLC,** a limited liability company

By: ______________________
Name: HERSHY DECKER
Title: Managing Partner

# Exhibit 2

## ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of August 18, 2022 (the "**Agreement Date**"), by and between Marich Bein LLC (collectively the "**Buyer**"), and The Litigation Practice Group PC (the "**Seller" or "LPG**", and together with the Buyer, the "**Parties**"), and The Litigation Practice Group PC ("LPG").

### RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which The Litigation Practice Group PC ("LPG") shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

### ARTICLE 1.
### DEFINITIONS

Section 1.1 Certain Definitions. Certain defined terms used in this Agreement are set forth on **Exhibit A**.

### ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1 Assignment of the Purchased Accounts to the Buyer. Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens. Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2 No Assumption of Liabilities. The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3 Payment of Purchase Price. Buyer shall pay $500,000.00 for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**"). The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4 Guarantee of LPG. If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement. The replacement file shall yield no less than the receivable of the failed file. In addition, if any any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file

package as a whole equals 80%. This guarantee shall continue until the completion of the 24th month following execution of this agreement.

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1 Organization; Good Standing. The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2 Power and Authority. The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby. This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3 Title to, and Sufficiency of, the Purchased Accounts. The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4 Consents. The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5 No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Section 3.6 Compliance with Laws. The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7 Legal Proceedings. There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements. No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8 Condition of Purchased Accounts. Each Purchased Account shall have received no less than one processed payment.

Section 3.9 Confidentiality. Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**"). Seller will at all times keep the Confidential Information in confidence and trust. Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer. Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions. Seller agrees that violation of this Section 3.9. The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1 Organization; Good Standing. The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2 Power and Authority. The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby. This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 4.3 No Conflicts. The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4 Sufficient Funds. The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1 Appropriate Actions.

(a) General. Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1 Closing. The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing. The date on which the Closing occurs is hereinafter referred to as the "**Closing Date.**" The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2 Closing Deliverables of the Seller. At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer: (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3 Closing Deliverables of the Buyer. At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to Section 6.2, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4 Indemnification by the Seller. Subject to the limitations set forth in this Article 6, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of,

arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5 Indemnification by the Buyer. Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a **"Seller Indemnified Party"** and, collectively, the **"Seller Indemnified Parties"**), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6 Indemnification Procedures.

(a) No Restraints. Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a **"Third-party Claim"**), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim. The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred. In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense. The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b) No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim. An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party

Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c) If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**"). Such Notice of Claim shall specify the basis for such Direct Claim. The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c). If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined. In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

**ARTICLE 7.**
**MISCELLANEOUS**

Section 7.1 Entire Agreement; Amendment. This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof. This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2 Waivers. The rights and remedies of the Parties to this Agreement are cumulative and not alternative. To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3 Notices. All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

Section 7.4 Successors and Assigns. This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns. Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties. This Agreement will be binding upon any permitted assignee of any Party. No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5 Public Disclosure. Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6 Expenses and Fees. Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7 Specific Performance. The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8 Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9 Governing Law. This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10 Severability. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11 Construction. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER:**

Marich Bein LLC

By: ______________________

Name: Hershy Deutsch
Title: Managing Partner

**SELLER:**

**The Litigation Practice Group P.C.**

By: ______________________

Name: Daniel S. March
Title: Managing Shareholder

By: ______________________

Name: Tony M. Diab, an individual

## EXHIBIT A

## DEFINITIONS

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a) **"Action"** shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b) **"Agreement"** shall have the meaning set forth in the preamble to this Agreement.

(c) **"Agreement Date"** shall have the meaning set forth in the preamble to this Agreement.

(d) **"Affiliate"** shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals. For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e) **"Bill of Sale and Assignment and Assumption Agreement"** shall have the meaning set forth in Section 6.2.

(f) **"Business"** shall mean the business of the Seller as conducted on the Agreement Date.

(g) **"Buyer"** shall have the meaning set forth in the preamble to this Agreement.

(h) **"Buyer Indemnified Parties"** shall have the meaning set forth in Section 6.4.

(i) **"Closing"** shall have the meaning set forth in Section 6.1.

(j) **"Closing Date"** shall have the meaning set forth in Section 6.1.

(k) **"Direct Claim"** shall have the meaning set forth in Section 6.6(c).

(l) **"Excluded Assets"** shall have the meaning set forth in Section 2.1.

(m) **"Excluded Liabilities"** shall have the meaning set forth in Section 2.2.

(n) **"Governmental Body"** shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

(o) **"Indebtedness"** means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p) **"Indemnified Party"** shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q) **"Indemnifying Party"** shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r) **"Knowledge"** shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s) **"Law"** shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t) **"Liabilities"** shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u) **"Lien"** shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v) **"Losses"** shall have the meaning set forth in Section 6.4.

(w) **"Notice of Claim"** shall have the meaning set forth in Section 6.6(c).

(x) **"Organizational Documents"** shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y) **"Party"** or **"Parties"** shall have the meaning set forth in the preamble to this Agreement.

(z) **"Permitted Liens"** shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa) **"Person"** shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

(bb) **"Purchase Price"** shall have the meaning set forth in Section 2.3.

(cc) **"Purchased Accounts"** shall have the meaning set forth in the Recitals.

(dd) **"Seller"** shall have the meaning set forth in the preamble to this Agreement.

(ee) **"Seller Indemnified Parties"** shall have the meaning set forth in Section 6.5.

(ff) **"Tax"** or **"Taxes"** shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg) **"Tax Returns"** means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh) **"Third Party"** or **"Third Parties"** shall mean any Person other than the Parties or their respective Affiliates.

(ii) **"Third-party Claim"** shall have the meaning set forth in Section 6.6(a).

(jj) **"Transaction Agreements"** shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk) **"Upfront Cash Payment"** shall have the meaning set forth in Section 2.3.

(ll) **"Wire Instructions"** shall have the meaning set forth in Section 2.3.

**EXHIBIT B**

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between **Buyer, and Seller**. Each of the Seller and the Buyer are sometimes referred to herein, individually, as a **"Party"** and, collectively, as the **"Parties."**

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the **"Purchase Agreement"**), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1. Defined Terms. Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2. Sale of Purchased Accounts; Assignment. The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3. Further Assurances. Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4. Terms of the Purchase Agreement. This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference. The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5. Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[*Remainder of page intentionally left blank.*]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

Marich Bein LLC

By: ______________________________
Name: [illegible]
Title: Managing Partner

**SELLER:**

**The Litigation Practice Group P.C.**

By: ______________________________
Name: Daniel S. March
Title: Managing Shareholder

By: ______________________________
Name: Tony M. Diab, an individual

*[Signature Page to Accounts Receivable Purchase Agreement]*

**Schedule 2.3**
**Wire Instructions**

**Account Holder Name: GoFi LLC**

**Address: 3345 Michelson Dr., Ste 400, Irvine, CA 92612**

**Routing Number: 026009593**

**Account Number:** [redacted]

# EXHIBIT 2.1

## ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of September 21, 2022 (the "**Agreement Date**"), by and between Marich Bein LLC (collectively the "**Buyer**"), and The Litigation Practice Group PC (the **"Seller" or "LPG"**, and together with the Buyer, the **"Parties"**), and The Litigation Practice Group PC ("LPG").

### RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which The Litigation Practice Group PC ("LPG") shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

### ARTICLE 1.
### DEFINITIONS

Section 1.1 Certain Definitions. Certain defined terms used in this Agreement are set forth on **Exhibit A**.

### ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1 Assignment of the Purchased Accounts to the Buyer. Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens. Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2 No Assumption of Liabilities. The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3 Payment of Purchase Price. Buyer shall pay $2,740,000.00 for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**"). The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4 Guarantee of LPG. If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement. The replacement file shall yield no less than the receivable of the failed file. In addition, if any any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file

package as a whole equals 80%. This guarantee shall continue until the completion of the 24th month following execution of this agreement.

**ARTICLE 3.**
**REPRESENTATIONS AND WARRANTIES OF THE SELLER**

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1 Organization; Good Standing. The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2 Power and Authority. The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby. This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3 Title to, and Sufficiency of, the Purchased Accounts. The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4 Consents. The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5 No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Section 3.6 Compliance with Laws. The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7 Legal Proceedings. There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements. No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8 Condition of Purchased Accounts. Each Purchased Account shall have received no less than one processed payment.

Section 3.9 Confidentiality. Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**"). Seller will at all times keep the Confidential Information in confidence and trust. Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer. Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions. Seller agrees that violation of this Section 3.9. The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1 Organization; Good Standing. The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2 Power and Authority. The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby. This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 4.3 No Conflicts. The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4 Sufficient Funds. The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1 Appropriate Actions.

(a) General. Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1 Closing. The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing. The date on which the Closing occurs is hereinafter referred to as the "**Closing Date.**" The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2 Closing Deliverables of the Seller. At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer: (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3 Closing Deliverables of the Buyer. At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to Section 6.2, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4 Indemnification by the Seller. Subject to the limitations set forth in this Article 6, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result

of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5 Indemnification by the Buyer. Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6 Indemnification Procedures.

(a) No Restraints. Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim. The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred. In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense. The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b) No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim. An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party

Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c) If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**"). Such Notice of Claim shall specify the basis for such Direct Claim. The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c). If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined. In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

## ARTICLE 7.
## MISCELLANEOUS

Section 7.1 Entire Agreement; Amendment. This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof. This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2 Waivers. The rights and remedies of the Parties to this Agreement are cumulative and not alternative. To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3 Notices. All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

Section 7.4 Successors and Assigns. This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns. Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties. This Agreement will be binding upon any permitted assignee of any Party. No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5 Public Disclosure. Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6 Expenses and Fees. Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7 Specific Performance. The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8 Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9 Governing Law. This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10 Severability. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11 Construction. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.**

**BUYER:**

Marich Bein LLC

By: ______________________
Name: Herbert Deutsch
Title: Managing Partner

**SELLER:**

**The Litigation Practice Group P.C.**

By: ______________________
Name: Daniel S. March
Title: Managing Shareholder

By: ______________________
Name: Tony M. Diab, an individual

**EXHIBIT A**

**DEFINITIONS**

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a) **"Action"** shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b) **"Agreement"** shall have the meaning set forth in the preamble to this Agreement.

(c) **"Agreement Date"** shall have the meaning set forth in the preamble to this Agreement.

(d) **"Affiliate"** shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals. For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e) **"Bill of Sale and Assignment and Assumption Agreement"** shall have the meaning set forth in Section 6.2.

(f) **"Business"** shall mean the business of the Seller as conducted on the Agreement Date.

(g) **"Buyer"** shall have the meaning set forth in the preamble to this Agreement.

(h) **"Buyer Indemnified Parties"** shall have the meaning set forth in Section 6.4.

(i) **"Closing"** shall have the meaning set forth in Section 6.1.

(j) **"Closing Date"** shall have the meaning set forth in Section 6.1.

(k) **"Direct Claim"** shall have the meaning set forth in Section 6.6(c).

(l) **"Excluded Assets"** shall have the meaning set forth in Section 2.1.

(m) **"Excluded Liabilities"** shall have the meaning set forth in Section 2.2.

(n) **"Governmental Body"** shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

(o) **"Indebtedness"** means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p) **"Indemnified Party"** shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q) **"Indemnifying Party"** shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r) **"Knowledge"** shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s) **"Law"** shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t) **"Liabilities"** shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u) **"Lien"** shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v) **"Losses"** shall have the meaning set forth in Section 6.4.

(w) **"Notice of Claim"** shall have the meaning set forth in Section 6.6(c).

(x) **"Organizational Documents"** shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y) **"Party"** or **"Parties"** shall have the meaning set forth in the preamble to this Agreement.

(z) **"Permitted Liens"** shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa) **"Person"** shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

(bb) **"Purchase Price"** shall have the meaning set forth in Section 2.3.

(cc) **"Purchased Accounts"** shall have the meaning set forth in the Recitals.

(dd) **"Seller"** shall have the meaning set forth in the preamble to this Agreement.

(ee) **"Seller Indemnified Parties"** shall have the meaning set forth in Section 6.5.

(ff) **"Tax"** or **"Taxes"** shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg) **"Tax Returns"** means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh) **"Third Party"** or **"Third Parties"** shall mean any Person other than the Parties or their respective Affiliates.

(ii) **"Third-party Claim"** shall have the meaning set forth in Section 6.6(a).

(jj) **"Transaction Agreements"** shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk) **"Upfront Cash Payment"** shall have the meaning set forth in Section 2.3.

(ll) **"Wire Instructions"** shall have the meaning set forth in Section 2.3.

**EXHIBIT B**

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**Agreement**"), is made by and between **Buyer**, and **Seller**. Each of the Seller and the Buyer are sometimes referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties.**"

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the "**Purchase Agreement**"), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1. Defined Terms. Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2. Sale of Purchased Accounts; Assignment. The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3. Further Assurances. Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4. Terms of the Purchase Agreement. This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference. The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5. Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[*Remainder of page intentionally left blank.*]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER:**

Maricit Bern LLc

By: ______________________
Name: [illegible]
Title: Managing Partner

**SELLER:**

**The Litigation Practice Group P.C.**

By: ______________________
Name: Daniel S. March
Title: Managing Shareholder

By: ______________________
Name: Tony M. Diab, an Individual

**Schedule 2.3**
**Wire Instructions**

**$700,563.85**

**Account Holder Name: GoFi LLC**

**Address: 3345 Michelson Dr., Ste 400, Irvine, CA 92612**

**Routing Number: 026009593**

**Account Number:** [redacted]

**$2,039,436.15**

**Account Holder Name: Vulcan Consulting Group LLC**

**Address: 20101 SW Cypress St, Newport Beach, CA 92660**

**Routing Number: 026009593**

**Account Number:** [redacted]

# EXHIBIT 2.2

## ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of October 6, 2022 (the "**Agreement Date**"), by and between Marich Bein LLC (collectively the "**Buyer**"), and The Litigation Practice Group PC (the "**Seller**" **or "LPG"**, and together with the Buyer, the "**Parties**"), and The Litigation Practice Group PC ("LPG").

### RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

### ARTICLE 1.
### DEFINITIONS

Section 1.1 Certain Definitions. Certain defined terms used in this Agreement are set forth on **Exhibit A**.

### ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1 Assignment of the Purchased Accounts to the Buyer. Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens. Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2 No Assumption of Liabilities. The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3 Payment of Purchase Price. Buyer shall pay $3,161,745.75 for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**"). The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4 Guarantee of LPG. If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement. The replacement file shall yield no less than the receivable of the failed file. In addition, if any any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file

DocuSign Envelope ID: AF8E46FE-01E4-4924-AC81-56BD61526E06

package as a whole equals 80%. This guarantee shall continue until the completion of the 24th month following execution of this agreement.

**ARTICLE 3.**
**REPRESENTATIONS AND WARRANTIES OF THE SELLER**

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1 Organization; Good Standing. The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2 Power and Authority. The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby. This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3 Title to, and Sufficiency of, the Purchased Accounts. The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4 Consents. The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5 No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Section 3.6 Compliance with Laws. The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7 Legal Proceedings. There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements. No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8 Condition of Purchased Accounts. Each Purchased Account shall have received no less than one processed payment.

Section 3.9 Confidentiality. Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**"). Seller will at all times keep the Confidential Information in confidence and trust. Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer. Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions. Seller agrees that violation of this Section 3.9. The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1 Organization; Good Standing. The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2 Power and Authority. The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby. This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

DocuSign Envelope ID: AF8E46FE-01E4-4924-AC81-56BD61526E06

Section 4.3 No Conflicts. The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4 Sufficient Funds. The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

**ARTICLE 5.**
**COVENANTS**

Section 5.1 Appropriate Actions.

(a) General. Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

**ARTICLE 6.**
**CLOSING**

Section 6.1 Closing. The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing. The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**." The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2 Closing Deliverables of the Seller. At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer: (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3 Closing Deliverables of the Buyer. At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to Section 6.2, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4 Indemnification by the Seller. Subject to the limitations set forth in this Article 6, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of,

arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5 Indemnification by the Buyer. Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6 Indemnification Procedures.

(a) No Restraints. Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim. The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred. In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense. The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b) No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim. An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party

Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c) If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**"). Such Notice of Claim shall specify the basis for such Direct Claim. The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c). If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined. In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

## ARTICLE 7.
## MISCELLANEOUS

Section 7.1 Entire Agreement; Amendment. This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof. This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2 Waivers. The rights and remedies of the Parties to this Agreement are cumulative and not alternative. To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3 Notices. All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

Section 7.4 Successors and Assigns. This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns. Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties. This Agreement will be binding upon any permitted assignee of any Party. No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5 Public Disclosure. Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6 Expenses and Fees. Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7 Specific Performance. The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8 Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9 Governing Law. This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10 Severability. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11 Construction. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

DocuSign Envelope ID: AF8E46FE-01E4-4924-AC81-56BD61526E06

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

Marich Bein LLC

By: [signature]
Name: HERSHAH OBUFEID
Title: Managing Partner

**SELLER:**

**The Litigation Practice Group P.C.**

By: DocuSigned by: Daniel S March 10/6/2022
9B494BB1993341E...
Name: Daniel S. March
Title: Managing Shareholder

**APPROVAL OF ASSIGNMENT AND GUARANTEE**

The assignment of the Purchased Accounts set forth in this Agreement as well as the guarantee included therein is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: DocuSigned by: Daniel S March 10/6/2022
9B494BB1993341E...
Name: Daniel S. March
Title: Managing Shareholder

By: DocuSigned by: Tony Diab 10/6/2022
A29AA849BA1B409...
Name: Tony M. Diab

*[Signature Page to Accounts Receivable Purchase Agreement]*

DocuSign Envelope ID: AF8E46FE-01E4-4924-AC81-56BD61526E06

## EXHIBIT A

## DEFINITIONS

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a) "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b) "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c) "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d) "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals. For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e) "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f) "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g) "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h) "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i) "**Closing**" shall have the meaning set forth in Section 6.1.

(j) "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k) "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l) "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m) "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n) "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

DocuSign Envelope ID: AF8E46FE-01E4-4924-AC81-56BD61526E06

(o) **"Indebtedness"** means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p) **"Indemnified Party"** shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q) **"Indemnifying Party"** shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r) **"Knowledge"** shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s) **"Law"** shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t) **"Liabilities"** shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u) **"Lien"** shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v) **"Losses"** shall have the meaning set forth in Section 6.4.

(w) **"Notice of Claim"** shall have the meaning set forth in Section 6.6(c).

(x) **"Organizational Documents"** shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y) **"Party"** or **"Parties"** shall have the meaning set forth in the preamble to this Agreement.

(z) **"Permitted Liens"** shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa) **"Person"** shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

DocuSign Envelope ID: AF8E46FE-01E4-4924-AC81-56BD61526E06

(bb) **"Purchase Price"** shall have the meaning set forth in Section 2.3.

(cc) **"Purchased Accounts"** shall have the meaning set forth in the Recitals.

(dd) **"Seller"** shall have the meaning set forth in the preamble to this Agreement.

(ee) **"Seller Indemnified Parties"** shall have the meaning set forth in Section 6.5.

(ff) **"Tax"** or **"Taxes"** shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg) **"Tax Returns"** means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh) **"Third Party"** or **"Third Parties"** shall mean any Person other than the Parties or their respective Affiliates.

(ii) **"Third-party Claim"** shall have the meaning set forth in Section 6.6(a).

(jj) **"Transaction Agreements"** shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk) **"Upfront Cash Payment"** shall have the meaning set forth in Section 2.3.

(ll) **"Wire Instructions"** shall have the meaning set forth in Section 2.3.

DocuSign Envelope ID: AF8E46FE-01E4-4924-AC81-56BD61526E06

**EXHIBIT B**

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between **Buyer**, and **Seller**. Each of the Seller and the Buyer are sometimes referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**."

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the "**Purchase Agreement**"), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1. Defined Terms. Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2. Sale of Purchased Accounts; Assignment. The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3. Further Assurances. Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4. Terms of the Purchase Agreement. This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference. The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5. Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[*Remainder of page intentionally left blank.*]

DocuSign Envelope ID: AF8E46FE-01E4-4924-AC81-56BD61526E06

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER:**

Marich Being LLC

By: [signature]
Name: HERSH DEVESH
Title: Managing Partner

**SELLER:**

**The Litigation Practice Group P.C.**

By: DocuSigned by: Daniel S March 10/6/2022
9B484BB1899541E...
Name: Daniel S. March
Title: Managing Shareholder

DocuSign Envelope ID: AF8E46FE-01E4-4924-AC81-56BD61526E06

**Schedule 2.3**
**Wire Instructions**

**$3,161,745.75**

**Account Holder Name:** The Litigation Practice Group PC

**Address:** 17542 E 17th Street, Ste 100, Tustin, CA 92780

**Routing Number:** 322271627

**Account Number:** [redacted]

# EXHIBIT 2.3

## ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of November 14, 2022 (the "**Agreement Date**"), by and between Marich Bein LLC (collectively the "**Buyer**"), and The Litigation Practice Group PC (the "**Seller**" **or** "**LPG**", and together with the Buyer, the "**Parties**"), and The Litigation Practice Group PC ("LPG").

### RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

### ARTICLE 1.
### DEFINITIONS

Section 1.1 Certain Definitions. Certain defined terms used in this Agreement are set forth on **Exhibit A**.

### ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1 Assignment of the Purchased Accounts to the Buyer. Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens. Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2 No Assumption of Liabilities. The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3 Payment of Purchase Price. Buyer shall pay $4,700,000.00 for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**"). The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4 Guarantee of LPG. If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement. The replacement file shall yield no less than the receivable of the failed file. In addition, if in any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file package as

a whole equals 80%. This guarantee shall continue until the completion of the 24th month following execution of this agreement.

**ARTICLE 3.**
**REPRESENTATIONS AND WARRANTIES OF THE SELLER**

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1 Organization; Good Standing. The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2 Power and Authority. The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby. This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3 Title to, and Sufficiency of, the Purchased Accounts. The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4 Consents. The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5 No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Section 3.6 Compliance with Laws. The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7 Legal Proceedings. There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements. No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8 Condition of Purchased Accounts. Each Purchased Account shall have received no less than one processed payment.

Section 3.9 Confidentiality. Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the **"Confidential Information"**). Seller will at all times keep the Confidential Information in confidence and trust. Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer. Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions. Seller agrees that violation of this Section 3.9. The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

**ARTICLE 4.**
**REPRESENTATIONS AND WARRANTIES OF THE BUYER**

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1 Organization; Good Standing. The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2 Power and Authority. The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby. This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 4.3 No Conflicts. The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4 Sufficient Funds. The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1 Appropriate Actions.

(a) General. Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1 Closing. The closing of the transactions contemplated by this Agreement (the **"Closing"**) will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing. The date on which the Closing occurs is hereinafter referred to as the **"Closing Date."** The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2 Closing Deliverables of the Seller. At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer: (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **Exhibit B** (the **"Bill of Sale and Assignment and Assumption Agreement"**), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3 Closing Deliverables of the Buyer. At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to Section 6.2, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4 Indemnification by the Seller. Subject to the limitations set forth in this Article 6, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a **"Buyer Indemnified Party"** and, collectively, the **"Buyer Indemnified Parties"**), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a **"Loss"** and, collectively, the **"Losses"**) paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of,

arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5 Indemnification by the Buyer. Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6 Indemnification Procedures.

(a) No Restraints. Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim. The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred. In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense. The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b) No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim. An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party

Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c) If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**"). Such Notice of Claim shall specify the basis for such Direct Claim. The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c). If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined. In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

**ARTICLE 7.**
**MISCELLANEOUS**

Section 7.1 Entire Agreement; Amendment. This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof. This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2 Waivers. The rights and remedies of the Parties to this Agreement are cumulative and not alternative. To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3 Notices. All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

Section 7.4 Successors and Assigns. This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns. Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties. This Agreement will be binding upon any permitted assignee of any Party. No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5 Public Disclosure. Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6 Expenses and Fees. Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7 Specific Performance. The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8 Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9 Governing Law. This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10 Severability. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11 Construction. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

Marich Bein LLC

By: ______________________
Name: Herbert Dennison
Title: Managing Partner

**SELLER:**

**The Litigation Practice Group P.C.**

By: ______________________
Name: Daniel S. March
Title: Managing Shareholder

**APPROVAL OF ASSIGNMENT AND GUARANTEE**

The assignment of the Purchased Accounts set forth in this Agreement as well as the guarantee included therein is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: ______________________
Name: Daniel S. March
Title: Managing Shareholder

By: ______________________
Name: Tony M. Diab, an individual

**Vulcan Consulting Group LLC**

By: ______________________
Name: Lisa Cohen
Title: Managing Member

**Gallant Law Group P.C.**

By: ______________________
Name: Robert Tobia
Title: Chief Executive Officer

[*Signature Page to Accounts Receivable Purchase Agreement*]

**EXHIBIT A**

**DEFINITIONS**

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a) **"Action"** shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b) **"Agreement"** shall have the meaning set forth in the preamble to this Agreement.

(c) **"Agreement Date"** shall have the meaning set forth in the preamble to this Agreement.

(d) **"Affiliate"** shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals. For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e) **"Bill of Sale and Assignment and Assumption Agreement"** shall have the meaning set forth in Section 6.2.

(f) **"Business"** shall mean the business of the Seller as conducted on the Agreement Date.

(g) **"Buyer"** shall have the meaning set forth in the preamble to this Agreement.

(h) **"Buyer Indemnified Parties"** shall have the meaning set forth in Section 6.4.

(i) **"Closing"** shall have the meaning set forth in Section 6.1.

(j) **"Closing Date"** shall have the meaning set forth in Section 6.1.

(k) **"Direct Claim"** shall have the meaning set forth in Section 6.6(c).

(l) **"Excluded Assets"** shall have the meaning set forth in Section 2.1.

(m) **"Excluded Liabilities"** shall have the meaning set forth in Section 2.2.

(n) **"Governmental Body"** shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

(o) **"Indebtedness"** means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p) **"Indemnified Party"** shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q) **"Indemnifying Party"** shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r) **"Knowledge"** shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s) **"Law"** shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t) **"Liabilities"** shall mean any direct or indirect liability, indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u) **"Lien"** shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v) **"Losses"** shall have the meaning set forth in Section 6.4.

(w) **"Notice of Claim"** shall have the meaning set forth in Section 6.6(c).

(x) **"Organizational Documents"** shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y) **"Party"** or **"Parties"** shall have the meaning set forth in the preamble to this Agreement.

(z) **"Permitted Liens"** shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa) **"Person"** shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

(bb) **"Purchase Price"** shall have the meaning set forth in Section 2.3.

(cc) **"Purchased Accounts"** shall have the meaning set forth in the Recitals.

(dd) **"Seller"** shall have the meaning set forth in the preamble to this Agreement.

(ee) **"Seller Indemnified Parties"** shall have the meaning set forth in Section 6.5.

(ff) **"Tax"** or **"Taxes"** shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg) **"Tax Returns"** means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh) **"Third Party"** or **"Third Parties"** shall mean any Person other than the Parties or their respective Affiliates.

(ii) **"Third-party Claim"** shall have the meaning set forth in Section 6.6(a).

(jj) **"Transaction Agreements"** shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk) **"Upfront Cash Payment"** shall have the meaning set forth in Section 2.3.

(ll) **"Wire Instructions"** shall have the meaning set forth in Section 2.3.

**EXHIBIT B**

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**Agreement**"), is made by and between **Buyer**, and **Seller**. Each of the Seller and the Buyer are sometimes referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties.**"

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the "**Purchase Agreement**"), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1. Defined Terms. Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2. Sale of Purchased Accounts; Assignment. The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3. Further Assurances. Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4. Terms of the Purchase Agreement. This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference. The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5. Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[*Remainder of page intentionally left blank.*]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER:**

Marich Bein LLC

By: ______________________
Name: Hershey Olwesci
Title: Managing Partner

**SELLER:**

**The Litigation Practice Group P.C.**

By: ______________________
Name: Daniel S. March
Title: Managing Shareholder

By: ______________________
Name: Tony M. Diab, an individual

**Vulcan Consulting Group LLC**

By: ______________________
Name: Lisa Cohen
Title: Managing Member

**Gallant Law Group P.C.**

By: ______________________
Name: Robert Tobia
Title: Chief Executive Officer

**Schedule 2.3**
**Wire Instructions**

**$2,400,000.00**

**Account Holder Name:** The Litigation Practice Group PC

**Address:** 17542 E 17th Street, Ste 100, Tustin, CA 92780

**Routing Number:** 322271627

**Account Number:** [redacted]

**$2,300,000.00**

**Account Holder Name: Vulcan Consulting Group LLC**

**Address: 20101 SW Cypress St., Newport Beach, CA 92660**

**Routing Number: 026009593**

**Account Number:** [redacted]

# Exhibit 3

Christopher B. Ghio (State Bar No. 259094)
Christopher Celentino (State Bar No. 131688)
Jeremy B. Freedman (State Bar No. 308752)
**DINSMORE & SHOHL LLP**
655 West Broadway, Suite 800
San Diego, CA 92101
Telephone: 619.400.0500
Facsimile: 619.400.0501
christopher.ghio@dinsmore.com
christopher.celentino@dinsmore.com
Jeremy.freedman@dinsmore.com

Proposed Special Counsel to Richard A. Marshack,
Chapter 11 Trustee for the Bankruptcy Estate of
The Litigation Practice Group P.C.

FILED & ENTERED

JUN 23 2023

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY bolte DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**

In re:

THE LITIGATION PRACTICE GROUP P.C.,

Debtor.

RICHARD A. MARSHACK,
Chapter 11 Trustee,

Plaintiff,

v.

TONY DIAB, an individual; DANIEL S. MARCH, an individual; ROSA BIANCA LOLI, an individual; LISA COHEN, an individual; WILLIAM TAYLOR CARSS, an individual; ENG TAING, an individual; HENG TAING, an individual; MARIA EEYA TAN, an individual; JAKE AKERS, an individual; HAN TRINH, an individual; JAYDE TRINH, an individual; WES THOMAS, an individual; SCOTT JAMES EADIE, an individual; JIMMY CHHOR, an individual; DONGLIANG JIANG, an individual; MAX CHOU, an individual; OAKSTONE LAW GROUP PC; GREYSON LAW CENTER PC; PHOENIX LAW, PC; MAVERICK MANAGEMENT GROUP, LLC; LGS HOLDCO, LLC; CONSUMER LEGAL GROUP, P.C.; VULCAN CONSULTING GROUP LLC; BAT INC. d/b/a COAST PROCESSING; PRIME

Case No. 8:23-bk-10571-SC

Adv. Proc. No. 8:23-ap-01046-SC

Chapter 11

**ORDER ON TRUSTEE, RICHARD MARSHACK'S OMNIBUS MOTION GRANTING :**
**1) TURNOVER OF ESTATE PROPERTY AND RECORDED INFORMATION PURSUANT TO 11 U.S.C. § 542;**
**2) PRELIMINARY INJUNCTION;**
**3) LOCK-OUT;**
**4) RE-DIRECTION OF UNITED STATES PARCEL SERVICES MAIL;**
**5) ORDER TO SHOW CAUSE RE COMPLIANCE WITH COURT ORDER; AND**
**6) OTHER RELIEF AS NECESSARY TO EFFICIENT ADMINISTRATION OF THIS MATTER**

Date: June 12, 2023
Time: **1:30 P.M.**
Judge: Hon. Scott C. Clarkson
Place: Courtroom 5C
411 W. Fourth Street
Santa Ana, CA 92701

LOGIX, LLC; TERACEL BLOCKCHAIN FUND II LLC; EPPS; EQUIPAY; AUTHORIZE.NET; WORLD GLOBAL; OPTIMUMBANK HOLDINGS, INC. d/b/a OPTIMUM BANK; MARICH BEIN, LLC; BANKUNITED, N.A.; REVOLV3, INC.; FIDELITY NATIONAL INFORMATION SERVICES, INC. d/b/a FIS; WORLDPAY, LLC; WORLDPAY GROUP; MERIT FUND, LLC; GUARDIAN PROCESSING, LLC; PAYLIANCE, LLC; TOUZI CAPITAL, LLC; SEAMLESS CHEX INC; DWOLLA, INC.; STRIPE, INC.; and DOES 1 through 100, inclusive,

Defendants.

In his capacity as the duly appointed and acting Chapter 11 Trustee, Richard Marshack ("Trustee") filed an Omnibus Emergency Motion for Turnover of Estate Property and Recorded Information Pursuant to 11 U.S.C. § 542; Preliminary Injunction; Lock-Out; Re-Direction of United States Postal Service Mail; Setting an Order To Show Cause re Compliance with the Court's Order as to Tony Diab, Rosa Loli aka Rosa Bianca Loli aka Bianca Loli ("Rosa Loli"), Lisa Cohen, Daniel March and William Taylor "Ty" Carss; and Other As Necessary to the Efficient Administration of this Matter under seal on May 25, 2023, which matter was heard on May 25, 2023, pursuant to Local Bankruptcy Rule 9075-1. The Court, having considered the pleadings on file and the discussion of the parties at the hearing, and having placed its findings of fact and conclusions of law in support of this order orally on the record at the hearing, and finding that exigent circumstances exist and good cause appearing therefor, hereby **ORDERS AS FOLLOWS**:

**TURNOVER ORDER OF ESTATE PROPERTY AND RECORDED INFORMATION:**

**A. RECORDED INFORMATION**

Within twenty-four (24) hours from the date of this Order or notice thereof, whichever is later, the following information regarding any and all persons who signed a Legal Services Contract with LPG or whose file was purchased or otherwise transferred to LPG; Oakstone Law Group, PC ("Oakstone"); Greyson Law, P.C. ("Greyson"); Gallant Law Group, PC ("Gallant") and its affiliate Center Pointe; Phoenix Law, PC (Phoenix"); LGS Holdco., LLC; Consumer Legal Group, PC ("CLG"); Maverick Management, LLC ("Maverick"); Vulcan Consulting Group, LLC ("Vulcan"); BAT Inc. d/b/a Coast Processing ("Coast Processing"); Strategic Consulting Solutions, LLC ("SCS"); Prime Logix, LLC ("Prime Logix"); Touzi Capital, LLC ("Touzi"); Tony Diab; Rosa Loli aka Rosa Bianca Loli aka Bianca Loli ("Rosa Loli"); Lisa Cohen; Eng Taing; Heng Taing; Maria Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie, Jimmy Chhor; Dongliang Jiang; Max Chou; and/or any other alias', agents or corporate entities affiliated with same, for which the client's file remains open and/or continues to make payments under an agreed upon installment contract, except those clients who signed a Legal Services Contract post-petition (hereinafter "Client") shall be turned over to the Trustee by Debtor:

///

1. All Client files, including but not limited to names, contact information, client file management, communications, account information, letters, pleadings, communications, payment history, financial account information, credit reports, executed legal services contracts, automated clearing house ("ACH") contracts, executed installment contracts, account balances, debts in dispute, payment history, file status, settlements, debt invalidations and/or any other information created, managed and stored electronically utilizing DebtPayPro, a Forth, Inc. ("DPP") software program's software license, key or account, that was opened and is maintained and controlled by LPG; Oakstone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG; Maverick; Vulcan; Coast Processing; SCS; Prime Logix; Touzi; Tony Diab; Rosa Loli; Lisa Cohen; Eng Taing; Heng Taing; Maria Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie, Jimmy Chhor; Dongliang Jiang; Max Chou; and/or any other alias', agents or corporate entities affiliated with same (the "DPP Data");

2. All administrative usernames and passwords that give the Trustee access to any DPP account held, maintained or controlled by LPG; Oakstone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG; Maverick; Vulcan; SCS; Coast Processing; Prime Logix; Touzi; Tony Diab; Rosa Loli; Lisa Cohen; Eng Taing; Heng Taing; Maria Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie, Jimmy Chhor; Dongliang Jiang; Max Chou; and/or any other alias', agents or corporate entities affiliated with same;

3. All Client files, including but not limited to names, contact information, client file management, communications, account information, letters, pleadings, communications, payment history, financial account information, credit reports, executed legal services contracts, ACH contracts, executed installment contracts, account balances, debts in dispute, payment history, file status, settlements, debt invalidations and/or any other information created, managed and stored electronically utilizing proprietary software program "LUNA" hosted on Amazon Web Services ("AWS") and located at the current domain "lunapp.com" that is maintained and controlled by LPG; Oakstone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG; Maverick; Vulcan; SCS; Coast Processing; Prime Logix; Touzi; Tony Diab; Rosa Loli; Lisa Cohen; Eng Taing; Heng Taing; Maria Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie, Jimmy Chhor; Dongliang

Jiang; Max Chou and/or any other alias', agents or corporate entities affiliated with same (the "Luna Data");

4. All administrative usernames and passwords that give the Trustee access to any AWS account where Luna, its software program, databases and client information is held, stored and hosted that is maintained or controlled by LPG; Oakstone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG; Maverick; SCS; Vulcan; Coast Processing; Prime Logix; Touzi; Tony Diab; Rosa Loli; Lisa Cohen; Eng Taing; Heng Taing; Maria Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie, Jimmy Chhor; Dongliang Jiang; Max Chou and/or any other alias', agents or corporate entities affiliated with same;

5. All ACH files related to Client information, details, accounts, history of electronic fund transfers ("EFT"), payments, amounts held, interest on held amounts, penalty fees, nonsufficient fund fees or other ACH related charges to the Clients stored electronically or in hard copy associated with ACH processing service providers and/or affiliated financial institutions, including but not limited to EPPS; EquiPay, LLC ("EquiPay"); Merit Fund, LLC ("Merit Fund"); Authorize.net a subsidiary of Visa, Inc. ("Authorize.net"); World Global; OptimumBank Holdings, Inc. dba Optimum Bank ("Optimum Bank"); BankUnited, Inc. ("BankUnited"); Marich Bein, LLC ("Marich Bein"); Revolv3, Inc. ("Revolv3"); Fidelity National Information Services, Inc. dba FIS , including but not limited to its subsidiaries Worldpay, LLC , Worldpay Group or any other subsidiaries providing ACH processing services ("FIS"); Guardian Processing, LLC ("Guardian"); Payliance, LLC ("Payliance"); Seamless Chex, Inc. ("Seamless"); Dwolla, Inc. ("Dwolla") Stripe, Inc. ("Stripe"); and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875" or any such substantially similar ACH identification transaction (hereinafter the "ACH Data");

6. All files, information, reports, spreadsheets, account numbers, routing numbers, and databases related to transfer of funds out of any account opened, maintained and controlled by LPG; Oakstone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG; Maverick; SCS; Vulcan; Coast Processing; Prime Logix; Touzi; Tony Diab; Rosa Loli; Lisa Cohen; Eng Taing; Heng Taing; Maria Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie, Jimmy Chhor; Dongliang

Jiang; Max Chou; and/or any other alias', agents or corporate entities affiliated with same that were processed and executed by ACH processing service providers and/or their affiliated financial institutions, including but not limited to EPPS; EquiPay; Merit Fund; Authorize.net; World Global; Optimum Bank; BankUnited; Marich Bein; Revolv3; FIS; Guardian; Payliance; Seamless; Dwolla; Stripe; and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875" or any such substantially similar ACH identification transaction (hereinafter the "ACH Transfer Data");

7. All administrative usernames and passwords that give the Trustee access to any ACH processing accounts, software, database or other program at ACH processing service providers and/or affiliated financial institutions, including but not limited to EPPS; EquiPay; Merit Fund; Authorize.net; World Global; Optimum Bank; BankUnited; Marich Bein; Revolv3; FIS; Guardian; Payliance; Seamless; Dwolla; Stripe; and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875" or any such substantially similar ACH identification transaction used to upload or input Client information, initiate Client ACH EFTs, transfer Client ACH funds to outside financial institutions or otherwise manage any account opened, maintained and controlled by LPG; Oakstone; Greyson; Phoenix; LGS Holdco., LLC; CLG; SCS; Vulcan; Coast Processing; Prime Logix; Touzi; Tony Diab; Rosa Loli; Lisa Cohen; Eng Taing; Heng Taing; Maria Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie, Jimmy Chhor; Dongliang Jiang; Max Chou; and/or any other alias', agents or corporate entities affiliated with same;

8. All accounting records, files, data and information for LPG; Oakstone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG; SCS; Vulcan; Coast Processing; and Prime Logix stored on NetSuite, Quickbooks and Microsoft SharePoint, G-Suite or other permanent or cloud based systems (hereinafter the "Accounting Data");

9. All contracts, records, reports, information, data and details regarding the transfer or sale of any Client files or future Client ACH payments to any other law firm, organization, corporate entity, person(s), or investment group (otherwise known as factoring companies) by LPG; Oakstone; Greyson; Phoenix; LGS Holdco., LLC; and/or CLG (hereinafter the "Client Transfer-Out Data");

10. All contracts, records, reports, information, data, cost basis, payment information and details regarding the transfer or receipt of any Client files or future Client ACH payments from any other law firm, organization, corporate entity, person(s), investment or marketing group (otherwise known as capping companies) to LPG; Oakstone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; Maverick; and/or CLG (hereinafter the "Client Transfer-In Data");

11. All information, data, tables, spreadsheets and reports regarding Client information stored on Formgrid, Inc. dba Airtable's ("Airtable") cloud based data management system used by LPG; Oakstone; Greyson; Phoenix; LGS Holdco., LLC; and/or CLG to manage the aforementioned information (hereinafter the "Airtable Data"); and

12. All administrative usernames and passwords that give the Trustee access to any Airtable account opened, maintained or controlled by LPG; Oakstone; Greyson, Phoenix; LGS Holdco., LLC; Maverick; and/or CLG; and

13. All email accounts related to LPG; Oakstone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; and/or CLG stored maintained and/or hosted on Office 365, g-suite or any other email server, whether physical or cloud based servers (hereinafter "Email Data").

14. Nothing herein is intended to require Greyson or its owner, Scott Eadie, or Greyson employees Jayde Trinh or Han Trinh to turn over: (a) any files for Clients which Greyson did not obtain from or through access to data or personnel, including affiliated attorneys, from LPG, Phoenix, Oakstone, LGS Holdco, LLC, CLG, or Gallant; (b) any accounting records, files, data and information for Clients which Greyson did not obtain from or through any access to data or personnel, including affiliated attorneys, from LPG, Phoenix, Oakstone, LGS Holdco, LLC, CLG, or Gallant; (c) contracts, records, reports, information, data and details regarding the transfer or sale of any Client files or future Client ACH payments to any other law firm, organization, corporate entity, person(s), or investment group for Clients which Greyson did not obtain from or through any access to data or personnel, including affiliated attorneys, from LPG, Phoenix, Oakstone, LGS Holdco, LLC, CLG, or Gallant. Further, nothing herein is intended to prevent Greyson from storing, maintaining, and/or hosting email accounts and domains on Office 365, g-suite or any other email server, whether physical or cloud based, that is unrelated to LPG, Phoenix, Oakstone, LGS Holdco, LLC, CLG, or

Gallant, and provided that such email accounts and domains were not funded through, acquired or developed by funds the genesis of which was the legacy files of LPG, including but not limited to any funds delivered after January 1, 2019, from, through or affiliated with Maverick, Vulcan. Coast Processing; SCS, Prime Logix, Oakstone, Gallant, Touzi, and/or any of the ACH payment processors or financial institutions named in this Order.

**B. ESTATE FUNDS**

Within five (5) calendar days from the date of this order or notice thereof, whichever is later, the following shall be turned over to the Trustee:

1. All post-petition Client ACH payments processed on or after March 20, 2023, and received by LPG; Oakstone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG; Maverick; SCS; Vulcan; Coast Processing; Prime Logix; Touzi; Tony Diab; Rosa Loli; Lisa Cohen; Eng Taing; Heng Taing; Maria Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie, Jimmy Chhor; Dongliang Jiang; Max Chou; and/or any other alias', agents or corporate entities affiliated with same related to LPG Clients who entered into a Legal Services Agreement pre-petition and who have received the services provided in the contract;

2. The $6,308,702.72 million dollars in post-petition ACH EFTs processed through LPG's Revolv3, Inc. merchant account from March 2023 to the present, including any amounts that have been transferred, wired or otherwise withdrawn from LPG's Revolv3, Inc. merchant account to Oakstone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG; Maverick; SCS; Vulcan; Coast Processing; Prime Logix; Touzi; Tony Diab; Rosa Loli; Lisa Cohen; Eng Taing; Heng Taing; Maria Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie, Jimmy Chhor; Dongliang Jiang; Max Chou; and/or any other alias', agents or corporate entities affiliated with same;

3. Nothing herein is intended to require Greyson to turnover any post-petition Client ACH payments related to the approximate 48 LPG clients who are contemplated to be serviced by Greyson and for whom Greyson provides the Chapter 11 Trustee with signed retention agreement to the extent such funds were processed or received after the date of the signed retention agreement with Greyson.

///

///

**PRELIMINARY INJUNCTION**

From the date of this **ORDER** and until further Ordered by this Court:

**1. Control Over ACH Transfers:** All covered entities and individuals (defined below) are hereby enjoined and shall not interfere with any ACH electronic funds transfer being executed pursuant to documents authorizing such transfers to be executed in favor of LPG as follows:

a) Covered Entities and Individuals: The following entities and individuals, and anyone acting on their behalf: LPG; Oakstone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG; Maverick; Vulcan; Coast Processing; Prime Logix; SCS; Touzi; Tony Diab; Rosa Loli; Lisa Cohen; Eng Taing; Heng Taing; Maria Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie, Jimmy Chhor; Dongliang Jiang; Max Chou; and/or any other alias', agents or corporate entities affiliated with same shall, absent further order from this Court, are Preliminary Enjoined as follows:

i) Enjoined Conduct re ACH Instructions: No covered entity or individual shall initiate, cause to be initiated, or instruct any company or person that processes ACH transfers and/or their affiliated financial institutions, including EPPS; EquiPay; Merit Fund; Authorize.net; World Global; Optimum Bank; BankUnited; Marich Bein; Revolv3; FIS; Guardian; Payliance; Seamless; Dwolla; Stripe; and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875" or any such substantially similar ACH identification transaction, to execute any ACH EFT on any file, financial institution, or current or former client of LPG, to or for the benefit of LPG, including but not limited to Oakstone; Greyson; Phoenix; CLG; Prime Logix; SCS; Maverick; and/or Vulcan, without the express authorization of Trustee;

ii) Enjoined Conduct re Bank Accounts: No covered entity or individual shall open, or cause to be opened, any account, whether business or personal, that can receive or send money or anything of value, at any company including banking, financial, or similar institutions and/or receive, directly or indirectly, any funds drawn from ACH electronic fund transfers;

**2. Enjoined Execution of ACH Transfer**: All covered entities and individuals (defined below) are hereby enjoined and prohibited from interfering with any ACH electronic funds transfer

///

being executed pursuant to documents authorizing such transfers to be executed in favor of LPG as follows:

a) Covered Entities and Individuals: All companies capable of processing ACH electronic funds transfers, including EPPS; EquiPay; Merit Fund; Authorize.net; World Global; Optimum Bank; BankUnited; Marich Bein; Revolv3; FIS; Guardian; Payliance, Seamless; Dwolla; Stripe; and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875" or any such substantially similar ACH identification transaction are enjoined absent further order of this court, from:

i) Enjoined Conduct re ACH Transfers: No covered entity or individual shall transfer, wire, divert or otherwise permit the withdraw any funds received from any ACH electronic funds transfer on any client file, financial institution, or current or former client of LPG, to or for the benefit of LPG or any or more of its alleged assignees or transferees, including but not limited to Oakstone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG and/or Maverick to any financial account maintained, owned or controlled by Vulcan; Coast Processing; Prime Logix; SCS; Touzi; Tony Diab; Rosa Loli; Lisa Cohen; Eng Taing; Heng Taing; Maria Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie, Jimmy Chhor; Dongliang Jiang; Max Chou; and/or any other alias', agents or corporate entities affiliated with same. All ACH funds held by any covered entity or individual shall be held in trust until such time as written authorization and instruction is provided by Trustee;

ii) Preliminary Injunction Mandating Turnover to Trustee: all covered entities and individuals shall hold in trust any and all funds, receipts, and transfers related to any account, file, or current or former client of LPG; Oakstone; Greyson; Phoenix; LGS Holdco., LLC; CLG; Maverick; Vulcan; Coast Processing; Prime Logix; SCS; Touzi; Tony Diab; Rosa Loli; Lisa Cohen; Eng Taing; Heng Taing; Maria Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie, Jimmy Chhor; Dongliang Jiang; Max Chou and/or other alias', agents or corporate entities affiliated with same until expressly directed to release, wire or transfer such funds by the Trustee and to a bank account whose information shall be provided with any such request; and, shall upon request by the

///

Trustee provide an accounting of any and all such funds held in trust to the Trustee upon written request within 10 days of said request;

3. LPG; Oakstone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG; SCS; Vulcan; Coast Processing; Prime Logix; SCS; Touzi; Tony Diab; Rosa Loli; Lisa Cohen; Eng Taing; Heng Taing; Maria Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie, Jimmy Chhor; Dongliang Jiang; Max Chou and/or any other alias', agents or corporate entities affiliated with same are hereby enjoined and shall not incur, take out or pledge any receivables of LPG; Oakstone; Greyson; Gallant; Phoenix; Prime Logix; SCS; Touzi; Maverick; and/or CLG without seeking leave of court;

4. Any and all funds held at Bank of America on behalf of Prime Logix and/or Vulcan, including but not limited to account Nos. ending in xxx951 and xxx9021 and/or any other financial accounts having received funds originating from LPG; Oakstone; Greyson; Gallant; Phoenix; LGS HoldCo., LLC; CLG; and/or Maverick shall be held in trust and shall not be with withdrawn, wired, drawn against, moved, or otherwise transferred without the express consent of the Trustee in writing and to a financial account identified by the Trustee at the time the authorization is provided.

5. Nothing herein is intended to prevent Greyson or its owner, Scott Eadie, or Greyson employees Jayde Trinh or Han Trinh from initiating, causing to be initiated, or instructing any company or person that process ACH transfers to execute any ACH EFT on any file or financial institution related to any Clients which Greyson did not obtain from or through access to data or personnel, including affiliated attorneys, from LPG, Phoenix, Oakstone, LGS Holdco, LLC, CLG, or Gallant, or related to the approximate 48 LPG clients who are contemplated to be serviced by Greyson, or whom Greyson provides the Chapter 11 Trustee with signed retention agreement, and as to which such processing occurs from and after the date of the signed retention agreement.

**LOCKOUT ORDER**

From the date of this **ORDER** until further order of this Court:

1. All persons identified below are enjoined and shall not access or attempt to gain access whether physically, remotely, electronically, or virtually to the following locations associated with LPG; Oakstone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG; Maverick; Vulcan; Coast

Processing; Prime Logix; SCS; Touzi; Tony Diab; Rosa Loli; Lisa Cohen; Eng Taing; Heng Taing; Maria Eeya Tan; Jake Akers; Jayde Trinh; Wes Thomas; Scott James; Eadie, Jimmy Chhor; Dongliang Jiang; Max Chou; and/or any other alias', agents or corporate entities affiliated with same: a) 3347 Michelson Drive, Suites 400, 410 & 420, Irvine, California 92612; b) 17542 17th St Suite 100, Tustin, California 92780; b) Luna's domain located on AWS; c) DPP Data or accounts; d) Accounting Data and/or accounts on NetSuite, Quickbooks and Microsoft SharePoint, G-Suite or other permanent or cloud based systems; e) ACH processing accounts, whether individual, merchant or business, held at any ACH processing or affiliated financial institution, including but not limited to EPPS; EquiPay; Merit Fund; Authorize.net; World Global; Optimum Bank; BankUnited; Marich Bein; Revolv3; FIS; Guardian; Payliance; Seamless; Dwolla; Stripe; and/or any entity associated with the ACH identification transaction "LPG 949-226-6262 #5 2363 RT 9 TOMS RIVER NJ 0875" or any such substantially similar ACH identification transaction; f) Vulcan and/or PrimeLogix' financial accounts at Bank of America, including but not limited to Account Nos. ending in xxx951 and xxx9021; and g) the Email Data, as follows:

i) Tony Diab;

ii) Rosa Loli aka Rosa Bianca Loli aka Bianca Loli;

iii) Lisa Cohen;

iv) Daniel March;

v) Eng Taing;

vi) Maria Eeya Tan (except as may be authorized by the Trustee in the exercise of his business judgment)

vii) Jake Akers;

viii) Han Trinh;

ix) Jayde Trinh;

x) Wes Thomas;

xi) William Taylor "Ty" Carss (except at may be authorized by the Trustee in the exercise of his business judgment);

x) Scott James Eadie;

xi) Jimmy Chhor;

xii) Brad Lee;

xiii) Dongliang Jiang;

xiv) Heng Taing; and

xiiv) Max Chou.

Nothing herein is intended to prevent Greyson or its owner or employees from accessing or attempting to gain access whether physically, remotely, electronically, or virtually to 3347 Michelson Drive, Suites 400B, Irvine, California 92612 (but, for the sake of clarity, nothing herein confers any legal right to possession of access to such suite, which possession or access is governed by applicable law) or from accessing or attempting to gain access whether physically, remotely, electronically, or virtually to ACH processing accounts with Revolv3 so long as Greyson or its owner or employees do not access or attempt to access any ACH processing account at Revolv3 or otherwise held by LPG; Prime Logix; Guardian; Oakstone; Phoenix; and/or any other account previously used to processes LPG client ACH transfers that is not in Greyson's own name and established by or through funds the source of which is unrelated to legacy LPG clients and established in Greyson's own name after the date of this Order.

**ORDER TO RE-DIRECT MAIL**

From the date of this **ORDER** until further order of this Court:

1. Trustee is hereby authorized to instruct the United States Postal Service to re-direct any and all mail processed by the United States Postal Service Directed to: a) LPG, 17542 17th St Suite 100, Tustin, California 92780; b) Oakstone, 888 Prospect Street, Suite 200 La Jolla, California 92037; c) Phoenix, 3347 Michelson Drive, Suites 400, 410 & 420, Irvine, California 92612; d) Prime Logix, 3347 Michelson Drive, Suites 400, 410 & 420, Irvine, California 92612; e) CLG, PO Box 412 Elmsford, NY 10523; f) Greyson, 3347 Michelson Drive, Suites 400, 410 & 420, Irvine, California 92612; and/or any other address associated with such entities, shall be forwarded and re-directed to an address provided by the Trustee until such time as ordered by the Court. To the extent that the Trustee receives any mail addressed to Greyson, the Trustee shall .pdf a copy of the correspondence to Greyson's counsel, Doug Plazak of Reid & Hellyer at dplazak@rhlaw.com, within 24 hours of

said receipt, unless receipt falls on a Friday or a day preceding any Federal or State holiday and/or emergency requiring Trustee's office to close, in which case any mail received by Trustee and addressed to Greyson shall be forwarded to Greyson's counsel the next business day.

**NOTICE TO LPG CLIENTS**

Trustee is hereby authorized to provide notice to any and all LPG clients, including those transferred and/or assigned to Oakstone; Greyson; Gallant; Phoenix; LGS Holdco., LLC; CLG; and/or Maverick regarding: i) LPG's Bankruptcy filing; ii) pending evaluation of their file; and iii) status prior to assuming or rejecting their contract in substantially the same form of notice attached to this Order as Exhibit 1.

# # #

Date: June 23, 2023

Exhibit 1

[Client Name]
[Date]
[Address Line 1]
[Address Line 2]
[Address Line 3]
Tel:
Email:

**RE: STATUS REGARDING YOUR MATTER WITH THE LITIGATION PRACTICE GROUP**

Dear [Name],

Please be advised that on May 20, 2023, The Litigation Practice Group ("LPG") filed for protection under Chapter 11 of the Bankruptcy Code. On May 8, 2023, the United States Bankruptcy Court—Central District of California, Case No. 8:23-bk-10571, appointed Richard Marshack, Esq. as the duly appointed Chapter 11 Trustee to oversee the administration of LPG's Bankruptcy matter. See Docket No. 65.

Subsequently, the United States Bankruptcy Court authorized Trustee to obtain information in order to review and evaluate the status of your file at LPG and/or any other debt relief law firm your file may have been transferred or assigned to at or around the time LPG filed for Bankruptcy, including but not limited to Oakstone Law Group, P.C.; Greyson Law Center, P.C.; Gallant Law Group, PC; Phoenix Law, P.C.; LGS Holdco., LLC; Consumer Legal Group, P.C. and/or Maverick Management Group, LLC.

Over the coming weeks, Trustee Richard Marshack will provide status of your file and continuation of legal services pursuant to the Legal Services Agreement with LPG.

We greatly appreciate your patience and cooperation while we work on your behalf.

Sincerely,

[Signatory name]

# Exhibit 4

8

UNITED STATES BANKRUPTCY COURT CENTRAL DISTRICT OF CALIFORNIA

**Fill in the information to identify the case (Select only one Debtor per form):**

☒ The Litigation Practice Group P.C. (Case No. 23-10571)

FILED

FEB 22 2024

By Omni Agent Solutions, Claims Agent
For U.S. Bankruptcy Court
Central District of California

Official Form 410

# Proof of Claim

04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

Carefully read instructions included with this Proof of Claim before completing. In order to have your claim considered for payment and/or voting purposes, complete ALL applicable questions.

## Part 1: Identify the Claim

**1. Who is the current creditor?**

Marich Bein LLC
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☒ No
☐ Yes From whom?

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Name: David Kupetz | Name: Hershy Deutsch |
| Number Street: 300 S. Grand Ave., Suite 2600 | Number Street: 99 Wall Street, Number 2613 |
| City State ZIP Code: Los Angeles, CA 90071 | City State ZIP Code: New York, NY 10005 |
| Contact Phone: 213-687-6774 | Contact Phone: |
| Contact email: david.kupetz@lockelord.com | Contact email: |

Uniform claim identifier for electronic payments in chapter 13 (if you use one)

**4. Does this claim amend one already filed?**

☒ No
☐ Yes Claim Number on court claims registry (if known) Filed On MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☒ No
☐ Yes Who made the earlier filing?

102106-1 SCK



EXHIBIT 4
Page 159

## Part 2: Give Information About the Claim as of the Date the Case Was Filed

**6. Do you have any number you use to identify the debtor?**

- [x] No
- [ ] Yes Last 4 digits of the debtor's account or any number you use to identify the debtor: ______

**7. How much is the claim?**

$ 22,304,093.25

**Does this amount include interest or other charges?**

- [ ] No
- [x] Yes Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information

Contracts with debtor (Assignment of Servicing Rights agreement and 4 Accounts Receivable Purchase Agreements)

**9. Is all or part of the claim secured?**

- [x] No
- [ ] Yes The claim is secured by a lien on property

**Nature of property:**

- [ ] Real Estate If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*
- [ ] Motor Vehicle
- [ ] Other Describe: ______

**Basis for perfection:** ______

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.

**Value of Property:** $ ______

**Amount of the claim that is secured:** $ ______

**Amount of the claim that is unsecured:** $ ______ (The sum of the secured and unsecured amounts should match the amount in line 7).

**Amount necessary to cure any default as of the date of the petition:** $ ______

**Annual Interest Rate:** (when case was filed) ______%

- [ ] Fixed
- [ ] Variable

**10. Is this claim based on a lease?**

- [x] No
- [ ] Yes **Amount necessary to cure any default as of the date of the petition.** $

**11. Is this claim subject to a right of setoff?**

- [x] No
- [ ] Yes Identify the property: ______

**12. Is this claim for the value of goods received by the debtor within 20 days before the commencement date of this case (11 U.S.C. §503(b)(9))?**

- [x] No
- [ ] Yes Amount of 503(b)(9) Claim: $ ______

**13. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☒ No

☐ Yes *Check all that apply*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ |
| ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ |
| ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ |
| ☐ Contributions to an employee benefit plan 11 U.S.C. § 507(a)(5). | $ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $ |

* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it.**

**FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am the guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date 02/20/2024
MM / DD / YYYY

[signature]
Signature

**Print the name of the person who is completing and signing this claim:**

Name: Hershy Deutsch
First Name Middle Name Last Name

Title: Managing Member

Company: Marich Bein LLC
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address: 99 Wall Street, Number 2613
Number Street
New York, NY 10005
City State ZIP Code

Contact Phone Email

**Attachment to Proof of Claim**

1. Marich Bein LLC ("MB"), a New York limited liability company, entered business transactions with The Litigation Practice Group, P.C. ("LPG").

2. In connection with and evidencing the business transactions between MB and LPG, MB and LPG executed contracts.

3. The contracts between MB and LPG include: (1) Assignment of Servicing Rights ("Servicing Agreement") dated September 19, 2022; (2) Accounts Receivable Purchase Agreement entered on August 18, 2022 ("MB1"); (3) Accounts Receivable Purchase Agreement entered September 21, 2022 ("MB2"); (4) Accounts Receivable Purchase Agreement entered October 6, 2022 ("MB3"); and (5) Accounts Receivable Purchase Agreement entered November 14, 2022 ("MB4"). MB1, MB2, MB3, and MB4 are collectively referred to as the "AR Purchase Agreements".

4. A true and correct copy of the Servicing Agreement is attached hereto as Exhibit 1.

5. True and correct copies of MB1, MB2, MB3, and MB4 are attached hereto as Exhibits 2, 3, 4, and 5, respectively. The spreadsheets of Purchased Accounts (as that term is defined in the AR Purchase Agreements) connected to each AR Purchase Agreement is omitted from the Exhibits to protect the privacy of the account debtors. The spreadsheets can be made available to the trustee for LPG upon request.

6. Pursuant to MB1, MB2, MB3, and MB4, MB paid LPG $12,058,335 to purchase and acquire specified accounts receivables (defined in the AR Purchase Agreements).

7. Under the Servicing Agreement, LPG unconditionally, absolutely and irrevocably assigned to MB all of its rights in the servicing, collection and administration of accounts receivables. As set forth in the Servicing Agreement, MB was entitled to and earned Servicing Fees (as defined in the Servicing Agreement).

8. Pursuant to the AR Purchase Agreements, LPG was guaranteed payment of not less than $37,104,601.

9. LPG breached its obligations to MB under the Servicing Agreement and the AR Purchase Agreements. MB complied with and performed its obligations under the AR Purchase Agreements and the Servicing Agreement.

10. Under the Servicing Agreement and the AR Purchase Agreements, LPG has indemnification obligations to MB.

11. Pursuant to the AR Purchase Agreements, LPG is liable to MB for expenses, including (without limitation) legal fees. MB continues to incur such expenses as a result of LPG's defaults.

136466519v.1

12. As of January 31, 2024 (expenses, including legal fees continue to accrue), MB's claim against LPG is calculated as follows:

| | |
|---|---|
| **Total Contractual Obligations** | |
| Servicing Fees: | $1,085,638.00 |
| Expenses\Legal Fees\Indemnification: | $1,103,816.64 |
| Guaranteed Payment: | $37,104,601.84 |
| | |
| **Payments Received to Date** | |
| Funds Collected and Applied to Claim | $16,989,963.23 |
| | |
| **Claim** | |
| Total Claim Amount (as of 1/31/24) | $22,304,093.25 |

13. MB reserves all, rights, claims, and defenses, and submission of this Proof of Claim is not intended as a waiver or release of MB's rights, claims, or defenses, including, without limitation, any rights of setoff and/or recoupment.

14. MB reserves its right to amend and/or supplement this Proof of Claim for any purpose and to the extent permitted by applicable law.

15. MB expressly reserves, any and all rights that it has or may have against LPG's officers, directors, members, managers, controlling persons, and non-debtor affiliates.

16. The filing of this Proof of Claim is not and shall not be deemed or construed as: (a) a waiver, release, or limitation of MB's rights against any person, entity, or property; (b) consent by MB or any of its officers, members, or managers to the jurisdiction or venue of this Court or any other court with respect to proceedings, if any, commenced against MB or otherwise involving its officers, members, or managers; (c) a waiver, release, or limitation of the right of MB and/or its officers, members, or managers to trial by jury; (d) consent by MB or any of its officers, members, or managers to a jury trial in this Court pursuant to 28 U.S.C. § 157(e) or otherwise; (e) a waiver, release, or limitation of the right of MB or any of its officers, members, or managers to have any final orders in any non-core matters or proceedings entered only after de novo review by a U.S. District Court Judge; or (f) consent to this Court hearing or deciding any matter or proceeding, to the extent this Court lacks the constitutional authority to do so.

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: **655 West Broadway, Suite 800, San Diego, CA 92101**

A true and correct copy of the foregoing document entitled (*specify*):

**TRUSTEE'S FOURTH AMENDED COMPLAINT FOR (1) INJUNCTIVE RELIEF; (2) AVOIDANCE, RECOVERY, AND PRESERVATION OF TWO-YEAR ACTUAL FRAUDULENT TRANSFERS; (3) AVOIDANCE, RECOVERY, AND PRESERVATION OF TWO-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS; (4) AVOIDANCE, RECOVERY, AND PRESERVATION OF FOUR-YEAR ACTUAL FRAUDULENT TRANSFERS; (5) AVOIDANCE, RECOVERY, AND PRESERVATION OF FOUR-YEAR CONSTRUCTIVE FRAUDULENT TRANSFERS; (6) AVOIDANCE, RECOVERY AND PRESERVATION OF PREFERENTIAL TRANSFER MADE WITHIN NINETY DATES OF THE PETITION DATE; (7) BREACH OF CONTRACT; (8) CONVERSION; (9) TURNOVER;(10) DEEPENING INSOLVENCY (11) RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT VIOLATIONS; (12) CONSPIRACY; (13) AIDING AND ABETTING FRAUD, CONVERSION AND DEEPENING INSOLVENCY AGAINST MARICH BEIN, LLC, GOFI LLC, PACIFIC STAFFING, LLC, CALLFI, LLC, ACUFI, LLC, LISA COHEN, HESHY DEUSTCH, NACHMAN WEISZ, ISRAEL RECHES, AND NICHOLAS KOHLSCHREIBER**

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) March 3, 2026, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- <u>Attorneys for Plaintiff Richard A. Marshack, Chapter 11 Trustee</u>
  **Yosina M Lissebeck** - Yosina.Lissebeck@Dinsmore.com, caron.burke@dinsmore.com; ayrton.celentino@dinsmore.com
  **Veneeta Jaswal -** veneeta.jaswal@dinsmore.com, kathy.gumm@dinsmore.com; wendy.yones@dinsmore.com
  **Richik Sarkar -** richik.sarkar@dinsmore.com, Noreen.Leciejewski@dinsmore.com
  **Jeremy Freedman -** jeremy.freedman@nelsonmullins.com, bonnie.connolly@dinsmore.com
  **Christopher Ghio** - christopher.ghio@dinsmore.com, bonnie.connolly@dinsmore.com

- <u>Attorneys for Hershey Deustch, Israel Reches, Nachman Weisz</u>
  **Mary H Haas** - maryhaas@dwt.com, melissastrobel@dwt.com;lit-docket@dwt.com; kimberlysimmonsgreene@dwt.com

- <u>Attorneys for Marich Bein</u>
  **David S Kupetz** - david.kupetz@troutman.com, mylene.ruiz@troutman.com

- Attorneys for BankUnited, N.A.
  **Howard Steinberg** - steinbergh@gtlaw.com, pearsallt@gtlaw.com; NEF-BK@gtlaw.com; howard-steinberg-6096@ecf.pacerpro.com
  **Bina Palnitkar** - palnitkarb@gtlaw.com

- **Richard A Marshack (TR)** - pkraus@marshackhays.com, ecf.alert+Marshack@titlexi.com

- Attorneys for BCB Bancorp, Inc.
  **Jesse S Finlayson** - jfinlayson@ftrlfirm.com, hkader@ftrlfirm.com

- **Alan W Forsley** - alan.forsley@flpllp.com, awf@fkllawfirm.com, awf@fl-lawyers.net, addy@flpllp.com, andrea@flpllp.com

- **Brandon J. Iskander** - biskander@goeforlaw.com, kmurphy@goeforlaw.com; jfountain@goeforlaw.com

- **United States Trustee (SA)** - ustpregion16.sa.ecf@usdoj.gov

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**: On (*date*) March 3, 2026, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

The Honorable Scott C. Clarkson,
United States Bankruptcy Court
Ronald Reagan Federal Building & Courthouse
411 West Fourth Street, Suite 5130 / Courtroom 5C
Santa Ana, CA 92701-4593

☒ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _______________, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| March 3, 2026 | Bonnie Connolly | /s/ Bonnie Connolly |
| *Date* | *Printed Name* | *Signature* |

**GOFI, LLC**
316 Iris Ave.
Corona del Mar, CA 92625

c/o Registered Agent, CSC – Lawyers Incorporating Service
Attn: Becky Degeorge
2710 Gateway Oaks Drive
Sacramento, California 95833

**CALLFI, LLC**
8 The Green, STE A
Dover, DE 19901

**ACUFI, LLC**
1401 21st St STE R
Sacramento, CA 95811

1 Technology Drive Building G
Irvine, CA 92618

**PACIFIC STAFFING, LLC**
8950 Cal Center Drive, Suite 230
Sacramento, CA 95826

**LISA COHEN**
20101 SW Cypress Street
Newport Beach, CA 92660

666 W. 18th Street
Laguna Nigel, CA 92627

**NICHOLAS KOHLSCHREIBER**
3312 Ocean Blvd
Corona Del Mar, CA 92625

347 N New River Dr E, Fort
Lauderdale, FL 33301

**VULCAN CONSULTING GROUP LLC**
c/o Registered Agent, Tony M. Diab
1278 Glenneyre Street
Laguna Beach, CA 92651